**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, LEONARD BRIGHT, VANITA REDDY, LANDON SADLER, and AARON GEORGE, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT L. ALBRITTON, JAY GRAHAM, DAVID C. BAGGETT, JOHN W. BELLINGER, JAMES R. BROOKS, MICHAEL A. HERNANDEZ III, WILLIAM MAHOMES JR., KELLEY SULLIVAN GEORGIADES, and SAM TORN, in their official capacities as members of the Texas A&M University System Board of Regents, <br><br> Defendants. | CIVIL ACTION NO. _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## COMPLAINT

1.      Plaintiffs American Association of University Professors ("AAUP"), on behalf of its members in the Texas A&M University System ("Texas A&M"), and individually named member professors Leonard Bright, Vanita Reddy, Landon Sadler, and Aaron George (collectively, "Plaintiffs") challenge Texas A&M System Policy ("System Policy") 08.01's prohibition on teaching "gender and race ideology, or topics related to sexual orientation, and gender identity" in academic coursework (the "Censorship Policy" or the "Policy").

2.      On its face, the Censorship Policy imposes a complete prohibition, in all core-curriculum courses, on courses "advocat[ing]" particular disfavored views of race or gender, or any topics related to sexual orientation or gender identity, but the Policy does not impose any corresponding ban on opposing views on these issues. For non-core and graduate courses, any

1

"teaching" at all—not just "advocacy," though the Censorship Policy does not define either term— on disfavored viewpoints of race or gender or topics related to sexual orientation or gender identity is prohibited. Exceptions are only permitted through a standardless pre-clearance process available "in limited circumstances," upon a showing of a "necessary educational purpose" that the Policy does not define.

3.　　This Policy has been implemented throughout the Texas A&M System in conjunction with changes to System Policy 12.01, which now requires that course teaching and discussion be limited to what is written in syllabi. Under the Policy, Texas A&M now conducts an unprecedented review of all course syllabi to root out prohibited ideas and promotes an online Portal where students are encouraged to report their instructors for perceived violations of the Censorship Policy.

4.　　The Censorship Policy is an abrupt about-face for an institution with a long history of academic excellence developed through ensuring a robust marketplace of ideas in which free speech was not only respected but encouraged. The Censorship Policy is a radical departure from this storied history, threatening instructors with "disciplinary action up to and including termination" for "[n]oncompliance" and imposing a prophylactic ban on politically disfavored speech related to race, gender, and sexual orientation. It offers insufficient guidance as to what may or may not be taught, assigned, or said in a classroom, and allows virtually unfettered enforcement discretion such that disfavored viewpoints can be censored.

5.　　Although it is not explicit in the text of the Policy, then-interim president of Texas A&M University admitted publicly (and the Board has indicated in its subsequent guidance), that the Censorship Policy is being enforced to ban **all** discussion, not just advocacy, of the disfavored viewpoints on race, gender, and sexual orientation in **all** courses unless prior approval is obtained

from the president, and approval may only be granted for non-core or graduate level courses. Faculty have been given little-to-no guidance as to how to obtain approval from the president. In short, the Censorship Policy effects a complete ban of these disfavored ideas in core courses, and a ban with a standardless exemption process for non-core and graduate courses.

6.      Accordingly, the Censorship Policy has prohibited Texas A&M University instructors from teaching works, ranging from Plato's *Symposium* to the Oscar-winning best picture *Moonlight*. One history professor was kept from teaching about the Fourteenth Amendment's expansion of LGBTQ+[1] rights, yet was allowed to teach about Phyllis Schlafly's views on the harms of gender equality under the Equal Rights Amendment in another course. And in one course, the movie *Barbie*, which raises questions about cisgender and heterosexual gender roles and identity, was permitted to be viewed but works involving main characters who are LGBTQ+ were banned.

7.      Texas A&M's Censorship Policy and implementation through its ongoing syllabi review and Policy 12.01 violate Plaintiffs' First Amendment free speech and Fourteenth Amendment due process rights. The Censorship Policy imposes unconstitutionally vague, viewpoint discriminatory, prior restraints on First Amendment protected academic speech throughout the Texas A&M University System. The ongoing syllabi review and threatened enforcement actions will continue into and beyond the fall semester commencing August 24, 2026.

---

[1] LGBTQ+ is an umbrella term that includes people "who identify as lesbian, gay, bisexual, trans-gender, queer or questioning, with the plus sign representing other identities." The Annie E. Casey Foundation, *What Does LGBTQ+ Stand For?*, Casey Connects Blog (Apr. 25, 2023), https://perma.cc/M463-SN9N. While Texas A&M also uses "LGBT" and "LGBTQ" for various courses or censorship, these terms are synonymous and refer to the same concept throughout the complaint.

Plaintiffs will continue to suffer irreparable constitutional injury unless this Court declares the Censorship Policy and its enforcement unconstitutional and enjoins its enforcement.

## PRELIMINARY STATEMENT

8.    This case centers on the enforcement of a vague policy aimed at suppressing politically disfavored viewpoints about race, gender, and sexual orientation. The Censorship Policy restricts what instructors at one of the nation's largest public university systems can teach, barring instructors from "advocacy" of "race or gender ideology," and topics related to sexual orientation and gender identity, but allowing criticism or denigration of those viewpoints—all while providing no guidance as to what many of those terms mean or what faculty may or may not do or say under the Censorship Policy.

9.    As the first public higher education institution in the State of Texas, Texas A&M campuses have historically been incubators for open discourse and intellectual curiosity. Diversity of thought has long been cherished at Texas A&M and American universities more broadly. Protecting academic freedom is not only important for professors and universities—it is critical to our free society and our democracy. Indeed, by statute, "Postsecondary education for qualified Texans who desire to pursue such education is important to the welfare and security of this state and the nation and, consequently, is an important public purpose." Tex. Educ. Code § 61.002(c).

10.    The U.S. Supreme Court has similarly long recognized the "vital role in democracy" played by universities: "To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation . . . Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *see also Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385

4

U.S. 589, 603 (1967) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection" (internal quotation marks and citations omitted)).

11.    Despite these constitutional requirements, following a campaign of targeted political pressure, the Texas A&M University System Board of Regents revised Policy 08.01 to ban "gender and race ideology" and topics related to sexual orientation and gender identity in academic coursework, imposing just the kind of strait jacket on Plaintiffs that the Supreme Court warned against in *Sweezy*.

12.    While there is considerable ambiguity about what is allowed and what is not, it is clear that the Censorship Policy is asymmetric on its face. As written and enforced, the Censorship Policy burdens only one side of each contested question. Because it forbids "race ideology" and "gender ideology," as those terms are loosely defined, an instructor may teach that a person's sex and gender are the same, but not that they may differ; may present the case that systemic racism does not exist or is a sham, but not present the case that it does exist or how it impacts social groups, even to explain the diverging viewpoints to students. And, in practice, the Censorship Policy's prohibition on teaching topics related to sexual orientation and gender identity allows a professor to teach about heterosexual and cisgender relationships and families, but not their same-sex or transgender counterparts.

13.    That asymmetry is a feature of the Policy's plain text and its enforcement. In implementing the Censorship Policy, the College Station University's College of Arts & Sciences instructed the English Department that Policy 08.01 "will not be applied to heteronormative

5

orientation and identity"—what the Board prescribed as politically favored. This leaves no question that only disfavored views of each subject—race, gender, and sexual orientation—are prohibited. Under this Orwellian approach, one professor was allowed to discuss a variety of contexts in which the Fourteenth Amendment applies, but his course was not approved until he dropped references to how it applies to sexual orientation. In another instance, a philosophy professor was told that he could either remove readings from Plato from his Contemporary Moral Issues course or halt the course altogether. In particular, the University flagged Plato's *Symposium*, which discusses a theory that humans were one—containing all sexes and genders—until they were split by Zeus. Because of the Censorship Policy, the professor removed the Plato works from his syllabus. And, in another instance, a professor was permitted to assign readings discussing an anti-gay activist, while another professor was barred from teaching an Academy Award winning best picture that focused on a gay character.

14.    There is no mistaking the Board of Regents' intent to "cast a pall of orthodoxy" over A&M classrooms. They have authoritatively selected ideas about race, gender, and sexual orientation that cannot be exposed to students even though these ideas are foundational to academic discourse and are hotly debated in our society. This is not only a violation of instructors' constitutional rights, but also a grave disservice to our Nation's future leaders.

15.    If there were any doubt that the Censorship Policy was enacted to prohibit *particular* disfavored viewpoints on race, gender, and sexual orientation, the interim president of the flagship campus explained that under the Censorship Policy: "Anything to do with race or gender ideology"—which the Censorship Policy defines as particular ideas about race and gender—"was not allowed to be taught in the core courses." And to accomplish that end, he confirmed, the Censorship Policy imposes a prior restraint such that "if you were going to touch

on those subjects, or subjects of sexual orientation" in any way, that such speech first "had to be approved by the president, and then only in upper-division or graduate-level courses." As a result, according to the university interim president, **all** discussion of disfavored viewpoints on race, gender, and sexual orientation is banned unless prior approval is obtained from the president, which may only be granted for non-core,[2] upper-division, or graduate level courses.

16.     By the early weeks of the Spring 2026 semester, at the flagship campus, at least six courses had been abruptly canceled, and instructors were advised to remove various topics or materials from their curriculum that might be implicated under the Censorship Policy. Similarly, with respect to the Fall 2026 semester, the College of Arts and Sciences has canceled three courses and required "mitigation," i.e., censorship, for seven additional courses to proceed in the fall.

17.     The language of the Censorship Policy alone provides little guidance on where the proverbial "line" is for acceptable discourse, necessarily allowing for discriminatory enforcement and rendering the Policy void for vagueness.

18.     A law or policy is void for vagueness when it "[1] fails to provide a person of ordinary intelligence fair notice of what is prohibited, [and, 2] is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). For example, in *Keyishian*, the Supreme Court vindicated professors' claims against their board of regents for requiring a loyalty oath, "emphasiz[ing] once again that precision of regulation must be the touchstone in an area so closely touching our most precious freedoms, for standards of permissible statutory vagueness are strict in the area of free expression." 385 U.S. at 603–04 (citation modified). The Censorship

---

[2] Although the interim president did not mention non-core courses, the exemption requirement appears to apply to all non-core courses.

Policy fails on both prongs of the vagueness analysis. Plaintiffs have no way of knowing what topics and discussions cross the line into banned "race or gender ideology," or "topics related to sexual orientation and gender identity" and have been admonished repeatedly for seeking additional information. And the Censorship Policy's vagueness has resulted in arbitrary and discriminatory enforcement—different departments have distinct interpretations, instructors have received seemingly random exemptions or been offered differing remedial measures, etc.

19.     The Texas A&M University System is vast, covering 12 universities, serving over 150,000 students, and employing more than 4,000 faculty. Every semester, thousands of courses are offered systemwide ranging from introductory first-year courses with hundreds of students to upper-level graduate seminars that include a handful of scholars deeply immersed in their fields. Under the vague, viewpoint discriminatory Policy, professors must decide each semester how to self-censor in an effort to comply with the syllabus review and then must teach every day under the threat of "disciplinary action up to and including termination" for "[n]oncompliance" under System Policy 01.01(7) if they run afoul of the Censorship Policy's vague terms. All the while, Defendants and their agents are encouraging students to monitor and report on their professors for non-compliance.

20.     Every academic discipline is subject to the Censorship Policy even though "race and gender ideology" or topics related to sexual orientation and gender identity might arise in very different ways across campuses, departments, and fields. For example, what does it mean to ban "course content that promotes activism on issues of race or ethnicity" at Prairie View A&M University, a historically Black university founded in 1876 within the Texas A&M University System?

8

21.    As the Supreme Court has noted, ideological censorship is particularly pernicious in fields where hard truths are elusive and ideologies evolve over time. In university classrooms, we expect bad ideas to be discussed until they are disproven. Likewise, the Supreme Court has long admonished that it is not for the government—including the Board of Regents as an arm of the State of Texas—to decide which ideas are "bad" and to prophylactically ban their dissemination.

22.    Yet that is exactly what the Board of Regents has done here. They have not simply exercised discretion to determine what subjects generally should be taught for viewpoint-neutral reasons such as attendance. Rather, they have determined that certain perspectives must be banned in courses system-wide, and that students cannot handle differing professional and academic viewpoints. That is particularly problematic here in the context of a preeminent state university system that is charged with protecting constitutional values.

23.    Named plaintiff professors teach in the Public Policy, English, Women's and Gender Studies, and American History departments. Each of these fields touches directly on issues related to race, gender, and sexual orientation. But the Censorship Policy arbitrarily prohibits Professors Bright, Reddy, Sadler, and George from teaching particular viewpoints on those issues when they conflict with the Board's preferred ideology, regardless of whether the professors' expertise and the best pedagogical practices in their fields of study demand that those alternative viewpoints be part of the discussion. The Policy also harms Plaintiff AAUP's members across the Texas A&M system in every field by prescribing what is approved and chilling their academic freedom. Instead of ensuring the quality of an A&M education, the Board of Regents has severely undermined it and impermissibly suppressed Plaintiffs' First and Fourteenth Amendment rights.

