**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, LEONARD BRIGHT, VANITA REDDY, LANDON SADLER, and AARON GEORGE,

Plaintiffs,

v.

ROBERT L. ALBRITTON, JAY GRAHAM, DAVID C. BAGGETT, JOHN W. BELLINGER, JAMES R. BROOKS, MICHAEL A. HERNANDEZ III, WILLIAM MAHOMES JR., KELLEY SULLIVAN GEORGIADES, and SAM TORN, in their official capacities as members of the Texas A&M University System Board of Regents,

Defendants.

CIVIL ACTION NO. 4:26-cv-06268

**PLAINTIFFS' MOTION FOR AND MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ..... 1

STAGE OF THE PROCEEDING AND STATEMENT OF THE ISSUES ..... 2

BACKGROUND ..... 2

I. Texas A&M Abdicates Its Commitment to Academic Freedom and Free Expression ..... 2

II. The Board Revises System Policies 08.01 and 12.01 ..... 3

III. Policy Guidance Has Been Shifting, Conflicting, and Vague ..... 4

IV. Plaintiffs Are Suffering Harm from the Enforcement of the Censorship Policy ..... 8

A. AAUP ..... 8

B. Leonard Bright ..... 9

C. Vanita Reddy ..... 10

D. Landon Sadler ..... 11

E. Aaron George ..... 12

SUMMARY OF ARGUMENT ..... 13

ARGUMENT ..... 14

I. The Court Has Jurisdiction ..... 14

A. AAUP Has Associational Standing ..... 14

B. The Individual Plaintiffs Each Have Standing Against Defendants ..... 15

C. Defendants Are Properly Subject to Suit Under *Ex parte Young* ..... 16

II. The Censorship Policy Violates the First Amendment ..... 18

A. The First Amendment Forbids Viewpoint Discrimination, Especially to Protect Academic Freedom Interests ..... 18

B. The Censorship Policy Impermissibly Constitutes Viewpoint Discrimination and Infringes on Protected Academic Freedom ..... 21

C. The Censorship Policy Is an Unconstitutional Prior Restraint on Speech ..... 24

D. The Censorship Policy Fails Strict Scrutiny ..... 26

E. The Censorship Policy Also Fails Under *Pickering/NTEU* ..... 26

III. The Censorship Policy is Void for Vagueness ........ 28

A. The Censorship Policy Does Not Give Professors Fair Notice of What it Prohibits ........ 28

B. The Censorship Policy Allows Arbitrary and Discriminatory Enforcement ........ 31

IV. The Remaining Preliminary Injunction Factors Favor Plaintiffs ........ 34

A. Irreparable Harm ........ 34

B. Balance of Equities and Public Interest ........ 34

CONCLUSION ........ 34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Trs. of the Univ. of N.C. Wilmington*,
640 F.3d 550 (4th Cir. 2011) .......... 20

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
627 F.3d 547 (5th Cir. 2010) .......... 15

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .......... 16, 25

*Bishop v. Aronov*,
926 F.2d 1066 (11th Cir. 1991) .......... 20

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) .......... 17, 34

*BST Holdings, L.L.C. v. OSHA*,
17 F.4th 604 (5th Cir. 2021) .......... 34

*Buchanan v. Alexander*,
919 F.3d 847 (5th Cir. 2019) .......... 19, 26, 27

*Chiu v. Plano Indep. Sch. Dist.*,
339 F.3d 273 (5th Cir. 2003) .......... 25

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) .......... 25

*Computer & Commc'ns Indus. Ass'n v. Paxton*,
2026 WL 2130729 (5th Cir. July 24, 2026) .......... 15

*Ctr. for Freedom v. Carmouche*,
449 F.3d 655 (5th Cir. 2006) .......... 16

*Davis v. E. Baton Rouge Par. Sch. Bd.*,
78 F.3d 920 (5th Cir. 1996) .......... 24, 25

*Ex parte Young,*
209 U.S. 123 (1908) .......... 16, 17

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) .......... 28

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) .......... 26

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) .......... 33

*Healy v. James*,
408 U.S. 169 (1972) .......... 18, 19

*Heim v. Daniel*,
81 F.4th 212 (2d Cir. 2023) .......... 20

*Honeyfund.com Inc. v. Governor*,
94 F.4th 1272 (11th Cir. 2024) .......... 21

*Iancu v. Brunetti*,
588 U.S. 388 (2019) .......... 24

*In re Dinnan*,
661 F.2d 426 (5th Cir. 1981) .......... 19

*Jackson v. Wright*,
82 F.4th 362 (5th Cir. 2023) .......... 17, 18

*Janus v. AFSCME, Council 31*,
585 U.S. 878 (2018) .......... 27

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967) .......... 19, 27, 28, 33

*Kramer v. Price*,
712 F.2d 174 (5th Cir. 1983) .......... 28

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993) .......... 13

*Lowery v. Mills*,
157 F.4th 729 (5th Cir. 2025) .......... 19

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) .......... 20, 21

*Mi Familia Vota v. Ogg*,
105 F.4th 313 (5th Cir. 2024) .......... 17, 18

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018) .......... 24

*Mock v. Garland*,
75 F.4th 563 (5th Cir. 2023) .................................................................................... 2

*Moore v. City of Kilgore*,
877 F.2d 364 (5th Cir. 1989) .................................................................................... 24

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018)................................................................................................. 26

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)................................................................................................. 18

*NetChoice, L.L.C. v. Fitch*,
134 F.4th 799 (5th Cir. 2025) .................................................................................. 14

*Obergefell v. Hodges*,
576 U.S. 644 (2015)................................................................................................. 30

*Opulent Life Church v. City of Holly Springs*,
697 F.3d 279 (5th Cir. 2012) .................................................................................... 34

*Papachristou v. City of Jacksonville*,
405 U.S. 156 (1972)................................................................................................. 32

*Pernell v. Fla. Bd. of Govs.*,
181 F.4th 1135 (11th Cir. 2026) ............................................................................... 20

*Pres. & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*,
798 F. Supp. 3d 77 (D. Mass. 2025) ........................................................................ 15

*Reges v. Cauce*,
175 F.4th 1014 (9th Cir. 2026) ................................................................................ 20

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)................................................................................................... 34

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)....................................................................................... 23, 25, 26

*Se. Promotions, Ltd. v. Conrad,*
420 U.S. 546 (1975)................................................................................................. 25

*Shamloo v. Miss. State Bd. of Trs. of Insts. of Higher Learning*,
620 F.2d 516 (5th Cir. 1980) .................................................................................... 32

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)................................................................................................. 24

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020) .......... 15

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957) .......... 19

*United States v. Nat'l Treasury Emps. Union*,
513 U.S. 454 (1995) .......... 26, 27

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) .......... 25

*United States v. Williams*,
553 U.S. 285 (2008) .......... 31

*Vidal v. Elster*,
602 U.S. 286 (2024) .......... 18

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .......... 21

*Women's Med. Ctr. of Nw. Hous. v. Bell*,
248 F.3d 411 (5th Cir. 2001) .......... 13, 28, 30

**Statutes**

Tex. Educ. Code § 85.21(a) .......... 17

## INTRODUCTION

Plaintiffs[1] move to preliminarily enjoin the Texas A&M Board of Regents from enforcing revised Texas A&M University System Policy 08.01's prohibition on discussing "race or gender ideology, or topics related to sexual orientation or gender identity" in academic coursework (the "Censorship Policy" or the "Policy").

The Censorship Policy is unconstitutional for at least two reasons. *First*, the Censorship Policy violates the First Amendment because it discriminates on viewpoint and is a prior restraint. The Policy bans discussion about "race or gender ideology, or topics related to sexual orientation or gender identity"—but only when a professor expresses disfavored viewpoints on these topics. A professor who criticizes these concepts teaches freely; a professor who explains their scholarly foundations risks "disciplinary action up to and including termination." The First Amendment forbids the government from choosing which viewpoints may be heard and nowhere is that prohibition more vital than in the university classroom, where the Supreme Court has long recognized the importance of academic freedom.

