**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, LEONARD BRIGHT, VANITA REDDY, LANDON SADLER, and AARON GEORGE,

Plaintiffs,

v.

ROBERT L. ALBRITTON, JAY GRAHAM, DAVID C. BAGGETT, JOHN W. BELLINGER, JAMES R. BROOKS, MICHAEL A. HERNANDEZ III, WILLIAM MAHOMES JR., KELLEY SULLIVAN GEORGIADES, and SAM TORN, in their official capacities as members of the Texas A&M University System Board of Regents,

Defendants.

CIVIL ACTION NO. 4:26-cv-06268

**DECLARATION OF W. SETH COOK IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1. My name is William Seth Cook. I am fully competent to make this declaration, and I have personal knowledge that the following facts are true and correct.

2. This declaration is made in support of Plaintiffs' Motion for a Preliminary Injunction.

3. I am an attorney at Yetter Coleman LLP and serve as counsel for Plaintiffs in the above-captioned case.

4. Exhibit A to this declaration is a true and correct copy of The Texas A&M University System Policy 12.01, Academic Freedom, Responsibility and Tenure (revised Nov. 13, 2025).

5. Exhibit B to this declaration is a true and correct copy of Texas A&M University Student Rules, Appendix XI: Texas A&M Rules on Freedom of Expression (revised 2015).

6. Exhibit C to this declaration is a true and correct copy of Jessica Priest, *Faculty panel: Texas A&M wrongly fired professor after gender lesson*, The Texas Tribune (Nov. 22, 2025), https://perma.cc/ZK97-T36B.

7. Exhibit D to this declaration is a true and correct copy of James Bickerton, *Greg Abbott Issues Warning to Texas A&M President Over DEI*, Newsweek (Jan. 15, 2025), https://perma.cc/V9NM-U6UQ.

8. Exhibit E to this declaration is a true and correct copy of Ryan Quinn, *Texas A&M Pulls Out of Event Rufo Described as 'Racial Segregation'*, Inside Higher Ed (Jan. 16, 2025), https://perma.cc/FV9P-36UN.

9. Exhibit F to this declaration is a true and correct copy of Laura Spitalniak, *Texas A&M fires professor after viral video, raising free speech concerns*, Higher Ed Dive (Sept. 10, 2025), https://perma.cc/75FE-YP5W.

10. Exhibit G to this declaration is a true and correct copy of Jessica Priest, *Texas A&M System declines to reinstate fired lecturer despite faculty panel's findings*, The Texas Tribune (Dec. 24, 2025), https://perma.cc/6PGJ-8TP9.

11. Exhibit H to this declaration is a true and correct copy of Revisions to System Policy 08.01, Civil Rights Protections and Compliance, https://perma.cc/Z7PU-78DD.

12. Exhibit I to this declaration is a true and correct copy of The Texas A&M University System Policy 08.01, Civil Rights Protections and Compliance (revised Dec. 18, 2025).

13. Exhibit J to this declaration is a true and correct copy of a December 2025 email chain among Texas A&M University System officials, including Dr. James R. Hallmark, Vice Chancellor for Academic Affairs, concerning the Board of Regents' December 18, 2025 revisions to System Policy 08.01.

14. Exhibit K to this declaration is a true and correct copy of a December 3, 2025 email from Dr. James R. Hallmark, Vice Chancellor for Academic Affairs, to Texas A&M University System presidents transmitting the "FAQs for Implementation of changes to 08.01 and 12.01," together with the attached FAQ document.

15. Exhibit L to this declaration is a true and correct copy of an excerpt of the transcript of the Texas A&M University System Board of Regents meeting addressing the reporting mechanism for alleged violations of the revised policies.

16. Exhibit M to this declaration is a true and correct copy of a Texas A&M University statement, *Texas A&M University Completes Spring 2026 Course Review to Support Academic Integrity* (Jan. 30, 2026), https://perma.cc/RL75-EEAU.

17. Exhibit N to this declaration is a true and correct copy of Jessica Priest, *Texas A&M eliminates women's and gender studies degree program*, The Texas Tribune (Jan. 30, 2026), https://perma.cc/58BE-VMR5.

18. Exhibit O to this declaration is a true and correct copy of an excerpt of the Minutes of the Texas A&M University System Board of Regents meeting held November 12–13, 2025, reflecting adoption of Minute Orders 264-2025 and 265-2025 approving revisions to System Policies 08.01 and 12.01.

19. Exhibit P to this declaration is a true and correct copy of The Texas A&M University System Policy 02.01, Board of Regents (revised May 19, 2022).

20. Exhibit Q to this declaration is a true and correct copy of a page from The Texas A&M University System website, Office of the Chancellor, describing the Board of Regents Leadership, https://perma.cc/CWY4-BTEH.

21. Exhibit R to this declaration is a true and correct copy of an email from Jill Woodlall, Chief of Staff of Academic Affairs attaching updated FAQs regarding the implementation of Texas A&M Policies 8.01 and 12.01, https://perma.cc/SE8W-2Z3J.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed in Houston, Texas on September 2, 2026.

/s/ *W. Seth Cook*
W. Seth Cook

# Exhibit A

# 12.01 Academic Freedom, Responsibility and Tenure

Revised November 13, 2025 (MO -2025)
Next Scheduled Review: November 13, 2030
Click to view Revision History.

## Policy Summary

The relationship between faculty and the academic institution of The Texas A&M University System (system) for which they work is a balance between the responsibilities and obligations of the faculty with the requirements and demands of the system academic institution. This policy provides the basis upon which faculty may be hired, tenured, and dismissed. The responsibilities of the faculty are described as are the criteria by which they will be evaluated.

## Policy

The following policies on academic freedom, responsibility and tenure apply separately, but equally, to each of the universities (academic institutions) of the system.

1. ACADEMIC FREEDOM

1.1 Institutions of higher education exist for the common good. The common good depends upon an uninhibited search for truth and its open expression. Hence, it is essential that each faculty member be free to pursue scholarly inquiry and to voice and publish individual conclusions concerning the significance of evidence that the faculty member considers relevant. Each faculty member must be free from the corrosive fear that others, inside or outside the academic community, because their vision may differ, may threaten the faculty member's professional career or the material benefits accruing from it.

1.2 Each faculty member is entitled to full freedom in the classroom in discussing the subject that the faculty member teaches, but a faculty member will not introduce a controversial matter that has no relation to the classroom subject or teach material that is inconsistent with the approved syllabus for the course. Each faculty member is also a citizen of the nation, state, and community; and when speaking, writing, or acting as such, must be free from institutional censorship or discipline, subject to academic responsibility. In such instances, the faculty member should clearly state that the faculty member is not speaking for the system academic institution.

2. ACADEMIC RESPONSIBILITY OF FACULTY MEMBERS

The concept of academic freedom for faculty must be accompanied by an equally demanding concept of academic responsibility. Faculty members have a responsibility to the system academic institution, their profession, their students, and society at large. The rights and privileges of faculty members extended by society and protected by governing boards and

administrators through written policies and procedures on academic freedom and tenure, and as further protected by the courts, require reciprocally, the assumption of certain responsibilities by faculty members. Some of those are:

2.1 The fundamental responsibilities of faculty members as teachers and scholars include maintenance of competence in their field of specialization and the exhibition of professional competence in the classroom, studio, or laboratory and in the public arena through activities such as discussions, lectures, consulting, performances, exhibitions, publications, and participation in professional organizations and meetings.

2.2 Faculty members must recognize that the public will judge their profession and system academic institutions by their statements. Hence, faculty members should at all times strive to be accurate in their statements, exercise appropriate restraint, show respect for the opinions of others, and make every effort to indicate that they are not speaking or acting for the system academic institution when they are speaking or acting as private persons.

2.3 The constitutionally protected rights of faculty members, as citizens, to freedom of expression on matters of public concern must be balanced with the interest of the state, as an employer, in promoting the efficiency of the educational services it performs through its employees. A faculty member's comments are protected even though they may be highly critical in tone or content, or erroneous, but such statements are not protected free speech if they either substantially impede the faculty member's performance of daily duties or materially and substantially interfere with the regular operation of the system academic institution, department, or college. False statements made with knowledge of their falsity or in reckless disregard of the truth are not entitled to constitutional protection, and public statements may be so without foundation as to call into question the fitness of the faculty member to perform his or her professional duties.

2.4 Faculty members should be professional in their conduct in the classroom and in relationships with students. They should maintain respect for the student and for the student's posture as a learner and should be appropriately available to students for consultation on coursework.

2.5 Faculty members have the responsibility to provide timely and adequate notice of their intention to interrupt or terminate institutional services.

3. WRITTEN TERMS OF EMPLOYMENT

3.1 All new faculty members must be provided with an appointment letter stating the initial terms and conditions of employment. Any subsequent modifications or special understandings in regard to the appointment, which may be made on an annual basis, should be stated in writing and a copy given to the faculty member. All faculty members, unless the terms and conditions of their appointment letter state otherwise, are expected to engage in teaching, scholarship, and service. Essential job functions for a position may vary depending upon the nature of the department in which the faculty member holds expertise, external funding requirements attached to the position, licensing or accreditation requirements, and other circumstances. It is therefore important that essential job functions for each faculty position be listed in the initial appointment letter. For example, all of the following that are applicable should be listed: teaching

responsibilities, responsibilities for advising students, independent and/or collaborative research responsibilities, engaging in patient care, committee assignments, conditions imposed by external accrediting agencies, conditions for holding a named professorship or endowed chair, or a position that combines academic and administrative duties, and any other specific essential functions for the position in question. All appointment letters must indicate whether the appointment being offered is with tenure, tenure track, or non-tenure track.

3.2 The appointment letter for a faculty member with administrative duties must state the portion of the faculty member's salary that is associated with the administrative duties. The portion of the faculty member's salary not associated with the administrative duties must not exceed the salaries of other faculty with similar qualifications and performing similar duties. The appointment letter for faculty members with administrative duties must also state that the administrative duties may be removed without cause.

3.3 The system academic institution must notify faculty members annually, in writing, of their salary. Any other changes or additions to the appointment should also be included.

3.4 Faculty members are expected to fulfill the terms and conditions of employment for the following year unless they resign prior to 30 calendar days after receiving notice of the terms.

3.5 An annual performance review will be conducted for all faculty members regardless of their title in accordance with written procedures. The purpose of the annual performance review is to facilitate dialogue between the administration and faculty and provide a process to evaluate each faculty member's accomplishments in the context of departmental, college, university, and system goals. An unsatisfactory rating in any one area (e.g., teaching effectiveness, research, creative activities and other scholarly endeavors, or service) requires the implementation of a written short-term development plan for the faculty member, including performance improvement benchmarks.

3.6 Generally, all faculty members are entitled under Texas law to see their personnel files and to obtain a copy of the information in these files at their own expense.

4. TENURE POLICY

Tenure means the entitlement of faculty members to continue in their academic positions unless dismissed for good cause. Tenured faculty who remain in good standing will continue to enjoy those privileges customarily associated with tenure, including an expectation of continuing employment, appropriate compensation, a suitable office and workspace, serving as a principal investigator and conducting research, teaching classes, participating in faculty governance, and representing oneself as a tenured faculty member at their system academic institution. However, tenure will not be construed as creating a property interest[1] in any attributes of the faculty position beyond the faculty member's regular annual salary. A specific system of faculty tenure should undergird the integrity of each system academic institution. System academic institution tenure systems should have these elements:

[1] A property interest refers to the constitutionally protected interest that may not be taken by the state without affording due process as required by federal and state law.

4.1 Beginning with appointment to a tenure-track position, the probationary period for a faculty member must not exceed seven (7) years. This period may, at the system academic institution's option, include appropriate full-time service at other institutions of higher education, even if the inclusion of such service extends the total probationary period in the academic profession beyond the normal maximum of seven (7) years. However, any credit for prior service included within the seven-year probationary period must be agreed upon in writing at the time of employment. System academic institutions must develop a rule authorizing extension of the probationary period beyond seven (7) years to permit a possible "time-out" due to special conditions or in order to pursue special opportunities. Such extensions must be based on extraordinary circumstances and require written concurrence by the faculty member, department head, dean, and the chief academic officer, or the chief academic officer's designee. A person who is a member of the U.S. National Academy of Sciences and/or the U.S. National Academy of Engineering and/or the U.S. National Academy of Medicine at the time of employment by a system academic institution shall be eligible for tenure upon arrival at such institution and must be presented to the system Board of Regents (board) for its consideration, and a grant of tenure to such faculty member shall not be subject to a probationary period. Tenure is granted only by the affirmative action of the system board upon recommendation of the chief executive officer (CEO). At the conclusion of the probationary period, unless appropriately informed otherwise, the faculty member will not have tenure. Prior to the beginning of the last year of the probationary period, the system academic institution must notify the faculty member in writing of a decision regarding the granting or denial of tenure. The failure by the system academic institution to so notify will not be construed as a grant of de facto tenure. If the decision is not to award tenure, the faculty member is entitled to serve for two additional long semesters following the term or semester in which the notice is received.

4.2 Notice of non-reappointment, or of intention not to reappoint a non-tenured tenure track faculty member, should be given in writing in accordance with the following standards:

(a) not later than March 1 of the first academic year of probationary service, if the appointment expires at the end of that year; or, if a one-year appointment terminates during an academic year, at least three months in advance of its termination;

(b) not later than December 15 of the second year of probationary service, if the appointment expires at the end of that year; or, if an initial two-year appointment terminates during an academic year, at least six months in advance of its termination; and

(c) at least twelve months before the expiration of a probationary appointment after two or more years with the system academic institution.

4.3 Good cause for dismissal of a faculty member relates directly and substantially to the performance of professional duties and may include, but not be limited to, the following:

(a) professional incompetence;

(b) continuing or repeated failure to perform duties or meet responsibilities to the system academic institution or to students or associates;

(c) failure to successfully complete a post-tenure review professional development program;

(d) moral turpitude adversely affecting the performance of duties or the meeting of responsibilities to the system academic institution, or to students or associates;

(e) violation of system policies, system regulations, system academic institution rules, or laws substantially related to performance of faculty duties;

(f) conviction of a crime related to the fitness of a faculty member to engage in teaching, research, service/outreach, and/or administration;

(g) unprofessional conduct adversely affecting to a material and substantial degree the performance of duties or the meeting of responsibilities to the system academic institution, or to students or associates;

(h) falsification of academic credentials;

(i) bona fide financial exigency or the phasing out of institutional programs requiring reduction of faculty (see Section 9);

(j) the reduction or discontinuance of institutional programs based on educational considerations and requiring the termination of faculty members (see Section 9); or

(k) a finding of sexual harassment or other serious misconduct, in accordance with system policy.

4.4 A faculty member who is found responsible for sexual harassment or other serious misconduct may be summarily dismissed or suspended without pay pending dismissal in accordance with the procedures outlined in Section 8.2. A faculty member may be dismissed for other reasons, as outlined in Section 4.3, after the faculty member has received notice of the cause for dismissal and an opportunity for a hearing in accordance with the procedures set forth in Section 8.3. Non-tenure track faculty may present a grievance in accordance with Section 6.5.