The Regents have crossed a line that the Constitution does not permit: American public university systems are not in the business of banning ideas.

## JURISDICTION AND VENUE

24.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

25.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial amount of the events giving rise to the claims occurred in this district.

26.    All Defendants are located within the State of Texas. Defendants, the individual Board of Regents for the Texas A&M University System, who have been named in their official capacity as members of the Board of Regents, are located within this district and division.

27.    This Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. § 2201(a) and Federal Rules of Civil Procedure 57 and 65.

## PARTIES

### I.  Plaintiffs

28.    Plaintiff AAUP is a nonprofit membership organization and labor union of faculty and other academic professionals based at colleges and universities around the country. The mission of the AAUP is to advance academic freedom and shared governance; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to realize its goals; and to ensure higher education's contribution to the common good. The interests it seeks to protect in this lawsuit are thus germane to the AAUP's purpose.

10

AAUP brings claims on behalf of its members in the Texas A&M University System. The AAUP has hundreds of members spread across the Texas A&M University System subject to the Censorship Policy. These members include full-time and part-time faculty, graduate students, and teaching staff involved in the academic mission of Texas A&M.

29.     Under the Censorship Policy, AAUP members have had their classes canceled, works removed from syllabi and discussion, and have been forced to disavow "advocacy" of disfavored views. AAUP members do not understand how to reasonably conform their conduct to the vague Policy and so many also have had to "mitigate" or self-censor their courses to try and meet the ever-moving targets set by the University. For example, one AAUP professor, who teaches a Contemporary Sociological Theory course, included in the syllabus a 2000 reading by Anne Fausto-Sterling titled "The Five Sexes, Revisited." This AAUP member was instructed to replace this reading with the author's 1993 piece titled "The Five Sexes." In that earlier 1993 piece, Fausto-Sterling set forth a model of gender tied to biological sex organs. By contrast, in the 2000 piece banned by Texas A&M, the author revisited her prior views on sex and gender and acknowledged that these concepts were not as black and white; rather, the author argued that gender is not tied to an individual's sex organs. This one-sided prohibition makes clear that the University's approval of the course syllabus hinged upon the inclusion of only favored viewpoints.

30.     The injunctive and declaratory relief sought here would bring relief to AAUP members without requiring the individual participation of every member.

31.     Plaintiff Dr. Leonard Bright is a tenured full Professor at Texas A&M University, College Station's Bush School of Government and Public Service. Dr. Bright also serves as the President of the AAUP Chapter at College Station. In implementing the Censorship Policy, the University canceled a graduate seminar Dr. Bright usually teaches titled Ethics in Public Policy,

11

which covers topics concerning ethical decision-making in public service. His class was flagged as potentially violating the Policy during Texas A&M's syllabus review, and, in this discussion-format course in which these topics were expected to arise organically, he was asked to identify exactly which days the concept of sexual orientation may come up. Because Dr. Bright could not identify discrete times when "sexual orientation" might come up in the course or in student discussions, his class was canceled three days *after* the Spring semester began.

32.    Plaintiff Professor Vanita Reddy is a tenured Associate Professor in English and a core Women's and Gender Studies faculty member at Texas A&M University, College Station, in the College of Arts and Sciences. Following implementation of the Censorship Policy, Professor Reddy's section of English/Women's and Gender Studies 333 course on LGBTQ literature was canceled for the Fall 2026 semester without allowing her an opportunity to submit a syllabus for review.

33.    Plaintiff Professor Landon Sadler is a full-time Lecturer in English and Associate faculty member of the Women's and Gender Studies department at the Texas A&M University, College Station, in the College of Arts and Sciences. Following implementation of the Censorship Policy, Professor Sadler's cross-listed English and Women's and Gender Studies 333 course LGBTQ Literatures was canceled without explanation for Fall 2026, despite Professor Sadler's request for an exemption. In addition, Professor Sadler was required to remove Academy Award winning Best Picture *Moonlight* from his Writing About Literature English 203 syllabus, again without explanation.

34.    Plaintiff Professor Aaron George is a tenured Assistant Professor of History at Tarleton State University, which is within the Texas A&M University System. Following implementation of the Censorship Policy, Professor George's course, History of Sexuality in

12

America, was removed from the course catalogue. He is also no longer permitted to teach Contemporary American History, which he had been planning to teach in the Fall 2026 semester. In two of his other classes, Professor George has been forced to censor viewpoints that are disfavored by the Board of Regents. For example, Professor George teaches History of the United States Since 1877 (HIST 1302), a core course that covers the Fourteenth Amendment. Following a student complaint on the first day of the Spring 2026 semester, he received an email informing him that he had violated the Censorship Policy, with no explanation as to how, but directing him "to make the necessary changes to the course immediately" or risk having his course canceled. Guessing as to what was deemed problematic on his syllabus, Professor George removed a reference to "LGBT Americans" from his description of the groups affected by the Fourteenth Amendment, which then prompted approval of his class.

## II. Defendants

35.    The Texas A&M University System Board of Regents is an arm of the state, established by statute and charged with governing the University System. *See* Tex. Educ. Code § 85.11. Each member of the Board of Regents is appointed directly by the Governor of Texas, with the advice and consent of the Texas Senate, for six-year terms. *Id.* § 85.12. The Board of Regents is empowered to "make bylaws, rules, and regulations it deems necessary and proper for the government of the university system and its institutions, agencies, and services" and "shall regulate the course of study and prescribe the course of discipline necessary to enforce the faithful discharge of the duties of the officers, faculty, and students." *Id.* § 85.21(a).

36.    Defendants are the board members of the Texas A&M University System sued in their official capacities. Those members are Robert L. Albritton, Chairman; Jay Graham,

13

Vice Chairman; David C. Baggett; John W. Bellinger; James R. Brooks; Michael A. Hernandez III; William Mahomes Jr.; Kelley Sullivan Georgiades; and Sam Torn.

37.    The office of the Board of Regents is located in College Station, Texas.

38.    Defendants are political appointees without significant experience in academic pedagogy.

39.    Robert L. Albritton is a business owner and executive from Fort Worth. He was first appointed to the Board of Regents by Governor Abbott in 2015 and was reappointed in 2021.

40.    Jay Graham is a CEO and petroleum engineer. He was appointed to the Board of Regents by Governor Abbott in 2019 and was reappointed in 2025.

41.    David C. Baggett is an energy industry executive from Houston. He was appointed to the Board of Regents by Governor Abbott in 2023.

42.    John W. Bellinger is a business owner. He was appointed to the Board of Regents by Governor Abbott in 2023.

43.    James R. Brooks is a business executive from San Angelo in the retail and energy sectors. He was appointed to the Board of Regents by Governor Abbott in 2021.

44.    Michael A. Hernandez III is a car dealership owner from Fort Worth. He was first appointed to the Board of Regents by Governor Abbott in 2019 and was reappointed in 2025.

45.    William Mahomes Jr. is an attorney in private practice. He was first appointed to the Board of Regents by Governor Abbott in 2015 and was reappointed in 2021.

46.    Kelley Sullivan Georgiades is a cattle ranch owner. She was appointed to the Board of Regents by Governor Abbott in 2025.

47.    Sam Torn is a former attorney in private practice. He was appointed to the Board of Regents by Governor Abbott in 2023.

14

48. The Board of Regents is charged with "provid[ing] the policy direction for the system and its member universities and agencies. The [B]oard will formulate, update, adopt and publish official policies for the system as described in System Policy 01.01, *System Policies and Regulations, and Member Rules and Procedures*." System Policy 02.01(1.1).

49. Additionally, the Board retains and exercises authority over the offices and systems that interpret policies. *See* System Policy 02.01(1.3)(a) ("The board . . . establishes, for each member under its control and management, goals consistent with the role and mission of the member . . ."); *see also* System Policy 02.01(1.3)(c) ("The board . . . appoints and annually evaluates each member chief executive officer (CEO)."); System Policy 01.03(1) ("The board appoints all of the officers, faculty members and other employees of the system."); System Policy 01.03(4.1.3) ("Upon recommendation of the university president and with approval of the chancellor, the board may award tenure to a faculty member.").

50. The Board proposed, considered, and adopted the revisions to System Policies 08.01 and 12.01 by unanimous votes on November 13, 2025, and again on December 18, 2025, at Board meetings in College Station, Texas where it regularly conducts meetings.

51. The Board of Regents also enforces the Censorship Policy. The Board directed that the Censorship Policy take immediate effect, fixed the Spring 2026 semester for the onset of enforcement, and required each campus chief executive to personally approve any course that would address the forbidden subjects. The Board also directed the creation of a System-wide mechanism by which students could report instructional content they believe violates the Censorship Policy.

52. The Board controls the officials who carry out the Censorship Policy. The presidents of the System's universities serve at the Board's pleasure, report to it through the

15

chancellor, and administer the curricular-review process at the Board's direction. The events described below confirm the point: when the Board judges University leadership insufficiently responsive to their demands, the Board may replace that leadership.

## FACTUAL ALLEGATIONS

### I.    Texas A&M Adopts and Implements the Censorship Policy

#### A.  Texas A&M Historically Has Been Committed to Academic Freedom and Excellence

53.     Texas A&M is the largest public university system in Texas and one of the largest in the Nation. The System educates more than 150,000 students across its 12 campuses and serves, through its agencies such as the Texas A&M AgriLife Extension Service, communities throughout the State. The flagship campus at College Station alone enrolls more than 74,000 students.

54.     The origins of Texas A&M date back to the First Morrill Act, signed in 1862 by Abraham Lincoln. The Act provided grants in the form of federal lands to each state for the establishment of a public institution to fulfill the Act's provisions related to providing a broad segment of the population with a practical education that had direct relevance to their daily lives. In Texas, the institution created was Texas A&M University in College Station, which opened in 1876 as the Agricultural and Mechanical College of Texas, the first public institution of higher education in the State. From the founding land-grant charge, Texas A&M has long proclaimed a mission of educating and serving Texans. As recently as 2022, the University's then-interim provost, Timothy P. Scott, hailed the institution's "land-grant mission to serve all the citizens of this great state."

55.     Over the years, ten additional campuses throughout the State have joined the Texas A&M University System, including most recently the Victoria campus in 2025.

16

56.    The University System has likewise long professed a commitment to the free exchange of ideas, which it historically has described as necessary to its core mission. The Faculty Rules at the main College Station campus make the connection explicit, explaining that Texas A&M exists to pursue the "common good" through "an uninhibited search for truth and its open expression," which necessarily entitles faculty to "full freedom in the classroom in discussing the subject being taught." The relevant rule provides in full:

> Academic Freedom: Institutions of higher education *exist for the common good*. The common good **depends upon an uninhibited search for truth and its open expression**. Hence, it is essential that faculty members be free to pursue scholarly inquiry and creative scholarship without undue restriction, and to voice and publish individual conclusions concerning the significance of evidence that they consider relevant. Each faculty member **must be free from the corrosive fear [or] threat** that others inside or outside the university community because their views may differ, may threaten the faculty member's professional career or the material benefits accruing from it.
>
> **Each faculty member is entitled to full freedom in the classroom in discussing the subject being taught.** Within the bounds of professional behavior, faculty members also have full freedom to express disagreement with other members of the university community. Although a faculty member observes the regulations of the institution, they maintain the right to criticize and seek revision. Faculty members also are citizens of the nation, state, and community; therefore, when speaking, writing, or acting outside their academic appointment, they must be free from institutional censorship or discipline. On such occasions, faculty members should make it clear that they are not speaking for the institution.[3]

57.    The University's Student Rules likewise declare that, "[i]n fulfilling its multiple missions as an institution of higher learning, it encourages the free exchange of ideas," and that "[t]he university will protect the rights of freedom of speech, expression, petition and peaceful

---

[3] University Statement on Academic Freedom, Responsibility, Tenure, and Promotion, Texas A&M University Faculty Rule 12.01.99.M1 § 2.1 (revised Sept. 12, 2024), https://perma.cc/R5RZ-EP2K (emphases added).

assembly as set forth in the U.S. Constitution."[4] The University has committed that its decisions concerning expressive activity will "in no circumstance . . . be based on the content or viewpoint of the expressive activity or upon the expected reaction of others."[5]

58.     For example, when controversial speaker Richard Spencer announced a stop at Texas A&M in 2016 (without an invitation from the University), Texas A&M issued a statement explaining that his views conflicted with leadership's values but that private citizens are allowed to reserve university space, without regard to their viewpoints. Rather than cancel the event, as many alumni and observers urged the University to do, Texas A&M organized a counter-event at the same time titled "Aggies United."

59.     When explaining the University's decision, then-president Michael Young stated:

At its most basic level, this is a university – a term that shares the same etymological root as universe and, as such, **we know at our core that all of us – professors, students and staff alike – are best served intellectually and practically when we are immersed in a holistic and educational environment that teaches us things we didn't know, often from a perspective with which we are not familiar**. We benefit immensely from challenges to analyze our beliefs through interaction with information and individuals with varying points of view, informed by a range of backgrounds and life experiences. That is fundamental to who we are as a university and, indeed, as a nation and world. Diversity of thought, belief, background and experience informs us, educates us, shapes us and prepares us for the world in which we all live and into which we launch our graduates every year.