Yet one department made explicit that the Policy targets only one side, stating it "will not be applied to heteronormative orientation and identity." And, under the Policy, a philosophy professor was forbidden to include Plato's teachings on gender in a course on Contemporary Moral Issues, and a history professor was allowed to teach Phyllis Schlafly's views that equal protection rights should *not* be expanded but could not teach their historical expansion to cover LGBTQ+

[1] Plaintiffs are American Association of University Professors ("AAUP"), on behalf of its Texas A&M University System ("Texas A&M") members, and named members Leonard Bright, Vanita Reddy, Landon Sadler, and Aaron George.

individuals. The Policy also imposes an unconstitutional prior restraint by preemptively censoring speech and subjecting it to a standardless exception policy.[2]

*Second*, the Censorship Policy violates due process because it is unconstitutionally vague. No one—not professors, department heads, or administrators—can say what exactly the Policy prohibits. And administrators have issued at least four rounds of conflicting guidance—defining "advocacy" one month and rescinding the entire guidance the next, then applying the rescinded standards. Predictably, enforcement has been arbitrary, which has caused self-censorship of viewpoints that might be deemed disfavored.

Mandatory course reviews for Spring 2027 courses begin in October 2026, and Plaintiffs respectfully request a preliminary injunction before the next round of unconstitutional censorship.

## STAGE OF THE PROCEEDING AND STATEMENT OF THE ISSUES

The issue presented is whether Defendants should be enjoined from enforcing the Censorship Policy. For a preliminary injunction to be granted, Plaintiffs must show: (1) substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that the injury outweighs any harm to the other party, and (4) that granting the injunction will not disserve the public interest. *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) (citation omitted). Defendants have waived service, and no other motions are pending before this Court.

## BACKGROUND

### I. Texas A&M Abdicates Its Commitment to Academic Freedom and Free Expression

Texas A&M has long deemed the free exchange of ideas necessary to its core mission of pursuing the "common good," through the "uninhibited search for truth and its open expression." *See* Academic Freedom, Responsibility and Tenure, Texas A&M University System Policy 12.01

[2] Plaintiffs use the term "exception" to refer to permission to teach a censored topic in non-core classes; it is also referred to as an exemption by administrators.

§ 1.1 (revised Nov. 13, 2025) (Declaration of W. Seth Cook Ex. A). It also purportedly believes that each faculty member is "entitled to full freedom in the classroom in discussing the subject being taught," *id.* § 1.2, and promises students that no "decision be based on the content or viewpoint of the expressive activity." Cook Decl. Ex. B. However, in recent years, Texas A&M succumbed to a sustained political campaign to exclude politically disfavored views. *E.g.*, *id.* Exs. D, E. In September 2025, a student surreptitiously recorded a class in which a lecturer discussed gender identity. *Id.* Ex. C. Under intense political pressure from State politicians including Governor Greg Abbott, the University fired the lecturer—a move which two faculty panels found violated the University's commitment to academic freedom. Cook Decl. Exs. F-G. The University later removed several department heads and, ultimately, the University President. *Id.*

## II. The Board Revises System Policies 08.01 and 12.01

Amidst this push for ideological purity, on November 13, 2025, the Board of Regents voted unanimously to revise System Policies 08.01 and 12.01, with enforcement to begin in the Spring 2026 semester. Cook Decl. Ex. H. As initially revised, System Policy 08.01 provided:

> No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity, unless the course and the relevant course materials are approved in advance by the member CEO.[3]

The revisions define "Gender Ideology" as "a concept that self-assessed gender identity should replace the biological category of sex or that biological sex has less value or legitimacy than self-assessed gender identity." System Policy 08.01, Definitions (Cook Decl. Ex. H).

"Race Ideology" is defined as:

> a concept that attempts to shame a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy or conspiracy, ascribe to them less value as contributors to society and public discourse because of their race or ethnicity, or assign them intrinsic guilt based on the actions of their presumed ancestors or

[3] System Policy 08.01 § 2.1(b). The "CEO" is the chief executive of the campus, typically its president.

> relatives in other areas of the world. This also includes course content that promotes activism on issues related to race or ethnicity, rather than academic instruction.

*Id.*

The same day the Board revised System Policy 08.01, it also revised System Policy 12.01, the System's academic-freedom and tenure policy, to provide in Section 1.2 that a faculty member "will not . . . teach material that is inconsistent with the approved syllabus for the course." *Id.*

On December 18, 2025, the Board revised System Policy 08.01 again, further limiting when the banned views may be expressed, providing:

> No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity. Upon prior written approval of the member CEO after review of the course and relevant course materials, specific non-core curriculum or graduate courses in some disciplines may teach race or gender ideology, or topics related to sexual orientation or gender identity. Such approval may be granted in limited circumstances upon demonstration of a necessary educational purpose.

*See* Civil Rights Protections and Compliance, Texas A&M University System Policy 08.01 § 2.1(b) (revised Dec. 18, 2025) (Cook Decl. Ex. I).

The Vice Chancellor for Academic Affairs summarized the overall thrust of the Policy on final revision: "no advocacy in any of the classes, no teaching of selected topics in the core, teaching said topics in other courses could be allowed when clear educational purpose justified such (president has to sign off on list of approved courses)." Cook Decl. Ex. J.

## III. Policy Guidance Has Been Shifting, Conflicting, and Vague

Professors must submit their syllabi for review and teach every day under threat of "disciplinary action up to and including termination" for "[n]oncompliance," System Policy 01.01(7), but Defendants have failed to provide any meaningful guidance. In December 2025, Vice Chancellor for Academic Affairs James Hallmark emailed each System CEO an "Implementation of 08.01 and 12.01 Changes FAQs" ("System FAQ 1"), which purported to define "advocacy"—

the initial crux of the Censorship Policy—as occurring when "teaching and course materials extend learning objectives in a way that requires students to hold certain beliefs, and/or to ridicule certain beliefs." Cook Decl. Ex. K. Around the same time, the College Station Provost published "Guidance and FAQs on Syllabus Course Review" ("Provost's First Guidance"), which adopted a different, more expansive definition of advocacy. Declaration of Dr. Leonard Bright ¶7, Ex. D. Both System FAQ 1 and the Provost's First Guidance made assurances that the Policy did not prohibit ***teaching*** the prohibited topics.

Days later, the Board revised the Policy and made clear that the initial guidance did not accurately state the Policy's censorial reach. *See* Cook Decl. Ex. I. In fact, Defendants interpret the Censorship Policy to completely ban ***teaching*** "race or gender ideology, or topics related to sexual orientation or gender identity" in core courses—and only a standardless exception policy exists for non-core and graduate courses. *See* Declaration of Teresa Klein ("Texas AAUP Decl.") ¶¶7-8; Cook Decl. Exs. J, K.

The shifting and contradictory guidance documents exacerbate the Plaintiffs' confusion and the resulting chill of their speech. For instance, prior to the start of the Spring semester, as Texas A&M rolled out the Censorship Policy, the Office of the Provost rescinded the Provost's First Guidance without providing a timely replacement. Bright Decl. ¶¶9, 13, 40. And Spring semester classes had already begun at Tarleton State University before anyone notified faculty that the Censorship Policy now barred any teaching about "race ideology," "gender ideology," or sexual orientation in core courses, regardless of advocacy. Declaration of Aaron George ¶¶20-22.

On January 14, 2026—two days after Spring classes began—Chief of Staff for Academic Affairs Jill Woodall emailed each university CEO new guidance entitled "Implementation of 08.01 and 12.01" ("System FAQ 2"). Cook Decl. Ex. R. System FAQ 2 provided that core curriculum

courses "must not teach or advocate race ideology or gender ideology, sexual orientation or gender identity," without defining "teach." *Id.* It also prohibited all "advocacy," even in non-core and graduate courses where previously permitted with advance approval. *See id.*

After the semester began, in February 2026, the College Station Provost issued "Guidance on Syllabus Course Reviews" ("Provost's Second Guidance"), to replace the rescinded First Guidance. Bright Decl. ¶40, Ex. K. The Provost's Second Guidance attempted to reinforce and synthesize System FAQ 2's conclusions:

> a. No courses advocate for race ideology or gender ideology, or topics related to sexual orientation or gender identity
> b. No core curriculum courses teach race ideology or gender ideology, or topics related to sexual orientation or gender identity
> c. Non-core curriculum or graduate courses that teach race ideology or gender ideology, or topics related to sexual orientation or gender identity have been reviewed and granted an exception by the university president (per System Policy 08.01).

*Id.* (emphases in original).

The Provost's Second Guidance deleted earlier language permitting professors to "cover[] varying definitions and theories regarding gender identity in a course related to gender, or material on same sex relationships in a course on sexuality," confirming that mere *discussion* of prohibited topics was prohibited without pre-approval. *Compare id. with* Bright Decl. ¶7, Ex. D.