## 5. ADMINISTRATIVE LEAVE

Faculty members may be placed on administrative leave with pay by the faculty member's dean, with the concurrence of the dean of faculties (or provost if there is no dean of faculties), pending an investigation into matters pertaining to the faculty member's job performance, including but not limited to, fiscal matters, improper conduct in teaching, research, or service, or an allegation of misconduct pursuant to System Regulation *08.01.01*, *Civil Rights Compliance*. Notification must be given in writing and include the reasons for placing the faculty member on administrative leave with pay and the terms of the leave. A faculty member placed on administrative leave with pay may appeal the decision to the provost by submitting an appeal in writing. The provost conducts the appeal and may appoint a person or persons to assist the provost in the appeal. The investigation process is not stayed by an appeal. The appeal should be completed within five (5) business days of receipt of the appeal. This provision is distinct from suspension during the pendency of termination proceedings. Placing a faculty member on administrative leave with pay is justified to aid in an investigation or if the welfare of the faculty member or that of students, colleagues, or other institutional employees is threatened by continuance, or if the continued presence of the faculty member would be disruptive of the regular operations of the system academic

institution. Any such leave should be with appropriate provisions for useful duties, including appropriate access to classrooms, laboratories, libraries, and other facilities. A tenured faculty member who has been placed on administrative leave with pay will be entitled to his or her regular annual salary.

6. NON-TENURE TRACK FACULTY

6.1 This section does not apply to Professional Track Faculty with multi-year appointments. (*See*, System Policy *12.07, Fixed Term Academic Professional Track Faculty*).

6.2 Appointments of non-tenure track faculty should be in writing and include specific beginning and ending dates for the appointment and clearly state that there is no implied guarantee or promise of future employment.

6.3 A system academic institution is not required to give a non-tenure track faculty member a reason for a decision not to reappoint for another appointment term or to provide a hearing. However, a system academic institution's rule for implementing this policy may provide that all or certain non-tenure track faculty members are entitled to appeal the institution's decision not to renew the faculty member's appointment or to dismiss the faculty member for cause.

6.4 Unless the academic institution's rule provides for an appeal, a non-tenure track faculty member whose appointment is not renewed may present a grievance in person to their dean or designee regarding the non-reappointment within 10 business days of receipt of the notice of non-reappointment. The dean or designee considers the grievance and renders a final decision in writing regarding the grievance within 10 business days of the presentation of the grievance.

6.5 Unless the academic institution's rule provides for an appeal, a non-tenure track faculty member who is dismissed for cause before the end of the term may present a grievance in person to the provost or designee regarding the dismissal within 10 business days of receipt of the notice of dismissal. The provost or designee considers the grievance and renders a final decision in writing regarding the grievance within 10 business days of the presentation of the grievance.

6.6 However, if a grievance or appeal related to the nonrenewal or dismissal of a non-tenure track faculty member includes an allegation(s) that the decision was based on discrimination, the provost, dean, or designee promptly reports the allegation(s) to the designated office in accordance with System Regulation *08.01.01*.

6.7 Any allegation(s) of discrimination will be exclusively adjudicated in accordance with the procedures outlined in System Regulation *08.01.01*. The grievance or appeal processes in this section are not stayed pending conclusion of the investigation, decision, and appeal processes outlined in System Regulation *08.01.01*.

7. NON-RENEWAL OF NON-TENURED TENURE TRACK FACULTY AT END OF AN APPOINTMENT TERM

Procedures in cases of non-renewal of non-tenured tenure track faculty members at the end of any appointment term (other than a one-year only appointment that has not been renewed) must have the following parts:

7.1 A system academic institution is not required to give a non-tenured tenure track faculty member a reason for a decision not to reappoint for another appointment term or to provide a hearing.

7.2 A non-tenured tenure track faculty member may present, in person, a grievance over non-renewal of the faculty member's employment at the system academic institution, including that the decision was made in retaliation for the faculty member's exercise of protected First Amendment rights. The board delegates the authority through the chancellor to the CEO to designate an individual within the system academic institution's administration to hear the faculty member's grievance. The system academic institution must adopt a method of promptly presenting, reviewing, and acting on grievances in accordance with this section.

7.3 In the alternative to a grievance in accordance with Section 7.2, a non-tenured tenure track faculty member may appeal a decision not to reappoint on the basis that the decision was made in violation of the academic freedom of the individual and/or for inadequate consideration of the faculty member's record of professional achievement. Such an appeal must be filed within 20 business days of the date on which the faculty member was given written notice of non-reappointment.

7.4 However, if a grievance or appeal related to the nonrenewal of a non-tenured tenure track faculty member includes an allegation(s) that the decision was based on discrimination, the CEO or designee promptly reports the allegation(s) to the designated office in accordance with System Regulation *08.01.01*.

7.5 Any allegation(s) of discrimination will be exclusively adjudicated in accordance with the procedures outlined in System Regulation *08.01.01*. The grievance or appeal processes in this section are not stayed pending conclusion of the investigation, decision, and appeal processes outlined in System Regulation *08.01.01*.

7.6 System academic institution appeal procedures must provide for preliminary consideration within 15 business days of the faculty member's notice of appeal of the allegations by a faculty committee to determine whether the faculty member has established a prima facie case that the decision was made in violation of the faculty member's academic freedom, or without adequate consideration of the faculty member's record of professional achievement. If the preliminary review committee determines that the faculty member has not alleged a prima facie case, the allegations will be dismissed and the decision not to reappoint stands. If the committee determines that the allegations do establish a prima facie case, the matter is referred for an evidentiary hearing under established system academic institution procedures. A prima facie case for purposes of this section means that the faculty member's evidence, alone and un-rebutted, would establish that a violation as defined in Section 7.3 may have occurred.

7.7 In any evidentiary hearing, the burden of proving that the decision was made in violation of academic freedom or without adequate consideration of the faculty member's record of professional achievement rests with the faculty member. The burden of proof must be

met by a preponderance of the evidence; i.e., that which is more convincing, more credible, and of greater weight than contrary evidence. Both the faculty member and the administration have the right of representation at this hearing. The system academic institution provides staff support to schedule and hold a hearing. If the appeal is filed before March 1, the hearing must be completed within 40 business days from the date the committee chair is notified of the appeal; the chair of the hearing committee may extend the time for completing the hearing by an additional 10 business days for good cause shown. If more than one appeal is filed in a given year, some appeals may be delayed until the first full academic term following the notice of appeal. The committee must complete its report within 10 business days of the completion of the hearing. The importance of conducting the hearing in a prompt manner guides the system academic institution and the hearing committee. Hearing committee members' departments assist as needed to accommodate the scheduling of the hearing.

8. DISMISSAL FOR CAUSE

8.1 Procedures. System academic institutions must establish proper procedures for dismissal of faculty for cause to address issues related to performance or misconduct. These dismissal procedures apply only to a faculty member who has tenure, a non-tenured tenure track faculty member, or a fixed-term professional track faculty member under System Policy *12.07* whose term appointment has not expired at the time of the dismissal. Such procedures must have the following parts:

8.1.1 A bona fide effort by appropriate administrative officers and/or other persons or committees should be made to achieve a satisfactory resolution of performance and/or misconduct issues through preliminary inquiry, discussion, or confidential mediation. During these proceedings, a faculty member has the right to an advisor, who may attend any meetings with the faculty member, but may communicate only with the faculty member. The advisor is not permitted to serve as an advocate for the faculty member in these preliminary proceedings.

8.1.2 Should these efforts fail to achieve a satisfactory resolution; the administration initiates a dismissal for cause or summary dismissal.

8.1.3 Unless a faculty member is summarily dismissed in accordance with the procedures outlined in Section 8.2, a faculty member may be reassigned or suspended with pay during the pendency of dismissal proceedings; however, suspension with pay is justified only if the welfare of the faculty member or that of students, colleagues or other institutional employees is threatened by continuance, or if the continued presence of the faculty member would be materially and substantially disruptive of the regular operations of the system academic institution. A suspension with pay should be with appropriate provisions for useful duties, including appropriate access to classrooms, laboratories, libraries, and other facilities.

8.2 Summary Dismissal or Suspended without Pay Pending Dismissal

8.2.1 A tenured faculty member may be subject to summary dismissal or suspension without pay pending dismissal if the stated cause for dismissal is a finding of serious misconduct that has been substantiated by an investigation conducted

in accordance with system policy. Serious misconduct includes, but is not limited to, sexual harassment, scientific misconduct, fraud, and violence or threat of violence in the workplace.

8.2.2 A non-tenured faculty member whose term appointment has not expired may be subject to summary dismissal or suspension without pay pending dismissal for good cause.

8.2.3 Prior to summary dismissal or suspension without pay pending dismissal, a faculty member will be provided with written notice of the charges, an explanation of the evidence, and an opportunity to respond to an administrator. A faculty member who is summarily dismissed or suspended without pay pending dismissal also has an opportunity for a post-termination evidentiary hearing appealing the dismissal in accordance with the procedures outlined in Section 8.3.

8.2.4 The faculty member and the administration each have the independent right to representation in this process.

8.2.5 The board delegates the authority through the chancellor to the CEO to designate an individual within the system academic institution's administration to hear a faculty member's response to the charges prior to summary dismissal or suspension without pay pending dismissal and determine, after considering the faculty member's response, whether or not to proceed with a summary dismissal or suspension without pay pending dismissal.

8.3 <u>Hearing</u>

8.3.1 A faculty member who is summarily dismissed or suspended without pay pending dismissal after the process described in Section 8.2 or a faculty member who receives a notice of dismissal for other reasons outlined in Section 4.3 may submit a notice of appeal to the system academic institution's CEO or designee within 10 business days of receipt of the notice of dismissal. The CEO or designee must notify the appropriate hearing committee within five (5) business days of the date the appeal has been filed. The system academic institution provides staff support to schedule a hearing.

8.3.2 However, if an appeal includes an allegation(s) that the decision was based on discrimination, the CEO or designee promptly reports the allegation(s) to the designated office in accordance with System Regulation *08.01.01*.

8.3.3 Any allegation(s) of discrimination will be exclusively adjudicated in accordance with the procedures outlined in System Regulation *08.01.01*. The appeal hearing process in this section is not stayed pending conclusion of the investigation, decision, and appeal processes outlined in System Regulation *08.01.01*.

8.3.4 The hearing committee must promptly schedule a hearing to be completed within 40 business days of being notified by the CEO or designee. The chair of the hearing committee may extend the time for completing the hearing 10

business days for good cause shown or longer for extenuating circumstances caused by the administration. The system academic institution and the hearing committee must conduct the hearing in a prompt manner. Hearing committee members' departments assist as needed to accommodate the scheduling of the hearing. The burden of proof is on the system academic institution to establish, by a preponderance of the evidence, the existence of good cause for dismissal and/or suspension without pay pending dismissal. The proceedings will be stenographically transcribed and copies made available to either party upon request.

8.3.5 The faculty member and the administration each have the independent right to representation.

8.3.6 The hearing committee must complete its report within 10 business days of the completion of the hearing. The hearing committee formulates explicit findings with respect to each of the grounds for dismissal and/or suspension without pay pending dismissal presented and recommends whether or not, in its judgment, there is good cause for dismissal and/or suspension without pay pending dismissal. The committee's findings and recommendations must be conveyed in writing to the CEO and to the faculty member.

8.3.7 If the faculty member's appointment is proposed to be terminated by the CEO, the full report of the hearing committee, the record of the hearing, the CEO's recommendation, and other relevant documentation available to both the faculty member and the system academic institution will be delivered to the chancellor, or designee, who carries out a review of the documentation. In the event that the chancellor identifies the need for information not contained in the documentation, the chancellor may choose to give the system academic institution and the faculty member an opportunity to present their arguments and take questions from the chancellor. The chancellor has a maximum of 20 business days in which to conduct the review. Upon completion of the review, the chancellor makes a final determination as to the dismissal and/or suspension without pay pending dismissal.

8.3.8 In the event that the review identifies information that is probative of the dismissal, and that was not made available to the faculty review committee and/or the CEO, the chancellor may return the matter to the system academic institution CEO. Upon return to the CEO, the hearing committee has 10 business days in which to conduct a follow-up hearing to evaluate the new information and render its findings and recommendations. The CEO then reviews the hearing committee's findings and recommendations and takes action as appropriate following the guidelines in Section 8.3.5.

8.3.9 A faculty member's termination from employment will be effective as determined by the chancellor, upon a finding by the chancellor, pursuant to these procedures, that there is good cause for the faculty member's dismissal. This decision is final.

9. TENURE, FINANCIAL EXIGENCY, AND TERMINATION OR REDUCTION OF PROGRAMS

9.1 Cases of bona fide financial exigency or the reduction or discontinuance of an institutional program based on educational considerations may permit exceptions to tenure regulations.

9.2 Definitions

9.2.1 Bona fide financial exigency means a pressing need to reorder the nature and magnitude of financial obligations in such a way as to restore or preserve the financial stability of any system academic institution. A bona fide financial exigency may exist without the entire system academic institution being affected.

9.2.2 Financial stability means the ability of a system academic institution to provide from current income the funds necessary to meet current expenses, including current debt payments and sound reserves, without invading or depleting capital.

9.2.3 Evidence of financial exigency may include but is not limited to, substantially declining enrollments, substantial revenue cutbacks, and substantial ongoing operating budget deficits.

9.2.4 Educational considerations that could result in the reduction or discontinuance of a program may include, but are not limited to:

(a) a substantial decrease in program enrollment;

(b) the need to shift substantial resources to other programs; or

(c) a substantial modification or redirection of a unit's mission.

9.3 Administration

9.3.1 When the system academic institution CEO believes that a state of bona fide financial exigency exists, the CEO informs the chancellor. If the chancellor concurs with this assessment, the chancellor informs the board. If the board finds that such conditions exist, a state of bona fide financial exigency will exist within that system academic institution.

9.3.2 When faculty dismissals are contemplated on grounds of financial exigency or program termination or reduction, there should be early, careful, and meaningful sharing of information and views with appropriate faculty representatives on the reasons indicating the need to terminate programs. Recommendations from such faculty representatives will be sought on alternatives available to the system academic institution to ensure continuation of a strong academic program and to minimize the losses sustained by affected students and faculty members.

9.3.3 Faculty members who are being considered for termination on the basis of a bona fide financial exigency or a program termination or reduction should be given opportunities for appointment in related areas at their system academic institution provided:

(a) they are qualified professionally to teach in those areas;

(b) positions are available; and

(c) the affected dean and department head or director concur.

9.3.4 Any tenured faculty member or faculty member whose term appointment has not expired, who is selected for termination on the basis of a bona fide financial exigency or a program termination or reduction necessitating a reduction in staff, must be given the following information:

(a) a written statement of the basis for the initial decision to lay off;

(b) a description of the manner in which the initial decision was made; and

(c) information and data upon which the decision makers relied.