In this, the 140th year since the birth of this great university, our core values remain very much intact – respect, excellence, leadership, loyalty, integrity, and selfless service. Let us never lose sight of these precious values when we engage in dialogue, recognizing that a healthy discourse – even disagreement – is invaluable in developing lifelong learning skills such as effective listening, perspective and communication and, perhaps most importantly, critical thinking . . .

**These fundamental principles we hold so dear at this university are also the bedrock of our freedom and unique participatory democracy, as memorialized**

---

[4] Texas A&M Rules on Freedom of Expression, Texas A&M University Student Rules, Appendix XI (revised 2015), https://perma.cc/B4ZJ-LGHM.

[5] *Id.*

**in our very founding documents and reinforced through countless judicial decisions over the years** . . .

The role of a university as a marketplace of ideas can continue only as long as those within the university are able to pursue what Oliver Wendell Holmes, renowned United States Supreme Court justice, called the "**free trade of ideas**". Additionally, he wrote "The best test of truth is the power of the thought to get itself accepted in the competition of the market, and the truth is the only ground upon which their wishes safely can be carried out."

At Texas A&M, we are neither fearful of this, nor do we apologize for it. **Instead, we infuse our marketplace of ideas with a culture of welcome and respect for all. We recognize that we can be provocative without being uncivil, that we can take ideas seriously and assess them without always agreeing with them, and that we all benefit when we interact with and learn from those holding many different perspectives and beliefs, especially those that differ from our own.**[6]

60.    Far from treating these as empty words, Texas A&M for years held itself out as a national leader in protecting free expression on campus. In January 2019, Texas A&M University became the first and only university in Texas to earn the highest, "green light" rating for its speech policies from the Foundation for Individual Rights in Education (now the Foundation for Individual Rights and Expression ("FIRE")). It was the largest university in the Nation to hold that rating.[7]

61.    Beginning in 2018, Texas A&M partnered with FIRE to review and revise its policies governing demonstrations, bias-incident reporting, residence halls, and internet use, bringing its written speech policies more in line with the First Amendment. FIRE praised the effort, stating that "[b]y revising its policies to attain green light status, Texas A&M University is

---

[6] Michael K. Young, *Freedom of Expression — Fostering a Fearless Front at Texas A&M University*, Off. of the President, Texas A&M University (Sept. 27, 2016), https://perma.cc/F9S7-YGVJ (emphases added).

[7] *Texas A&M Rated Best in Texas for Campus Speech Policies*, FIRE (Jan. 10, 2019), https://perma.cc/BE3S-C57V; *Texas A&M First and Only in Texas to Earn Highest Rating for Free Speech on Campus*, Texas A&M Today (Jan. 10, 2019), https://perma.cc/Q2XP-EHP8.

showing that its administration is serious about the university's commitment to free speech," and expressing hope that "other colleges and universities in Texas will follow its lead."[8]

62.    Until recently, university leaders embraced that reputation. In January 2019, Texas A&M University's then-president declared: "As one of the nation's premier institutions of higher learning, it is critical that Texas A&M affirms our commitment to free speech. A free exchange of ideas is not only a cornerstone of our democracy, it is the surest path to truth, discovery and scholarly advancement."[9] The University's vice president for student affairs added that "there is no place in Texas more committed to the First Amendment than Texas A&M University," because "[c]olleges and universities have long been viewed as a marketplace of ideas."[10]

63.    Before last year, the University was repeatedly rated the best in Texas for free speech in FIRE's College Free Speech Rankings. In the 2024 rankings, it placed among the top ten institutions in the Nation.[11] The University also built institutional structures to support open inquiry, including a dedicated First Amendment website and a team charged with facilitating—not suppressing—expressive activity on campus.[12]

64.    In short, Texas A&M has long presented itself to its students, its faculty, and the public as an institution that prizes academic freedom and the open contest of ideas as core to its

---

[8] Texas A&M Today, *supra* n. 7 (quoting FIRE Vice President of Policy Reform Azhar Majeed).

[9] FIRE, *supra* n. 7 (quoting Texas A&M University President Michael K. Young).

[10] *Id.* (quoting Texas A&M University Vice President for Student Affairs Dr. Daniel Pugh).

[11] Sean Stevens, *2024 College Free Speech Rankings, Foundation for Individual Rights and Expression* 7, FIRE (2023), https://perma.cc/L9FU-6W6Z (ranking Texas A&M University seventh in the Nation and first among Texas institutions); *see also Texas A&M Ranked No. 3 in National Free Speech Survey*, Texas A&M Today (Oct. 9, 2020), https://perma.cc/7QS7-FCX2.

[12] *See First Amendment at Texas A&M*, Texas A&M University, Div. of Student Affs., https://perma.cc/JD3A-LR56; *Texas A&M University Introduces First Amendment Website*, Texas A&M Today (Sept. 15, 2020), https://perma.cc/D5LU-K3B3.

commitment to the search for truth in the interest of the common good. As the University puts it on its dedicated First Amendment website: "As a Tier I research institution, the pursuit of truth through open and robust discourse is critical to academic inquiry. . . In this 'marketplace of ideas,' we encourage civil and respectful dialogue creating an environment that allows individuals to express their ideas and to have their ideas challenged in respectful and responsible ways."[13]

65.    The Board of Regents' adoption of the Censorship Policy marks a profound and dramatic repudiation of Texas A&M's historical commitments.

### B. The Board Faced Mounting Political Pressure Related to Discussion of Certain Perspectives on Race and Gender

66.    The University's dramatic U-turn was the culmination of a sustained partisan pressure campaign directed at Texas A&M's leadership and its Board of Regents.

67.    In 2023, Texas A&M offered Kathleen McElroy, an A&M alumna and prior editor at the *New York Times*, a tenured position to launch a new journalism program. After a partisan website criticized the decision, several Board of Regents members expressed concern over McElroy's hiring because of her work at the *New York Times* and her past support of increasing diversity in newsrooms. One A&M administrator told McElroy that her status as a Black woman may have played a role in the backlash, and reporting by the Texas Tribune revealed that Regents considered her appointment as conflicting with their vision of creating a journalism program to launch "Aggie journalist[s] with conservative values into the market."[14] Texas A&M ultimately

---

[13] *Texas A&M Essentials: Free Speech and the Right to Associate*, Off. of the Provost, Texas A&M University, https://perma.cc/U8WE-5LFS.

[14] Kate McGee, *Top Texas A&M officials were involved in botched recruiting of journalism professor, who will receive $1 million settlement*, Tex. Tribune (Aug. 3, 2023), https://perma.cc/66LS-3HLD; Ryan Quinn, *Texas A&M Dean Resigns Amid Black Editor Tenure Controversy*, Inside Higher Ed (July 19, 2023), https://perma.cc/FPC5-EXSV.

unwound its offer, relegating the position to a non-tenured offer, which McElroy then turned down. Following an internal investigation, Texas A&M paid McElroy a $1 million settlement, and the University's president resigned in the fallout from the "botched" hiring.[15]

68.     In another incident, in September 2025, a student surreptitiously recorded a Texas A&M University children's-literature class in which a lecturer discussed gender identity. The student took the video to then-President Mark A. Welsh III and demanded the lecturer be fired. That interaction was also recorded. Both recordings were provided to a state legislator, Representative Brian Harrison, who published the videos on social media on September 8, 2025, demanded that the University fire those responsible, and referred the University to federal authorities.[16]

69.     Representative Harrison characterized the University as misusing public funds to promote disfavored ideas, declaring that Texans "damn well don't want their money weaponized against them, their children, and their values to promote leftist indoctrination," and that the "president of the university must be fired." Representative Harrison also stated that there is "no excuse . . . for tax money to ever be spent on leftist, Marxist, socialist, transgender propaganda."[17]

---

[15] McGee, *supra* n. 14.

[16] Jessica Priest, Nicholas Gutteridge & Kate McGee, *How a Secret Recording Upended Texas A&M*, Tex. Tribune (Sept. 19, 2025), https://perma.cc/7Y4Z-AACE; Jessica Priest, *Video of Clash Over Gender-Identity Content in Texas A&M Children's Lit Class Leads to Firing, Removals*, Tex. Tribune (Sept. 9, 2025), https://perma.cc/R7JL-ZEZY.

[17] Joseph Mackinnon, *'Fish Rots From The Head': Student Claims Some Scalps After Exposing Trans Propaganda At Texas A&M — But The Fight's Not Over*, Blaze News (Sept. 10, 2025), https://perma.cc/2L7F-46Z4; Rachel de Guidice, *Texas Lawmaker Slams Texas A&M After Student Allegedly Removed from Class for Challenging Transgender Lesson*, Fox News (Sept. 9, 2025), https://perma.cc/3APW-Q3V6.

70. That official pressure was reinforced by an organized, years-long campaign by partisan outside groups demanding that the largest public university in Texas purge disfavored viewpoints. One advocacy outlet published more than 115 articles about Texas A&M during President Welsh's roughly two-year tenure, casting individual courses, professors, and programs as evidence of liberal "indoctrination." An alumni organization objected to what it called "a pattern of actions and statements which were typical of a DEI ideology" and pressed the Board to install "a conservative leader."[18]

71. Governor Greg Abbott amplified this pressure. Responding to the administrative removals, the Governor publicly demanded more, posting: "Good. Now, fire the professor who acted contrary to Texas law." The Governor—who appoints the members of the Board of Regents—had earlier warned, in connection with a related dispute, that unless the University changed course, "the president will soon be gone."[19]

72. Under pressure from the state government and partisan figures, the University capitulated. On September 8, 2025 (the same day of Representative Harrison's demand), President Welsh directed that the dean of the College of Arts and Sciences and the head of the English Department be removed from their administrative positions; the next day, the University terminated the lecturer. President Welsh justified the actions on the ground that the University had

---

[18] Kate McGee & Nicholas Gutteridge, *Why Texas A&M President Mark Welsh Lost His Job*, Tex. Tribune (Dec. 10, 2025), https://perma.cc/VSA8-SH8W.

[19] James Bickerton, *Greg Abbott Issues Warning to Texas A&M President Over DEI*, Newsweek (Jan. 14, 2025), https://perma.cc/V9NM-U6UQ; Ryan Quinn, *Texas A&M Pulls Out of Event Rufo Described as 'Racial Segregation'*, Inside Higher Ed (Jan. 16, 2025), https://perma.cc/FV9P-36UN.

delivered "material that was inconsistent with the published course description," insisting that the matter was "not about academic freedom[.]"[20]

73.     Two faculty panels charged with making findings and recommendations related to academic freedom matters for faculty later found that the termination violated academic freedom and good cause did not exist for the dismissal. Specifically, the panel determined that the stated reason for the professor's termination was pretextual and that Texas A&M did not follow its own stated process for terminating professors, making it clear that the termination was based on the content of the class. The panels' findings and recommendations were not followed, however, and the lecturer was not reinstated.[21]

74.     The pressure campaign against President Welsh also achieved its objective. Despite President Welsh's capitulation to demands that the lecturer and others be fired, on September 15, 2025, the Board's chairman told him to resign or be fired. Welsh tendered his resignation on September 18, 2025, and left office the next day. The Board chairman later recounted that the Governor had said it was "probably time for a change." After the resignation, Representative Harrison publicly took credit, posting: "WE DID IT! TEXAS A&M PRESIDENT IS OUT!!"[22]

75.     Rather than install new leaders drawn from academia, the Board put in place officials who previously served as partisan politicians. The Board installed as interim president of

---

[20] Priest, *supra* note 16; Laura Spitalniak, *Texas A&M Fires Professor After Viral Video, Raising Free Speech Concerns*, Higher Ed Dive (Sept. 10, 2025), https://perma.cc/75FE-YP5W.

[21] Associated Press, *Texas A&M's Firing of Professor Ruled Unjustified*, NBC 5 Dallas-Fort Worth (Nov. 22, 2025), https://perma.cc/LQ67-VCAW; Laura Spitalniak, *Texas A&M Committee Sides with Professor Fired Amid Conservative Furor*, Higher Ed Dive (Nov. 25, 2025), https://perma.cc/7UV7-CS6Y; Jessica Priest, *Texas A&M Declines to Reinstate Fired Lecturer Despite Faculty Panel's Findings*, Tex. Tribune (Dec. 24, 2025), https://perma.cc/6PGJ-8TP9.

[22] McGee & Gutteridge, *supra* n. 18 (reporting the Board chairman's account of his conversation with the Governor, and Representative Harrison's post following the resignation).

the flagship campus a former state senator and government affairs advisor, Tommy Williams.[23] And the System's chancellor, Glenn Hegar, is a former state senator whose career was in elected office and public finance—not academic administration.

76.     As a result, by November 2025, a university long celebrated for protecting the open exchange of ideas as fundamental for the uninhibited search for truth as part of its mission to serve the common good was primed to forfeit that reputation to satisfy a partisan political agenda aimed at eliminating any discussion of disfavored views on race, gender, and sexual orientation.