Faced with conflicting or missing guidance, colleges and departments imposed their own reading of the Censorship Policy. The English Department made the viewpoint discrimination clear, explaining that the Policy "will not be applied to heteronormative orientation and identity," and therefore bans only "[LGBTQ] sexual orientation or gender identity." Declaration of Vanita Reddy ¶11, Ex. C (brackets in original). When asked if it is ever appropriate to engage a student discussing prohibited topics, professors were also told to treat student speech differently, *id.* ¶22 & Ex. F; Bright Decl. ¶¶44, 47 & Ex. M, and to move on "as quickly as possible" if discussion is

unavoidable. Declaration of George McConnell ¶8. And, at Tarleton State University, syllabi were screened by an AI-powered platform that flagged "DEI words"—"diverse," "bias," "gender," "climate," and "ethnicity"—for "extra scrutiny"—even though Tarleton State admitted this review should not cover coursework. George Decl. ¶7. Defendants also encourage students to monitor and report professors through EthicsPoint, an online portal where students and public alike can anonymously report course content they consider "inaccurate," "misleading," or "inappropriate," Cook Decl. Ex. L; *see also* George Decl. ¶32, Ex. K, intensifying the Censorship Policy's chill.

At College Station, the result of the first round of syllabus review was that "hundreds of syllabi across 17 colleges and schools" had to be modified to bring them into compliance. Cook Decl. Ex. M. Even after professors self-censored, 54 courses were sent for final review, resulting in 48 exceptions—often based on unexplained conditions—and at least six courses were canceled outright: Religions of the World; Ethics in Public Policy; Introduction to Race and Ethnicity; Diversity in Sport Organizations; Cultural Leadership and Exploration for Society; and Diversity, Equity and Inclusion in Youth Development Organizations. Reddy Decl. ¶9, Ex. B; *see also* Bright Decl. ¶52; Cook Decl. Exs. M-N. Other courses were removed from the core curriculum, risking dramatically reduced attendance. Bright Decl. ¶52; Texas AAUP Decl. ¶9. Further, the College Station campus announced that it was winding down the entire Women's and Gender Studies program because it could not be reconciled with the Censorship Policy. Reddy Decl. ¶9, Ex. B.

The censorship has continued into Fall 2026, with LGBTQ Literatures, History of Sexuality in America, and Sociology of Gender among the courses canceled or removed from course catalogs. *Id.* ¶¶12-15; George Decl. ¶25; Declaration of Landon Sadler ¶¶18-21; Declaration of Pamela Neumann ¶¶6, 21. As early as October 2026, departments will begin the review process for Spring 2027. Sadler Decl. ¶30 & Ex. G.

## IV. Plaintiffs Are Suffering Harm from the Enforcement of the Censorship Policy

### A. AAUP

AAUP is a nonprofit membership organization and labor union of faculty and other academic professionals and brings claims on behalf of its hundreds of members in the Texas A&M University System. Declaration of Todd Wolfson ("Nat'l AAUP Decl.") ¶¶3-5; Texas AAUP Decl. ¶3. AAUP members beyond the named plaintiffs have been censored under the Censorship Policy:

- A member philosophy professor was banned from teaching Plato's *Symposium* in a course on Contemporary Moral Issues. Declaration of Martin Peterson ¶¶4, 11-12 ("Peterson Decl.") & Ex. C. The section of Plato's *Symposium* focused on the "Myth of Androgyne," which explores a theory that humans were once all sexes and genders until they were split by Zeus. The professor removed the material from the course in order to comply with the Censorship Policy, *id.* ¶13, Ex. E, but ultimately resigned as a result of the Censorship Policy. *Id.* ¶27.

- A member professor was forced to teach an older version of an article in her Sociology of Gender course instead of the more up-to-date version, presumably because the updated article contained a disfavored, more fluid viewpoint on gender. Declaration of Chaitanya Lakkimsetti ¶¶6-10.

- Another member professor's Sociology of Gender course was canceled at Texas A&M International University over a textbook cover image and its foreword: she was told the textbook's content complied with the Censorship Policy but not its cover, which portrayed an individual's face where half was masculine-presenting and the other half feminine with makeup, even though the textbook was allowed at College Station. Neumann Decl. ¶¶2, 4, 12-21 & Exs. D, E, F, G.

Members do not know what the line between advocating and teaching is, what is considered "race or gender ideology" or a "topic related to sexual orientation or gender identity," or how the exception process operates. Texas AAUP Decl. ¶¶7-8. Facing this uncertainty, they are self-censoring to avoid class cancellation or discipline. Reddy Decl. ¶21; George Decl. ¶¶23-24, 28-29, 31, 33-35; Peterson Decl. ¶26. One member removed a foundational book from his Spring 2026 course because it explored topics he feared might run afoul of the Policy, including queer theory, feminist theory, and critical race theory. McConnell Decl. ¶¶2-3, 6-12. Although he did not believe he was "advocating," he worried otherwise his class would be canceled. *Id.* ¶12.

### B. Leonard Bright

Dr. Leonard Bright is a tenured full professor at Texas A&M's Bush School of Government and Public Service and President of AAUP's College Station chapter. Bright Decl. ¶¶1-4.

On January 9, 2026, his Department Head Dr. Taylor told Dr. Bright that a course he taught for seven years, Ethics in Public Policy (PSAA 642), needed an exception due to the "breadth of the university's working definition of advocacy"—which had been rescinded. *Id.* ¶¶11-13. When Dr. Bright asked for clarification on which parts of his syllabus violated the Censorship Policy, Dr. Taylor pointed to "some of the readings" from week 5 and noted that, regardless of whether a professor was actually "advoca[ting]," there was a "risk that students could interpret a faculty member's comments or reading assignments as leading or encouraging them to hold specific positions on political policies and actions, even if the faculty member has clearly and explicitly indicated that students are not required to hold such positions." *Id.* ¶14.

Expressing concern that interpreting "advocacy" from a subjective student point of view would leave professors vulnerable to an arbitrary standard, Dr. Bright explicitly disavowed any advocacy and noted that his course would "not require students to hold, affirm, or renounce any belief, nor [would] it penalize students for their views." *Id.* ¶15. Since he believed his course was not in violation of the Censorship Policy, Dr. Bright did not seek an exception. *Id.* The day after the first class, Bush School Dean John Sherman told Dr. Bright that his week 5 readings did not require an exception, but that one would be required for a different reason: listing "sexual orientation" among the social identities the course examines. *Id.* ¶¶16-20 & Exs. G, H. Per the Vice Provost, sexual orientation had to be excluded altogether, or Dr. Bright would need to list every instance in which the topic could arise—in discussion or in readings. *Id.*

Dr. Bright explained that he could not identify when certain topics would be covered because concepts like race, gender, and sexuality would be addressed throughout the course: they

may arise organically in readings, current-event analyses, book reviews, written assignments, and classroom discussion. *Id.* ¶¶21-23. To confine such viewpoints to a single day would fundamentally undermine the pedagogy of his seminar-style graduate class. *Id.* ¶¶21-23, 28-34. On January 14, 2026, after the class began, the course was publicly canceled because Dr. Bright could not identify every instance when "sexual orientation" would be discussed. *Id.* ¶¶24-27.

It remains unclear to Dr. Bright whether "advocacy" of the restricted topics is always prohibited, or if exceptions are available, and whether "teaching" of the prohibited topics is unrestricted at the graduate level or requires an exception. *Id.* ¶¶36-41, 46-48. For example, Dr. Bright was granted an exception for a class in the Spring of 2026, Foundations of Public Service (PSAA 601), where his syllabus stated that the class would discuss issues related to race, gender, and sexuality but that such discussions would be instructional and not advocacy. *Id.* ¶¶42-43. Dr. Bright does not understand why this exception was granted, but his Ethics in Public Policy (PSAA 642) class was canceled. *Id.* On March 16, 2026, Dr. Bright was told "an instructor cannot include blanket statements in a syllabus indicating that race ideology or gender ideology, or topics related to sexual orientation or gender identity might come up at any point in a course. Information on specific readings, lectures, etc., related to these topics must be submitted for an exception request." *Id.* ¶¶44-46 & Ex. M.

### C. Vanita Reddy

Professor Vanita Reddy is a tenured Associate Professor in English and a core Women's and Gender Studies faculty member at the College Station campus, and an AAUP member. Reddy Decl. ¶¶2-3. Prof. Reddy's LGBTQ Literatures course was canceled after the exception request for another section of the same class was denied, despite the fact that she was never able to submit her own syllabus for review. *Id.* ¶¶7-8, 10, 12-15. Prof. Reddy's confusion was deepened when

Associate Dean Cynthia Werner advised that it was okay to teach novels containing LGBTQ+ characters, so long as they were not used to teach sexual orientation. *Id*. ¶¶22-23 & Ex. F.