9.3.5 The faculty member selected for termination must be given an opportunity to respond in a hearing before an appropriate faculty committee. In this hearing, the burden of proof rests with the system academic institution to demonstrate by some credible evidence that a bona fide financial exigency exists or that educational considerations led to the reduction or discontinuance of a program. The faculty committee formulates findings whether or not, in its judgment, a bona fide financial exigency exists or that educational considerations led to the reduction or discontinuance of a program. The faculty committee's findings and recommendations, if any, must be conveyed in writing to the CEO and to the faculty member.

9.3.6 Any faculty member reassigned to another position or terminated has the right to reappointment to their previous position if it is re-established within two (2) calendar years.

## Related Statutes, Policies, or Requirements

Tex. Educ. Code § 51.354

Tex. Educ. Code § 51.942

System Regulation *12.01.01, Institutional Rules for Implementing Tenure*

System Policy *12.06, Post-Tenure Review of Faculty and Teaching Effectiveness*

System Policy *12.07, Fixed Term Academic Professional Track Faculty*

## Member Rule Requirements

A rule is required to supplement this policy. See Section 4.1.

## Contact Office

Academic Affairs
(979) 458-6072

# Exhibit B

TEXAS A&M UNIVERSITY
Student Rules

# APPENDIX XI: TEXAS A&M RULES ON FREEDOM OF EXPRESSION

*(Revised: 2015)*

**Home** | *Appendix XI: Texas A&M Rules on Freedom of Expression*

## I. General Expressive Activity Information

Texas A&M University is committed to providing an educational and work climate that is conducive to the personal and professional development of each individual. In fulfilling its multiple missions as an institution of higher learning, it encourages the free exchange of ideas. The university will protect the rights of freedom of speech, expression, petition and peaceful assembly as set forth in the U.S. Constitution. Texas A&M University maintains its right to regulate reasonable time, place and manner restrictions concerning acts of expression and dissent.

As a public institution of higher learning, Texas A&M University provides forums for the expression of ideas and opinions. These include:

- Traditional public forums include the University's public streets, sidewalks, parks, and similar common areas. These areas are generally available for expressive activity, planned or spontaneous, for the individual or small groups (generally where a crowd of 25 or less will be present, and/or where an event is not promoted in advance, and/or when an event is not sponsored by a student organization) at any time without the need for reservation, or prior approval. (Obstructing or impeding the flow of vehicular or pedestrian traffic is prohibited.)

- Designated public forums include other parts of campus that may become temporarily available for expressive activity as designated by the university. These temporary locations, while in existence, will be treated similar to public streets, sidewalks, and parks in terms of access and availability for expressive activity. (Obstructing or impeding the flow of vehicular or pedestrian traffic is prohibited.)
- Limited public forums have limited open access for public expression, or they may be limited to particular groups or to particular topics. Creation of, and access to, limited public forums for student publications may be requested through Student Life.
- Non public forums are areas that are not traditional public forums or designated public forums. These include areas that are not by tradition or designation forums for public communication. These forums will be restricted to use for their intended purpose and are not available for public expressive activity. Examples include, but are not limited to, classrooms, residence hall rooms, faculty and staff offices, academic buildings, administration buildings, medical treatment facilities, libraries, research and computer laboratories, the MSC lawn, Easterwood Airport, Brayton Fire Training School, and research facilities.

Additionally, there are areas such as residences, the Bush Library, the nuclear reactors, utility buildings, etc. that have distance requirements, crowd placement restrictions, and security concerns that may vary depending on security needs, terror alerts, and other factors. Additionally, security needs, terror alerts, local and national events may affect the availability of spaces that would otherwise be routinely available. Information about existing requirements, restrictions, or security concerns will be discussed at the time the reservation request is processed.

Those who choose to observe and/or listen to expressive activities, bear the responsibility of recognizing and honoring the right of free speech. Any acts that are disruptive to the normal operations of the university, including classes and university business, or that invade the rights of others will not be tolerated. Faculty, staff, and students engaging in a disruptive activity may be subject to disciplinary action. Any participant in a disruptive activity may face criminal charges.

Ideas or expressions put forth in expressive activities are not necessarily the views of Texas A&M University, its officers, administrators, or leaders, unless otherwise noted.

## II. Reservable Free Speech Areas

Rudder Fountain Area, Lawrence Sullivan Ross Statue Area, and the West Mall Area are reservable free speech areas and will be reserved at the request of students and non-students for expressive activity. The act of confirming a reservation will ensure the availability of space. A reservation is not required, except as described in section III. Each area available for reservation is described below.

*Rudder Fountain Area*–space between Memorial Student Center and Rudder Tower. Sound equipment is allowed and is available for use in this area at a small fee. The volume of any sound equipment must be kept at a level that would not interfere with any academic or other program taking place in nearby buildings.

*Lawrence Sullivan Ross Statue Area*–space west of the Academic Building and near the statue of Lawrence Sullivan Ross. No sound equipment is permitted in this area. (This area is not available for expressive activity during Silver Taps and/or during the Ross Volunteer practice for Silver Taps.)

*West Campus Mall Area*–space east of the Heep Center and marked by flagpoles and plantings. No sound equipment is permitted in this area.

## III. Advance Reservation Requirements

In an effort to ensure safety and to promote an environment conducive to study, advanced reservation for expressive activity is required (in the form of an approved Reservation Request for Space) for events or activities that are promoted in advance, and/or sponsored by student organizations, and/or expected to draw a crowd of more than 25 people. Advance reservation is also required for activities near intersections, and/or in close proximity to academic buildings anytime classes, and/or study activities, and/or research are taking place.

## IV. Reservation Procedures

Individuals or groups who are either required to make advance reservation (see section III) or those individuals or groups who otherwise wish to make advance reservations shall request use of the space through the Scheduling Office on the second floor of Rudder Tower. If advance reservation is required, (see section III) requests must be made at least five business days in advance of the event. Additional collaboration and coordination may be required from a building/space proctor and Student Activities. Usually use of the space will be assigned to the person or organization that requests the area first. University sponsored events have first priority on the use of campus facilities. **The university reserves the right to locate any assembly so as to ensure that the activity does not interfere with the normal operation of the university or interfere with the rights of others.**

The decision to confirm a request for space will be based on proper and timely completion of the Reservation Request form, compliance with applicable sound and sign requirements, and availability of space. The decision to confirm will be based on the foregoing criteria, and in no circumstance will any decision be based on the content or viewpoint of the expressive activity or upon the expected reaction of others. If a request is denied, the rationale for the decision will be provided in writing. The denial of a reservation request can be appealed to the Vice President for Student Affairs or a designee.

At the time of the request the following information will be required:

- Name information of the person or organization sponsoring the event. Contact information for one individual who will be present during the course of the event.
- Location, date and time requested for the event.
- General purpose of the event.
- List of planned activities (i.e. speech or rally, march with signs, distribution of literature, sit-in).
- Special equipment requested.
- Anticipated attendance.

For recognized student organizations, an officer of the sponsoring organization must be present at the event, and during the entire course of the event.

## Guidelines for Expression

1. Disruptive Activity – Obstruction, disruption or interference with classes, research, administrative functions or other university activities is not permitted. Likewise, infringement on the rights of others is prohibited.
2. Reasonable Access – It is important to provide reasonable access to, and exit from, any office, classroom, laboratory or building. Likewise, vehicular and pedestrian traffic should not be obstructed.
3. Picketing – Picketing in an orderly manner outside of university buildings may be permitted. Such activities should not become disruptive nor should they impede access. Picketing is not permitted inside campus buildings.
4. Literature – Literature may be distributed in traditional and designated free speech areas. Such activities should not become disruptive nor should they impede access.
5. Symbolic Protest – Displaying a sign, gesturing, wearing symbolic clothing or otherwise protesting silently is permissible unless it is a disruptive activity or impedes access. In addition, such acts should not block the audience's view or prevent the audience from being able to pay attention.
6. Noise – Making sustained or repeated noise in a manner that substantially interferes with a speaker's ability to communicate his/her message is not permitted. Noise levels should not interfere with classes, meetings or activities in progress or the privacy of residence hall students.
7. Force or Violence – Any attempt to prevent a university activity or other lawful assembly by the threat or use of force or violence is not permissible.
8. Presenting Identification – In accordance with the Texas Education Code it is unlawful for any person on any property either owned or controlled by the university to refuse to identify him/herself to a university official in response to a request. For the purpose of these rules a person identifies him/herself by presenting student or faculty/staff ID card or state issued ID card.

**9.** Damage to Property – Any damage to university or personal property in the course of, or as a result of, an expressive activity is prohibited. Care should be taken to ensure that university and personal property is not damaged or destroyed. This includes the campus lawns, shrubs and trees.

**10.** Other University Rules – All applicable *University Student Rules* should be followed whenever engaging in activities on campus. Consult the University Student Rules booklet for further information.

All individuals participating in expressive activity are expected to comply with state and federal law, municipal ordinances, *Texas A&M University Student Rules* and the above guidelines. Failure to do so may result in immediate removal from the campus and any other appropriate action by university officials and/or University Police.

# Exhibit C

THE TEXAS TRIBUNE



HIGHER EDUCATION

# Faculty panel: Texas A&M wrongly fired professor after gender lesson

Texas A&M did not have good cause to fire a professor after a video of a gender lesson created a political storm, and the school failed to follow due process, a faculty appeal committee found.

BY JESSICA PRIEST
NOV. 22, 2025, 2:18 P.M. CENTRAL




Students walk out of the College of Liberal Arts and Social Sciences at Texas A&M University on Sept. 18, 2025, in College Station. Antranik Tavitian for The Texas Tribune

Texas A&M University did not have good cause to fire Melissa McCoul, an English professor thrust into the spotlight after a video of her discussing gender identity circulated online and drew political backlash, a faculty committee unanimously found in a new report.

The university fired McCoul after a student secretly recorded her in a summer class teaching that there are more than two genders. The video was posted to X by state Rep. **Brian Harrison**, R-Midlothian, an Aggie who has used his social media to pressure universities to remove course content he finds offensive.

Texas A&M did not dismiss her until after Harrison's post in September went viral. It said it did not **fire her** for teaching there are more than two genders, but for failing to change her course content to align with the catalog description. There is no state or federal law prohibiting instruction on gender identity in college classes. She appealed the termination through the university's Committee on Academic Freedom, Tenure and Responsibility.

An eight-member panel from the committee held a full-day hearing on Nov. 3 and issued its findings to Interim President Tommy Williams on Nov. 18. Williams can accept the finding and reinstate McCoul or reject it and uphold her termination.

The committee reviewed all three reasons Texas A&M gave for firing McCoul — that she failed to perform her duties, violated policies and acted unprofessionally — and unanimously rejected each one. It also found the university failed to investigate, did not follow its own policies and never proved the allegations used to justify her dismissal.

"The university did not provide any documentary evidence that it conducted an investigation, nor did it provide compelling testimony to explain the decision to forgo due process," the report said, adding that the lack of review "caused considerable confusion in the president's office and the TAMU administration."

Texas A&M administrators are required to meet with an instructor and notify them when a dismissal is being considered so they have an opportunity to respond before any action is taken. The committee said it heard testimony from university officials acknowledging that they didn't do that with McCoul.

The committee also found that McCoul was never told to change her course content and did not have the authority to assign a different course number, even though one university official cited that as "one of three strikes" against her.

Finally, the committee said the university should've investigated the student who recorded McCoul to determine whether her behavior violated university rules that state disrupting or interfering with instruction can lead to disciplinary action.

A separate faculty committee concluded in September that McCoul's firing appeared to **violate her academic freedom**, but university officials said that committee lacked authority to review her dismissal and rejected its findings.

Texas A&M said in a statement that officials are aware of the Committee on Academic Freedom, Tenure and Responsibility's "non-binding findings" and that Williams has received the report and will review it "carefully before making a decision in the coming days and weeks."

McCoul's attorney, Amanda Reichek, said in a statement that her client is "pleased and thankful" with the committee's findings and waiting to see if Williams will reinstate her. If he does not, she said, McCoul will "swiftly pursue her First Amendment, due process and breach of contract claims in court."

Reichek also argued the firing followed political pressure, saying "the sequence of events establishes that A&M terminated Dr. McCoul shortly after Governor Greg **Abbott implored them to on X**." She called the university's stated reasons "a pretext for the University's true motivation: capitulation to Governor Abbott's demands."

The incident involving McCoul triggered **restrictive curriculum policies** and **reviews** at Texas A&M and other university systems across the state. It also unfolded as **Senate Bill 37** took effect, giving governor-appointed regents greater authority over curriculum decisions.

Earlier this month, the Texas A&M Board of Regents **approved two new policies**. One requires each of its 12 campus presidents to sign off on any course that could be seen as advocating for "race and gender ideology or topics related to sexual orientation or gender identity." The other prohibits faculty from teaching material inconsistent with the approved syllabus for each course. Administrators also announced courses would be audited every semester using artificial intelligence.

*The Texas Tribune partners with Open Campus on higher education coverage.*

---

# Exhibit D

News Article

# Greg Abbott Issues Warning to Texas A&M President Over DEI

PUBLISHED
JAN 15, 2025 AT 01:22 PM EST



Texas Governor Greg Abbott at the Republican National Convention in Milwaukee on July 17, 2024. Abbott hit out at Texas A&M University following r... Read More | *Alex Wong/GETTY/GETTY*

By James Bickerton
US News Reporter

0 Share

Newsweek is a Trust Project member

Governor Greg Abbott has weighed in on reports that Texas A&M University planned to send a delegation to a Ph.D. conference in Chicago that is open only to participants who identify "as Black/African American, Latinx/Hispanic American, or Native American/Canadian Indigenous."

*Newsweek* contacted Texas A&M University and Abbott's press office for comment via telephone and email, respectively, outside regular office hours.

### Why It Matters

In 2023, Abbott signed Senate Bill 17 into law, which banned diversity, equity, and inclusion initiatives at public institutions of higher education in Texas.

Read More on U.S.



Judge Slams ICE Deportation of Man Tortured by His Government

5 min read



States Cut Funding for Dolly Parton's Child Reading Program

8 min read



Pete Hegseth Faces Questions as Army Sets Leadership Vacancy Record

7 min read

As a national conversation around DEI continues, many are curious about how the Texas law will be enforced.



Texas Gov. Greg Abbott speaking on stage on the third day of the Republican National Convention at the Fiserv Forum on July 17, 2024 in Milwaukee, Wis... Read More | *Alex Wong/GETTY/GETTY*

**What To Know**

On Monday, independent journalist Christopher F. Rufo shared internal Texas A&M emails that indicated the university planned to send representatives to a conference in March that was not available to those who identified as white or Asian.

Rufo wrote on X, formerly Twitter: "EXCLUSIVE: Texas A&M is sponsoring a trip to a DEI conference that prohibits whites and Asians from attending. The university falsely claims that this use of taxpayer funds does not violate the state's DEI ban. @TAMU is supporting racial segregation and breaking the law."

When a user brought Rufo's post to Abbott's attention, the governor replied: "Hell, no. It's against Texas law and violates the US Constitution. It will be fixed immediately or the president will soon be gone."

The intent of SB-17 is very clear in that regard. We will continue to honor both the letter and the intent of the law."