### C.  The Board Revises System Policies 08.01 and 12.01

77.     On November 13, 2025, following the pressure campaign described above, the Board of Regents voted unanimously to revise System Policies 08.01 and 12.01. The revisions took effect immediately, with enforcement to begin in the Spring 2026 semester.[24]

78.     As revised, System Policy 08.01, subsection 2.1(b), provided: "No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity, unless the course and the relevant course materials are approved in advance by the member CEO."[25]

79.     This Censorship Policy is far from a paragon of clarity, which heightens concerns about the broad prior restraint it imposes on a professor's teaching. Professors have no fair notice

---

[23] *Tommy Williams Named Interim President of Texas A&M University*, Texas A&M Today (Oct. 3, 2025), https://perma.cc/P7ZC-P8NW; Nicholas Gutteridge, *Former State Lawmaker Tommy Williams Named Interim President of Texas A&M*, Tex. Tribune (Oct. 6, 2025), https://perma.cc/VXE5-AM9T.

[24] Texas A&M University Sys. Bd. of Regents, *Agenda Item Briefing: Revisions to System Policies 08.01 and 12.01* (Nov. 13, 2025), https://perma.cc/Z7PU-78DD; *see* Emma Whitford, *Texas A&M Requires Approval for Courses That "Advocate" Certain Ideologies*, Inside Higher Ed (Nov. 13, 2025), https://perma.cc/RE63-B3XR.

[25] The "member CEO" is the chief executive of the relevant campus—typically its president.

of what exactly is prohibited, which unsurprisingly is causing a chilling effect as professors put together their syllabi and teach, lead discussions, and answer questions in the classroom because the Censorship Policy clearly extends to include independent faculty speech. For example, the Censorship Policy fails to define in any way what it means for a course to "advocate." The Censorship Policy also leaves ambiguous whether "advocate" is intended to modify the phrase "topics related to sexual orientation or gender identity" and, if it does, how a course would "advocate . . . topics" or whether mere discussion of any such topics is prohibited altogether absent advance approval.

80.    The Censorship Policy does, however, define "Gender Ideology" and "Race Ideology" as particular viewpoints on gender and race. It defines "Gender Ideology" as "a concept that self-assessed gender identity should replace the biological category of sex or that biological sex has less value or legitimacy than self-assessed gender identity."

81.    It defines "Race Ideology" as "a concept that attempts to shame a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy or conspiracy, ascribe to them less value as contributors to society and public discourse because of their race or ethnicity, or assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world." The definition adds that "[t]his also includes course content that promotes activism on issues related to race or ethnicity, rather than academic instruction."

82.    System Policy 08.01 does not, however, prohibit advocating *against* or discussing viewpoints *counter to* those viewpoints the Censorship Policy defines as Gender Ideology or Race Ideology, or any topics related to sexual orientation or gender identity.

83.    The same day the Board revised System Policy 08.01, it also revised System Policy 12.01—the System's academic-freedom and tenure policy—to provide, in Section 1.2, that a

26

faculty member "will not . . . teach material that is inconsistent with the approved syllabus for the course."

84.    The Board also put in place a syllabus-review regime by which course syllabi must be approved, stating that "specific non-core curriculum or graduate courses in some discipline may teach race or gender ideology, or topics related to sexual orientation or gender identity" only upon "written approval of the member CEO after review of the course and relevant course materials."

85.    Additionally, the University created a mechanism for students to report instructors for content that students perceived violated the Censorship Policy.

86.    In doing so, the Board made clear that the prior restraint it imposed through Policy 08.01 applies broadly to any classroom discussion.

87.    Subsequently, Texas A&M University announced a two-phase syllabus review process for all courses consistent with these policies. This revision converted the syllabus approval process into an instrument to control classroom discussion and suppress disfavored views related to gender and race.

88.    On December 18, 2025, at a special meeting, the Board revised System Policy 08.01 again, further narrowing the circumstances in which the otherwise-forbidden perspectives on gender or race could be addressed. As revised, the Censorship Policy provides:

> No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity. **Upon prior written approval** of the member CEO after review of the course and relevant course materials, specific non-core curriculum or graduate courses in some disciplines **may teach race or gender ideology, or topics related to sexual orientation or gender identity**. Such approval may be granted in limited circumstances upon demonstration of a necessary educational purpose.[26]

---

[26] Civil Rights Protections and Compliance, Texas A&M University System Policy 08.01 § 2.1(b) (revised Dec. 18, 2025), https://perma.cc/PR37-HJS8 (emphases added); *see* Jessica Priest, *Texas*

89.     Again, the Censorship Policy did not define the term "advocate," leaving unclear whether any discussion whatsoever about the disfavored perspectives was prohibited or whether or how the Censorship Policy distinguishes between discussion, teaching, and advocating.

90.     More significantly, the intent of this revision was to make clear the complete ban on the prohibited ideas in core classes and the limited, highly regulated teaching of these ideas elsewhere. As the Vice Chancellor for Academic Affairs Hallmark stated, "[t]he Board tweaked Policy 08.01 this morning, the language change was to capture the intent from last November's meeting: no advocacy in any of the classes, no teaching of selected topics in the core, teaching said topics in other courses could be allowed when clear educational purpose justified such (president has to sign off on list of approved courses)."

### D. Defendants Implement the Censorship Policy and Provide Shifting, Conflicting Guidance

91.     Defendants began enforcing the Censorship Policy across the System's campuses for the Spring 2026 semester with little advance guidance and on a compressed timeline. The result was an inconsistent and often chaotic rollout that varied from campus to campus and from department to department.

92.     Implementation differed markedly across the System's universities. Guidance documents circulated to faculty at some campuses defined key terms and offered examples that did not match the guidance, timing, or enforcement experienced at others, or were eventually contradicted by further action by the Board of Regents.

93.     At the flagship campus in College Station, the rollout began with an announcement, and no accompanying explanation. On November 14, 2025, the College Station provost emailed

---

*A&M Tightens Rules on Race and Gender Courses*, Tex. Tribune (Dec. 18, 2025), https://perma.cc/V9KT-WU32.

faculty, staff, and graduate students announcing the revised Censorship Policy and a new curricular-review process, stating only that the University was "reviewing the revised policies and creating processes to ensure our compliance" and would "be following up soon with additional guidance on next steps."

94.     Around the same time, Defendants announced that they had "enhanced" EthicsPoint—an online reporting portal—so that students could "report concerns about course content," including content they considered "inaccurate, misleading, or inappropriate." Indeed, anyone—whether affiliated with the school or not—can make a complaint to the portal, and may even choose to remain anonymous. Thus, with no guidance, the University paired its new speech restrictions with a System-wide channel for students and others to report instructors for violating those restrictions.

95.     Faculty were left to guess at the meaning of the Censorship Policy. The first known piece of substantive guidance from Defendants—an "Implementation of 08.01 and 12.01 Changes FAQs" ("System FAQ 1")—did not issue until early December 2025, when Vice Chancellor for Academic Affairs Hallmark emailed it to the CEO of each Texas A&M System university. It instructed that undergraduate core courses "must not **advocate** race or gender ideology, sexual orientation, or gender identity," and warned that, even where a core course must "**address**" those subjects, the University "must be vigilant to ensure" that the content "is fundamental to a sound postsecondary education" and "does not **advocate**" the forbidden views. For undergraduate non-core and graduate courses, the guidance prohibited "[a]dvocating race or gender ideology, sexual orientation, or gender identity . . . **unless** the course and the relevant course materials are approved in advance by the university president." (emphasis added).

96.     That guidance also purported to define "advocacy"—the very term on which the Policy turns—stating that "[t]o Advocate is when teaching and course materials extend learning objectives in a way that requires students to hold certain beliefs, and/or to ridicule certain beliefs."

97.     Around the time Defendants issued System FAQ 1 in December, the Office of the Provost at College Station published "Guidance and FAQs on Syllabus Course Review" ("Provost's First Guidance") on its website, in an apparent attempt to institute the Policy. Its definition of advocacy differed from System FAQ 1 by adding a more expansive clause: "**To advocate is to support or argue for a cause, policy, or group, or to plead in favor of it**; when teaching and course materials extend learning objectives in a way that requires students to hold certain beliefs, and/or to ridicule certain beliefs" (emphasis added).

98.     These two initial guidance documents—the Provost's First Guidance and System FAQ 1—share some common themes. They both illustrate the censorial and viewpoint-discriminatory intent animating the Censorship Policy since its inception. And they also contradict later changes to, and enforcement of, the Policy. For example, both guidance documents made assurances that the Policy did not prohibit the *teaching* of the prohibited topics. System FAQ 1 asserted that "System Policy does not preclude a course on human sexuality including material on same sex relationships" or "a course on gender from including material on different perspectives on gender, including perspectives that some may not find agreeable. We would expect our faculty teaching gender courses to include this material." And the Provost's First Guidance echoed that sentiment: "The revised policy does not preclude courses from covering topics such as . . . varying definitions and theories regarding gender identity in a course related to gender, or material on same sex relationships in a course on sexuality, as examples."

99.    But the Board's December 18 revision of the Policy, the System's subsequent guidance, and even University- and department-level guidance documents all make clear that the System's and Provost's initial representation that the Censorship Policy would not interfere with teaching "different perspectives" was flatly incorrect, especially for core courses, and that the initial guidance failed to reflect the Policy's true censorial reach.

100.    The shifting and contradictory nature of the provided guidance exacerbated the confusion surrounding the Censorship Policy and its resulting chill. Prior to the start of the Spring semester, the Office of the Provost rescinded the Provost's First Guidance without providing an immediate or timely replacement.

101.    On January 14, 2026, the Board released new guidance entitled "Implementation of 08.01 and 12.01" ("System FAQ 2"), which was emailed to each university CEO by Chief of Staff for Academic Affairs Jill Woodall. This guidance—which did not issue until two days after Spring classes began—stated expressly that core curriculum courses "must not **teach** or **advocate** race ideology or gender ideology, sexual orientation or gender identity" (first emphasis added). Even though this was the first known guidance by the Board on the revised Censorship Policy, it failed to define the word "teach," which was now clearly the operative restriction for the prohibited ideas.

102.    System FAQ 2 confirmed that the Censorship Policy now restricted and regulated the **teaching** of the prohibited subjects in non-core and graduate classes. It also, in contrast to System FAQ 1, outright prohibited all "advocacy"—even in non-core and graduate classes where it was previously permitted with advance approval by a university president.

103.    However, in spite of System FAQ 2's total ban on teaching the prohibited ideas in core courses, it inexplicably maintained System FAQ 1's previous assertion that under the

31

Censorship Policy, "[f]aculty are expected to teach historically significant, empirically established, and discipline grounded topics," including teaching about same-sex relationships and different perspectives on gender in courses on gender and human sexuality.

104.    After the semester began, the Provost of the College Station University issued new guidance, "Guidance on Syllabus Course Reviews" ("Provost's Second Guidance"), to replace its rescinded First Guidance.

105.    The February 26, 2026 version of the Provost's Second Guidance attempted to reinforce and synthesize System FAQ 2's conclusions:

    a. **No courses advocate** for race ideology or gender ideology, or topics related to sexual orientation or gender identity

    b. No **core curriculum courses teach** race ideology or gender ideology, or topics related to sexual orientation or gender identity

    c. **Non-core curriculum or graduate courses that teach** race ideology or gender ideology, or topics related to sexual orientation or gender identity have been reviewed and granted an exception by the university president (per System Policy 08.01).

(emphasis added).

106.    The Provost's Second Guidance, unlike the First, contained the same definition of advocacy as System FAQs 1 and 2. But unlike the System FAQs, it also contained a definition of teach—"[i]mparting information or skill so that others may learn; to cause to know something; to cause to know how; to guide the study of; to instruct by precept, example, or experience."

107.    Unlike System FAQ 2, which maintained its dubious assertion that under the Policy "[f]aculty are expected to teach historically significant, empirically established, and discipline grounded topics," the Provost's Second Guidance affirmatively deleted any previous references to permitting the "covering [of] varying definitions and theories regarding gender identity in a course related to gender, or material on same sex relationships in a course on sexuality." This made clear

32

that any **teaching** of prohibited topics was forbidden, absent a pre-approved exception allowed only in non-core or graduate courses.

108. The Censorship Policy's ban on teaching these perspectives—as clarified by the Provost's Second Guidance—was underscored by the Policy's implementation across the Texas A&M System. Any discussions of the prohibited ideas—whether in core classes or otherwise and including those on gender identity and same sex relationships—have been the target of a draconian, censorial regime that has forced professors to self-censor, modify their courses, or give their classes up entirely.