After LGBTQ Literatures was canceled, Prof. Reddy was assigned to teach American Ethnic Literature (ENGL 338), which explores race in the writings of, among others, Black Americans, American Indians, Jewish Americans, and Latino/as. *Id.* ¶17. Prof. Reddy is unsure which of her anticipated teachings will lead to complaints or other discipline under the Censorship Policy because the definition of "race ideology" relies on subjective, feelings-based concepts such as "guilt" and "shame." *Id.* ¶¶18, 20. She fears that merely teaching certain materials could violate, or be accused of violating, the Censorship Policy as she cannot control the impact certain readings will have on the feelings of her students. *Id.* ¶¶18-20.

Prof. Reddy must therefore self-censor or risk discipline. *Id.* ¶21. Indeed, she removed a play exploring Mexican American identity that includes a lesbian love story because she was unsure if it would violate the Policy because it involves LGBTQ+ identities and racial issues. *Id.*

**D. Landon Sadler**

Professor Landon Sadler is a full-time Lecturer in English, Associate faculty of Women's and Gender Studies, and a member of AAUP. Sadler Decl. ¶¶2-4. During the review of his "Writing About Literature" course, Prof. Sadler was concerned about the Censorship Policy's applicability and asked whether the film *Moonlight* and the poem "Trans/Generation" ran afoul of the Policy, though he did not believe teaching them constituted advocacy. Sadler Decl. ¶¶9-17. His department head confirmed that both violated the Censorship Policy. *Id.* ¶13, Ex. C. Prof. Sadler was nonetheless permitted to teach *Barbie*—a film centered on cisgender identity and heterosexual orientation—while *Moonlight* and "Trans/Generation" were banned for their LGBTQ+ themes. *Id.* ¶23. Further, he was permitted to teach *Lady Bird*—a woman's coming of age story including a heterosexual sex scene—without objection. *Id.* ¶25.

Prof. Sadler's section of LGBTQ Literatures was postponed in November 2025 on the understanding that he could teach the course in Fall 2026. *Id.* ¶¶19-20. However, when he submitted the exception request for the fall, the justification was deemed insufficient and the course was canceled. *Id.* ¶¶18-21. Prof. Sadler was never told what would justify an exception. *Id.* ¶22. He does not understand what the Policy permits or prohibits and does not know how to conform his conduct to comply in the future. *Id.* ¶¶23-26.

**E. Aaron George**

Professor Aaron George is a tenured Assistant Professor of History at Tarleton State University and an AAUP member. George Decl. ¶¶1-2. On December 8, 2025, faculty were required to upload syllabi to an AI-powered compliance platform called Simple Syllabus and told that words such as "diverse," "bias," "gender," "climate," and "ethnicity" would be receiving "extra scrutiny." *Id.* ¶7. On review, the administration demanded that he cut two readings from HIST 4311 (Research in American Political History, 1929 to the Present)—the primary source *A Gay Manifesto* and Kevin Kruse's *White Flight*—or lose the course. *Id*. ¶¶10-12, Ex. G.

On the first day of the spring semester, Prof. George learned about a student complaint regarding his U.S. History from Reconstruction to the Present course, which had been approved. *Id.* ¶14, Ex. H. The Dean told Prof. George to fix his syllabus or his class would be canceled, but the dean did not tell him what the issue was. His department chair guessed that the complaint concerned the inclusion of LGBTQ+ Americans in the Fourteenth Amendment section. *Id.* ¶¶15-16. Prof. George removed mention of LGBTQ+ communities, sent his syllabus back to the Dean, and it was then approved. *Id.* ¶¶17-19, Ex. H. In that same course, however, he was allowed to assign Phyllis Schlafly's "What's Wrong with Equal Rights for Women?" which argued *against* the expansion of constitutional rights to additional groups. *Id*. ¶17.

The Censorship Policy has also prevented Prof. George from teaching two Fall 2026 courses: he was told by his department head that he could not teach HIST 4343 (Contemporary History of the United States), and he and his department head removed his History of Sexuality in America course from the course catalog to avoid disciplinary action. George Decl. ¶¶25-26. He has also begun removing works from other classes for the same reasons. The lack of guidance means that Prof. George does not understand the reach of the Policy—chilling his speech both in and out of the classroom. This concern is heightened by the prospect of students asking about prohibited viewpoints and submitting complaints if he responds. *Id*. ¶¶31-35.

## SUMMARY OF ARGUMENT

Plaintiffs have standing to bring these claims because their classroom speech has been restricted, and Defendants are proper because they enacted and enforce the Policy. Plaintiffs are likely to succeed on the merits because the Censorship Policy is unconstitutional for two reasons.

*First*, the Policy violates the First Amendment because it is plain viewpoint discrimination. It censors certain views on race, gender, and sexual orientation, and violates vital academic freedom protections. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (the "First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others"). The Policy is also an impermissible prior restraint because it preemptively bans speech and subjects it to an arbitrary review process.

*Second*, the Policy is impermissibly vague because "persons of common intelligence must necessarily guess at [its] meaning and differ as to [its] application." *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001). Each plaintiff has been forced to guess at the Policy's meaning or self-censor to avoid adverse employment consequences or further censorship.

This Court should enjoin the enforcement of the Censorship Policy because Plaintiffs have shown a likelihood of success on the merits, constitutional harms are irreparable, and vindicating the First Amendment against unconstitutional speech restrictions is always in the public interest.

## ARGUMENT

### I. The Court Has Jurisdiction

#### A. AAUP Has Associational Standing

AAUP is a union and a traditional membership organization, with hundreds of members spread across every campus in the Texas A&M University System. Nat'l AAUP Decl. ¶¶3-5. AAUP meets the three requirements of associational standing: "(1) its individual members would have standing to bring the suit; (2) [it] seeks to vindicate interests germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804 (5th Cir. 2025).

First, its Texas A&M University System members have standing to sue in their own right. Named Plaintiffs Bright, Reddy, Sadler, and George are all AAUP members and have standing. *See infra* Argument Section I.B. Further, the Policy's ban on politically disfavored speech and the imposition of a standardless exception process injure all AAUP's A&M System members. As a result, AAUP members have been censored and had their speech chilled for fear of running afoul of a vague, discriminatory policy. *Id.*; McConnell Decl. ¶¶9-12; Peterson Decl. ¶¶12, 19-26; Neumann Decl. ¶¶12-21; Lakkimsetti Decl. ¶¶6-16; Texas AAUP Decl. ¶¶6-10.

Second, the claims are directly germane to AAUP's organizational purposes. "Advancing and protecting academic freedom stands at the core of the AAUP's mission." Nat'l AAUP Decl. ¶9. Its mission also includes "protect[ing] . . . shared governance," "defin[ing] fundamental professional values and standards for higher education," and "ensur[ing] higher education's contribution to the common good." *Id.* ¶8. Protecting "well-established First Amendment rights in

higher education" through suit "furthers [AAUP's] purposes." *See Pres. & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 113 (D. Mass. 2025).

Third, resolution of this case does not require individual members' participation, and AAUP's representation of its members is a "matter[] of administrative convenience and efficiency." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550-51 (5th Cir. 2010). Here, Defendants' Policy "applie[s] equally against a large number of association members," and "[p]roving the illegality of the [Policy] . . . require[s] some evidence from members, but once proved as to some, the violations would be proved as to all." *Id.* at 552. Further, AAUP requests only injunctive and declaratory relief, which counsels in favor of finding the third prong satisfied. *Id.* at 551, 553 ("'[i]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members") (citation omitted).

### B. The Individual Plaintiffs Each Have Standing Against Defendants

The individual Plaintiffs all have standing to enjoin Defendants because they have each (1) suffered an injury in fact, (2) that is fairly traceable to the challenged action of the Defendants, and (3) that will likely be redressed by a favorable decision. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020), *as revised* (Oct. 30, 2020).

First, Professors Bright, Reddy, Sadler, and George have each suffered ongoing injuries to their free speech and due process rights. They have all had classes canceled or removed from the course offerings based on the Policy. Reddy Decl. ¶¶13-14; Bright Decl. ¶24; Sadler Decl. ¶21; George Decl. ¶¶25-26. And Professors George and Sadler were forced to remove readings, discussions, and other materials with gender, sexual orientation, and race-related content. George Decl. ¶¶10-19; Sadler Decl. ¶¶12-17. This direct censorship constitutes injury in fact. *See Computer & Commc'ns Indus. Ass'n v. Paxton*, 2026 WL 2130729, at *7 (5th Cir. July 24, 2026) (noting concrete injury-in-fact exists for direct censorship, such as "an already harmful, targeted

campaign of government threats made to book distributors, which had then ceased circulating certain [books]") (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 60-64 & n.6 (1963)).