View this post on X

Welsh also sent an email to the university's faculty about his social media statement, adding that the institution would no longer be attending the conference.

"I don't believe we fully considered the spirit of our state law in making the initial decision to participate. This particular conference's limitations on the acceptance of race is not in line with the intent of SB-17, and, as a result, we will not be sending anyone to participate in this conference," Welsh wrote.

Abbott has won plaudits on the right by opposing what he calls woke ideology. In December, the state launched a lawsuit against the National Collegiate Athletic Association seeking to require the body to prohibit transgender athletes from participating in women's sports.

In May, Abbott told Texas A&M University that it would be "jeopardizing state funding" if it adopted a Biden administration update to Title IX that banned discrimination over gender identity.

#### What People Are Saying

**Rufo wrote on X following Welsh's announcement that Texas A&M University would not participate in the conference**: "WINNING: The president of Texas A&M has terminated the university's participation in a segregated conference. He admits that the university initially approved students to go to a conference that 'limited attendees by race.' But after he got caught, he changed his mind."

#### What Happens Next

It is unclear whether Abbott will regard the matter as closed now that Welsh has announced Texas A&M will not be attending the conference, or whether he is planning any further action.

In November, Republicans won the White House and a majority in both chambers of Congress, triggering speculation that they could try to introduce similar legislation on a national level.

View 0 Comments

# Exhibit E

January 16, 2025

# Texas A&M Pulls Out of Event Rufo Described as 'Racial Segregation'

The national conservative activist wrote on social media that a student recruiting conference violates the state's DEI ban because it excludes whites and Asians. Governor Abbott then threatened to fire the A&M president.

By Ryan Quinn

YOU HAVE 2/3 ARTICLES LEFT

**Explore how we got here — and see what comes next.**

Get unlimited access to our daily news and archives.

Subscribe



From left, Texas governor Greg Abbott, Texas A&M University president Mark A. Welsh III and conservative activist Christopher Rufo.

Photo illustration by Justin Morrison/Inside Higher Ed | Brandon Bell/Getty Images | Brett Coomer/Houston Chronicle/Getty Images | Thomas Simonetti/The Washington Post/Getty Images | McKenna Baker/iStock/Getty Images

---

Texas A&M University said this week it's no longer sending representatives to a conference aimed at recruiting prospective minority doctoral students after online accusations and threats—including from the governor.

First, Christopher Rufo, an anti–diversity, equity and inclusion activist and senior fellow at the conservative Manhattan Institute, alleged on social media that sponsoring a trip to the conference violated a state law banning DEI programs at public colleges. Then the state's Republican governor, Greg Abbott, piled on, writing that "it will be fixed immediately or the president will soon be gone."

The fallout may have spread beyond Texas A&M. *The Texas Tribune* reported that the PhD Project, the host of the March conference in Chicago, had listed on its website "at least eight other Texas public universities that have participated in the conference … but most were removed sometime Tuesday afternoon."


## Most Popular

**Investigation of Chinese Student Scholarships Raises Concern**

**Penn Now Enforcing Math Prerequisites**

**August Cuts to Start the Academic Year**


A spokeswoman for the University of Texas system, which includes most of the universities the *Tribune* said were listed, told *Inside Higher Ed* in an email that the UT system recommended Tuesday "to five UT academic institutions that had participated in The PhD Project to withdraw membership. It did not receive a directive from the governor's office." She didn't specify why the UT system made that recommendation.

A Texas Tech University spokeswoman told *Inside Higher Ed* that Texas Tech "was previously a partner of the PhD Project to support the development of doctoral students and faculty in academia. We are no longer affiliated with the organization." But she didn't specify when the affiliation ended.

A University of North Texas spokesperson said it "discontinued its affiliation with the PhD Project in early 2024. The university is working with them to remove our name from the list

of partners." The University of Houston didn't comment.

The incident continues the debate over how broadly Texas's Senate Bill 17, a 2023 law that banned DEI programs at public universities, should be interpreted—and how broadly anti-DEI laws elsewhere should be.

"There is no requirement in SB 17 that bans attending conferences that are restricted on the basis of race or identity," said Jeremy Young, director of state and higher education policy at PEN America, a free speech and academic freedom advocacy group. But Young said the vagueness of this and other anti-DEI legislation "opens these laws to the exact thing that Rufo and Governor Abbott have done here."

"I think the governor and Rufo are wrong, but I think that we're even having this conversation is evidence that the law is deeply broken and potentially unconstitutional," Young said.

Rufo kicked off the deluge of online criticism Monday, posting on X that he had an "EXCLUSIVE."

"Texas A&M [University] is sponsoring a trip to a DEI conference that prohibits whites and Asians from attending," Rufo wrote.

He included what appeared to be screenshots from the application for the PhD Project's upcoming annual conference, showing that prospective doctoral students must identify as Black, African American, Latino, Hispanic American, Native American or Canadian Indigenous if they wished to attend. The PhD Project, which didn't return requests for comment Wednesday, aims to diversify business schools by encouraging minorities to pursue doctorates, according to its website.

## Editor's Picks

**How New Visa Limits Are Already Affecting Colleges**

**The Fight for Fair Funding at One Historically Black Land-Grant University**

**DOD Demands 30 American Universities Audit Foreign Partnerships**

Rufo also attached screenshots of a Texas A&M employee email inviting faculty and advanced Ph.D. students to attend the conference to help recruit students. The university confirmed the email's authenticity.

"The university falsely claims that this use of taxpayer funds does not violate the state's DEI ban," Rufo wrote. "@TAMU is supporting racial segregation and breaking the law."

Kurt Schlichter, a conservative author, shared Rufo's post to his own followers and tagged Greg Abbott, Texas's Republican governor. Schlichter wrote, "Is my newly adopted state gonna put up with this crap? Because I came from California, and it leads to thousands of houses getting burned down."

Abbott responded to that by threatening to somehow oust the university's president, Mark A. Welsh III.

"Hell, no," Abbott posted. "It's against Texas law and violates the U.S. Constitution."

Firing the president is up to the Texas A&M Board of Regents, though the governor could apply pressure.

On Monday, Welsh, who didn't provide an interview, released a statement saying, "Texas A&M does not support any organization, conference, process or activity that excludes

people based on race, creed, gender, age or any other discriminating factor. The intent of SB 17 is very clear in that regard. We will continue to honor both the letter and the intent of the law."

According to the screenshots Rufo provided from a partial email, a university employee wrote that the A&M general counsel's office had concluded that "supporting The PhD Project is permissible under recruitment exemptions in SB 17."

Later, Welsh sent a statement to employees in the university's Mays Business School saying that "while the proper process for reviewing and approving attendance at such events was followed, I don't believe we fully considered the spirit of our state law in making the initial decision to participate." For future conferences and events, he said, "We need to be sure that attendance at those events is aligned with the very clear guidance we've been given by our governing bodies."

Young said it's "deeply troubling" that the Texas A&M president is saying he's complying with the spirit rather than the letter of the law.

"Complying with the spirit of the law in this case means complying with the wishes of politicians," he said. "That is a classic example of jawboning—his job is on the line."

## Written By

Ryan Quinn

## Share This Article

# Exhibit F

HIGHER ED DIVE

DIVE BRIEF

# Texas A&M fires professor after viral video, raising free speech concerns

The termination came the day after a state lawmaker shared the clip and accused the professor of perpetuating "DEI and LGBTQ indoctrination."

Published Sept. 10, 2025



Laura Spitalniak
Editor




*wellesenterprises via Getty Images*

Texas A&M University this week quickly fired a children's literature professor and removed a department head and a dean from their administrative positions after a state representative shared a video of the instructor teaching about gender identity.

On Monday, Texas State Rep. Brian Harrison took to social media to accuse the professor and Texas A&M of perpetuating "DEI and

LGBTQ indoctrination," a common refrain among conservative critics of higher education.

The video Harrison shared went viral, spurred conservative outcry and prompted the Texas A&M system to announce a coursework audit of every class at its 12 universities. Harrison also called for the flagship's president to be fired over the incident.

The speed and punitive nature of the university's response stirred outrage from faculty and free speech organizations and left the massive public system at the center of a maelstrom over academic freedom, due process and bans on diversity, equity and inclusion.

"We are witnessing the death of academic freedom in Texas, the remaking of universities as tools of authoritarianism that suppress free thought," Jonathan Friedman, managing director of Pen America's U.S. Free Expression Programs, said in a statement. "Faculty at Texas A&M and across the state have been put on notice: they must not teach about any concepts politicians disfavor, because Big Brother is watching."

## Ousted in a day

Harrison posted a two-minute video on Monday that he described, in all capital letters, as showing a student "kicked out of class after objecting to transgender indoctrination." The lawmaker also called on the Trump administration and Texas Gov. Greg Abbott to take action against the university.

In the video, a student tells a professor that teaching there are more than two genders goes against the student's religious beliefs and violates an executive order from President Donald Trump. Trump signed an executive order in January directing the federal government to only recognize two sexes, male and female, a position at odds with the scientific and medical communities.

The professor replies that the subject matter is not illegal to teach, despite what the student says, and tells them to leave if they choose.

Neither speaker's face is shown on camera, and the video is not dated or timestamped.

Texas A&M on Wednesday did not immediately respond to a request for comment and to verify the video.

## Swift and escalating responses from Texas A&M leaders

Texas A&M President Mark Welsh took to social media to respond to Harrison's video the same day.

In a late evening statement, Welsh said he learned Monday afternoon that leaders of the university's college of arts and sciences "approved plans to continue teaching course content that was not consistent with the course's published description."

As a result, Welsh told the university provost to immediately remove the college's dean and English department head from their administrative positions.

"Our students use the published information in the course catalog to make important decisions about the courses they take in pursuit of their degrees," Welsh said. "If we allow different course content to be taught from what is advertised, we let our students down."

The next morning, Welsh announced that the professor involved had been fired, just a day after he said he learned about the incident.

"This isn't about academic freedom; it's about academic responsibility," Welsh said in the Tuesday statement. "Our degree programs and courses go through extensive approval processes,

and we must ensure that what we ultimately deliver to students is consistent with what was approved."

Welsh also ordered the university's deans and department heads to audit the content of their courses "to ensure they align with the course descriptions." The flagship Texas A&M campus has 16,000 course sections, according to the president, and enrolls over 79,000 students.

The inconsistency between course descriptions and taught material was not a new problem, said Welsh. Earlier this year, the arts and sciences college signed off on another children's literature course for the summer term "that did not align with any reasonable expectation of standard curriculum for the course," he said.

> **This isn't about academic freedom; it's about academic responsibility.**
>
> Mark Welsh
> *President of Texas A&M University*

After someone raised the issue, the university provided students with alternatives to complete the class and "made changes to ensure this course content does not continue in future semesters," Welsh said. He did not provide further details on the summer course or the inconsistencies.

"At that time, I made it clear to our academic leadership that course content must match catalog descriptions for each and every one of our course sections," he said. But the president said the latest discrepancy between a course description and its content shows the problem persisted.

The system's board of regents also announced Tuesday that it had directed Chancellor Glenn Hegar to audit every course for "full compliance with all applicable laws."

In a statement, the board said it was working "to ensure that what happened this week will not be repeated," saying it "will not tolerate actions that damage the reputation of our institutions."

Auditing the entire system's courses will be a massive undertaking. The university system, one of the country's biggest, enrolls about 175,000 students across 12 institutions and has an annual budget of $8.1 billion, according to institutional data.

Hegar confirmed the systemwide audit shortly after the board's statement and applauded Welsh's decision to fire the professor.

"His action shows insubordination and indoctrination have no place on our campus or in our classrooms," Hegar said Tuesday evening.

### State pressure and federal inquiries

Abbott this week praised Welsh for stripping the college officials of their administrative positions and called for the "professor who acted contrary to Texas law" to be fired.

It is unclear what law the governor is referring to, and his office did not respond to questions Wednesday. In 2023, Texas passed a sweeping ban on most diversity, equity and inclusion work at public colleges, but the law does not affect what faculty can teach.

However, Harrison said on social media Tuesday that the professor's termination wasn't enough. "The President must also be fired," the state lawmaker said.

In his calls for governmental intervention, Harrison accused Welsh of mishandling the student's complaint about the professor. He

shared two audio recordings that he says include Welsh initially declining to fire the professor at the student's request and defending education on LGBTQ+ topics.

Abbott and Welsh have already clashed once this year. The governor threatened the Texas A&M leader's job after a university email invited some employees and Ph.D. students to attend a higher education conference for Black, Hispanic and Native American participants. Welsh ultimately said no one would attend, to comply with state law, The Texas Tribune reported.

Harrison also called on the U.S. departments of Education and Health and Human Services to investigate Texas A&M. The state lawmaker, who served as HHS' chief of staff during the first Trump administration, further requested the agencies "ensure that Texas universities receiving federal funds are complying with President Trump's Executive Orders."

Neither department responded to a request for comment on Wednesday.

Harmeet Dhillon, assistant attorney general for the U.S. Department of Justice's civil rights division, called Harrison's video "deeply concerning" in a Monday social media post and said her office would look into it.

### 'An abuse of their power'

Texas A&M's rapid-fire termination of the professor, removal of academic leaders from administrative roles, and decision to audit all coursework drew significant condemnation from faculty groups and free speech advocates.

> **Faculty at Texas A&M and across the state have been put on notice: they must not teach about any concepts**

> **politicians disfavor, because Big Brother is watching.**
>
> Jonathan Friedman
> *Managing director of Pen America's U.S. Free Expression Programs*

Zeph Capo, president of Texas American Federation of Teachers, said Wednesday that neither recent state laws nor Trump's executive orders supersede the U.S. Constitution, adding that nothing legally takes away faculty's right to due process and free speech.

"Lawmakers and the governor himself using their considerable platforms to publicly call for the removal of a faculty member, a dean, a department chair, and the president of the university based on viral video clips is an abuse of their power and a level of histrionics that ought to concern us all," Capo said in statement. "This is not normal, and we cannot let this race to a moral panic become the new normal."

The Texas Conference of the American Association for University Professors sounded alarms Wednesday after Texas A&M announced its systemwide course audit.

"What has happened at Texas A&M this week should concern every Texan," Texas-AAUP said. "Not only has the integrity of academic freedom come under fire, but the due process rights of a faculty member have been trampled at the urging of state politicians + the governor himself."

The same day, the University of Texas-Austin's AAUP chapter expressed solidarity with its Texas A&M peers and cast doubt on Abbott's accusation that the professor had violated state law.

A petition to reinstate the fired professor and Texas A&M administrators to their positions garnered over 1,900 signatures as of Wednesday evening.

# Exhibit G

THE TEXAS TRIBUNE

DONATE School Ratings Big Bend THC Ban U.S. Senate Polls TribFest 2026

HIGHER EDUCATION

# Texas A&M System declines to reinstate fired lecturer despite faculty panel's findings

A vice chancellor upheld the firing of Melissa McCoul, seen in a viral video being confronted by a student on her gender identity teachings, saying the termination was done with "good cause."