109. Faced with conflicting or missing System and University-level guidance, some academic departments improvised their own interpretations with an understanding that particular perspectives on gender, race, and sexual orientation are prohibited. At College Station, a senior dean instructed faculty that "[i]f a major plot line concerns gay, lesbian, transgender, etc. identities, then the literary text should NOT be included in a core curriculum course." The English Department issued a multi-page interpretation of what it means to "teach" a "topic related to" sexual orientation or gender identity. Notably, in this guidance the Department narrowed the text of the Censorship Policy to "[LGBTQ+] sexual orientation or gender identity"—a limitation not expressed in the Policy but one that was widely understood to be the true aim of the Censorship Policy. Further, the guidance exemplifies the inscrutable nature of the Censorship Policy: asking faculty to assess whether such content reached a "threshold of thematic emphasis at which it could reasonably be identified as a 'topic' of the course." Such a ponderous inquiry may be appropriate for meta-academic discourse but falls far short of the clarity demanded when regulations infringe on free speech.

110.   Neither the Censorship Policy itself nor any of the shifting and contradictory guidance described above provide any kind of intelligible or workable standard for determining whether particular actions or speech are allowed.

111.   But what becomes clear from analyzing the Censorship Policy alongside the interpretive guidance provided is that it imposes a complete ban, in *every single course*, on the "advocacy" of the prohibited ideas of race, gender, and sexual orientation, without any corresponding ban on opposing views on these issues. For core courses, any "teaching" at all— not just "advocacy," though the Censorship Policy does not define either term—is completely banned for the prohibited viewpoints on race or gender or topics related to sexual orientation or gender identity. In non-core and graduate courses, this teaching is only permitted through an arbitrary and standardless pre-clearance process.

### E. The Censorship Policy is Enforced through an All-Encompassing Curricular Review

112.   The review process compounded the confusion. To obtain approval for a non-core course, faculty were required to submit their syllabi and to answer how they were "ensuring that there is no advocacy related to the topics in this course." At this point, faculty had seen or been told multiple working definitions of advocacy—all of which were excessively vague and some of which were rescinded with no clear replacement. As a result, faculty seeking approval tried to seek clarification from deans and department heads, who applied differing and sometimes contradictory understandings of the term.

113.   Across the Spring 2026 term, the Board caused thousands of courses to be subjected to a syllabus review. Following the review, some courses were granted conditional approval requiring instructors to disclaim "advocacy"; some were compelled to change a course's number

or core-curriculum status; some were required to remove certain assigned materials deemed to violate the Censorship Policy; and others were canceled outright.

114. At College Station alone, the Board required review of approximately 5,400 course syllabi. According to a University press release, the result was that "hundreds of syllabi across 17 colleges and schools" had to be modified to bring them into compliance. Ultimately, even after professors had self-censored to be in compliance, deans forwarded 54 courses to the president and provost for final review, and the president granted 48 exceptions—several only after the instructors assured administrators that they were not "advocating" the prohibited subjects.

115. Six courses were canceled outright at the flagship campus for the Spring 2026 semester without even an opportunity to revise their syllabi to be in compliance: Introduction to Race and Ethnicity; Religions of the World; Ethics in Public Policy; Diversity in Sport Organizations; Cultural Leadership and Exploration for Society; and Diversity, Equity and Inclusion in Youth Development Organizations.

116. Review of core courses produced sweeping changes. Defendants directed that a core philosophy course remove its modules on race and gender—including assigned readings from Plato's *Symposium* because Aristophanes' "Myth of the Androgyne" violated the Censorship Policy's prohibition and prior restraint on discussions of gender ideology. That professor, once a chair of the University's Academic Freedom Council, self-censored his course to gain approval, but ultimately resigned from his position in April 2026 because of the Censorship Policy's infringement on his speech.

117. Other courses were stripped of core-curriculum credit or re-listed as non-core "special topics" courses after their instructors declined to remove disfavored content, with the change in designation often resulting in a precipitous decline in attendance.

118.   The Censorship Policy also reached entire programs. On January 30, 2026, Defendants announced that they were winding down the University's Women's and Gender Studies offerings—the bachelor of arts, bachelor of science, graduate certificate, and minor—on the ground that they could not be reconciled with the Censorship Policy. The provost explained that the decision was "based on the requirements of System policy."

119.   Review has also been completed for most Fall 2026 courses and resulted in continued censorship. For instance, both sections of an LGBTQ literature course slated for the Fall have been canceled outright. As early as October 2026, departments will also begin the censorship review process for Spring 2027 classes.

120.   Absent a ruling from this Court, Defendants will continue to strip disfavored ideas about race, gender, and sexual orientation from Texas A&M classrooms  in violation of the First Amendment, and, indeed, the University's own commitment to free speech and academic freedom.

## II.  Plaintiffs Are Suffering Harm from the Enforcement of the Censorship Policy

### A.  AAUP

121.   AAUP members throughout the Texas A&M University System are subject to the Censorship Policy and face ongoing and irreparable constitutional injury from it.

122.   There are AAUP chapters at Prairie View A&M University, Tarleton State University, Texas A&M International University, Texas A&M University–Central Texas, Texas A&M University–College Station, Texas A&M University–Corpus Christi, Texas A&M University–Kingsville, Texas A&M University–San Antonio, Texas A&M University–Texarkana, East Texas A&M University, and West Texas A&M University. As of August 2026, AAUP had 445 members in the Texas A&M University System. The Censorship Policy applies to all campuses where AAUP's A&M members work.

123.    Advancing and protecting academic freedom for its members at these campuses is core to the AAUP's mission.

124.    Since enactment of the Censorship Policy, the AAUP members have faced threats to, and actual violations of, their First Amendment rights. Some professors have been directly censored, and the entire faculty now teaches under the looming threat of censorship.

125.    In addition to the named plaintiffs discussed below, other members have had their speech directly censored. One member professor was forced to remove Plato from his syllabus, and he subsequently left Texas A&M. Another member professor, who teaches a Contemporary Sociological Theory course, was forced to revert to an earlier version of an article because the updated version contained viewpoints disfavored by the University.

126.    Further, AAUP members face significant uncertainty over what materials and subject matters they may discuss in their courses. Members do not know what the line between advocating or teaching is, what will be considered race or gender ideology, and what is considered a "topic related to sexual orientation or gender identity." Nor do they understand what content is entitled to an exemption or when it is sufficient to simply disclaim advocacy as opposed to censoring course material. The enforcement of the Policy has shown that its vagueness leads to arbitrary and discriminatory enforcement aimed at particular viewpoints. Materials that engage LGBTQ+ themes are significantly more likely to be censored or provoke reviews than materials that discuss cisgender, heterosexual themes. Similarly, materials that explore politically disfavored views on race are more likely to be censored than materials that promote approved viewpoints on race.

127.    Fearing the prospect of outright censorship and lacking clear standards, member instructors have been chilled and forced into self-censorship.

128.    For example, facing uncertainty over what the Censorship Policy restricted and a fear of course cancelation, one member professor removed a foundational book from his Spring 2026 course because it explored topics he feared might run afoul of the policy, including queer theory, feminist theory, and critical race theory. Although the member did not believe he was advocating for any of these topics, he worried his class would be canceled outright if he did not remove the book. This professor would feature this work in the future if not for the Censorship Policy.

129.    AAUP members have been and will continue to be chilled in their speech as a result of the Censorship Policy and have been and will continue to be forced to censor their academic teachings to conform to the vague and shifting guidance from the Texas A&M University System if the Censorship Policy continues.

### B.  Leonard Bright

130.    Plaintiff Dr. Leonard Bright is a tenured full professor at Texas A&M University – College Station's Bush School of Government and Public Service. He has worked at Texas A&M since 2011 and has been tenured for the entirety of his time at the University.

131.    He teaches courses in the Master of Public Service and Administration degree program.

132.    He is also the President and a member of the AAUP Chapter at Texas A&M – College Station. As President, he advocates for professors' academic freedom, tenure, and shared governance at the university and provides guidance to members on navigating their professional and legal responsibilities.

133. The Censorship Policy has directly censored Dr. Bright's speech and his academic freedom: the University canceled one of his classes over alleged violations of the policy and his future classes remain at risk of censorship or cancelation.

134. In early December 2025, Dr. Bright was informed that his Spring 2026 class syllabi would be due in January 2026.

135. At some point, he received the Provost's First Guidance from the University. As discussed above, that initial guidance, in part, provided a definition and examples of "advocacy," and permitted "advocacy" in graduate courses with advanced University approval.

136. While that initial guidance was far from clear, the University removed it from the website, leaving Dr. Bright to craft his Spring syllabi without receiving any instructions or clarifications to the Censorship Policy, which Dr. Bright found to lack specificity, clarity, and definite standards.

137. Nevertheless, in a good faith attempt to comply with the Censorship Policy, he submitted his syllabus for Ethics in Public Policy (PSAA 642) for review in early January.

138. Dr. Bright has taught this graduate course for seven years. It focuses on the theory and practice of analyzing and responding to ethical responsibilities and dilemmas in professional conduct and addresses policy debates about race, gender, religion, sexual orientation, and other social identities. As a graduate course, this class is traditionally populated by older students who have completed their undergraduate degrees and who—even more than undergraduates—are academically prepared to participate in frank, detailed discussions about sensitive issues.

139. On January 9, 2026, Department Head Dr. Taylor emailed Dr. Bright to inform him that the course, which inherently requires a discussion of differing viewpoints, was flagged as

39

needing an exemption because it included "material that relates to race ideology, gender ideology, or sexual orientation."

140.    While Dr. Taylor did not identify any specific course content of concern, she noted that the "breadth of the university's working definition of advocacy" required the exemption request.

141.    But Dr. Bright was unaware of whether there was, at that time, a working definition of advocacy, since the Provost's First Guidance that mentioned it had been rescinded.

142.    When Dr. Bright asked for clarification on which parts of his syllabus ran afoul of the Censorship Policy, Dr. Taylor pointed to "some of the readings" from Week 5 of the syllabus that were apparently "covered under system policy 08-01" and "clearly qualif[ied] for additional review," without specifying which readings or describing how they violated the Censorship Policy.

143.    Dr. Taylor added that, regardless of whether a professor was actually engaging in "advocacy," there was a "risk that students could interpret a faculty member's comments or reading assignments as leading or encouraging them to hold specific positions on political policies and actions, even if the faculty member has clearly and explicitly indicated that students are not required to hold such positions."

144.    Dr. Bright responded with his concerns that interpreting "advocacy" from a subjective student point of view would leave professors vulnerable to a vague and arbitrary standard.

145.    Nonetheless, he explicitly disavowed that he would engage in any advocacy in the course and noted that his course would "not require students to hold, affirm, or renounce any belief, nor [would] it penalize students for their views."

40

146. Because he made this disavowal, Dr. Bright told Dr. Taylor that his course was not in violation of the Censorship Policy's advocacy prohibition and, therefore, that he would not be seeking an exemption.

147. On January 12, 2026, Dr. Bright conducted the first meeting of PSAA 642 for the Spring 2026 semester.

148. The next day, on January 13, 2026, the second day of the semester, Dr. Bright received an email from the Bush School Dean John Sherman informing him that the Bush School sent his Ethics in Public Policy syllabus to the Vice Provost for Academic Affairs to get an opinion on whether an exemption was required under the Censorship Policy.

149. According to Dean Sherman, the Vice Provost determined that the course may need an exemption, but for a completely different reason than Dr. Taylor had identified. Indeed, the Vice Provost noted that the unidentified week 5 readings did not require an exemption as long as Dr. Bright disavowed "advocacy." Instead, the Vice Provost concluded that the syllabus' reference to "sexual orientation" in its "Professional Perspective and Academic Freedom Statement" indicated a potential violation of the Censorship Policy, requiring an exemption.

150. The offending Professional Perspective and Academic Freedom Statement is:

[This course] examines a range of theories, empirical research, and policy debates addressing the impact of race, gender, religion, sexual orientation, and other social identities on public policy and the professional ethical responsibilities of public servants. These topics are approached for the purpose of scholarly analysis, professional development, and critical evaluation of public administration practice.

In the course of instruction, I may share my own professional perspectives on issues related to the course content and matters of public concern. These views are offered for educational purposes only and do not represent the official positions or views of Texas A&M University or any affiliated institution. Students are not expected to agree with the instructor's professional perspectives, and respectful disagreement and critical engagement are welcomed and encouraged.

41

151.    Dean Sherman noted that the Vice Provost explained that if the topic of sexual orientation would be "covered" during the course, either through discussion or course readings, the course would require an exemption unless Dr. Bright opted to voluntarily exclude the topic from the class and remove it from the syllabus. If Dr. Bright did not opt to exclude the topic, he would be required to identify in the syllabus every instance in which the topic of sexual orientation would be "covered," so that his exemption request could be assessed:

> For PSAA 642, which you are also teaching, VPAA notes that you make reference to sexual orientation in the Academic Freedom statement you include in the syllabus, but that it is not clear where such discussion will occur during the course. Please identify in the syllabus where the topic of sexual orientation will be covered through discussion or course readings. If it exists as such, then VPAA notes that an exemption will be required. We will submit such an exemption to VPAA this afternoon unless you opt to exclude this topic voluntarily. Likewise, if this topic is only included in the Academic Freedom statement but will not be covered in the course, then VPAA notes that references to sexual orientation must be removed from your Academic Freedom statement.