Moreover, Plaintiffs have been harmed by the Policy's unconstitutional vagueness. Plaintiffs have self-censored and remain unsure how to conform their teaching to comply with the Policy. Texas AAUP Decl. ¶¶6-10; Reddy Decl. ¶¶18-23; Bright Decl. ¶¶36-50; Sadler Decl. ¶¶24-30; George Decl. ¶¶24, 28-29, 31, 34-35. "[A] chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury to support standing." *Ctr. for Indiv. Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006).

Second, these injuries are all directly traceable to Defendants. The Board of Regents unanimously adopted and amended the Policy and directly enforces it—including through promulgating guidance. Cook Decl. Exs. K, O, R. It also "expanded" and promoted a System-wide reporting mechanism to allow students, or any member of the public, to report alleged violations of the Policy. Cook Decl. Ex. L; *see also* George Decl. ¶32, Ex. K. Finally, it controls the other officials who enforce the Policy. *See* System Policy 02.01, § 1.3(a) ("The board . . . establishes, for each member under its control and management, goals consistent with the role and mission of the member . . ."); *see also* System Policy 02.01, § 1.3(c) ("The board . . . appoints and annually evaluates each member chief executive officer (CEO)."); System Policy 01.03, § 1 ("The board appoints all of the officers, faculty members and other employees of the system.").

Third, the individual Plaintiffs' claims will be redressed through the requested relief because enjoining Defendants from further implementing or enforcing the Policy, and rescinding their previous enforcement of the Policy, will alleviate Plaintiffs' injuries.

### C. Defendants Are Properly Subject to Suit Under *Ex parte Young*

Defendant members of the Board of Regents are not shielded by sovereign immunity because Plaintiffs' claims satisfy the *Ex parte Young* exception. 209 U.S. 123, 159-60 (1908).

Plaintiffs are seeking prospective injunctive relief against Defendants in their official capacities as "individual state officials acting in violation of federal law." *Book People, Inc. v. Wong*, 91 F.4th 318, 334 (5th Cir. 2024) (citation omitted).

In addition to the primary *Ex parte Young* requirements, the Fifth Circuit also requires that defendants have more than "some connection with the enforcement of the" challenged policy, *id.* (citation omitted), an inquiry for which the Fifth Circuit has provided certain "guideposts": (1) a mere "scintilla" of enforcement power; and (2) more than a "general duty" to implement the "laws of the state." *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023) (Oldham, J.) (citations omitted).

As to Guidepost 1, *Jackson* is instructive. There, the Fifth Circuit held that the "some connection" test was satisfied in a suit against the University of North Texas' Board of Regents regarding university officials' decision to remove a professor from an academic journal, allegedly in violation of the First Amendment. *Id.* at 368. *Jackson* concluded that the UNT Board defendants "satisfie[d] the 'scintilla of enforcement' standard" because of "their governing authority over UNT," as evidenced by the UNT Regents' policies. *Id.* at 367. Likewise, Defendants here have ultimate governing authority over the entire A&M University System. They are empowered by statute to "make bylaws, rules, and regulations it deems necessary and proper for the government of the university system and its institutions, agencies, and services" and "shall regulate the course of study and prescribe the course of discipline necessary to enforce the faithful discharge of the duties of the officers, faculty, and students." Tex. Educ. Code § 85.21(a).

Defendants are significantly more involved with enforcement than the Board in *Jackson*. Here, they passed the policy, issued guidance, controlled implementation, maintained authority over campus presidencies, and encouraged reports of violations. *See Mi Familia Vota v. Ogg*, 105

F.4th 313, 329 (5th Cir. 2024) (noting "'significant[] overlap'" between "traceability and redressability components of standing" and *Ex parte Young*).

Guidepost 2 is also satisfied because the Board has more than a general duty to implement laws. In *Jackson,* the court determined that the Board defendants had "more than 'the general duty to see that the laws of the state are implemented'" because they had "direct governing authority over the UNT officials that [were] allegedly continuing to violate [plaintiff's] First Amendment rights, including authority to countermand the decisions of the subordinate UNT officials." *Id.* So too here. Defendants retain and exercise authority over the offices and systems that interpret and implement their policies, see System Policy 02.01, § 1.3(a); System Policy 02.01, § 1.3(c); System Policy 01.03, § 1, and thus have "direct governing authority over" them, *Jackson*, 82 F.4th at 368. Specifically, the presidents of the System's universities serve at the Board's pleasure, report to it through the chancellor, and administer the curricular-review process at the Board's direction. *See* Cook Decl. Exs. P-Q; Cook Decl. Ex. I § 2.1(b). Thus, Defendants are properly named.

## II. The Censorship Policy Violates the First Amendment

### A. The First Amendment Forbids Viewpoint Discrimination, Especially to Protect Academic Freedom Interests

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). A "viewpoint-based regulation targets not merely a subject matter, but particular ***views*** taken by speakers on a subject." *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (emphasis added) (quotation marks omitted). "[T]he precedents of this Court leave no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary . . . ." *Healy v. James*, 408 U.S. 169, 180 (1972). Indeed, "[t]he college classroom with its surrounding environs is particularly the

'marketplace of ideas,' and we break no new constitutional ground in reaffirming the Nation's dedication to safeguarding academic freedom." *Id.* at 180-81.

The Supreme Court has recognized that:

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.

*Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). The Court decided *Sweezy* at a time when our country was deeply divided and political officials attempted to dictate what viewpoints professors could propound in the classroom. Faced with the threat of mandatory ideological uniformity and loyalty oaths for university professors, the Court was unequivocal: "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.* Soon thereafter, the Court reaffirmed that "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

The Fifth Circuit has taken note. "Time after time the Supreme Court has upheld academic freedom in the face of government pressure." *In re Dinnan*, 661 F.2d 426, 430 (5th Cir. 1981). In *Buchanan v. Alexander*, the Fifth Circuit observed that "[t]he Supreme Court has established that academic freedom is 'a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.'" 919 F.3d 847, 852 (5th Cir. 2019) (citing *Keyishian*, 385 U.S. at 603). In line with the established principle that "classroom discussion is protected activity," *id.* at 852, the Fifth Circuit warned that were a university to "invoke[] a speech code to enforce ideological conformity, a [First Amendment] § 1983 action would be appropriate." *Lowery v. Mills*, 157 F.4th 729, 747 (5th Cir. 2025), *cert. denied*, No. 25-927, 2026 WL 1855135 (U.S.

June 29, 2026).[4] Five other circuits have agreed. *See Reges v. Cauce*, 175 F.4th 1014 (9th Cir. 2026)*; Heim v. Daniel*, 81 F.4th 212 (2d Cir. 2023); *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021); *Adams v. Trs. of the Univ. of N.C. Wilmington*, 640 F.3d 550 (4th Cir. 2011); *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991).

Amidst the many examples, the Eleventh Circuit's recent opinion in *Pernell v. Fla. Bd. of Govs.*, 181 F.4th 1135 (11th Cir. 2026), is especially instructive. Florida barred public university instruction that "espouses, promotes, advances, inculcates, or compels" various propositions about race and sex similar to those at issue in this case; promoting the listed concepts was prohibited, but "criticizing them was not." *Id.* at 1145. The Eleventh Circuit affirmed the injunction, weighing the classroom context, the State's position as a public employer, and the "strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Id.* at 1159-62. It rejected the State's view that "mere exposure to what the State views as the wrong viewpoint is itself a serious harm," because that is viewpoint discrimination. *Id*. The First Amendment will not abide political actors "barring all professors from sharing politically disfavored ideas," *id.* at 1162, because such "[v]iewpoint-based restrictions designed to compel or ban a set of beliefs are dangerous in any setting, and they are especially pernicious in the classroom context." *Id.* at 1149.

The courts have protected very different kinds of speech by professors under the First Amendment. In *Meriwether v. Hartop*, the Sixth Circuit, reversed the dismissal of a religiously conservative university professor's First Amendment academic freedom claim based on his right to choose how to address students in his classroom. 992 F.3d at 499. The university reprimanded the professor for violating a policy requiring professors to use students' preferred pronouns even

[4] *Dinnan, Buchanan,* and *Lowery* each involved individual professors disciplined after the fact; to Plaintiffs' knowledge the Fifth Circuit has never confronted as broad and preemptive an attack on First Amendment academic freedom as this case presents.

though he had made efforts to find a mutually agreeable and respectful way to address students. *Id.* The court explained that:

> Traditionally, American universities have been beacons of intellectual diversity and academic freedom. They have prided themselves on being forums where controversial ideas are discussed and debated. And they have tried not to stifle debate by picking sides. But [the University] chose a different route: It punished a professor for his speech on a hotly contested issue. And it did so despite the constitutional protections afforded by the First Amendment.