BY JESSICA PRIEST
DEC. 24, 2025, 4:58 P.M. CENTRAL



James Hallmark, vice chancellor for academic affairs for the Texas A&M University System, gives a presentation on course review to the Committee on Academic and Student Affairs during the University System Board of Regents

meeting at the Texas A&M Hotel and Conference Center in College Station on Nov. 13, 2025. Courtney Sacco for The Texas Tribune

Listen to this article
Texas A&M System declines to reinstate fired lecturer despite faculty panel's findings
About 3 Minutes
1x
Everlit

Audio recording is automated for accessibility. Humans wrote and edited the story. See our **AI policy**, and give us **feedback**.

Texas A&M University will not reinstate a lecturer who was fired in the fall after a video of her teaching about gender identity in a children's literature class went viral, despite a faculty appeals panel unanimously concluding that her dismissal was not justified.

The New York Times **first reported** Wednesday that interim Texas A&M president Tommy Williams deferred the decision to the university system, and that James Hallmark, the system's vice chancellor for academic affairs, wrote in a Dec. 19 memo that Melissa McCoul's termination in September was supported by "good cause." He did not explain his reasoning.

McCoul's attorney, Amanda Reichek, confirmed to The Texas Tribune that this sequence of events occurred.

"Dr. McCoul is disappointed by the University's unexplained decision to uphold her termination, but looks forward to pursuing her First Amendment, Due Process, and breach of contract claims in court very soon," Reichek wrote in a statement.

Chris Bryan, the system's vice chancellor of marketing and communications, also confirmed McCoul was not reinstated, but declined to comment further.

**McCoul was fired in September** after a student over the summer secretly recorded a classroom exchange in which the student disagreed with McCoul about whether it was legal to teach that there are more than two genders. The student then met with — and also secretly recorded — then-university president Mark Welsh III, who initially refused to fire McCoul. State Rep. **Brian Harrison**, R-Midlothian, posted the videos on X weeks after they were made.

Although there is no law prohibiting instruction that acknowledges more than two genders, Welsh did eventually fire her after the videos drew conservative backlash, saying her teaching

was not consistent with the course description. **Welsh later resigned**.

After McCoul's firing, the university system began reviewing courses across its 12 universities, including through the use of **an artificial intelligence tool**. On Dec. 18, the Board of Regents **passed** a policy prohibiting courses from "advocating race or gender ideology, or topics related to sexual orientation or gender identity" except in certain non-core or graduate courses that are reviewed, shown to serve a "necessary educational purpose" and approved in writing by a campus president.

Two faculty panels have found McCoul's termination **was not justified** and that her academic freedom was violated, concluding the university fired her over what she taught and failed to follow required dismissal procedures.

The controversy at Texas A&M, along with new laws expanding the power of governor-appointed regents over curriculum, hiring and discipline and expression on campuses, sparked changes across Texas higher education, with university systems launching course audits and adopting new restrictions on how race, gender and sexuality are taught.

*The Texas Tribune partners with Open Campus on higher education coverage.*

*Disclosure: The New York Times, Texas A&M University and the Texas A&M University System have been financial supporters of The Texas Tribune, a nonprofit, nonpartisan news organization that is funded in part by donations from members, foundations and corporate sponsors. Financial supporters play no role in the Tribune's journalism. Find a complete **list of them here**.*

---

© 2026 The Texas Tribune
Powered by Newspack

# Exhibit H

# 08.01 Civil Rights Protections and Compliance

Revised November 13, 2025 (MO -2025)
~~Revised May 29, 2025 (MO 087-2025)~~
Next Scheduled Review: ~~May 29~~November 13, 2030
Click to view Revision History.

## Policy Summary

This policy outlines the civil rights protections provided by The Texas A&M University System (system) to employees, students, applicants for employment and admission, and the public, and sets forth procedures and responsibilities for compliance with applicable laws and regulations.

## Definitions

Diversity, Equity, and Inclusion – means engaging in any of the following actions:

1. Influencing hiring or employment practices with respect to race, sex, color, or ethnicity, other than through the use of equal opportunity described in Section 1.1;
2. Promoting differential treatment of or providing special benefits to individuals in violation of Section 2.1;
3. Promoting policies or procedures about race, color, or ethnicity, except as expressly authorized by OGC in accordance with state law; or
4. Conducting trainings, programs, or activities about race, color, ethnicity, gender identity, or sexual orientation, other than those expressly authorized by OGC in accordance with state law.

Diversity, Equity, and Inclusion Office – means a member office, division, or other unit that is established for the purpose of engaging in a diversity, equity, and inclusion function.

Gender Ideology – means a concept that self-assessed gender identity should replace the biological category of sex or that biological sex has less value or legitimacy than self-assessed gender identity.

Race Ideology – means a concept that attempts to shame a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy or conspiracy, ascribe to them less value as contributors to society and public discourse because of their race or ethnicity, or assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world. This also includes course content that promotes activism on issues related to race or ethnicity, rather than academic instruction.

## Policy

1. AUTHORITY AND SCOPE OF THE EQUAL OPPORTUNITY PROGRAM

1.1 The system provides equal opportunity for employment to all persons regardless of race, color, sex, religion, national origin, age, disability, genetic information, veteran status, or any other classification protected by federal, state or local law and strives to achieve full and equal employment opportunity throughout the system.

1.2 The System Ethics and Compliance Office (SECO), in coordination with the Office of General Counsel (OGC), is responsible for the system's compliance with civil rights laws and regulations. This includes, but is not limited to, addressing charges or complaints filed with federal, state and local agencies, and audits or compliance reviews of policies and procedures carried out by the U.S. Department of Labor, the Equal Employment Opportunity Commission, the Texas Workforce Commission's Civil Rights Division, the U.S. Department of Education's Office of Civil Rights, and other state and federal civil rights compliance agencies.

1.3 The system promotes equal employment opportunity through its procedures, training, compliance with applicable legal requirements, and other methods authorized by federal regulations.

2. PROHIBITED ACTIONS

2.1 Prohibited Discrimination or Instruction

a. System Employment. No individual will be subjected to discrimination in system employment on the basis of race, color, sex, religion, national origin, age, disability, genetic information, veteran status, or any other classification protected by federal, state or local law.

b. Other System Programs and Activities. No individual will, on the basis of any classification protected by state, federal, or local law, be excluded from participation in, or be denied the benefit of, or be subjected to discrimination under any system program or activity. No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity, unless the course and the relevant course materials are approved in advance by the member CEO.

2.2 Except as required by federal law, a member or member employee must not:

a. establish or maintain a diversity, equity, and inclusion office, or hire or assign an employee or contractor to perform diversity, equity, and inclusion functions; or

b. compel, require, induce, or solicit any person to provide a statement about diversity, equity, and inclusion or give preferential treatment to any person based on the provision of a statement about diversity, equity, and inclusion.

2.3 Except as required by federal law, a member or member employee must not require, as a condition of enrollment at the member or performing any member function, any person to participate in a diversity, equity, and inclusion training that includes a training, program, or activity about race, color, ethnicity, gender identity, or sexual orientation,

unless developed and approved by OGC in accordance with state law.

2.4 Retaliatory action of any kind is prohibited when taken against a complainant, respondent, witness or other person participating in a discrimination investigation, complaint, hearing or suit. Such retaliatory action is regarded as a separate and distinct cause for complaint and possible disciplinary action, including dismissal or expulsion.

2.5 The prohibitions in Sections 2.2 and 2.3 do not apply to the following:

a) Academic course instruction;
b) An employee or student's scholarly research or creative work;
c) An activity of a student organization registered with or recognized by a member;

d) A guest speaker or performer on a short-term engagement;
e) Policies, practices, procedures, programs, or activities to enhance student academic achievement or postgraduate outcomes without regard to race, sex, color, or ethnicity;
f) Data collection; or
g) Student recruitment or admissions.

3. RESPONSIBILITIES

3.1 Each member chief executive officer (CEO) is responsible for equal opportunity and program accessibility in accordance with federal, state and local laws and regulations and system policy.

3.2 SECO, in coordination with OGC, serves as the liaison between members and federal, state and local compliance agencies. SECO is also responsible for the coordination of all civil rights reporting requirements for the system and its members under applicable state and federal regulations.

3.3 Each member CEO must appoint, a Title IX of the Education Amendments of 1972 Coordinator, a Section 504 of the Rehabilitation Act of 1973 Coordinator and other administrators who oversee the implementation of guidelines to ensure compliance with legal and regulatory provisions under this policy.

4. PROCEDURES

4.1 The administrators appointed under Section 3.3 must inform SECO as soon as a charge or complaint of discrimination or notice of civil rights audit, compliance review or other inquiry is received from a federal, state or local agency.

4.2 The system developed a regulation providing systemwide standards for the receipt and processing of complaints of discrimination.

4.3 A member may not spend state funds appropriated for a fiscal year until the system submits a report to the legislature and the Texas Higher Education Coordinating Board certifying the system's compliance with Texas Education Code Section 51.3525 during the preceding state fiscal year. SECO implements monitoring processes to assess member compliance with Texas Education Code Section 51.3525 throughout the state fiscal year.

The System Internal Audit Department includes DEI compliance in its systemwide risk assessment as part of the annual audit plan process. Audits are conducted as necessary based on the annual risk assessment. SECO annually provides a report to the Board of Regents (board) for the August regular meeting and the board approves SECO's submission of this report on behalf of the system. This section takes effect January 1, 2024 for money appropriated for the state fiscal year beginning September 1, 2024.

4.4 The board designates the chancellor or designee to provide legislative testimony in accordance with Texas Education Code Section 51.3525. This section takes effect January 1, 2024.

## Related Statutes, Policies, or Requirements

The Equal Pay Act of 1963
Title VI of the Civil Rights Act
Title VII of the Civil Rights Act of 1964, as amended
The Age Discrimination in Employment Act of 1967
Title IX of The Education Amendments of 1972
The Rehabilitation Act of 1973, as amended
The Americans with Disabilities Act of 1990, as amended
The Genetic Information Nondiscrimination Act of 2008
Executive Order 14173
Tex. Educ. Code Sec. 51.3525 ~~(Effective January 1, 2024)~~
Tex. Educ. Code § 51.354
Tex. Lab. Code Ch. 21, Employment Discrimination
Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended
Uniformed Services Employment and Reemployment Rights Act
System Policy *07.01, Ethics*

## Member Rule Requirements

A rule is not required to supplement this policy.

## Contact Office

Ethics and Compliance
(979) 458-6203

# Exhibit I

# 08.01 Civil Rights Protections and Compliance

Revised December 18, 2025 (MO -2025)
Next Scheduled Review: December 18, 2030
Click to view Revision History.

## Policy Summary

This policy outlines the civil rights protections provided by The Texas A&M University System (system) to employees, students, applicants for employment and admission, and the public, and sets forth procedures and responsibilities for compliance with applicable laws and regulations.

## Definitions

Diversity, Equity, and Inclusion – means engaging in any of the following actions:

1. Influencing hiring or employment practices with respect to race, sex, color, or ethnicity, other than through the use of equal opportunity described in Section 1.1;
2. Promoting differential treatment of or providing special benefits to individuals in violation of Section 2.1;
3. Promoting policies or procedures about race, color, or ethnicity, except as expressly authorized by OGC in accordance with state law; or
4. Conducting trainings, programs, or activities about race, color, ethnicity, gender identity, or sexual orientation, other than those expressly authorized by OGC in accordance with state law.

Diversity, Equity, and Inclusion Office – means a member office, division, or other unit that is established for the purpose of engaging in a diversity, equity, and inclusion function.

Gender Ideology – means a concept that self-assessed gender identity should replace the biological category of sex or that biological sex has less value or legitimacy than self-assessed gender identity.

Race Ideology – means a concept that attempts to shame a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy or conspiracy, ascribe to them less value as contributors to society and public discourse because of their race or ethnicity, or assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world. This also includes course content that promotes activism on issues related to race or ethnicity, rather than academic instruction.

## Policy

1. AUTHORITY AND SCOPE OF THE EQUAL OPPORTUNITY PROGRAM

1.1 The system provides equal opportunity for employment to all persons regardless of race, color, sex, religion, national origin, age, disability, genetic information, veteran status, or any other classification protected by federal, state or local law and strives to achieve full and equal employment opportunity throughout the system.

1.2 The System Ethics and Compliance Office (SECO), in coordination with the Office of General Counsel (OGC), is responsible for the system's compliance with civil rights laws and regulations. This includes, but is not limited to, addressing charges or complaints filed with federal, state and local agencies, and audits or compliance reviews of policies and procedures carried out by the U.S. Department of Labor, the Equal Employment Opportunity Commission, the Texas Workforce Commission's Civil Rights Division, the U.S. Department of Education's Office of Civil Rights, and other state and federal civil rights compliance agencies.

1.3 The system promotes equal employment opportunity through its procedures, training, compliance with applicable legal requirements, and other methods authorized by federal regulations.

2. PROHIBITED ACTIONS

2.1 Prohibited Discrimination or Instruction

a. System Employment. No individual will be subjected to discrimination in system employment on the basis of race, color, sex, religion, national origin, age, disability, genetic information, veteran status, or any other classification protected by federal, state or local law.

b. Other System Programs and Activities. No individual will, on the basis of any classification protected by state, federal, or local law, be excluded from participation in, or be denied the benefit of, or be subjected to discrimination under any system program or activity. No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity. Upon prior written approval of the member CEO after review of the course and relevant course materials, specific non-core curriculum or graduate courses in some disciplines may teach race or gender ideology, or topics related to sexual orientation or gender identity. Such approval may be granted in limited circumstances upon demonstration of a necessary educational purpose.

2.2 Except as required by federal law, a member or member employee must not:

a. establish or maintain a diversity, equity, and inclusion office, or hire or assign an employee or contractor to perform diversity, equity, and inclusion functions; or

b. compel, require, induce, or solicit any person to provide a statement about diversity, equity, and inclusion or give preferential treatment to any person based on the provision of a statement about diversity, equity, and inclusion.

2.3 Except as required by federal law, a member or member employee must not require, as a condition of enrollment at the member or performing any member function, any person

to participate in a diversity, equity, and inclusion training that includes a training, program, or activity about race, color, ethnicity, gender identity, or sexual orientation, unless developed and approved by OGC in accordance with state law.

2.4 Retaliatory action of any kind is prohibited when taken against a complainant, respondent, witness, or other person participating in a discrimination investigation, complaint, hearing, or suit. Such retaliatory action is regarded as a separate and distinct cause for complaint and possible disciplinary action, including dismissal or expulsion.

2.5 The prohibitions in Sections 2.2 and 2.3 do not apply to the following:

a) Academic course instruction (governed by Section 2.1(b) of this policy);
b) An employee or student's scholarly research or creative work;
c) An activity of a student organization registered with or recognized by a member;
d) A guest speaker or performer on a short-term engagement;
e) Policies, practices, procedures, programs, or activities to enhance student academic achievement or postgraduate outcomes without regard to race, sex, color, or ethnicity;
f) Data collection; or
g) Student recruitment or admissions.

3. RESPONSIBILITIES

3.1 Each member chief executive officer (CEO) is responsible for equal opportunity and program accessibility in accordance with federal, state and local laws and regulations and system policy.