152.    Dr. Bright responded to Dean Sherman that, as a graduate level course, it was not possible to specify a particular day when a topic might arise but reiterated his commitment to not advocate a particular viewpoint:

> Because PSAA 642 [Ethics in Public Policy] is a graduate-level, discussion-centered course, it is neither possible nor pedagogically appropriate to specify with certainty the precise timing or manner in which these topics may arise. These issues may be addressed throughout the course as relevant to the subject matter, including through assigned readings, current-event analyses, book reviews, written assignments, and classroom discussion. At no point does the course require students to adopt, affirm, or reject particular beliefs regarding these topics. Students are evaluated solely on analytical rigor, use of evidence, and professional engagement.

153.    Dean Sherman responded by explaining that, without identification of the specific occasions when the topic of sexual orientation would arise, the course would not receive an exemption and therefore could not be authorized:

Dr. Bright,

Based on your response below, it is not possible to determine the extent to which you intend to introduce topics of sexual orientation into your curriculum. **This specificity is necessary for the required exemption.** As stated in TAMUS 08.01:

*No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity. Upon prior written approval of the member CEO after review of the course and relevant course materials, specific non-core curriculum or graduate courses in some disciplines may teach race or gender ideology, or topics related to sexual orientation or gender identity. Such approval may be granted in limited circumstances upon demonstration of a necessary educational purpose.*

**Absent an exemption, I will not authorize continuation of this course.**

Please advise if you wish to modify your response and indicate how and where you intend to cover the topic of sexual orientation in this course so we can assess whether to endorse and submit an exemption request.

Best,

John

154.    In response, Dr. Bright explained again to Dean Sherman that he could not identify when certain topics would be covered because concepts like race, gender, and sexuality would be addressed throughout the course, including through assigned readings, current-event analyses, book reviews, written assignments, and classroom discussion.

155.    Dr. Bright also worried that if he did attempt to specify days where the targeted topics would be covered, but discussions of them organically arose on other days, he would be penalized under System Policy 12.01, which prohibits faculty from introducing material that is inconsistent with the approved syllabus for the course.

156.    The next day, on January 14, 2026, Dean Sherman notified Dr. Bright that the course would be canceled immediately because Dr. Bright could not identify every instance when the prohibited topics would be discussed in class. This cancelation occurred after the semester began and the class had already met.

157.     Dean Sherman also sent out a college-wide communication announcing the cancelation of PSAA 642. The University's decision to publicly announce the cancelation of Dr. Bright's course was not a routine administrative communication. By publicizing their cancelation of one of the University's most prominent advocates for academic freedom, the administration conveyed a message to the broader faculty that resistance to the Censorship Policy could result in similar consequences—thereby reinforcing the Censorship Policy's chilling effect.

158.     Dr. Bright's graduate-level course was singled out under the Censorship Policy because the course "examines a range of theories, empirical research, and policy debates addressing the impact . . . sexual orientation, and other social identities on public policy and the professional ethical responsibilities of public servants."

159.     The cancelation elucidates the Censorship Policy's discriminatory purpose and effect—it censors targeted subsets of disfavored ideas—in Professor Bright's case, ideas about how sexual orientation has impacted public policy—and thus "impose[s] a[] strait jacket upon [our] intellectual leaders" and casts a "pall of orthodoxy" over the University. *Sweezy*, 354 U.S. at 250; *Keyishian*, 385 U.S. at 603.

160.     Dr. Bright wishes to teach Ethics in Public Policy and other courses in the future. However, he reasonably fears that this course and others will continue to be prohibited or substantially censored under the Censorship Policy.

161.     The varying interpretations of the vague Censorship Policy's application to his class by different University officials, culminating in the class's cancelation, severely compound Dr. Bright's uncertainty regarding what is or is not allowed under the Censorship Policy.

162.     While one official pointed to undisclosed readings and the subjective and broad definition of "advocacy" as reasons the class may have run afoul of the Censorship Policy, the

Vice Provost determined that any concerns about the readings and discussion could be addressed by a statement from Dr. Bright disavowing advocacy.

163. These inconsistencies raise serious questions. *First*, could the policy's prohibition on "advocacy" be alleviated by a professor's disavowal as Dean Sherman and the Vice Provost conveyed, or was the existence of advocacy premised on a student's subjective experience as Dr. Taylor had indicated?

164. *Second*, what was the operative definition of "advocacy" and how does that apply in an academic setting, where a professor's role is to encourage students to consider and grapple with differing perspectives?

165. *Third*, did the Censorship policy restrict just the "advocacy" of the forbidden topics in graduate courses, or did it also restrict their very mention or teaching? The rescinded Provost's First Guidance and System FAQ 1, which some administrators may still have been relying on, indicated that "advocacy" in graduate courses required advanced approval, but openly permitted the "teaching" of the topics at issue (e.g., "[t]hese topics can and should be addressed/taught in appropriate disciplines when part of the discipline's body of knowledge").

166. The same day that Dr. Bright's class was canceled, the System published System FAQ 2.

167. However, System FAQ 2's requirements for graduate courses varied greatly from those in the Provost's First Guidance. According to System FAQ 2, the Censorship Policy allows no advocacy in graduate courses, even with advanced approval. And per System FAQ 2, the mere teaching of the prohibited topics in graduate courses apparently requires advanced approval.

168.    Given the vague text of the Censorship Policy and the constantly shifting guidance, Dr. Bright does not know what standard he is going to be held to or how to conform his conduct to the Censorship Policy.

169.    The operative definition of "advocacy" has been inconsistent between System, University, and Department level guidance to Dr. Bright and has sometimes been based on subjective, anticipated student perspectives.

170.    It is also unclear to Dr. Bright whether "advocacy" of the restricted topics is always prohibited, or if exemptions are available, and whether "teaching" of the prohibited topics is unrestricted at the graduated level, or whether it requires an exemption. The plain language of the Censorship Policy does not provide clear prohibitions and the subsequent guidance issued by the University conflicts with the plain language of the Censorship Policy itself and still does not provide clarity about how the Censorship Policy is being implemented.

171.    For example, Dr. Bright was granted an exemption for a class in the Spring of 2026, Foundations of Public Service (PSAA 601), where his syllabus stated that the class would discuss issues related to race, gender, and sexuality but that such discussions would be instructional and not advocacy. Dr. Bright does not understand why this exemption was granted but his exemption request for Ethics in Public Policy (PSAA 642) was denied. Dr. Bright also has reason to believe that such exemptions will not be granted in the future. On March 16, 2026, he received an email from Dean Sherman noting that "an instructor cannot include blanket statements in a syllabus indicating that race ideology or gender ideology, or topics related to sexual orientation or gender identity, might come up at any point in a course. Information on specific readings, lectures, etc., related to these topics must be submitted for an exception request." After receiving this email, Dr. Bright removed a statement from his Foundations of Public Service (PSAA 601) Fall 2026

syllabus indicating that discussions regarding a range of social identities, including gender identity and sexual orientation, may arise in class. He received an exemption for the syllabus and is set to teach two sections of Foundations of Public Service in the Fall.

172.    The Censorship Policy's vagueness is highlighted by its arbitrary and inconsistent application to Dr. Bright's courses. Despite the timely submission of his syllabus for review, identifying topics of interest that may arise in his class, seeking the input and clarifications of multiple University officials, and explicitly disavowing advocacy, the University still canceled his class. Dr. Bright does not know how he could have modified his class and still have complied with the policy.

173.    Dr. Bright expressly disavowed advocacy, and he explained why the pedagogy of the graduate class was inherently open-ended and discussion based, and yet he was still denied an exemption.

174.    Finally, the vagueness and subjectivity of the definitions for "race and gender ideology" and "topics related to sexual orientation and gender identity" do not provide Dr. Bright with notice of what content is prohibited, and he reasonably fears that the Censorship Policy will lead to censorship of future classes.

175.    Dr. Bright has taught Ethics in Public Policy numerous times in the past and wishes to teach it again.

176.    But under the Censorship Policy, it seems that any mention of race, gender, or sexual orientation could be targeted based on students' perceptions and feelings and the arbitrary application of the policy by University officials, which could lead to future class cancelations or additional requirements of Dr. Bright to modify his syllabi.

177.   Dr. Bright does not know how to conform his conduct to comply with the vague and arbitrary Censorship Policy. As a result, he must either self-censor and sacrifice his academic freedom or have classes canceled and be otherwise subject to discipline for violations of an irredeemably unclear policy.

### C. Vanita Reddy

178.   Plaintiff Professor Vanita Reddy is a tenured Associate Professor in Texas A&M University College Station's English Department, in the College of Arts and Sciences. She has worked at Texas A&M since 2009, with the exception of a fellowship in 2013-2014. She has been tenured since September 2016.

179.   Professor Reddy is a member of AAUP.

180.   Her research focuses on the intersections of race, gender, and sexuality in diasporic and transnational contexts. She has taught classes on multiethnic literature, Asian American literature and culture, literary theory, LGBTQ+ literature, gender theory, and feminist theory, in both the English Department and Women's and Gender Studies Program.

181.   One of Professor Reddy's English classes was canceled, and her other classes may also be canceled or will be restricted under the Censorship Policy.

182.   Over her years of teaching, Professor Reddy has developed a course and syllabus for her sections of LGBTQ Literatures (ENGL/WGST 333) and Theories of Gender (ENGL 680), both of which she has taught numerous times.

183.   In applying the Censorship Policy to Professor Reddy, the University offered a clear statement that it is silencing particular disfavored viewpoints.

184.   Professor Reddy was on faculty development leave for the Fall 2025–Spring 2026 school year. While on leave, in February 2026, the University informed her that her courses would

48

be scheduled for Fall 2026. But then, in March 2026, she received published guidance from the English Department, which declared that the Censorship Policy's prohibition on "topics related to sexual orientation or gender identity," "will **not** be applied to heteronormative orientation and identity" (emphasis added). Instead, the Censorship Policy would apply **only** to "LGBTQ gender identity or sexual orientation," or classes "which will employ the established methodologies of LGBTQ studies."

185.    The English Department's guidance made explicit what Professor Reddy had understood to be the common interpretation of the Censorship Policy—that its prohibition on "gender ideology," "sexual orientation" and "gender identity" was designed to exclusively target discussion of LGBTQ+ or nonnormative gender identities and sexualities, even if those words do not actually appear in the Censorship Policy itself. The guidance to Professor Reddy made clear that the Censorship Policy will not take issue with materials or teaching that asserts that sex differences are inherent in our "natural order," but will not allow the viewpoints of women's and gender studies scholars that one's "biological sex" does not determine one's gender, sexual orientation, or general place in the social hierarchy. In doing so, the guidance reinforces the Censorship Policy's targeted and discriminatory purpose and effect—to ban one subset of ideas and viewpoints and create a pall of orthodoxy in every classroom across the University system.

186.    After publishing this guidance, the English Department concluded that LGBTQ Literatures would require an exemption because it necessarily involved teaching topics related to gender identity and sexual orientation, specifically LGBTQ+ authors and identities.

187.    Professor Reddy's colleague, Plaintiff Professor Sadler, who taught another section of the LGBTQ Literatures course, submitted an exemption request for his section. As discussed below, Professor Sadler's exemption request was denied and, rather than canceling just that

49

specific section, the course was canceled entirely. This cancelation included Professor Reddy's section, despite the fact that she had not yet even submitted her syllabus for her section of the course or any exemption request related to her syllabus for the class and was on leave.

188. Professor Reddy's course was targeted under the Censorship Policy because it taught disfavored viewpoints. Canceling Professor Reddy's course before she even submitted a syllabus confirms the arbitrary and across-the-board nature of the Censorship Policy, which prohibits LGBTQ+-specific viewpoints, regardless of how they are taught or integrated into the curriculum, because the very teaching of such content is forbidden under the Censorship Policy.

189. Professor Reddy has taught LGBTQ Literatures in the past and wishes to do so again in the future, as it is central to her academic and research interests in both literature and gender studies. From what she has been told, however, it appears that so long as the Censorship Policy is in place, she will not be permitted to teach the class, regardless of what she proposes for a syllabus or how she intends to teach the materials.

190. Professor Reddy additionally does not know how to conform her conduct with regard to her other classes to comply with the Censorship Policy.

191. At this time, Professor Reddy understands that she will still be teaching her graduate course Theories of Gender (ENGL 680) in the Fall 2026 semester, although she has not yet submitted a syllabus for the course or sought an exemption under the Censorship Policy. Any gender theory course would be analytically incomplete and incoherent without considering non-normative gender identities and sexual orientations, alongside normative and "traditional" views on these topics. But because the guidance the department gave to Professor

50

Reddy would preclude these viewpoints, she is unsure and confused about how to conform her teaching of this course to comply with the Censorship Policy.

192. Additionally, informal guidance from an associate dean of the College of Arts and Sciences further exacerbated Professor Reddy's difficulty complying with the Censorship Policy. When asked whether novels that contain LGBTQ+ characters can be taught in non-core courses in the English Department, Associate Dean Cynthia Werner stated that if a novel **contains** a queer character but is not being used **to teach** sexual orientation, then she "personally think[s] it is okay to keep the book in the course." The Associate Dean said this despite *Moonlight* being banned in Professor Sadler's class for featuring queer characters. *See supra* ¶ 151.