*Id.* at 498. The court went on to warn:

> If professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity. A university president could require a pacifist to declare that war is just, a civil rights icon to condemn the Freedom Riders, a believer to deny the existence of God, or a Soviet émigré to address his students as 'comrades.' That cannot be. 'If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe' orthodoxy.

*Id.* at 506 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

*Meriwether* is particularly instructive because it rests on judicial restraint rather than any novel speech rights. As Judge Thapar explained, the Supreme Court "has not overruled its academic-freedom cases," and "[i]t is not our prerogative to set this binding precedent aside." *Id.* at 506 (citation omitted). In combination, *Pernell* and *Meriwether* teach that, regardless of which side of a political debate university officials and politicians land on, the "greatest First Amendment sin," *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024), is to impose that view on the entire campus by banning opposing viewpoints.

### B. The Censorship Policy Impermissibly Constitutes Viewpoint Discrimination and Infringes on Protected Academic Freedom

The Policy on its face bans only one side of the debate. Its two defined terms are entirely viewpoint-based: "Race Ideology" reaches concepts that "shame" a race or "assign" it "intrinsic guilt," and "Gender Ideology" the concept that "self-assessed gender identity should replace the biological category of sex." System Policy 08.01, Definitions. So, a professor may teach that

systemic racism is a sham, but not that racial hierarchy persists and shapes American life. She may teach that sex and gender are the same, but not that gender identity is a distinct concept from biological sex. The Policy prohibits one ideology and leaves its opponent undisturbed.

Enforcement confirms the point. Prof. George had to cut *A Gay Manifesto* and *White Flight* as viewpoints on the topics of LGBTQ+ history and desegregation. George Decl. ¶¶10-12. And he was allowed to assign Phyllis Schlafly's viewpoint on the expansion of equal protection in "What's Wrong with Equal Rights for Women?" but could not discuss other viewpoints on the expansion of constitutional rights to LGBTQ+ Americans. *Id.* ¶¶14-19. Prof. Sadler had to remove *Moonlight* and "Trans/Generation" from Writing About Literature (ENGL 203), while *Barbie* and *Lady Bird* drew no objection. Sadler Decl. ¶¶13-14, 23, 25-26. Dr. Bright's Ethics in Public Policy (PSAA 642) was canceled in part because it addressed how sexual orientation has shaped public policy, yet there was no issue with discussion about how other identities and personal characteristics play a role. Bright Decl. ¶¶24, 27. And Prof. Reddy's LGBTQ Literatures (ENGL/WGST 333) was canceled after her department announced that the Censorship Policy "will **not** be applied to heteronormative orientation and identity." Reddy Decl. ¶¶11, 13-14 & Ex. C. As one department head put it: "**<u>central admin</u>** interprets gender identity as having to do with nonbinary/trans identity, and for the prohibition on teaching about sexual orientation, they interpret that to be material that is about people who are not heterosexual. Again, this is not me, it is BoR/central admin." Lakkimsetti Decl. ¶7, Ex. C (emphasis in original).[5] The record reflects no course censored for advancing the opposing viewpoints.

[5] *See also* Lakkimsetti Decl. ¶¶8, 14 (could teach only version of article with less fluid viewpoint on gender and scholarship on cisgender siblings); McConnell Decl. ¶¶14-16 (exception required for LGBTQ+ themes but not heterosexual sex scenes); Reddy Decl. ¶16 (LGBTQ Literatures canceled but not Women Writers (ENGL 374) or Studies in Women Writers (ENGL 474)).

Further, even if the Censorship Policy were more evenhanded and banned all discussions of race, sexual orientation, or gender—which it does not—it would still constitute impermissible viewpoint discrimination because it excludes entire classes of viewpoints. On this point, *Rosenberger* is instructive. There, a university denied funding to a student newspaper under guidelines barring support for activities that "primarily promoted or manifested a particular belief in or about a deity or an ultimate reality." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 825 (1995). The Court held the guidelines unconstitutional because they "cast disapproval on particular viewpoints" and "risk[ed] the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Id.* at 836. This was impermissible viewpoint discrimination even though the policy excluded a multitude of viewpoints on religion because "[i]t is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint." *Id.* at 831. And, of particular relevance here, the Court noted that "[i]f the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." *Id.*

Universities generally have the authority to decide who to hire and which courses to offer, within constitutional bounds. The academy is obligated to uphold pedagogical standards, and it is therefore entirely appropriate for deans and administrators to address instances of ineffective instruction and outdated or unsupported scholarship. This is the everyday work of academia. But this is not what the Board has done. Put simply, the Board has preemptively and categorically banned discussing particular disfavored viewpoints and ideologies about race, gender, and sexual orientation for the sake of suppressing those ideas. This betrays the university's core mission to

explore and explain ideas—good, bad, and otherwise. Open discussion and high-quality instruction are the hallmarks of the American university, not censorship and forced ideological conformity.

Defendants are entitled to their views on race, gender, and sexual orientation. But they may not eradicate opposing views from university classrooms. The Censorship Policy's viewpoint discrimination "end[s] the matter"—no more is needed to show that the Policy is unconstitutional and should be enjoined. *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019). "[R]estrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). "[I]t is all but dispositive to conclude that a law is . . . viewpoint discriminatory." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

The Censorship Policy is facially unconstitutional in all its applications because it bans disfavored viewpoints for the sake of suppressing them. The Censorship Policy is therefore also unconstitutional as it has been applied to Plaintiffs. When a law discriminates against viewpoints, the Supreme Court does "not pause to consider whether [it] might admit some permissible applications." *Iancu*, 588 U.S. at 398-99. The Supreme Court has "never applied" the usual weighing of a law's unconstitutional applications against its legitimate ones "to a viewpoint-discriminatory law;" rather, the "finding of viewpoint bias ended the matter." *Id.*

### C. The Censorship Policy Is an Unconstitutional Prior Restraint on Speech

Unlike the typical academic freedom case, which arises after the speech has occurred, the Censorship Policy stops the speech before it happens, which makes it a prior restraint—an *independently fatal* defect. A prior restraint "prohibits the utterance or publication of particular information or commentary." *Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 928 (5th Cir. 1996) (citation omitted). "The great evil of a prior restraint is that it prevents the public from receiving the information possessed by the gagged speaker, and so from judging the information's worth and the speaker's case." *Moore v. City of Kilgore*, 877 F.2d 364, 392 (5th Cir. 1989).

The Censorship Policy does exactly that. As the Vice Chancellor for Academic Affairs explained: "no advocacy in any of the classes, no teaching of selected topics in the core." And with respect to teaching race, gender, and sexual orientation outside of the core—the "president has to sign off" and there must be a "clear educational purpose." Cook Decl. Ex. J.

Prior restraints bear "a heavy presumption against [their] constitutional validity." *Bantam Books, Inc.*, 372 U.S. at 70. That presumption is "heavier—and the degree of protection broader—than that against limits on expression imposed by [after-the-fact] penalties." *Se. Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558-59 (1975). Defendants bear the burden of showing the restrained speech poses a "clear and present danger, or a serious or imminent threat to a protected competing interest," *Davis*, 78 F.3d at 928, and that the Censorship Policy was "accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Se. Promotions, Ltd.,* 420 U.S. at 559. Defendants can show neither.

In fact, the Policy's exception process makes matters worse. "[P]lacing unbridled discretion in the hands of a government official or agency constitutes a prior restraint." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988); *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003). The Censorship Policy supplies no standards and no timeline for when exceptions may be granted. Professors are not told and do not understand how exceptions are determined. Texas AAUP Decl. ¶¶7-8; McConnell Decl. ¶¶13-16; Bright Decl. ¶¶42-46, 52; Reddy Decl. ¶14; Sadler Decl. ¶21. Some classes receive exceptions, others are canceled; some exceptions are granted in totality, others require course modification or just disavowal of advocacy. Texas AAUP Decl. ¶¶7-8; Bright Decl. ¶¶43-44, 52; Reddy Decl. ¶16. At least one course was canceled without the chance to seek an exception. *See, e.g.*, Reddy Decl. ¶¶13-14. That is quintessential "unbridled discretion," confirming the Policy is an unconstitutional prior restraint.