3.2 SECO, in coordination with OGC, serves as the liaison between members and federal, state, and local compliance agencies. SECO is also responsible for the coordination of all civil rights reporting requirements for the system and its members under applicable state and federal regulations.

3.3 Each member CEO must appoint a Title IX of the Education Amendments of 1972 Coordinator, a Section 504 of the Rehabilitation Act of 1973 Coordinator and other administrators who oversee the implementation of guidelines to ensure compliance with legal and regulatory provisions under this policy.

4. PROCEDURES

4.1 The administrators appointed under Section 3.3 must inform SECO as soon as a charge or complaint of discrimination or notice of civil rights audit, compliance review, or other inquiry is received from a federal, state, or local agency.

4.2 The system developed a regulation providing systemwide standards for the receipt and processing of complaints of discrimination.

4.3 A member may not spend state funds appropriated for a fiscal year until the system submits a report to the legislature and the Texas Higher Education Coordinating Board certifying the system's compliance with Texas Education Code Section 51.3525 during the preceding state fiscal year. SECO implements monitoring processes to assess member compliance with Texas Education Code Section 51.3525 throughout the state fiscal year.

The System Internal Audit Department includes DEI compliance in its systemwide risk assessment as part of the annual audit plan process. Audits are conducted as necessary based on the annual risk assessment. SECO annually provides a report to the Board of Regents (board) for the August regular meeting and the board approves SECO's submission of this report on behalf of the system. This section takes effect January 1, 2024 for money appropriated for the state fiscal year beginning September 1, 2024.

4.4 The board designates the chancellor or designee to provide legislative testimony in accordance with Texas Education Code Section 51.3525. This section takes effect January 1, 2024.

## Related Statutes, Policies, or Requirements

The Equal Pay Act of 1963
Title VI of the Civil Rights Act
Title VII of the Civil Rights Act of 1964, as amended
The Age Discrimination in Employment Act of 1967
Title IX of The Education Amendments of 1972
The Rehabilitation Act of 1973, as amended
The Americans with Disabilities Act of 1990, as amended
The Genetic Information Nondiscrimination Act of 2008
Executive Order 14173
Tex. Educ. Code Sec. 51.3525
Tex. Educ. Code § 51.354
Tex. Lab. Code Ch. 21, Employment Discrimination
Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended
Uniformed Services Employment and Reemployment Rights Act
System Policy *07.01, Ethics*

## Member Rule Requirements

A rule is not required to supplement this policy.

## Contact Office

Ethics and Compliance
(979) 458-6203

# Exhibit J

**From:** LaRue, John
**To:** Gordon, Janet
**Subject:** Fw: Agenda Item 2 - Revised Exhibit - December 18, 2025
**Date:** Friday, December 19, 2025 10:07:35 AM
**Attachments:** TAMUS Policy 08.01 REVISED FINAL.pdf

---

Get Outlook for iOS

---

**From:** Rudowsky, Catherine <catherine.rudowsky@tamucc.edu>
**Sent:** Friday, December 19, 2025 8:57:07 AM
**To:** Miller, Kelly <kelly.miller@tamucc.edu>; LaRue, John <john.larue@tamucc.edu>
**Subject:** Fw: Agenda Item 2 - Revised Exhibit - December 18, 2025

FYI.

---

**From:** Hallmark, James R. <JHallmark@tamus.edu>
**Sent:** Thursday, December 18, 2025 5:57 PM
**To:** A&M System CAOs (Chief Academic Officers) <CAOs@tamus.edu>
**Cc:** A&M System CAOs' Assistants <CAOs-Assistants@tamus.edu>
**Subject:** FW: Agenda Item 2 - Revised Exhibit - December 18, 2025

See attached. The Board tweaked Policy 08.01 this morning, the language change was to capture the intent from last November's meeting: no advocacy in any of the classes, no teaching of selected topics in the core, teaching said topics in other courses could be allowed when clear educational purpose justified such (president has to sign off on list of approved courses).

JRH

**Dr. James Hallmark | Vice Chancellor for Academic Affairs**
Office of Academic Affairs
JHallmark@tamus.edu

1122 TAMU| College Station, TX 77840-7896
Tel. 979.458.6070 | Fax 979.458.6044 | www.tamus.edu
The Texas A&M University System

# Exhibit K

**From:** Hallmark, James R.
**To:** A&M System CEOs - Presidents
**Cc:** A&M System CEOs" Assistants (CEAs) - Universities
**Subject:** FAQs for Implementation of changes to 08.01 and 12.01
**Date:** Wednesday, December 3, 2025 8:45:37 PM
**Attachments:** FAQ Implementation of 08.01 and 12.01 revisions FINAL 12.03.2025.pdf

---

Presidents,

Please see attached FAQs regarding your implementation of changes to System policies 08.01 and 12.01. Please contact me with questions you may have regarding these FAQs or the implementation of these policy changes. Thank you.

JRH

**Dr. James Hallmark | Vice Chancellor for Academic Affairs**
Office of Academic Affairs
JHallmark@tamus.edu

1122 TAMU| College Station, TX 77840-7896
Tel. 979.458.6070 | Fax 979.458.6044 | www.tamus.edu
The Texas A&M University System

# Implementation of 08.01 and 12.01 Changes
# FAQs

**Should universities implement/improve their course and syllabus review process?**

**Yes.**

- Where a regular review does not exist, universities should establish a process for regular review and approval of courses to assess the course's relevance to the program's curriculum, fidelity to the body of knowledge in the discipline, and alignment with post-graduation needs of the students enrolled in the class.
- Universities should also regularly check compliance with Educ. Code 51.974 to ensure that accurate course information is publicly available, searchable and easy to locate online.

**However,**

- A university-level course review will supplement and not supplant the system-level course review.

**Should there be variance in what is taught (and approved) based on the level of the course?**

**Yes. Curriculum is developmentally based. A freshman's academic experience should differ from an upper division student and that of a graduate student.**

- Undergraduate Core
  - Core curriculum courses must be foundational and necessary to prepare students for civic and professional life. (Policy 11.06, § 2; Edu. Code 51.315(b))
  - Core curriculum courses must also comply with applicable federal and state law and system policies. These courses must not *advocate* race or gender ideology, sexual orientation, or gender identity. (System Policy 08.01, § 2.1.(b))
  - If there is a circumstance in which a core curriculum course should *address* race or gender ideology, sexual orientation, or gender identity, the university must be vigilant to ensure:
    - the content is fundamental to a sound postsecondary education;
    - the course complies with all legal and policy requirements; and
    - the course does not *advocate* race or gender ideology, sexual orientation, or gender identity.
- Undergraduate Non-Core
  - The body of knowledge for the discipline and the workforce or graduate/professional study needs of the students after graduation should be considered in assessing the appropriateness of material for a course.
  - Advocating race or gender ideology, sexual orientation, or gender identity is prohibited, unless the course and the relevant course materials are approved in advance by the university president.

  - If there is a circumstance in which an undergraduate course should *address* race or gender ideology, sexual orientation, or gender identity, the university must be vigilant to ensure:
    - it is the student's choice to take this course and is not in some way "required", **and/or**
    - the course does not *advocate* race or gender ideology, sexual orientation, or gender identity.
- Graduate/Professional
  - Advocating race or gender ideology, sexual orientation, or gender identity is prohibited in all courses regardless of level, including graduate courses, unless the course and the relevant course materials are approved in advance by the University President.
  - These topics can and should be addressed/taught in appropriate disciplines when part of the discipline's body of knowledge.
  - Teaching legal and medical material (e.g., Title IX, case law, medical procedures, etc.) is not prohibited when it is appropriate to the course and is consistent with the body of knowledge for the discipline.
  - When in doubt, seek the approval of the university president under System Policy 08.01, § 2.1(b).

**Can faculty teach difficult and historically sensitive subjects, subjects that may evoke strong reactions?**

**Yes, such topics should be taught, as they are academically appropriate, empirically grounded, and essential components of the disciplinary knowledge. Use a reasonableness standard.**

- Teaching difficult subjects is expected and the system policy does not prohibit it if it is related to the classroom subject and meets other system policy requirements. Faculty are expected to teach historically significant, empirically established, and discipline-grounded topics, even when these topics may be emotionally difficult or sensitive for some students. For example:
  - System policy does not preclude a course on U.S. History including information on slavery and its many impacts, including racism. We would expect our faculty teaching U.S. History to include this material.
  - System policy does not preclude a course on the Holocaust presenting its history and impacts. We would expect our faculty teaching WWII History to include this material.
  - System Policy does not preclude a course on human sexuality including material on same sex relationships. We would expect our faculty teaching human sexuality to include this material.
  - System Policy does not preclude a course on gender from including material on different perspectives on gender, including perspectives that some may not find agreeable. We would expect our faculty teaching gender courses to include this material.

- System Policy does not preclude a course on world religions. We would expect our faculty teaching world religions to include material on various world religions, including those less familiar in America.
- System Policy does not preclude a course on political science from examining government actions. We would expect our faculty teaching political science courses to study government shutdowns, aid to foreign countries, alliances, etc.

- System Policy 12.01, § 1.2, prohibits a faculty member from introducing a controversial matter that has no relation to the classroom subject or teaching material that is inconsistent with the approved syllabus for the course. Teaching grounded disciplinary content is always allowed; imposing personal belief or ideological adherence is prohibited.

**What does it mean to "advocate?"**

- To *Advocate* is when teaching and course materials extend learning objectives in a way that requires students to hold certain beliefs, and/or to ridicule certain beliefs. For examples in this context, to advocate is:
  - To lead, encourage, or require a student to feel personal shame over treatment of slaves in America; or conversely, to justify slavery in America as acceptable.
  - To lead, encourage, or require students to hold certain beliefs on same sex relationships or criticize/ridicule their beliefs on such relationships; or conversely, to criticize/ridicule or shame individuals who are in same sex relationships or are supportive of same sex relationships.
  - To lead, encourage, or require students to hold certain beliefs on gender identity whether the required belief is in two genders assigned at birth, or belief in many self-identified genders.
  - To lead, encourage, or require students to adhere to or embrace a specific religion, any religion, or no religion.
  - To lead, encourage, or require students to hold specific positions on political policies and actions, or ridicule those who may believe certain positions.
- Students' beliefs on these matters (among others) will vary. The faculty can, should, and must teach difficult subjects for the students to know and understand different perspectives, but not for the student to hold specific beliefs on those subjects for purposes of grading, nor may students be ridiculed for holding beliefs contrary to that of others.

**What happens when a class veers off the assigned material?**

**Apply a reasonableness standard.**

- A student asks a question that is off topic: (all of these responses are acceptable)
  - Acknowledge the question and engage in a brief dialogue on the topic, perhaps including other students in the discussion.
  - Acknowledge the question and suggest willingness to discuss outside of class.
  - Acknowledge the question but redirect the focus of the class stay on the assigned topic.
- An event occurs the students find exciting or troubling but is unrelated to the course learning material. This could include sporting events, a speaker coming to campus, world events, traumatic events, etc.

  - Acknowledge the event and, to the best the faculty member is able and feels comfortable, allow the students to share their excitement and feelings for a reasonable period of time, but ultimately return to the assigned materials as soon as possible.
- An event occurs that is consistent with the course learning materials but was unanticipated and not included in the syllabus.?
  - The faculty member can adjust to use the event in the classroom. These are remarkable learning opportunities. Faculty should understand and recognize different beliefs and perspectives among their students, but the discussion and change of focus is allowable as long as it fills a curricular purpose and contributes to fulfilling the course's learning outcomes.

**What happens if a faculty member chooses to teach material that has been reviewed and ruled inappropriate for that course or level?**

**The faculty member would be subject to progressive disciplinary action consistent with a violation of System Policy.**

- Just as there will be differences in judgment among faculty members when reviewing course materials, there could be differences in judgment between faculty in a program and the university president. The president's decision should be informed by faculty with expertise in the body of knowledge of the discipline, but ultimately the university president is the decider by policy.
- Willful failure to follow a president's decision will result in disciplinary action appropriate to the scope and scale of the action.
- Shifts in course content may occur either due to student interest or events occurring locally, nationally, or internationally. Faculty should consult with their department heads regarding such shifts to assure fidelity to the purpose of the course.

**Is the faculty member accountable for student led and student selected projects that may focus on gender ideology, sexual orientation, or gender identity?**

**No. Not necessarily. Apply a reasonableness standard.**

- The faculty member must remain neutral and avoid nudging the student or encouraging the student to pursue such topics in a course that is not approved for such a focus. However, if the student chooses to focus on one or more of these topics and the project meets the expected learning outcomes for the course, the student's choice is to be respected and the faculty member is expected to support the student's choice and is not otherwise prohibited.

# Exhibit L

| | |
|---|---|
| **From:** | Sodolak, Brian |
| **To:** | Rodriguez, Dee |
| **Cc:** | Spillers, Vickie; Agnew, Kelsey; Bell Sims, Jackie |
| **Subject:** | Meeting Transcripts |
| **Date:** | Monday, November 17, 2025 9:57:52 AM |
| **Attachments:** | Meeting of the Board of Regents - Including the Academic and Student Affairs, Research, Audit, Buildings and Physical Plant, and Finance Committees (Session I).txt<br>Meeting of the Board of Regents - Including the Academic and Student Affairs, Research, Audit, Buildings and Physical Plant, and Finance Committees (Session II).txt |

**Brian Sodolak | Assistant Director, IT Service Desk**
System Office IT Services
bsodolak@tamus.edu

1124 TAMU | College Station, TX 77840-7896
Tel. 979.458.6432 | Fax: 979.458.6299 | www.tamus.edu

Moore / Connally Building
301 Tarrow St. Suite 372
College Station, TX 77840-7896

THE TEXAS A&M UNIVERSITY SYSTEM

Thank you.
Well, howdy and good morning.
Howdy.
Let's try that again.
Howdy.
Howdy.
Ah, we're getting somewhere.
Good morning.
I will now reconvene the board meeting at 934 a .m. with a quorum of the board p
resent.
The board met in executive session yesterday, November
12th, from 12 p .m. to 5 p .m. and
this morning from 8 a .m. to 924 a .m.
We considered executive session agenda items and considered the board's decision
to move
to the next session.
The board has conferred with Chancellor Hager, several system and university adm
inistrators,
and our attorneys on personal, real personnel,
real property gifts, and legal matters.
Before I go any further, I would like to offer a
prayer and our thoughts to one of our regents
that is going into surgery this morning as we speak
for a pulmonary aneurysm that happened
yesterday.
In our board meeting, we have a question from the board.
We have a question from the board.
I had been on this board meeting, Regent Mahomes, and
I know you all joined me in those thoughts
and prayers as this board certainly has those thoughts
and prayers, and we are very optimistic
about the success of the surgery and we're glad
that, very candidly, we're glad the event
happened yesterday, because otherwise it would not have been a good result.
So it did work out the way it needed to, but he is in surgery.
believe as we speak and so just keep him in your prayers and appreciate that ver
y
very much. Now I would like to ask Isaiah Cray to please come forward for our
invocation. Isaiah is a management information systems major from Grand
Prairie, Texas. He has served as the associate staff member of operations and
the director of finance for the Southwestern Black Students Leadership
Conference. He also served as a personal relations
officer for the Black Student
Alliance at Texas A &M Galveston. Since being
enrolled at A &M, Isaiah has obtained
certificates in Microsoft's Azure Fundamentals, Azure
Data, AI Fundamentals,
Power Platform Fundamentals, as well as many other certificates in the Amazon
Web Services cloud performance. Isaiah is scheduled to graduate
in the fall of 2021. He will be a senior executive officer of the Department of