193. And when asked about how to respond to student questions about gender-based topics that arise in the classroom, Associate Dean Werner replied that instructors must consider the "topic prior to the question, existence of course exception approval, how the question is framed (including the tone)" before answering. This additional, informal guidance demonstrates the unfettered discretion in the enforcement of the virtually standardless Censorship Policy. Faculty are being asked to make instantaneous judgments about the "personal" assessments of administrators and of vague concepts like the "tone" of student questions in an attempt to comply with the Policy. And if they make the wrong judgment, they could be found to be out of compliance and subject to punishment.

194. Professor Reddy is further harmed by the Censorship Policy because she was also assigned to teach a course called American Ethnic Literature (ENGL 338) after her LGBTQ Literatures course was canceled. American Ethnic Literature explores the writings of Black Americans, American Indians, Jewish Americans, Latino/as and other ethnic groups who mention topics of race as a matter of course. But Professor Reddy is unsure which of

51

her anticipated teachings will be permitted under the Censorship Policy because the definition of "race ideology" is too vague and arbitrary for her to implement with any accuracy or precision. Specifically, the Censorship Policy's definition of race ideology relies on subjective, feelings-based concepts such as "guilt" and "shame." She fears that merely teaching certain relevant materials could run afoul of the Censorship Policy, especially since she cannot control the subjective feelings of her students or the impact that certain readings will have on them.

195.    Because Professor Reddy does not know how to manage or anticipate the subjective response of every potential student in her classes, she is left unsure of what is or is not allowed on the syllabus and what may or may not be taught or said in class discussions. Given that enforcement has targeted disfavored viewpoints related to gender and race, Professor Reddy fears that some of her planned required readings about Jim Crow and exclusionary immigration laws could especially be targeted for censorship. These readings highlight the existence and harms of historical social groupings, which could lead to students or administrators characterizing her class as "advocating" for "race ideology."

196.    As a result, Professor Reddy faces the untenable choice of self-censoring and sacrificing her academic freedom or being subject to discipline for violation of the vague Censorship Policy.

### D. Landon Sadler

197.    Plaintiff Professor Landon Sadler is a full-time lecturer in Texas A&M University, College Station's English Department and an Associate Faculty member of Women's and Gender Studies, in the College of Arts and Sciences. He has worked at Texas A&M since 2016, first as a graduate research assistant, then as a graduate teaching assistant while obtaining his Doctorate. He

became a lecturer in 2023. Professor Sadler's research focus is on feminist and queer theory as well as twentieth- and twenty-first-century American literature.

198.    Professor Sadler is a member of AAUP.

199.    As a result of the Censorship Policy, Professor Sadler's free speech and academic freedom have been violated. The Censorship Policy has directly infringed Professor Sadler's free speech and inhibited his academic freedom by mandating removal of significant works from his syllabus for a core curriculum course, Writing About Literature (ENGL 203). He separately had his LGBTQ Literatures course (ENGL/WGST 333) for Fall 2026 canceled outright due to the Censorship Policy.

200.    On December 20, 2025, Professor Sadler submitted the course Writing About Literature for review as required by the University. The syllabus was largely the same as in prior semesters and had previously been approved for instruction.

201.    During the review process for Writing About Literature, Professor Sadler identified *Moonlight*, a film by Barry Jenkins, and "Trans-Generation" a poem by acclaimed author Alok Vaid-Menon, as materials that might be deemed to violate the Censorship Policy, even though Professor Sadler did not believe the works themselves nor his teaching of them constituted advocacy.

202.    Professor Sadler's use of these works in his course focuses on their storytelling and composition elements and neither is used to "advocate" for any "gender ideology" or any other belief. Rather, Professor Sadler's use of both materials was intentional and grounded in the course's educational objectives of teaching literary analysis and reading comprehension. Professor Sadler believes that *Moonlight*, which won Best Picture at the Academy Awards, is effective for

teaching analysis, research, and presentation skills in film. And Alok's work helps students learn essential poetic devices such as alliteration, anaphora, eroteme, and spoken word.

203.    When Professor Sadler raised the question of whether these materials would run afoul of the policy, his interim department head emailed him directly and confirmed that, per the Censorship Policy, *Moonlight* and "Trans-Generation" would need to be removed.

204.    Professor Sadler removed both works because he did not want the course to be canceled in its entirety. Because they were removed, Professor Sadler was hindered in his ability to discuss any themes related to the works since System Policy 12.01 prohibits discussion or teaching related to any matters not on the syllabus.

205.    It is clear that Professor Sadler's course was censored because *Moonlight* and "Trans-Generation" represented disfavored ideologies and viewpoints related to gender and sexual orientation. Specifically, *Moonlight* chronicles the life of a young gay Black man growing up in a poor Miami neighborhood struggling with issues of masculinity and sexuality. And "Trans-Generation" is a poem about familial gender-based violence and how transgender identity serves as a survival tactic.

206.    In November 2025, after the initial passage of the Censorship Policy, Professor Sadler met with the interim head of the English department to discuss questions and concerns surrounding course alignment under the policy. The interim department head concluded after discussing LGBTQ Literatures (ENGL/WGST 333) with the Director of Undergraduate Studies that, due to the new policy, it would be best for Professor Sadler to pause teaching this course for Spring 2026. LGBTQ Literatures explores LGBTQ+ authors and texts that reference the experiences of LGBTQ+ people. Professor Sadler did not agree with the decision to pause the course but understood that he would still be permitted to teach the course in the Fall 2026 semester.

207.   On March 18, 2026, Professor Sadler submitted the syllabus for his anticipated Fall 2026 LGBTQ Literatures course. The course went through the normal course review process and was approved by the dean and interim department head. But, when he applied for an exemption under the Censorship Policy, the President of the University denied it and stated that the justification for the exemption was not compelling enough. Subsequently, the course was canceled for the Fall 2026 semester and Professor Sadler was not permitted to resubmit an exemption request.

208.   It is clear that materials were removed from Writing About Literature and that LGBTQ Literatures was canceled because they highlight a disfavored set of viewpoints with ideas and identities that the Board of Regents is prohibiting from being heard as part of academic discussions about gender, gender identity, and sexual orientation—not because of any legitimate concern about "advocacy" which Professor Sadler did not engage in.

209.   Further, it is clear that the topics of gender and sexual orientation more generally are not entirely barred under the Censorship Policy, but only disfavored LGBTQ+ perspectives. For instance, in the same Writing About Literature course in which materials were prohibited, Professor Sadler was permitted to teach *Barbie*, a movie that focuses on cisgender identity dynamics and heterosexual orientation by exploring the societal pressures placed on men and women when Ken tries to bring patriarchy back to Barbie land. What's clear is that the University deems the viewpoints the *Barbie* movie presents about gender to be acceptable, but not those in *Moonlight*, no matter its critical acclaim, because of its LGBTQ+ themes.

210.   More broadly Professor Sadler does not understand, nor was it ever clarified for him, how having students watch a movie and read a poem can be considered "advocating" for a particular ideology. Additionally, the fact that other professors have been permitted to teach certain

gender identity issues that appear in the works of Shakespeare, like the cross dressing in *As You Like It*, further demonstrates that it is not at all clear where the lines are drawn for what is or is not permitted.

211.    The vagueness of the Censorship Policy has thus led to arbitrary enforcement. As noted previously, the terms at issue in the Policy, understood literally, are extremely capacious—countless texts concern gender identity or sexual orientation on some level—but not every text that even deeply touches on these issues is being censored. Instead, there is unfettered discretion to excise those texts that include viewpoints that are politically disfavored.

212.    Professor Sadler intends to continue to teach at A&M and specifically wishes to teach LGBTQ Literatures and Writing About Literature in the future, but he does not know how to comport his conduct with the vague Censorship Policy. The University has provided no meaningful guidance to Professor Sadler on what it means to "advocate" for "gender ideology," "race ideology," or "topics related to sexual orientation or gender identity." Professor Sadler is left unsure what constitutes advocacy under the Censorship Policy, since he was censored for merely including works of literature on his syllabus. Nor does Professor Sadler understand what the terms "race ideology," "gender ideology," or topics related to sexual orientation or gender identity mean, particularly given the way the Censorship Policy has been enforced. Nearly every work of art that concerns human beings touches, implicitly or explicitly, on subjects of race, gender, or sexuality, but Professor Sadler has no way of knowing whether a particular work or topic of discussion will cross whatever line the Censorship Policy is attempting to draw.

### E. Aaron George

213.    Plaintiff Aaron George is an Assistant Professor of History at Tarleton State University, which is administered by the Texas A&M Board of Regents. Professor George has taught U.S. History at Tarleton for eight years.

214.    Professor George is a member of AAUP.

215.    The Censorship Policy has severely restrained Professor George's speech, limiting which courses he can teach, what he can assign in the classes he does teach, and how he discusses matters with his students—matters on which he previously had considerable academic freedom.

216.    Due to the Censorship Policy, he is no longer permitted to teach two courses that he had been planning to teach in the Fall 2026 semester: Contemporary American History and History of Sexuality in America.

217.    Before Professor George could proceed with teaching two of his other courses, History of the United States Since 1877 (HIST 1302) and Research in American Political History, 1929 to the Present (HIST 4311), the University administration demanded that he remove multiple readings and topics from his course curricula, or risk having those classes canceled for noncompliance with the Censorship Policy. He has been forced to remove at least three texts from his syllabi and lectures that cover topics about racial discrimination, gay rights, and discrimination on the basis of sexual orientation.

218.     On December 8, 2025, Professor George received an email from his Department Head informing faculty that in order to check for compliance with the Censorship Policy, they were required to upload syllabi to an AI-powered platform called Simple Syllabus. The email also said that a list of words such as "diverse", "bias", "gender", "climate", and "ethnicity" would be receiving "extra scrutiny." These terms inherently relate to concepts essential to teaching a history

course, which naturally covers the abolition of slavery, universal suffrage, and the civil rights movement. Professor George submitted his syllabi, which included readings and topics that he has included without any issues or student complaints throughout the eight years that he has taught those courses. He did not hear anything further, so he guessed that his syllabi were approved.

219. In January 2026, University administration demanded that Professor George remove two readings from his Research in American Political History, 1929 to the Present (HIST 4311) syllabus and change related course curriculum or his class would be canceled. The two readings were a primary source called *The Gay Manifesto* and the book *White Flight* by Kevin Kruse. Professor George complied with this order and removed the two readings from his syllabus, so that his class would not be canceled for non-compliance with the Censorship Policy.

220. In that same course, a reading that Professor George had assigned in his syllabus by Phyllis Schlafly titled "What's Wrong with Equal Rights for Women?" was not flagged for review. While he was forced to remove readings about LGBTQ+ rights and racial injustice, he was permitted to teach viewpoints that favor traditional, anti-egalitarian gender roles. This further illustrates that only the viewpoints that the Board disfavors are being targeted by the Censorship Policy.

221. Later in January 2026, on the first day of the spring semester, University administrators told Professor George that the President had received a complaint about a violation of the Censorship Policy in his course History of the United States Since 1877 (HIST 1302). The administration ordered Professor George to make changes to his syllabus immediately, or his class would be canceled. The issue with his syllabus that had been flagged was that it mentioned that the course explored the ways that the Fourteenth Amendment to the U.S. Constitution protected the rights of groups such as African Americans, LGBTQ+ Americans, and women.

222. As a historian, this is a crucial perspective of how the Fourteenth Amendment has progressed throughout U.S. history, with expansion from a purely race-based framework to a broader understanding of equal protection. But, because he did not want his course to be canceled, Professor George edited his syllabus to remove any mention of LGBT Americans.

223. Even though Professor George has removed readings, edited his syllabi, and altered his course lectures to avoid teaching topics that could be considered in violation of the Censorship Policy, he still is not sure if he will be subject to discipline under the Policy. University administration has not provided Professor George with clear directives except in an ad hoc manner, and it is unclear to him how the Policy is being implemented, and what the boundaries are for discussing topics that touch on race, gender, and sexuality. He is not sure if he is permitted to discuss historical figures that were supporting or critical about gay rights, or how he should answer a student's question in class about the historical gay rights movement.

224. Further obscuring his ability to understand and follow the Policy, University administration amended the Censorship Policy without notifying Tarleton faculty or posting it on the Tarleton website. For example, in January 2026, after the University administration reprimanded him and ordered him to change his syllabus, causing him to remove mention of LGBT Americans, Professor George searched for the relevant portion of Policy on Tarleton State University's website and could not find it. Days later, his Department sent an email noting that the Policy had been amended in December 2025 and told faculty that a previous FAQ document was no longer applicable.

225. Professor George wishes to provide the best possible learning environment for his students, but the Censorship Policy has restrained and deeply chilled his speech and his academic freedom. If the administration arbitrarily decides to enforce the Censorship Policy against him

again, then they may cancel his courses, which could lead to loss of pay. Disciplinary action for failure to comply with the Policy could also lead to a negative mark on his upcoming post-tenure review in 2027, or even termination by the University.