**D. The Censorship Policy Fails Strict Scrutiny**

"Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828. The Censorship Policy's viewpoint discrimination therefore ends the matter, and the Court can end its analysis there. If the Court does apply strict scrutiny, "the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000). Strict scrutiny is "unforgiving" and is "fatal in fact absent truly extraordinary circumstances." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 484-85 (2025) (quotation marks omitted). "That standard requires that a law be the least restrictive means of achieving a compelling state interest." *Id.* at 478.

Defendants cannot meet their burden. Keeping disfavored ideas from adult students is not a legitimate interest, much less a compelling one. *See Rosenberger*, 515 U.S. at 829 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."). Any other justification is undone by the Censorship Policy's underinclusiveness—leaving untouched the opposing viewpoints on the same topics—which "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 774 (2018).

**E. The Censorship Policy Also Fails Under *Pickering/NTEU***

Prior Fifth Circuit cases have analyzed post-hoc challenges to suppression of individual public university professors' classroom speech under the *Pickering* balancing test, which applies generally to public employee speech claims because "public university professors are public employees" and "classroom discussion is protected activity." *Buchanan*, 919 F.3d at 852-53. But *Pickering* is an awkward fit because public universities are unlike other government entities—their mission is to spread knowledge and pursue truth, not to carry out any particular government's

official policy or messaging. But, if it has any application here, that test must be modified according to *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 467 (1995) ("*NTEU*"). "[T]he *Pickering* framework was developed for use in a very different context—in cases that involve 'one employee's speech and its impact on that employee's public responsibilities.'" *Janus v. AFSCME, Council 31*, 585 U.S. 878, 907 (2018) (quoting *NTEU*, 513 U.S. at 467).

In contrast, cases involving "speech-restrictive law[s] with 'widespread impact,'" like the present dispute "give[] rise to far more serious concerns than could any single supervisory decision." *Id.* at 907 (quotation marks omitted). Thus, "when such a law is at issue, the government must shoulder a correspondingly 'heav[ier] burden,' and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights." *Id.* (citing *NTEU,* 513 U.S. at 466-68).

Under this modified *Pickering* approach, "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU,* 513 U.S. at 468. This test "more closely resembles exacting scrutiny than the traditional *Pickering* analysis." *Janus*, 585 U.S. at 907.

Defendants cannot meet this heavy burden. The Policy stifles speech on matters of public concern from a vast group of present and future professors, destroying the academic freedom that is necessary for students to receive a full education. Professors' First Amendment interests are at their zenith in the academic setting, where "[t]he vigilant protection of constitutional freedoms is nowhere more vital." *Keyishian*, 385 U.S. at 603. "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Buchanan*, 919 F.3d at 853. The Policy restricts classroom discussion of race, gender, and sexual orientation—

undeniably germane to their courses, *Buchanan*, 919 F.3d at 853, and among the most contested political questions of the day, Bright Decl. ¶¶18-19, 20-23, 33. And Defendants censored these topics precisely ***because*** they are matters of public concern.

Defendants cannot identify how the censored speech had a "necessary impact on the actual operation" of the Government so as to justify banning vast quantities of present and future expression as *NTEU* requires. Plaintiffs taught the now-banned material for years without complaint. Bright Decl. ¶11; Reddy Decl. ¶¶8, 15; Sadler Decl. ¶¶10-11; George Decl. ¶11; Peterson Decl. ¶9. The Policy has instead sown chaos as professors and administrators scramble to apply a vague censorship regime, and its enforcement mechanisms—including encouraging anonymous student reports on professors—have bred suspicion and fear across the University system. As a result, the Policy works *against* any efficiency interest Defendants might claim.

## III. The Censorship Policy is Void for Vagueness

"A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Women's Med. Ctr.*, 248 F.3d at 421. The test is most demanding where a law regulates speech: "rigorous adherence" to fair-notice requirements "is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012). In the university classroom, "precision of regulation must be the touchstone," for "standards of permissible statutory vagueness are strict in the area of free expression." *Keyishian*, 385 U.S. at 603-04 (cleaned up).

### A. The Censorship Policy Does Not Give Professors Fair Notice of What it Prohibits

When a regulation "is capable of reaching first amendment freedoms, the doctrine of vagueness 'demands a greater degree of specificity than in other contexts.'" *Kramer v. Price*, 712

F.2d 174, 177 (5th Cir. 1983) (citation omitted). The Censorship Policy fails this mandate. In fact, nearly every word of the Censorship Policy carries contested, subjective meanings:

*What does it mean to "advocate"?* The Censorship Policy does not say. System FAQ 1 defined advocacy as teaching that "requires students to hold certain beliefs, and/or to ridicule certain beliefs." Cook Decl. Ex. K. The College Station Provost's guidance added a second, broader definition: "to support or argue for a cause, policy, or group, or to plead in favor of it." Bright Decl. ¶7, Ex. D. The University then rescinded that guidance without immediate replacement. *Id.* ¶9. Dr. Bright's department head noted the "breadth of the university's working definition of advocacy," and applied a third subjective test: is there a "risk that students could interpret a faculty member's comments or reading assignments as leading or encouraging them to hold specific positions"? *Id.* ¶¶12-14 & Ex. F. And while the text of the Policy prohibits advocacy, it is now enforced against teaching in core courses without system guidance defining "teaching."

*What is a "topic"?* Again, the Censorship Policy does not say. The English Department reads "topic" to require a "threshold of thematic emphasis at which it could reasonably be identified as a 'topic' of the course." Bright Decl. ¶50, Ex. O. That definition is opaque and circular. Would "a stray mention" count? "One character in a reading? One reading out of many?" Reddy Decl. ¶¶22-23 & Ex. F. Prof. Reddy, who teaches in the English Department, guesses that it would not. *Id.* But Dr. Bright drew the opposite lesson when his course was canceled: "it seems like any amount of discussion or 'coverage' rises to the level of a 'topic.'" Bright Decl. ¶50.

*What is a topic related to sexual orientation or gender identity?* All human beings have some form of sexual orientation and gender identity.[6] What then does it mean to ban teaching any

---

[6] Sexual orientations include "lesbian, gay" and "heterosexual," among others. Sexual Orientation, *Dictionary of Psychology*, Am. Psychological Ass'n (Nov. 15, 2023), https://dictionary.apa.org/sexual-orientation. Similarly, "gender identity" is a "person's psychological sense of self in relation to their gender

topic ***related to*** sexual orientation or gender identity? Does it ban all discussions of human interaction and identity? Presumably not, but Plaintiffs cannot understand where the line is drawn. Texas AAUP Decl. ¶¶6-7; Sadler Decl. ¶¶23-26; George Decl. ¶34. If books with gay or trans characters are prohibited, what about cisgender, heterosexual characters? Is women's suffrage related to gender identity? Is the *Obergefell* decision legalizing gay marriage a topic related to sexual orientation? *See Obergefell v. Hodges*, 576 U.S. 644 (2015). As Prof. McConnell's dean noted, "[t]he BOR policy's definition of 'gender identity' isn't made clear in 08.01. One could as easily argue that a cisgender female wearing a pant suit is as out of alignment as a cisgender male wearing a dress (or kilt). The policy stays clear of trying to navigate those gray waters, leaving it to us to do so." McConnell Decl. ¶14, Ex. C.

*What do the ideology definitions forbid?* "Race Ideology" turns on whether content "attempts to shame" a race or "assign[s]" it "intrinsic guilt." System Policy 08.01, Definitions. "Gender Ideology" similarly turns on notions of "value" and "legitimacy." *Id.* But a policy is "impermissibly" vague when it "subjects [individuals] to sanctions based not on their own objective behavior, but on the subjective viewpoints of others." *Women's Med. Ctr.*, 248 F.3d at 422. Professor Reddy explains, "there is no way for me to anticipate in advance when a lesson might cause any student to feel guilt, shame, or that their ideas or identities are less valuable." Reddy Decl. ¶20.

*Does "advocate" modify "topics related to sexual orientation or gender identity" and how?* Grammatically, the Censorship Policy provides that a course may not "advocate . . . topics related to sexual orientation or gender identity." But professors do not know what it means for a course to "advocate" a "topic"—or whether assigning works that explore a topic, or that

. . . that may or may not correspond to a person's sex assigned at birth." *Id.* at Gender Identity, https://dictionary.apa.org/gender-identity.

themselves advocate, would be a violation even when the professor presents them only to raise issues for discussion. *See, e.g.*, George Decl. ¶¶8, 12, 31; Sadler Decl. ¶¶21-22, 24-27; Reddy Decl. ¶¶19, 22-23; Bright Decl. ¶¶45-48, 50.