Business and Technology. He will graduate in December
2025. After graduation, he plans to work in data analysis and software
development and use his experience to start a company focused on IT
consulting for small to mid -sized companies. He is no stranger to this group
here at the board. He has been a fantastic assistant over in our board
annex and with working with him over the years as all
the board members, Isaiah, you
you set a very good example of how you can be a great assistant to the board.
Isaiah is a very high standard and thank you for
being associated with us. So now if you can lead us.
Isaiah Williams Thank you, Chairman, for the kind

And a quick shout out to Tarleton State
for successfully piloting this process.
And following the successful data pilot, refined requests
have now gone out to our universities
such that here in the next month or so
we will have all members' data for deep analysis.
Upon identifying and identifying
the courses through this review process,
each identified course will be reviewed
by the university offering the course,
distinguishing between core curriculum, major requirements,
electives.
Courses will be looked at with an eye
toward the appropriateness of the materials
applicability
to the degree program.
I'm sorry, I skipped a line here.
Toward the appropriateness of the material for a core curriculum
course, the materials applicability to the degree
degree program, the established body of
knowledge supporting its discipline, enrollment trends
and student demand, and alignment with Texas
workforce needs and career pathways, and student
outcomes and program sustainability.
Presidents will report findings and recommendations
to the board for consideration.
Importantly, by doing this carefully and well, we have created a process that is
replicable
each semester instead of a one -off process.
It allows for thorough and valid review every semester,
supporting a discipline of accountability
and continuous improvement.
One additional component of this process deserves mention.
We've created a robust review process and are confident it will enhance our abil
ity
to ensure our students receive the course content appropriate for their enrolled
courses.
To provide students an opportunity to comment on
their experiences in a classroom, we've
expanded our ethics point process.
We've created a process to include a 24 -7 reporting mechanism for students to r
eport
what they consider inaccurate or misleading
course content, content that does not align
with the approved syllabus or other course -related issues.
When a student reports inappropriate material,
system staff will review the concern in a
timely manner and work with the appropriate university to address any concerns.

Chairman Torn, this concludes my comments on the course review process and its s
tatus,
and I'm open for questions or comments from the Board of Trustees.
I will now turn it over to Dr. Hallmark.
Thank you, Dr. Hallmark.
I appreciate that we have created a process that is
distinguishable for its deep dive
into the courses and that we've not settled for a superficial review.
We are thinking longer term about academic responsibility
and creating a process that
is repeatable.
Further, we've created a reporting mechanism.
We've created a reporting mechanism to listen to our students' concerns.

# Exhibit M

# TEXAS A&M UNIVERSITY COMPLETES SPRING 2026 COURSE REVIEW TO SUPPORT ACADEMIC INTEGRITY

Jan. 30, 2026

Texas A&M University today announced the completion of its comprehensive course review for the Spring 2026 semester, conducted in accordance with **Texas A&M University System Policies 08.01** (https://policies.tamus.edu/08-01.pdf) and **12.01** (https://policies.tamus.edu/12-01.pdf). The review examined approximately 5,400 course syllabi to ensure full compliance with System policy requirements.

A total of six courses were canceled, representing 0.11 percent of the courses offered this semester. The canceled courses include: one in the Bush School of Government and Public Service; two in the College of Arts and Sciences; two in the College of Agriculture and Life Sciences; and one in the College of

Education and Human Development. Throughout the process, university advisors ensured that course cancellations did not create any obstacles that would prevent students from staying on track to graduate as planned.

“For 150 years, Texas A&M has led the way for higher education in Texas, our mission unchanged,” Interim President Tommy Williams said. “Strong oversight and standards protect academic integrity and restore public trust, guaranteeing that a degree from Texas A&M means something to our students and the people who will hire them. That has been our focus through this process and will remain our focus as we move forward.”

Across campus, faculty members and department heads completed most of the work to ensure compliance. They modified hundreds of syllabi across 17 colleges and schools to meet policy requirements, underscoring the central role of faculty and departmental leadership in the process.

Additionally, as part of the review, deans of schools and colleges were given the opportunity to request exceptions for non–core curriculum courses if topics are germane to the subjects being taught. Ultimately, 54 courses were forwarded to the president and provost for final review, and the president granted 48 exceptions.

The university also announced plans to wind down academic program offerings, including bachelors’ degrees and a graduate certificate, in Women’s and Gender Studies. The decision reflected both the requirements of System policies and limited student interest in the program based on enrollment over the past several years. Students currently pursuing degrees in Women’s and Gender Studies will be allowed to complete their programs.

Provost Alan Sams also expressed his gratitude to the university’s faculty and staff for their diligence and professionalism throughout the review.

“By working together, we will continue to provide a rigorous, relevant and future-focused educational experience that prepares our students to lead with knowledge, integrity and purpose,” he said.

University officials also noted that — despite reports to the contrary — students at Texas A&M will continue to have opportunities in at least a dozen classes to study the works of Plato this semester and in every semester moving forward.

# Exhibit N

THE TEXAS TRIBUNE



HIGHER EDUCATION

# Texas A&M eliminates women's and gender studies degree program

University leaders also said six courses were canceled and 48 exceptions were granted under new rules on race and gender.

BY JESSICA PRIEST
JAN. 30, 2026, 1:37 P.M. CENTRAL UPDATED JAN. 30, 2026, 5:05 P.M. CENTRAL




Texas A&M University campus in College Station on Nov. 13, 2025. Cassie Stricker for The Texas Tribune

Texas A&M University announced Friday that it is eliminating its women's and gender studies degree program.

University leaders made the announcement alongside the results of a campuswide course review launched after a video of a student confronting a professor over gender identity content went viral last fall and **sparked political backlash**.

Interim President Tommy Williams made the decision because of low enrollment and cost, College of Arts and Sciences Interim Dean Simon North and Senior Executive Associate Cynthia Werner said in an email to faculty obtained by The Texas Tribune.

"We know this is devastating news," the administrators said. "One of the primary duties of university administrators is to be good stewards of public money. Even the smallest programs require ongoing investment in faculty time, staff support, and administrative oversight."

Texas A&M offered a bachelor of arts degree, a bachelor of science degree, an undergraduate minor and a graduate certificate in women's and gender studies. The program has 25 students seeking a major and 31 seeking a minor. Students already enrolled will be allowed to complete their programs over the next six semesters, but no new students will be accepted.

Women's and gender studies at Texas A&M is an interdisciplinary program rather than an academic department and does not have tenure-line faculty, relying instead on professors from other departments to teach its courses.

Chaitanya Lakkimsetti, an associate professor of sociology who has long taught in the women's and gender studies program, said it served as one of the few spaces on campus bringing students and faculty together from across disciplines. She said she met an English professor through the program, a connection that eventually led to a book they wrote on the #MeToo movement.

She said she taught a feminist theory graduate seminar last spring that enrolled 15 students from multiple departments, an unusually high number for a graduate course.

Lakkimsetti said she was saddened the program would no longer exist as a space for that kind of collaboration.

"We have to keep fighting and standing up for our students' right to have an education that is critical for the times they live in," she said.

After last fall's controversy, the Texas A&M University System Board of Regents passed a policy restricting how race and gender could be discussed in class and ordered a sweeping review of course offerings. Specifically, faculty may not advocate "race or gender ideology" or topics related to sexual orientation or gender identity unless a campus president grants a written exception for certain non-core or graduate-level courses that serve a necessary or educational purpose. System officials have not defined what qualifies as a necessary educational purpose.

University officials said Friday they examined 5,400 course syllabi for the spring semester and canceled six courses, or about 0.11 percent of courses offered. Officials said academic advisers ensured the cancellations did not disrupt students' progress toward graduation.

Faculty leaders disputed that framing. Leonard Bright, president of the Texas A&M chapter of the American Association of University Professors, said the six-course figure reflects only the most visible outcomes of the review and understates its impact.

Bright, whose own **ethics course was canceled** earlier this month under the same policy, said many faculty changed syllabi or removed material to avoid scrutiny.

"The cancellations and the exemptions are just the tip of the iceberg," Bright said.

The university confirmed that the six-course total announced Friday does not include courses that faculty revised or altered earlier in the review process.

The Tribune previously reported that North told faculty that **roughly 200 courses** in the College of Arts and Sciences had been identified as potentially affected by the policy, with some classes canceled, renumbered or altered before the spring semester began.

The canceled courses the university announced Friday were spread across the Bush School of Government and Public Service and the colleges of Arts and Sciences, Agriculture and Life Sciences, and Education and Human Development.

The university later identified canceled courses as Introduction to Race and Ethnicity; Religions of the World; Ethics in Public Policy; Diversity in Sport Organizations; Cultural

Leadership and Exploration for Society; and Diversity, Equity and Inclusion in Youth Development Organizations. All six were undergraduate courses.

Officials said the bulk of the course content review was performed by faculty and their department heads, who altered hundreds of syllabi. Deans forwarded 54 courses to the president and provost for final review. The president granted 48 exceptions.

Texas A&M has made similar cuts in recent years. In 2024, regents voted to eliminate dozens of low-enrollment minors and certificates, including an **LGBTQ+ studies minor**, a decision faculty said was made in response to conservative criticism and with limited faculty input.

Regents are expected to hear a presentation Thursday on low-performing academic programs across the system's 12 campuses, according to an agenda for its quarterly meeting.

PEN America, a national advocate for freedom of expression, criticized the decision Friday, saying Texas A&M is "running roughshod over academic freedom."

"Forcing faculty to restrict what they teach censors the knowledge accessible to students," said Amy Reid, program director for Freedom to Learn at PEN America. "Limiting what can be taught in a university classroom is not education, it's ideological control."

*The Texas Tribune partners with Open Campus on higher education coverage.*

*Disclosure: Texas A&M University has been a financial supporter of The Texas Tribune, a nonprofit, nonpartisan news organization that is funded in part by donations from members, foundations and corporate sponsors. Financial supporters play no role in the Tribune's journalism. Find a complete **list of them here**.*

---

# Exhibit O

requiring education, not advocation, and we are requiring that we teach what we say we are going to teach. He said the committee recommended approval of these two items to the full Board.

Regent Bellinger provided comments regarding the testimony received on Item 4.2.

On motion of Regent Torn, seconded by Regent Brooks, and by a unanimous vote, the following minute orders were approved (264-265).

~~~~

**MINUTE ORDER 264-2025 (ITEM 4.1)**

**APPROVAL OF NEW SYSTEM POLICY 08.02,**
**EXPRESSIVE ACTIVITY ON CAMPUS,**
**THE TEXAS A&M UNIVERSITY SYSTEM**

The new System Policy 08.02, Expressive Activity on Campus, as shown in the attached exhibit, is approved, effective immediately.

**MINUTE ORDER 265-2025 (ITEM 4.2-REVISED EXHIBIT)**

**APPROVAL OF REVISIONS TO POLICY 08.01,**
**CIVIL RIGHTS PROTECTIONS AND COMPLIANCE AND POLICY 12.01,**
**ACADEMIC FREEDOM, RESPONSIBILITY AND TENURE,**
**THE TEXAS A&M UNIVERSITY SYSTEM**

The revisions to System Policies 08.01, Civil Rights Protections and Compliance, and Policy 12.01, Academic Freedom, Responsibility and Tenure, as shown in the attached exhibits, are approved, effective immediately. These revised policies apply beginning with the Spring Semester 2026.

~~~~

**REPORT FROM THE COMMITTEE ON RESEARCH**

Regent Bellinger, Chairman of the Committee on Research, said the committee met earlier that day. He reported that the committee received presentations on the new Research Excellence Fund, which will accelerate research growth across all A&M System member institutions. Regent Bellinger added that the funding amount for this fund for FY 2026 had been considered by the Committee on Finance under Item 1.1. He said that the committee also received presentations from three select A&M System researchers. Regent Bellinger noted that there were no agenda items for committee consideration and therefore no Board action at this time.

~~~~
~~~~

# Exhibit P

# 02.01 Board of Regents

Revised May 19, 2022 (MO -2022)
Next Scheduled Review: May 19, 2027
Click to view Revision History.

## Policy Summary

This policy sets out the roles and responsibilities of the Board of Regents (board) of The Texas A&M University System (system) as assigned by law to the governing boards of institutions of higher education and clearly delineates the responsibilities of the board, its requirement for public transparency of agenda items and how the board is to be supported.

## Policy

1. RESPONSIBILITIES OF THE BOARD

The board accepts and adopts the following role and responsibilities assigned by law to governing boards of institutions of higher education:

1.1 The board provides the policy direction for the system and its member universities and agencies. The board will formulate, update, adopt and publish official policies for the system as described in System Policy *01.01, System Policies and Regulations, and Member Rules and Procedures*.

1.2 The board, being composed of lay members, exercises the traditional and time-honored role for such boards as its role has evolved in the United States and constitutes the keystone of the governance structure. In this regard the board:

(a) preserves institutional independence and defend its right to manage its own affairs through its chosen administrators and employees;

(b) enhances the public image of each member under its governance;

(c) interprets the community to each campus and interpret each campus to the community;

(d) nurtures each member under its governance to the end that each member achieves its full potential within its role and mission; and

(e) insists on clarity of focus and mission of each member under its governance.

1.3 In addition to other powers and duties assigned in law, the board:

(a) establishes, for each member under its control and management, goals consistent with the role and mission of the member;

(b) appoints the chancellor of the system;

(c) appoints and annually evaluates each member chief executive officer (CEO) and assist each CEO in the achievement of performance goals;

(d) sets campus admissions standards consistent with the role and mission of the member and in consideration of the admissions standards of similar institutions nationwide having a similar role and mission, and assuring impartial and equitable admission requirements as known by best practices in Texas and nationally in compliance with the Texas Higher Education Coordinating Board (coordinating board) uniform admission policy; and

(e) ensures that its formal position on matters of importance to the members under its governance is made clear to the coordinating board when such matters are under consideration by the coordinating board.

1.4 Each member of the board has the legal responsibilities of a fiduciary in the management of funds under the control of members subject to the board's control and management.

1.5 In fulfilling the responsibilities outlined in Section 1.3(c), the board receives recommendations from the chancellor and, in Section 1.3(d), the board receives recommendations from the respective presidents, agency directors and the chancellor.

1.6 No less than every two years, the board conducts a self-evaluation of its responsibilities and expectations. The board determines the appropriate method and scope of its assessment.