226.    Moreover, the Censorship Policy has deeply impacted Professor George's relationship with his students. Over the course of his eight years at Tarleton State University, Professor George has built meaningful relationships with students across the political spectrum. His classroom has always been enriched by diverse viewpoints and open discussions about issues of race, gender, and sexual orientation throughout American history. These differing viewpoints are important for students to engage with and understand, regardless of their political beliefs.

227.    However, the Censorship Policy has pitted students against faculty by encouraging students to report professors for noncompliance with the policy. The University administration has sent campus-wide emails encouraging students to submit anonymous complaints about faculty violations of the Censorship Policy.

228.    Professor George is now chilled in his speech with his students, both in the formal classroom setting and outside the classroom, because he must now worry that a student will ask him to violate the Censorship Policy if they on their own discuss or ask about certain prohibited viewpoints, and then submit a complaint against him if he responds or mentions forbidden viewpoints.

229.    In his core history courses, Professor George no longer teaches LGBTQ+ history at all because of the Censorship Policy, despite the importance of providing students a full view of American history so they can decide for themselves which views to embrace. The Censorship Policy thus threatens the very core of Professor George's academic integrity as a professor and as

a historian, forcing him to leave out viewpoints and concepts that are fundamental to American history, simply because they are disfavored by the Texas A&M Board of Regents.

## CLAIMS

230. Plaintiffs challenge the Censorship Policy both on facial grounds and as-applied to Plaintiffs.

## COUNT I

### VIOLATION OF THE FIRST AMENDMENT, INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT: FREEDOM OF SPEECH (42 U.S.C. § 1983)

231. All prior paragraphs are incorporated here by reference.

232. The First Amendment to the U.S. Constitution provides that the government "shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. When the Government regulates speech, it "bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted). The First Amendment has been applied to the states through the Fourteenth Amendment and is enforceable pursuant to 42 U.S.C. § 1983.

233. The First Amendment "protect[s] the freedom to think as you will and to speak as you think." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (citation and quotation marks omitted). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (citing *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972)). This "Nation is deeply committed to safeguarding academic freedom, which is of transcendent value" and "is therefore a special concern of the First Amendment." *Keyishian*, 385 U.S. at 603.

234.    Accordingly, the U.S. Supreme Court has explicitly recognized that "essentiality of freedom in the community of American universities" plays a "vital role in a democracy." *Sweezy*, 354 U.S. at 250. And while "[v]iewpoint-based restrictions designed to compel or ban a set of beliefs are dangerous in any setting," they are "especially pernicious in the classroom context." *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, No. 22-13992, 2026 WL 1955783, at *5 (11th Cir. 2026). Based on this special concern, the Fifth Circuit has recognized that "classroom discussion is protected activity." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019).

235.    Indeed, numerous federal appellate courts have recently re-affirmed the importance of First Amendment protections in the context of academic classroom instruction. *See, e.g.*, *Pernell*, 2026 WL 1955783, at *18 (holding that Florida's Stop W.O.K.E. Act that prohibits specific concepts in university classroom instruction violates instructors' First Amendment rights); *Reges v. Cauce*, 175 F.4th 1014, 1027 (9th Cir. 2026) ("The public university occupies a central place in the law of the First Amendment."); *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) (holding a professor's classroom speech was protected by the First Amendment).

236.    The Plaintiffs' speech addresses matters of public concern, which, particularly given their academic purpose in exploring social or political issues relevant to the community, weighs heavily against the University's interest. The Board has no interest in banning this speech other than simply disfavoring the prohibited viewpoints. The Censorship Policy thus prohibits the teaching of rigorous scholarship and valuable perspectives at the whim of the ideological preferences of State actors.

237.    Because the Censorship Policy is a "wholesale deterrent to a broad category of expression by a massive number of potential speakers" that "chills potential speech before it happens," Defendants' burden is especially heightened: they must show "that the interests of both

62

potential audiences and a vast group of present and future" faculty "in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation'" of the University. *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 467-68 (1995). Defendants cannot carry that burden.

238. By preventing professors from teaching or "advocating" perspectives of race, gender, and sexual orientation that do not fit within the State's chosen orthodoxy, the Censorship Policy impermissibly engages in viewpoint discrimination. The Supreme Court interprets "the term 'viewpoint' discrimination in a broad sense." *Matal v. Tam*, 582 U.S. 218, 243 (2017) (quoting *Rosenberger*, 515 U.S. at 831) (plurality op.). Just as prohibiting all discussion of atheism or religion at Texas A&M would be viewpoint-discriminatory, so too does the censorship of race, gender identity, and sexual orientation "discriminate against an entire class of viewpoints." *Rosenberger*, 515 U.S. at 831. The "Court's finding of viewpoint bias" effectively "end[s] the matter." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019).

239. The Censorship Policy violates academic freedom on a viewpoint-discriminatory basis by banning "race and gender ideology" and "topics related to sexual orientation and gender identity" from classroom instruction throughout the Texas A&M University System—but only when those topics are taught in ways that State actors disapprove. Any professor who does not comply with the Censorship Policy and instead teaches prohibited viewpoints could face discipline, including potential termination.

240. The Policy is undoubtedly a "regulation" that "targets . . . particular views taken by speakers on a subject." *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (quoting *Rosenberger*, 515 U.S. at 829). It subjects certain opinions on race, gender, and sexual orientation to strict review or outright bans based solely on whether the professors' teachings align with the State's view on, for

example, the relationship of biological sex to gender identity. Likewise, professors have been explicitly instructed that the ban on discussion of topics "related to sexual orientation" affirmatively "will not be applied to heteronormative orientation and identity."

241.    Because the clear purpose of the Censorship Policy is to "excis[e] certain ideas or viewpoints from the public dialogue," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994), and it impermissibly seeks to "tilt public debate in a preferred direction", *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578–79 (2011), and "interfere with an uninhibited marketplace of ideas," *303 Creative*, 600 U.S. at 585, the Censorship Policy censors based on the ideological views of the professors and violates the First Amendment's protection of academic freedom.

242.    As a result, Plaintiffs have had ideas censored in their syllabi and courses canceled due to the Board's perception of the class's ideological viewpoint. The Plaintiffs have, therefore, worked under an entirely justified fear that their classes may be—and have been, in some instances—canceled or heavily censored, that they will be denied tenure without regard for the quality of their scholarship, or that their employment will be terminated if they fail to adopt the State's preferred ideological viewpoints within their own teaching and scholarship.

243.    "The government violates the First Amendment when it [acts] solely to suppress the point of view [the speaker] espouses on an otherwise includible subject." *Cornelius v. NAACP Legal Def. Fund, Inc.*, 473 U.S. 788, 806 (1985). Indeed, that is precisely what the Board of Regents has chosen to do. The Board members are enforcing their preferred viewpoints over the entire university system by prohibiting the dissemination of disfavored ideas—an archetypal violation of the First Amendment.

244.    Unless declared unconstitutional and enjoined from enforcement, the Censorship Policy will continue to unlawfully deprive Plaintiffs of their First Amendment rights, causing *per*

*se* irreparable harm. *See Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

## COUNT II

### VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS
### (42 U.S.C. § 1983)

245. All prior paragraphs are incorporated here by reference.

246. The Due Process Clause of the Fourteenth Amendment "proscribes laws so vague that persons of common intelligence must necessarily guess at their meaning and differ as to their application." *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) (citation modified). The Fourteenth Amendment is enforceable pursuant to 42 U.S.C. § 1983.

247. A "fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *McLelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023).

248. The Censorship Policy is vague on its face and as-applied by Texas A&M University through its syllabus review processes.

249. Plaintiffs do not have notice as to what the Policy requires: (1) there are no clear definitions for key terms like "advocate;" (2) the definitions provided for "race ideology" and "gender ideology" depend entirely on an unknown listener's subjective feelings of "guilt" and "shame" or "value" and "legitimacy"; (3) it is not clear what constitutes "topics related to sexual orientation or gender identity" especially as any discussion of human beings will inevitably touch

65

on those subjects, nor is it clear what it means to "advocate . . . topics"; and (4) "race ideology," "gender ideology," and "topics related to sexual orientation or gender identity" have been subjectively and arbitrarily enforced without regard for the written definitions.

250.   Guidance from Texas A&M University officials has varied in confusing ways, leaving Plaintiffs to guess at what is prohibited and what is allowed under the Censorship Policy. Professor George was instructed to "delete" anything related to "race ideology" or "gender ideology" despite the Policy only prohibiting the "advocacy" of those concepts. Further, the University's College of Arts & Sciences instructed the English Department that the Censorship Policy "will not be applied to heteronormative orientation and identity" despite the Censorship Policy's wholesale prohibition on any discussion of "topics related to sexual orientation." The Censorship Policy's vagueness is leading to arbitrary and discriminatory enforcement, targeting views that Defendants and their agents determine to be disfavored on an ad hoc basis.

251.   Pursuant to its syllabus review, Texas A&M University officials have issued inconsistent mandates canceling classes and prohibiting specific books, topics, and materials. The University has plainly refused to justify or explain its decisions and when it does provide reasoning the logic is inconsistent and arbitrary. Courses which were granted exemptions in previous semesters have been entirely canceled without the chance to request an exclusion based on the same syllabus.

252.   The Censorship Policy is unconstitutionally vague in the way it outlines the prohibitions and restrictions on the Plaintiffs' speech. While it fails to give the Plaintiffs sufficient notice of what is prohibited, it also clearly fails to give notice to the administrators reviewing syllabi what they should be prohibiting. They are left with completely unfettered discretion to implement the Policy to prohibit speech as they see fit. And professors face the draconian threat

66

of discipline, including potential termination, for noncompliance with the Censorship Policy, despite the difficulties of even determining what it demands.

253.    This arbitrary decision-making is a result of the Censorship Policy's vagueness and is an independent constitutional harm. The result is inconsistent and internally incoherent enforcement, resulting in even more self-censorship and chilled speech.

254.    With their academic appointments and livelihoods at stake, Plaintiffs are confused about what is expected of them and what they should expect from the university administration and chilled in their speech as a result.

255.    Unless this Court declares the Censorship Policy unconstitutional and enjoins its enforcement, this vagueness will continue to be weaponized by the University to force self-censorship and chill constitutionally protected speech in violation of the Plaintiffs' Fourteenth Amendment Due Process rights.

## **PRAYER FOR RELIEF**

THEREFORE, based on the foregoing facts and arguments, Plaintiffs respectfully request that this Court:

A. Declare the Censorship Policy unconstitutional on its face and as applied to Plaintiffs because it restricts Plaintiffs' speech in violation of the First Amendment to the United States Constitution;

B. Declare the Censorship Policy unconstitutional on its face and as applied to Plaintiffs because it is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

C. Issue a preliminary and permanent injunction prohibiting Defendants from implementing or enforcing the Censorship Policy or substantially similar policies or practices;

67

D.  Issue a preliminary and permanent injunction re-instating classes canceled or demoted from status as "Core" classes pursuant to the Censorship Policy;

E.  Issue a preliminary and permanent injunction rescinding directives prohibiting inclusion of specific readings or other materials as part of courses pursuant to the Censorship Policy;

F.  Issue a preliminary and permanent injunction rescinding directives prohibiting teaching or discussion of subject matter pursuant to the Censorship Policy;

G.  Award Plaintiffs' legal costs, reasonable attorneys' fees, and other litigation expenses under 42 U.S.C. § 1988; and

H.  Grant any additional relief this Court deems just and proper.

August 3, 2026

Thomas Buser-Clancy
Tex. Bar No. 24078344,
SDTX No. 1671940
tbuser-clancy@aclutx.org
Chloe Kempf
Tex. Bar No. 24127325
SDTX No. 3852674
ckempf@aclutx.org
Sophia Howard
Tex. Bar No. 24152382
SDTX No. 3983052
SHoward@aclutx.org
Brian Klosterboer
Tex. Bar No. 24107833
SDTX No. 3314357
bklosterboer@aclutx.org
ACLU FOUNDATION OF TEXAS
INC.
P.O. Box 8306
Houston, TX 77288
(713) 942-8146

Emerson Sykes*
NY Bar No. 5020078
Ken Sexauer*
NY Bar No. 6231013
esykes@aclu.org
ksexauer@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, Floor 18,
New York, NY 10004
(212) 549-2500

*_Pro Hac Vice_ forthcoming

Respectfully submitted

/s/ _Jamie Alan Aycock_
Jamie Alan Aycock
Attorney-in-Charge
Tex. Bar No. 24050241
SDTX No. 1233210
jamieaycock@yettercoleman.com
Amy C. Farish
Tex. Bar No. 24097818
SDTX No. 3437044
afarish@yettercoleman.com
Ayla Syed
Tex. Bar No. 24136507
SDTX No. 3875654
asyed@yettercoleman.com
Jared LeBrun
Tex. Bar No. 24144647
SDTX No. 3909041
jlebrun@yettercoleman.com
W. Seth Cook
Tex. Bar No. 24138570
SDTX No. 3899868
scook@yettercoleman.com
YETTER COLEMAN LLP
600 TRAVIS STREET, SUITE 5400
HOUSTON, TEXAS 77002
(713) 632-8000