*What is a necessary educational purpose?* The vagueness of the policy extends to its exception. There is no guidance on what constitutes the "limited circumstances" demonstrating a "necessary educational purpose." *See supra* Argument Section II.C.

The result of a policy with vagueness layered on vagueness is that officials charged with implementing the Censorship Policy and professors told to submit to it are left guessing and must speculate about what is least likely to attract attention. Bright Decl. ¶¶14-15; Reddy Decl. ¶21; McConnell Decl. ¶¶11-12; Neumann Decl. ¶16 & Ex. D (provost determines that textbook would be banned not because of its content but because "books are sometimes judged by their cover and the opening pages rather than by their full substance"). For professors, the price of a wrong guess is "disciplinary action up to and including termination." System Policy 01.01(7).

Professor Peterson's experience is instructive. His Contemporary Moral Issues (PHIL 111) course included a lecture on "Sexual Morality." Peterson Decl. ¶13, Ex. D. The professor sought approval for a slide deck, noting his lack of clarity on the Policy. *See id.* ¶¶19-26, Exs. G, H, I, J, K. Ultimately, he was told that some slides violated the Policy and to remove them, but no one—not his department head, not the Provost, not even the Office of the General Counsel—would tell him ***which*** slides were offending. *Id.* Instead, he was left to make that determination on his own, with discipline and possible termination as the consequence if he got it wrong.

### B. The Censorship Policy Allows Arbitrary and Discriminatory Enforcement

A restriction on speech "so standardless that it authorizes or encourages seriously discriminatory enforcement" is unconstitutionally vague. *United States v. Williams*, 553 U.S. 285, 304 (2008) (citation omitted). Indeed, the Fifth Circuit has enjoined a university rule approving

only "wholesome" student activities because different administrators "could come to different conclusions as to its meaning"; a regulation "must not be designed so that different officials could attach different meaning to the words in an arbitrary and discriminatory manner." *Shamloo v. Miss. State Bd. of Trs. of Insts. of Higher Learning*, 620 F.2d 516, 523-24 (5th Cir. 1980). And yet, that is precisely what is happening here.

The Policy's vague terms clearly permit enforcement against disfavored ideas and viewpoints. The English Department's written guidance states that the Censorship Policy "will not be applied to heteronormative orientation and identity," even as it is enforced against LGBTQ+ identities. Reddy Decl. ¶11, Ex. C. Nowhere does the Policy exclude heteronormative orientation and identity, and yet its text is so vague that it permits such arbitrary enforcement. That appears to be the point: to "furnish[] a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) (quotation marks omitted).

The record is full of administrators reaching different conclusions as to the Censorship Policy's meaning. Dr. Bright's department head flagged unspecified readings under a rescinded "working definition of advocacy"; the Dean concluded that those same readings did not violate the Policy but that, per the Vice Provost, the phrase "sexual orientation" in his academic-freedom statement required an exception; and the course was canceled because Dr. Bright could not demarcate a particular day on which sexual orientation would be discussed. Bright Decl. ¶¶12-27. Meanwhile, another professor received an exception where he stated that issues of race, gender, and sexual orientation would arise throughout the class. McConnell Decl. ¶13. And Dr. Bright later received an exception for another course whose syllabus likewise disclosed discussions of race, gender, and sexuality throughout the class. But shortly thereafter, he received an email from

his Dean stating that such blanket disclosures were prohibited. Bright Decl. ¶¶42-45 & Ex. M. This dizzying back and forth is the epitome of arbitrary enforcement.

Troubling examples abound: Prof. George's syllabus was approved one day and flagged the next. George Decl. ¶¶9-10. Another of his courses was approved until a student complained and then he was told to change it immediately but not what to change. George Decl. ¶¶13-19. An AAUP professor's Sociology of Gender course was canceled over a textbook cover image: she was told the textbook's content complied with the Censorship Policy but not the cover, even though the textbook was allowed at the flagship campus. Neumann Decl. ¶¶12-21. An associate dean has been quoted as saying that whether a professor may answer a student's question depends in part on "how the question is framed (including the tone)." Reddy Decl. ¶22, Ex. F.

A vague enactment that "operates to inhibit the exercise of those freedoms," *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972), will inevitably chill speech because "[i]t would be a bold teacher who would not stay as far as possible from utterances or acts which might jeopardize his living by enmeshing him in this intricate machinery." *Keyishian*, 385 U.S. at 601. Texas A&M's professors have responded as *Keyishian* predicted: faced with vague prohibitions enforced on pain of termination, they steer far clear of anything the Censorship Policy might reach—all in the shadow of an anonymous student-reporting portal. *See supra* Background Section III.

Prof. McConnell removed a foundational methods text from his graduate course because he "did not want to risk having [his] course cancelled outright." McConnell Decl. ¶¶9-10. Prof. George now presents his lecture slides on LGBTQ+ history with censorship bars over the content and has cut primary sources documenting the military's discharge of gay servicemembers in the 1950s. George Decl. ¶¶24, 29. This is the archetypal unconstitutionally vague policy, where the threat of standardless enforcement chills prohibited and permitted speech alike.

## IV. The Remaining Preliminary Injunction Factors Favor Plaintiffs

### A. Irreparable Harm

It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 20 (2020) (per curiam) (citation omitted). Irreparable First Amendment and due process injuries are already rampant. Texas A&M's campuses are shot through with fear and paranoia. Classes have been canceled. Books banned. Fearing discipline and the loss of their livelihoods, professors have self-censored—scrubbing syllabi and removing essential texts from curriculum. Students are encouraged to report professors who do not toe the line, and professors labor under a constant shadow of an imposed orthodoxy. *See* George Decl. ¶32; Reddy Decl. ¶18.

### B. Balance of Equities and Public Interest

The ongoing First Amendment injury outweighs any damage an injunction might cause Defendants, because "neither [the State] nor the public has any interest in enforcing a regulation that violates federal law." *Book People*, 91 F.4th at 341 (citation omitted); *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). The Board of Regents can claim no legitimate interest in prophylactically restraining classroom discussion of politically disfavored viewpoints. Likewise, a preliminary injunction in this case will serve the public interest because "injunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012) (citation omitted). Texas has an interest in preserving the academic integrity of one of the state's premier institutions.

## CONCLUSION

Plaintiffs respectfully request that the Court preliminarily enjoin the unconstitutional speech restrictions in System Policy 08.01 until this case reaches a final merits resolution.

September 17, 2026

Respectfully submitted,

*/s/ Jamie Alan Aycock*
YETTER COLEMAN LLP
Jamie Alan Aycock
Attorney-in-Charge
Tex. Bar No. 24050241
SDTX No. 1233210
jamieaycock@yettercoleman.com
Amy C. Farish
Tex. Bar No. 24097818
SDTX No. 3437044
afarish@yettercoleman.com
Ayla Syed
Tex. Bar No. 24136507
SDTX No. 3875654
asyed@yettercoleman.com
Jared LeBrun
Tex. Bar No. 24144647
SDTX No. 3909041
jlebrun@yettercoleman.com
W. Seth Cook
Tex. Bar No. 24138570
SDTX No. 3899868
scook@yettercoleman.com
600 TRAVIS STREET, SUITE 5400
HOUSTON, TEXAS 77002
(713) 632-8000

Thomas Buser-Clancy
Tex. Bar No. 24078344,
SDTX No. 1671940
tbuser-clancy@aclutx.org
Chloe Kempf
Tex. Bar No. 24127325
SDTX No. 3852674
ckempf@aclutx.org
Sophia Howard
Tex. Bar No. 24152382
SDTX No. 3983052
SHoward@aclutx.org
Brian Klosterboer
Tex. Bar No. 24107833
SDTX No. 3314357
bklosterboer@aclutx.org
ACLU FOUNDATION OF TEXAS
INC.
P.O. Box 8306
Houston, TX 77288
(713) 942-8146

Emerson Sykes*
NY Bar No. 5020078
Ken Sexauer*
NY Bar No. 6231013
esykes@aclu.org
ksexauer@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, Floor 18,
New York, NY 10004
(212) 549-2500

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2026, a true and correct copy of the foregoing served on all counsel of record through the Court's CM/ECF electronic filing system.

/s/ *Jamie Alan Aycock*
Jamie Alan Aycock

**CERTIFICATE OF CONFERENCE**

I hereby certify that between August 28 and September 2, 2026, counsel for Plaintiffs conferred with counsel for Defendants, who confirmed they are opposed to the motion and will file a response in opposition.

/s/ *Jared LeBrun*
Jared LeBrun