2. PUBLIC TESTIMONY ON AGENDA ITEMS AT REGULAR MEETINGS OF THE BOARD OF REGENTS

A member of the public is allowed to present written and oral testimony, for a reasonable amount of time as determined by the chairman of the board, on any agenda item listed on the agenda for a regular meeting of the board that is open to the public. Testimony on a topic other than an agenda item will not be allowed.

2.1 A member of the public who desires to present written or oral testimony must deliver the following information to the executive director to the board of regents by e-mail, mail, facsimile, or hand delivery, no later than 24 hours before the regular board meeting is posted to begin:

(a) the name of the person submitting testimony;

(b) the agenda item to be addressed; ***and either***

(c) the written testimony ***or*** a written statement of the substance of the oral testimony.

E-mail delivery is not accepted unless the e-mail is sent to the address designated for public testimony requests on the board's website. Copies of the testimony or substance of the oral testimony are distributed to the board members at or before the board meeting.

2.2 The board considers the public testimony properly presented on an agenda item before voting on that agenda item. The chairman or a majority of the board may prescribe sanctions against any person exceeding established time limits or speaking on a topic other than the agenda item.

3. OFFICE OF THE BOARD OF REGENTS

3.1 The board appoints the executive director, Board of Regents. The executive director to the board is responsible for the management and operation of the Office of the Board of Regents under the direction of the chairman of the board.

The executive director to the board is authorized to process and recommend the approval of vouchers for the expenditure of funds allocated to the Office of the Board of Regents. The vouchers are reviewed for consistency with system and state purchasing and accounting requirements and approved by the System Office of Budgets and Accounting before being forwarded for payment.

The executive director to the board works cooperatively with the chancellor in all matters related to official actions by the board, including the planning and establishment of agenda for meetings, presentation and distribution of informational materials, and related functions.

The executive director to the board may be directed by the board chairman, chairs of board committees or individual board members to assist them by collecting information and reports from the chancellor and CEO or members of their respective staffs, and may make other requests to such persons on behalf of the board. It is the responsibility of the chancellor and CEOs to respond to such requests in a timely manner.

3.2 The mission of the Office of the Board of Regents is to provide staff support to each member of the board in the discharge of his or her responsibilities.

3.3 Objectives of the Office of the Board of Regents include the following:

(a) Make arrangements for all meetings of the board and its committees, and all special events hosted by the board, including arrangements for regents' travel.

(b) Under the direction of the chairman of the board, or the chairman of a standing committee, prepare and distribute the agenda and necessary supporting documentation for all meetings of the board and its committees and post notices of all meetings, and the subject matter, as required by law.

(c) Record, prepare and index the official minutes of the board and its committees and distribute copies thereof.

(d) File all official records, documentary files, correspondence and proceedings of the board and its committees.

(e) Prepare vouchers for payment to vendors and reimbursements to regents and maintain all accounting documents.

(f) Assist regents as requested with matters affecting students, faculty, staff, legislators, governmental officials and visitors.

3.4 The board annually establishes goals for the Office of the Board of Regents and evaluates the performance of staff in relation to goal accomplishment.

## Related Statutes, Policies, or Requirements

Tex. Educ. Code § 51.352

Tex. Educ. Code § 51.357

Tex. Educ. Code § 85.21

Public Testimony Information – The Texas A&M University System Board of Regents

System Policy *01.01, System Policies and Regulations, and Member Rules and Procedures*

## Member Rule Requirements

A rule is not required to supplement this policy.

## Contact Office

Board of Regents
(979) 845-9600

# Exhibit Q

THE TEXAS A&M UNIVERSITY SYSTEM

OFFICE OF THE CHANCELLOR



# LEADERSHIP

## Board of Regents

Members of The Texas A&M University System Board of Regents are appointed by the governor of the state of Texas to oversee the administration of and set policy for the A&M System's statewide network of 12 universities, a comprehensive health science center, eight state agencies, Texas A&M-Fort Worth and Texas A&M-RELLIS. They are responsible for ensuring a quality undergraduate and graduate education experience, the promotion of academic research and technology and the dispersal of outreach and public service programs developed by the A&M System. The board actively supports state legislative and higher education leadership to position Texas at the forefront of higher education nationally.

## A&M System Leadership

The Chancellor provides executive leadership for the Texas A&M University System, guiding vision, strategy, and enterprise-wide priorities. Vice Chancellors lead major portfolios and drive coordinated execution across universities, agencies, and system offices.

## Chief Executive Officers

The Texas A&M University System chief executive officers serve the chancellor and Board of Regents through their leadership in developing the overall strategic planning of the A&M System's 12 universities and eight state agencies and ensuring their sustained performance to the maximum benefit of the state of Texas and the nation.

THE TEXAS A&M UNIVERSITY SYSTEM

301 Tarrow Street

College Station, TX 77840

**VIEW ON GOOGLE MAPS**

979.458.7700

**General Inquiries**

TEXAS AMERICA 250

## LATEST NEWS




**TEXAS A&M FOREST SERVICE LAUNCHES TEXAS PRESCRIBED BURN MANAGER INSURANCE PROGRAM**

*August 31, 2026*

Texas A&M Forest Service today launched the Texas Prescribed Burn Manager Insurance Program to provide liability protection for qualified certified and insured prescribed burn managers. The program was established in response to House Bill 2563 in an effort to increase the use of prescribed fire as a wildfire mitigation tool by reducing liability barriers faced by prescribed burn managers.

## NATIONAL AVIATION LEADERS CONVENE TO DISCUSS THE FUTURE OF FLIGHT

August 24, 2026

Texas A&M-Fort Worth will host The Future of Advanced Aviation as part of its Voices That Innovate Speaker Series, presented by PNC Bank. The event will bring together leaders from industry, higher education and government.




**AVIATION TRAINING ENTERS NEW ERA AT TEXAS A&M-RELLIS**

August 20, 2026

More than 80 years after military aviators trained at Bryan Army Air Field, aviation training is taking a new form on the same historic ground.

## USEFUL LINKS

- Board of Regents Agenda Items
- Brand Guide
- Fact Book
- Staff Directory
- Policies Library
- Report a Website Problem

## FEATURED LINKS

- The RELLIS Campus
- News
- Research

→ Veterans

© 2026 – TEXAS A&M UNIVERSITY SYSTEM

# Exhibit R

**From:** Dotson, Amanda
**To:** Woods, Robin; Billington, Brian; Gordon, Janet
**Subject:** FW: FAQ Draft REVISION to 08.01
**Date:** Wednesday, January 14, 2026 12:29:51 PM
**Attachments:** Implementation of 08.01 and 12.01 revisions FINAL 1.14.26.docx

---

**From:** Woodall, Jill <jwoodall@tamus.edu>
**Sent:** Wednesday, January 14, 2026 12:28 PM
**To:** A&M System CEOs - Presidents <Presidents@tamus.edu>
**Cc:** A&M System CAOs (Chief Academic Officers) <CAOs@tamus.edu>; A&M System CEOs' Assistants (CEAs) - Universities <CEAs-Universities@tamus.edu>; A&M System CAOs' Assistants <CAOs-Assistants@tamus.edu>
**Subject:** FAQ Draft REVISION to 08.01

Presidents,

Please find attached updated FAQs reflecting the most recent changes to the implementation of revisions to 08.01.

Thank you!

**Jill Woodall | Chief of Staff, Academic Affairs**
Office of Academic Affairs
JWoodall@tamus.edu

1122 TAMU | College Station, TX 77840-7896
Cell. 979.402.0711 | www.tamus.edu

THE TEXAS A&M UNIVERSITY SYSTEM

# Implementation of 08.01 and 12.01 Changes
# FAQs
(Updated January 14, 2026)

**Should universities implement/improve their course and syllabus review process?**

**Yes.**

- Where a regular review does not exist, universities should establish a process for regular review and approval of courses to assess the course's relevance to the program's curriculum, fidelity to the body of knowledge in the discipline, and alignment with post-graduation needs of the students enrolled in the class.
- Universities should also regularly check compliance with Educ. Code 51.974 to ensure that accurate course information is publicly available, searchable and easy to locate online.

**However,**

- A university-level course review will supplement and not supplant the system-level course review.

**Should there be variance in what is taught (and approved) based on the level of the course?**

**Yes. Curriculum is developmentally based. A freshman's academic experience should differ from an upper division student and that of a graduate student.**

- Undergraduate Core
  - Core curriculum courses must be foundational and necessary to prepare students for civic and professional life. (Policy 11.06, § 2; Edu. Code 51.315(b))
  - Core curriculum courses must also comply with applicable federal and state law and system policies. These courses must not teach or *advocate* race or gender ideology, sexual orientation, or gender identity. (System Policy 08.01, § 2.1.(b)) See definitions at the end of this document.
- Undergraduate Non-Core
  - The body of knowledge for the discipline and the workforce or graduate/professional study needs of the students after graduation should be considered in assessing the appropriateness of material for a course.
  - Advocating race or gender ideology, sexual orientation, or gender identity is prohibited
  - If there is a circumstance in which an undergraduate non-core course should *address* race or gender ideology, sexual orientation, or gender identity the course and the relevant course materials must be approved in advance by the university president and
    - it is the student's choice to take this course and is not in some way "required", **<u>and/or</u>**
    - the course does not *advocate* race or gender ideology, sexual orientation, or gender identity.

- Graduate/Professional
  - Advocating race or gender ideology, sexual orientation, or gender identity is prohibited in all courses regardless of level, including graduate courses.
  - These topics can and should be addressed/taught in appropriate disciplines when part of the discipline's body of knowledge and approved in advance by the university's president.
  - Teaching legal and medical material (e.g., Title IX, case law, medical procedures, etc.) is not prohibited when it is appropriate to the course and is consistent with the body of knowledge for the discipline.
  - When in doubt, seek the approval of the university president under System Policy 08.01, § 2.1(b).

**Can faculty teach difficult and historically sensitive subjects, subjects that may evoke strong reactions?**

**Yes, such topics should be taught, as they are academically appropriate, empirically grounded, and essential components of the disciplinary knowledge. Use a reasonableness standard.**

- Teaching difficult subjects is expected and the system policy does not prohibit it if it is related to the classroom subject and meets other system policy requirements. Faculty are expected to teach historically significant, empirically established, and discipline-grounded topics, even when these topics may be emotionally difficult or sensitive for some students. For example:
  - System policy does not preclude a course on U.S. History including information on slavery and its many impacts, including racism. We would expect our faculty teaching U.S. History to include this material.
  - System policy does not preclude a course on the Holocaust presenting its history and impacts. We would expect our faculty teaching WWII History to include this material.
  - System Policy does not preclude a course on human sexuality including material on same sex relationships. We would expect our faculty teaching human sexuality to include this material.
  - System Policy does not preclude a course on gender from including material on different perspectives on gender, including perspectives that some may not find agreeable. We would expect our faculty teaching gender courses to include this material.
  - System Policy does not preclude a course on world religions. We would expect our faculty teaching world religions to include material on various world religions, including those less familiar in America.
  - System Policy does not preclude a course on political science from examining government actions. We would expect our faculty teaching political science courses to study government shutdowns, aid to foreign countries, alliances, etc.
- System Policy 12.01, § 1.2, prohibits a faculty member from introducing a controversial matter that has no relation to the classroom subject or teaching material that is inconsistent with the approved syllabus for the course. Teaching grounded disciplinary

content is always allowed; imposing personal belief or ideological adherence is prohibited.

**What does it mean to "advocate?"**

- To *Advocate* is when teaching and course materials extend learning objectives in a way that requires students to hold certain beliefs, and/or to ridicule certain beliefs. For examples in this context, to advocate is:
  - To lead, encourage, or require a student to feel personal shame over treatment of slaves in America; or conversely, to justify slavery in America as acceptable.
  - To lead, encourage, or require students to hold certain beliefs on same sex relationships or criticize/ridicule their beliefs on such relationships; or conversely, to criticize/ridicule or shame individuals who are in same sex relationships or are supportive of same sex relationships.
  - To lead, encourage, or require students to hold certain beliefs on gender identity whether the required belief is in two genders assigned at birth, or belief in many self-identified genders.
  - To lead, encourage, or require students to adhere to or embrace a specific religion, any religion, or no religion.
  - To lead, encourage, or require students to hold specific positions on political policies and actions, or ridicule those who may believe certain positions.
- Students' beliefs on these matters (among others) will vary. The faculty can, should, and must teach difficult subjects for the students to know and understand different perspectives, but not for the student to hold specific beliefs on those subjects for purposes of grading, nor may students be ridiculed for holding beliefs contrary to that of others.

**What happens when a class veers off the assigned material?**

**Apply a reasonableness standard.**

- A student asks a question that is off topic: (all of these responses are acceptable)
  - Acknowledge the question and engage in a brief dialogue on the topic, perhaps including other students in the discussion.
  - Acknowledge the question and suggest willingness to discuss outside of class.
  - Acknowledge the question but redirect the focus of the class stay on the assigned topic.
- An event occurs the students find exciting or troubling but is unrelated to the course learning material. This could include sporting events, a speaker coming to campus, world events, traumatic events, etc.
  - Acknowledge the event and, to the best the faculty member is able and feels comfortable, allow the students to share their excitement and feelings for a reasonable period of time, but ultimately return to the assigned materials as soon as possible.
- An event occurs that is consistent with the course learning materials but was unanticipated and not included in the syllabus.
  - The faculty member can adjust to use the event in the classroom. These are remarkable learning opportunities. Faculty should understand and recognize different beliefs and perspectives among their students, but the discussion and

change of focus is allowable as long as it fills a curricular purpose and contributes to fulfilling the course's learning outcomes.

**What happens if a faculty member chooses to teach material that has been reviewed and ruled inappropriate for that course or level?**

**The faculty member would be subject to progressive disciplinary action consistent with a violation of System Policy.**

- Just as there will be differences in judgment among faculty members when reviewing course materials, there could be differences in judgment between faculty in a program and the university president. The president's decision should be informed by faculty with expertise in the body of knowledge of the discipline, but ultimately the university president is the decider by policy.
- Willful failure to follow a president's decision will result in disciplinary action appropriate to the scope and scale of the action.
- Shifts in course content may occur either due to student interest or events occurring locally, nationally, or internationally. Faculty should consult with their department heads regarding such shifts to assure fidelity to the purpose of the course.

**Is the faculty member accountable for student led and student selected projects that may focus on gender ideology, sexual orientation, or gender identity?**

**No. Not necessarily. Apply a reasonableness standard.**

- The faculty member must remain neutral and avoid nudging the student or encouraging the student to pursue such topics in a course that is not approved for such a focus. However, if the student chooses to focus on one or more of these topics and the project meets the expected learning outcomes for the course, the student's choice is to be respected and the faculty member is expected to support the student's choice and is not otherwise prohibited.

DEFINITIONS:

Gender Ideology – means a concept that self-assessed gender identity should replace the biological category of sex or that biological sex has less value or legitimacy than self-assessed gender identity.

Race Ideology – means a concept that attempts to shame a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy or conspiracy, ascribe to them less value as contributors to society and public discourse because of their race or ethnicity, or assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world. This also includes course content that promotes activism on issues related to race or ethnicity, rather than academic instruction.