**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, LEONARD BRIGHT, VANITA REDDY, LANDON SADLER, and AARON GEORGE,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT L. ALBRITTON, JAY GRAHAM, DAVID C. BAGGETT, JOHN W. BELLINGER, JAMES R. BROOKS, MICHAEL A. HERNANDEZ III, WILLIAM MAHOMES JR., KELLEY SULLIVAN GEORGIADES, and SAM TORN, in their official capacities as members of the Texas A&M University System Board of Regents,<br><br>Defendants. | CIVIL ACTION NO. 4:26-cv-06268 |

**<u>DECLARATION OF AARON GEORGE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

1. I, Aaron George, declare as follows:

2. I am a Plaintiff in the above-captioned matter. I am suing on behalf of myself and as a member of American Association of University Professors (AAUP).

3. I am a tenured Assistant Professor of History at Tarleton State University, which is a founding member of the Texas A&M System. Tarleton is one of 11 higher educational institutions administered by the Texas A&M Board of Regents.

4. I am a member of the Tarleton State University chapter of the American Association of University Professors.

5. I am a published historian and I hold a doctorate and masters degrees in U.S. History. I specialize in intellectual and cultural history, and I am an expert in the field of LGBTQ+ history. I have written an academic monograph and have published multiple articles in academic publications. My scholarship explores changing notions of gender after World War II, historical LGTBQ+ social movements, masculinity, and the intellectual history of America in the 20th century. A true and correct copy of my CV is attached here as **Exhibit A.**

6. I have taught at Tarleton State University for eight years. Throughout my time at Tarleton, I have taught two core classes at least a dozen times: HIST 1301 (History I: U.S. History up to Civil War) and HIST 1302 (History II: U.S. History Reconstruction to the Present). I have also taught many upper-level history courses, such as a course on the Gilded Age, a course focused on the politics of 20th century America, the History of Sexuality in America, and a capstone course for history majors. In addition, I have previously taught graduate level seminars, such as a course on LGBTQ+ movements in American history for Tarleton masters' students.

**<u>The Censorship Policy</u>**

7. I first learned about Policy 08.01 ("Censorship Policy") on December 8, 2025 through an email I received from my department chair, Dr. Jensen Branscombe. Dr. Branscombe announced that the Texas A&M Board of Regents had passed the Censorship Policy, and that Tarleton State University President Hurley was coordinating with the deans to ensure that all syllabi were compliant with the Policy. The administration instructed us to upload our spring syllabi to the Simple Syllabus platform for review and warned that we should be aware of any language in our syllabi that "may fall under the categories listed in the

08.01 rule revision." In the following sentence, the department chair, drew our attention to a "related[]" list of "DEI Compliance Review Search Terms." The department chair acknowledged that this list of words was created for compliance with SB 17, a law that does not concern courses, nevertheless she warned that if such terms appeared in our syllabi, the course would likely receive extra scrutiny. I interpreted this portion of Dr. Branscombe's email to mean that the DEI terms would be used in determining whether we were complying with the Censorship Policy and that we should avoid use of such terms in our syllabus. The email included an attached FAQ document, a copy of university administration correspondence, a copy of the Censorship Policy, and a list of DEI search terms that had been generated as part of SB17 compliance review. A true and correct copy of this email and the attached documents are included as **Exhibits B, C, D, E, and F**.

8. Throughout my time at Tarleton, it always seemed that the University deeply valued academic freedom and the benefits of exposing students to a wide range of viewpoints to explore. When I saw the Censorship Policy, I was shocked and appalled that the Board of Regents would censor faculty in such an extreme manner. However, at first I believed that it would not affect me or my courses. As an American history professor, discussion of race, gender, and sexual orientation are essential to my courses, which cover the abolition of slavery, universal suffrage, and the civil rights movement. As I do not advocate any specific beliefs in my classes, I did not at first believe that this policy would threaten discussion of these topics. As a historian, I do not engage in "advocacy" of any kind in my classroom; my role is to gather historical facts and encourage my students to practice analyzing those facts from as objective a view as possible. However, I and other faculty members that I spoke to were anxious about this policy, given that, as written, it was hopelessly vague and

it was unclear how it would be enforced. The University's communications only exacerbated the confusion.

9. As instructed, I uploaded my syllabi to the Simple Syllabus portal for the courses I was set to teach in Spring 2026 semester, HIST 1302 (U.S. History from Reconstruction to the Present) and HIST 4311 (Research in American Political History, 1929 to the Present). My syllabi included readings and topics that I have assigned without any issues or student complaints throughout the eight years I have been teaching at Tarleton. I didn't hear anything further, so I assumed that my syllabi were not flagged for further review.

**<u>Censorship of HIST 4311 (Research in American Political History, 1929 to the Present)</u>**

10. On January 6, 2026, Dr. Branscombe told me that my spring syllabi were approved. However, the next day, on January 7, 2026, I received a follow-up email. Dr. Branscombe said: "Hello Aaron, I know I messaged you yesterday about your syllabi being approved, but the upper administration is also reviewing syllabi and flagged your 4311 syllabus due to a couple of reading assignments. I spoke with the dean yesterday to provide an explanation for why those readings were included and he sent it forward to the provost for approval. The decision of the provost is to make changes to two of the reading assignments in order for the class to proceed. The readings in question are your primary source *The Gay Manifesto* and the book *White Flight*. Our options for proceeding are for you to change those readings and related content in class. Or, if you are not comfortable doing that, we will need to cancel the class and find another one for you to teach. Please let me know your thoughts. We can have a follow-up conversation to discuss these options if you prefer. Just let me know." A true and correct copy of this email is attached as **Exhibit G**.

11. HIST 4311 (Research in American Political History, 1929 to the Present) is an upper-level course. In the past, both of these have been key texts in my classroom. *White Flight* is an award-winning book by the esteemed historian Kevin Kruse; it provides a history of desegregation and the civil rights movement in Atlanta in the 1950s and 1960s. *The Gay Manifesto* is a historical document written by Carl Whitman in 1970; it provides a firsthand account of how leftist movements in the U.S. evolved in the late 1960s and allows students to practice academic analysis of a primary history source. *White Flight* helps my students understand both how the civil rights movement changed over the fifties and sixties and also understand the backlash against it in cities like Atlanta. *The Gay Manifesto* is part of an important classroom discussion in which we talk about radical social movements at the end of the sixties and discuss how the views of these authors might differ from modern social movements. I have assigned *White Flight* three of the four times I have taught an upper level course on 20th century American politics and *The Gay Manifesto* all four times; it has also, occasionally, appeared in my core courses in order to help my students understand the various countercultural movements of the sixties. During my time teaching both texts, I have never received a complaint from a student or any other person regarding this content.

12. With great reservations, I ultimately decided to remove those two works rather than have my class cancelled. After I submitted my censored syllabus for approval, it was approved. I did not require students to read either of these texts or discuss them in class. I believe that these works were censored because the administration is worried that they represent viewpoints that are disfavored by certain higherups. I do not think that instruction of either of these texts constitutes "advocacy." I use reading assignments like these to teach my students how to engage in critical analysis of historical sources as neutral observers; I

do not advocate for or demand that they adopt any particular views of history or contemporary issues. However, since the Censorship Policy is so vague, I think that university administrators are not approving anything that seems like it could represent viewpoints that the Board of Regents would find unfavorable.

**Censorship of HIST 1302 (U.S. History from Reconstruction to the Present)**

13. The Board of Regents' Censorship Policy also forced me to censor my HIST 1302 (U.S. History from Reconstruction to the Present) course during the Spring Semester.

14. On January 13, 2026, the first day of Spring Semester classes, I received an email from the Dean of Tarleton State University's College of Liberal and Fine Arts, Dr. Emran El-Badawi. He told me: "The President received a student complaint about a policy violation in HIST 1302 (syllabus attached). Please be advised that TAMUS policy 08.01 prohibits teaching what is dub[bed] "gender ideology, or topics related to sexual orientation or gender identity" (https://policies.tamus.edu/08-01.pdf). The student has moved to a different class. You are kindly requested to make the necessary changes to the course immediately to bring it back in line with policy, or risk having the course cancelled. This is urgent given we are already in the first week of classes." Dean El-Badawi did not tell me the identity of the student, the content of the complaint, or what I specifically needed to edit.

15. My 1302 syllabus for the semester had already been approved so I was confused what the issue could be. I called Dr. Branscombe to ask for clarification. She told me that her requests for clarifications from the dean had led her to believe that the violation had to do with one sentence in my syllabus that used the phrase "LGBT." My conversation with her also made it clear that this specific violation had not been mentioned in the email because

the dean's office had wanted to avoid putting it in writing. Dr. Branscombe told me that I needed to change my syllabus immediately or my class would be canceled. I informed her that I was on my way to a social engagement and that I would not be able to get home to change it until 10:00 PM that night. She told me that Dean El-Badawi wanted it to be done more immediately, but that she would email him and tell him that I would do it later at night.

16. From the way Dr. Branscombe described it, I guessed that the issue with my syllabus was that it included the following phrase:

i. "In particular, this course focuses on the ways the 14th Amendment changed the relationship between Americans and their government, and the ways the role of the government expanded to protect the rights of groups such as African Americans, LGBT Americans, and women."

17. I was absolutely appalled to discover that this minor—and to my eyes, uncontroversial—statement was the source of the violation. At the time, I did not think that the Censorship Policy prohibited discussion of LGBTQ+ topics entirely; however, if the dean was asking me to remove even references to the LGBTQ+ community, that made me realize that the Censorship Policy was being enforced in a much more expansive manner than I had thought. I did not want to change this content in my course, because it is a crucial lens through which I teach the Fourteenth Amendment and the historical progression of equality under the law in the United States. As a historian, I use the experiences of the LGBTQ+ community to demonstrate the way in which the American government gradually moved from understanding the 14th Amendment in a purely race-based framework towards a belief that the amendment protected the rights of all American

citizens. If I were to remove mention of LGBTQ+ Americans, then I would be censoring that crucial viewpoint entirely. Furthermore, another assigned reading by conservative anti-feminist activist Phyllis Schlafly, titled "What's The Problem with Equal Rights for Women" wasn't even flagged for review. If the administration wanted to prohibit instruction on any topics having to do with gender identity or sexual orientation, then this reading assignment, which has "equal rights for women" in its title, would certainly have been prohibited, too. This indicates to me that enforcement of the Censorship Policy is clearly biased to favor politically conservative views.

18. I didn't want my course to be canceled, so I edited my syllabus to read as follows:

> "In particular, this course focuses on the ways the 14th Amendment changed the relationship between Americans and their government, and the ways the role of the government expanded to protect the rights of groups such as African Americans and other communities."

19. I sent the censored version back to Dr. Branscombe and Dean El-Badawi later that night and it was promptly approved. A true and correct copy of this email exchange and my original 1302 syllabus are attached here as **Exhibits H and I**.

20. The next day, on January 14, 2026, I met with Dr. Branscombe to discuss what had happened, and to ask why I had to remove LGBTQ+ content from my syllabus. She told me that over winter break, in December, the Censorship Policy had been amended and that it was being interpreted to entirely prohibit teaching LGBTQ+ topics in core courses.

21. I did not know that the Censorship Policy had been changed after November, and I was extremely confused and frustrated. The Policy was already incredibly vague, and now the Board of Regents had changed it. To my knowledge, Tarleton State did not even notify faculty about the updates. I went to the Tarleton State University website to try to find the updated Policy to understand the new restrictions, but the website only had the previous version that had been published in November.

22. The following day, on January 15, 2026, Dr. Branscombe sent an email to the rest of the History department, instructing us to note that the Policy had been changed. She said: "I wanted to pass along an update on TAMUS Rule 08.01 that was drafted last November and revised in December. If you have not reviewed the rule recently, the wording in section 2.1b was amended after the fall semester ended: [link]. Following this change, Tarleton's administration has altered its interpretation of the rule. Regardless of advocacy, the following topics may not be addressed in any core curriculum course: race ideology (see rule linked to above for definition); gender ideology (see rule linked to above for definition); sexual orientation; gender identity . . . These topics may only be discussed in an upper-level course with written approval from the president. I am hoping we will see some communication directly from our dean or provost on this, but in the meantime, I wanted to make sure you were all aware the change in the rule and its interpretation on campus. The FAQ document we received (that I forwarded in my December 8 email) is no longer applicable." A true and correct copy of this email is attached as **Exhibit J**.

23. I followed up with Dr. Branscombe to ask if the amended Policy meant that I could not talk about LGBTQ+ communities at all in my classroom. She told me that she had asked the Dean the same question, and he did not provide a direct answer, but that he

instead accused the History faculty of trying to "cause trouble." I still do not know whether I can talk about LGBTQ+ communities at all in my classroom, but, as I explain further below, I have stopped discussing these communities in core courses because of the Censorship Policy.

**<u>The impact of the Censorship Policy on my present and future instruction</u>**

24. In Fall 2026, I am teaching three HIST 1301 courses, (U.S. History from Founding through the Civil War, and one HIST 1302 Honors courses (U.S. History from Reconstruction to the Present). In order to make sure that I am in compliance with the Censorship Policy and to not risk disciplinary action or my class being canceled, I have censored the History 1302 curriculum in the following ways:

a. I continue to censor mention of how the Fourteenth Amendment has historically applied to LGBTQ+ Americans.

b. I removed a text that I typically assign, the Huey Committee documents, which is a primary source that demonstrates the U.S. military discharging gay service-members in the 1950s.

25. In Fall 2026, I would have liked to offer my course on the History of Sexuality. I have taught a version of this course twice at Tarleton State University. History of Sexuality is an upper-level course, but after I tried and failed to get approval to teach *Gay Manifesto* in my other upper-level course, Dr. Branscombe and I could not imagine any situation in which I would get approval to teach an entire course on the topic of sexual orientation. We removed the course from the curriculum, because we are worried that teaching this course would be a risk to me and position at the university.

26. I also would have liked to teach HIST 4343 (Contemporary History of the United States) in Fall 2026. The course is listed in the catalog, but Dr. Branscombe believed that too much of my course content would violate the Censorship Policy, so I am not permitted to teach it either. HIST 4343 is a course I developed to teach students about American history in the last fifty years, so that students might understand the origins of current political and social controversies. In our exchanges, Dr. Branscombe worried that this course would, by its nature, discuss current political issues and thus could cover political points of view disfavored by the Board of Regents. In addition, since LGBTQ+ rights have been a crucial issue in the last fifty years, discussions of LGBTQ+ communities would inevitably be of interest to students, which would put me in danger of violating the Censorship Policy if I engaged with student questions.

27. Since I began teaching, I have always thought that it is important to teach about LGBTQ+ communities throughout history. Censoring mention of LGBTQ+ communities in American history reinforces the idea that LGBTQ+ people do not exist, which is a dominant viewpoint for many of my students here in rural Texas. For many of my students, my class is the first time that they are exposed to the view that LGBTQ+ communities have always been present throughout history. I have had at least one student tell me "I didn't know that gay people existed in the 1950's!" and I believe that this is a common experience for many other students. I also frequently have trans students enrolled in my classes each semester, and I believe that there are a number of gay and lesbian students in my classes as well. Regardless of whether they belong to the LGBTQ+ community or not, it is important to allow all my students to consider the viewpoint that these communities are a part of American history. I never require students to agree with me in order to succeed

academically in my course. However, as a professor, it is my job to expose my students to new ideas and viewpoints so that they can make informed decisions about their own beliefs and positions.

28. Out of concern for my ability to continue to teach at Tarleton, I try my best to follow the Censorship Policy, even though it has severely impacted my ability to teach and I do not know how exactly to ensure that I am in compliance.

29. In my lower level, core courses, I no longer teach LGBTQ+ history at all. When I get to the portions of my course lectures that typically explore these historical trends and events, I present my former slides with a censorship bar over the content, and a copy of Policy 08.01. Many of my students have not heard about the Censorship Policy and are outraged when they hear that they are not able to get the full education from me that they desire. They are eager to learn about all sides of U.S. history, including viewpoints that are restricted by the Censorship Policy. Many students ask me to provide them with this information outside of class. I have not done this, because I worry that I could still be disciplined for noncompliance with the Censorship Policy, and not all students are able to get this core information this way.

30. Tarleton State University administrators have not provided a formal process to seek an exception to teach censored content in upper-level courses. The Censorship Policy specifies that member CEOs may give prior written approval for non-core courses to teach "race or gender ideology or topics related to sexual orientation or gender identity.” However, I do not know how to gain such prior approval and to my knowledge there is no formal mechanism to do so.

31. After the administration refused to grant me approval to teach *Gay Manifesto* and *White Flight* in my upper-level course, I have felt no choice but to restrain my instruction on censored topics altogether so as not to "cause trouble" as my dean described it. In my upper-level courses, I still sometimes risk discussing LGBTQ+ people in U.S. history, usually only in response to student questions about the topic. I am, however, very careful to only answer what the student asked and to try to avoid discussing anything further that might violate the Policy. This is extremely difficult, because the university has never given a direct answer about what is and is not explicitly forbidden by the Censorship Policy. I worry that a student in my class or a person passing by in the hallway that overhears my lectures will report me.

32. This fear of my own students reporting on me has been bolstered by ominous emails sent out multiple times per semester by the Texas A&M System Ethics and Compliance Officer, Janet Gordon. With the subject line "Do The Right Thing," these emails advertise a 24/7 hotline where students are encouraged to report any professors for misconduct, including a "new reportable category concerning inaccuracies misalignment between course description, syllabi, or instructional content." These emails have created a climate of fear and paranoia, where faculty members feel like they must always be looking over their shoulder. A true and correct copy of one of these emails is included as **Exhibit K.**

33. The Censorship Policy has thus deeply impacted my relationships with my students. I am proud that in my eight years at Tarleton State University, I have built meaningful relationships with students across the political spectrum. My classroom has always been enriched by diverse viewpoints and open discussions about issues of race, gender, and sexual orientation, among many other topics inherent to American history. However, under

the Censorship Policy, I cannot help but feel chilled from speaking with my own students, because I am now forced to wonder if a student from a different political background will lead me to violate the Censorship Policy for the purposes of reporting me. I am heartbroken that under this Policy, it is incredibly difficult to maintain an open, curious, welcoming spirit with my students. The Texas A&M Board of Regents have pitted students against faculty, and it is clear that the quality of our academic relationships has severely degraded in this hostile climate.

34. I still do not know if the censorship actions I have taken are sufficient to protect me from disciplinary action under the Censorship Policy, because it is unclear how exactly it is being implemented and what the boundaries are for discussing topics that touch on race, gender, and sexuality or what the administration considers advocacy. That leaves me to wonder: am I permitted to talk about historical figures that were critical about gay rights? What about figures that were supportive of gay rights? What if a student asks a question about the gay rights movement during class? I recently published a book about shifting notions of masculinity in veterans after World War II—would telling my students about my book be a violation of the Policy? More broadly, it is unclear to me whether I may even discuss true historical events that necessarily involve discussing sexual orientation like the Stonewall riots, the HIV/AIDs crises, or even the *Obergefell* decision legalizing gay marriage.

35. What is clear to me is that if a student reports me, or if the administration otherwise deems that I have violated the Censorship Policy, then they may cancel my class. If a class I am teaching is canceled, then that could lead to loss of pay because I would not be teaching a full course load. I also fear that it would be a negative mark on my post-tenure

review, which I am slated for in 2029. Even though I am tenured, a negative post-tenure review could ultimately lead to my termination by Tarleton State University and the Texas A&M University System. Because the Censorship Policy is so vague, and because I have been reported and threatened with course cancelation multiple times already, I am taking increasingly large precautions and broadly censoring my classroom instruction out of fear that I will be threatened or disciplined for noncompliance again.

36. I've never known a time in my career when professors were censored like this in the way they can teach their courses. I intend to continue teaching at Tarleton State University because I care deeply about the student community that I serve, and I still believe that the Texas A&M University System can return to its commitment to academic excellence in public higher education. Tarleton State University has a crucial mission to educate rural Texan students, many of whom are first generation students, and I believe fully in the mission of this school. I wish to provide the best possible educational environment for my students, but the vague and discriminatory censorship regime under the Censorship Policy has severely interfered with my ability to provide the quality education that they deserve.

37. I declare under penalty of perjury that the foregoing is true and correct. Executed on August 31, 2026.

Dr. Aaron George

# Exhibit A

# *Curriculum Vitae*

Dr. Aaron George
Associate Professor of History
Tarleton State University
206-817-3573
ageorge@tarleton.edu

## Education:

**Ohio State University (Columbus, OH)**

**May 2017-** Doctor of Philosophy in History
Fields of Specialization:
US History
The History of Gender and Sexuality
Intellectual History
Advisors: Dr. David Steigerwald, Dr. Daniel Rivers

**Western Washington University (Bellingham, WA)**

**June 2012-** Master of Arts in History
GPA: 3.85
Focus in Modern United States History, History of Gender,
Minor Focus in Early Modern Europe
Advisor: Kevin Leonard
Language Skills: Two Years of Japanese

**June 2008-** Bachelor of Arts in History
**June 2008-** Bachelor of Arts in Philosophy
GPA: 3.68

## Teaching:

**Tarleton State University (Fall 2018-Present):**

History 1301: Early American History
History 1302: Modern American History
History 3315: Rise of Industrial America, 1877-1929
History 4310: Recent American History, 1929-Present
History 4350: Topics in The History of Sexuality in America
History 4350: History and Sociology of Sexuality (co-taught with Dr. Derek Lehman)
History 5086: Reading in the History of America in the 1990s
History 5332: American History in the 1950s
History 5331: Topics in American History in the 1950s
History 5331: Readings in LGBT History

**Ohio State University (Summer 2014-Summer 2017):**

History 1152: American Civilization 1877 to the Present
History 2002: Making America Modern
History 2010: The History of American Capitalism
History 2630: History of Modern Sexuality

## Employment:

**2025-Present:** Associate Professor of History at Tarleton State University

**2019-2025:** Assistant Professor of History at Tarleton State University.

**2018-2019:** Instructor of History at Tarleton State University.

**2017-2018:** Ohio State University Post-Doctoral Fellow, in partnership with the Office of the Secretary of Defense Historical Office.

## Peer Reviewed Research/Publications:

**2023-** *When Cowboys Come Home: Veterans, Authenticity, and Manhood in Post-World War II America* (Rutgers University Press, Forthcoming November 10th, 2023)

**2021- "**Edward Field's Life in the Postwar Closet: Manhood and Gay Authenticity in Postwar America," in *Gender and History* (Vol 33 no 2., January 28th 2021), 513-535, https://onlinelibrary.wiley.com/doi/10.1111/1468-0424.12517

**2021-** "No Place for Artistes": James Jones' Quest for Authenticity in the Post-War Midwest," in *The Sower and the Seer: Perspectives on the Intellectual History of the American Midwest,* ed. Jon K. Lauck, Paul Murphy, Andrew Seal, Joe Hogan, and Gleaves Whitney (Wisconsin Historical Society Press, 2021).

**2017-** *When Cowboys Come Home: Re-Imagining Manhood in Post-World War II America.* Dissertation. Accepted by the Ohio State University Graduate School, May 2017.

**2016- "**Gray Flannel Suit, Or Red Strait jacket? Anti-communist Views on the Organization Man," *The Journal of Popular Culture* (Vol 49, Issue, 6 December 2016), 1320-1340

**2012-** "Cold War Fictions: Gender, Anticommunism, and the Reconfiguration of the Post-War United States," Western Washington University, Master's Thesis on Modern US, Cold War, Cultural and Gender History.

## Other Publications:

**2023-** "Before Lawrence v Texas: The Making of a Queer Social Movement. By Wesley G. Phelps," Review. New Mexico Historical Review (Forthcoming).

**2022-** "When Wal-Mart Comes to Town, Primary Source Analysis" in *Defining Documents in American History: The 1980s*, ed. Michael Shally-Jensen, (Salem Press, 2022), 621-635.

**2020- "**Nancy Reagan's "Just Say No" Address to the Nation" in *Defining Documents in American History, United States Drug Policy*, ed. Michael Shally-Jensen, (Salem Press, 2020). 341-346.

**2019-** "Red Lion Broadcasting v. FCC, Primary Source Analysis," in *Defining Documents in America History*, ed. Michael Shelly-Jensen, (New York: Free Press, ABC-CLIO 2019).

**2019- "***Big Business: A Love Letter to An American Anti-Hero*, Primary Source Analysis," in *Business and Society,* ed. Michael Shelly-Jensen, ABC-CLIO.

**2015-** "Spaghetti in the Age of Mechanical Reproduction," in Origins: Current Events in Political Perspectives, http://origins.osu.edu/milestones/may-2015-spaghetti-age-mechanical-reproduction

**2015-** "American Consumer Culture," in *American Political Culture, An Encyclopedia*., ABC-CLIO, 2015

**2014-** "At the Movies: Catching Up With The Roosevelts," in Origins: Current Events in Political Perspective, http://origins.osu.edu/connecting-history/9242014-movies-catching-roosevelts

**2014-** "January 2014: Fifty Years Later, We Still Need to Learn to Love the Bomb," in Origins: Current Events in Political Perspective, originsmilestones.tumblr.com/post/72769901958/january-2014-fifty-years-later-we-still-need-to-learn

## Conferences:

**2023-** Planned, Organized, and Hosted The Phi Alpha Theta 2023 North Central Texas Regional Conference, at Tarleton, Fort Worth Campus.

## Conference Papers:

**2025-**"True Crime as Confessional: Truman Capote, Authenticity, and Identity in Mid-Century America," The Society for US Intellectual Historians 2025 Annual Meeting, Detroit, Michigan.

**2024-**"Witnesses to the Crime: William Bradford Huie and Authenticity in the Era of Civil Rights," The Society for US Intellectual Historians 2024 Annual Meeting, Boston, Massachusetts.

**2023-**"'The Men Who Came Running': The Handy Writers' Colony and Anti-Domesticity in 1950s America," The Society for US Intellectual Historians 2023 Annual Meeting, November 11th, Denver, Colorado.

**2016- "**Edward Field's Life in the Postwar Closet: Manhood and Gay Authenticity in Postwar America," The American Studies Association 2016 Annual Meeting, Denver, Colorado

**2016-** "'His Strength and Courage, Daring and Resourcefulness': *The Lone Ranger* and Manliness During Wartime," The Popular Culture Association Annual Conference, Seattle Washington.

**2015-** "Manliness After War: James Jones and the Veteran Response to Post-War America," The Mid-west Popular Culture Association Annual Conference, Cincinnati, Ohio

**2013-** "'The Philosophy that Lived Under the Red Flag': Anticommunism and Sexual Violence," (Revised), Women's and Gender History Symposium, University of Illinois, Champaign-Urbana

**2012-** "'The Philosophy that Lived Under the Red Flag': Anticommunism and Sexual Violence," Phi Alpha Theta History Honors Conference, Spokane, Washington

**2012-** "Marrying Stalin: The Communist Attack on the Post-War Family," History Graduate Conference, Louisiana State University, Baton Rouge

## Other Presentations:

**2015-** "The Wilderness Years," Anglicon, Seattle, Washington

**2015-** "The History of Gay and Lesbian Men and Women," Discussion, Orange Middle School, Ohio History Day, December 2nd

## Awards:

**2009-** John Bullman Memorial Scholarship

**2009-** Western Washington University Graduate School Tuition Waiver

**2010-** Western Washington University Graduate School Tuition Waiver

**2012-** Ohio State University Graduate School University Fellowship

**2013-** 2012-2013 Arts & Humanities Graduate Research Small Grant

**2014-** Bradley Fellow for the Academic Year 2014-2015

**2014-** History Department Summer Research Award

**2015-** Foster Rhea Dulles Award

# Exhibit B

Outlook

## New Syllabus Review Process - spring 2026

**From** Branscombe, Dr. Jensen <BRANSCOMBE@tarleton.edu>
**Date** Mon 12/8/2025 3:16 PM
**To** History, Geography & GIS <historygeographygis@tarleton.onmicrosoft.com>; HSGG adjuncts and VI <hsggadjunctsandvi@tarleton.onmicrosoft.com>

4 attachments (1 MB)

Item-4.2-TAMUS-Policies-08.01-and-12.01-Revisions-3RD-REVISED-FINAL-website.pdf; 2025-DEI-Search-Terms.pdf; FAQ Implementation of 08.01 and 12.01 revisions FINAL 12.03.2025 (1).pdf; 111325 Hegar letter to Faculty DATE CORRECTED.pdf;

Dear colleagues,

As much as we are all looking forward to the upcoming holiday break, planning and preparation for the spring semester will also be underway in the coming weeks.

So, before we wrap up the fall semester, I wanted to make sure everyone is aware of a new policy and procedure related to course syllabi resulting from new rules adopted during the November Texas A&M Board of Regents meeting.

Apologies for the rather lengthy email about this, but I figured I would err on the side of providing more info than is needed. The most important information is this:

- Due to a new syllabus review process, all spring syllabi for 16-week and 1st 8-week courses are due in Simple Syllabus by January 7, 2026 (the Wednesday before classes start on Monday, January 12). Department Heads will conduct the review to ensure that, in the words of Dean El-Badawi, “the syllabus agrees with catalog description and established student learning outcomes for the course.”

- Certain “DEI” words are continuing to receive extra scrutiny, including in course content, so please be aware of the terms on the attached “DEI Compliance Review Search Terms.”

- The attached “FAQ” document may be helpful to you as you prep for your spring courses.

To elaborate a little more, the syllabus review is being implemented due to a revision to TAMUS rule 12.01 (Academic Freedom, Responsibility and Tenure) that states that a faculty member will not teach material that is inconsistent with the approved syllabus for the course.

As always, and as legally required, Academic Affairs will continue to collect copies of all syllabi to make them publicly available (these will be pulled from Simple Syllabus at the beginning of the semester; Simple Syllabus will not be publicly available throughout the semester).

In addition to the change to rule 12.01, please also be aware that another TAMUS rule revision (to 08.01 Civil Rights Protections and Compliance) states that “No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity,

unless the course and the relevant course materials are approved in advance by the member CEO." I have attached the full text of these rules as revised.

Please be cognizant of any language in your syllabi that may fall under the categories listed in the 08.01 rule revision. Relatedly, I am attaching a list of "DEI Compliance Review Search Terms" Tarleton has generated as part of its SB17 compliance review. Although this law does not explicitly affect course instruction, these words may receive extra scrutiny if they appear in course syllabi so I wanted you to be aware of this list of terms.

I know this is a lot. I am sharing this so that you all have the most up-to-date information on course syllabi as policies related to them continue to evolve. Please review and follow up with any questions or concerns.

We have received some guidance from the System on implementing these new rules. So, in addition to the rule revisions and DEI search terms, I am also attaching an FAQ document pertaining to the syllabus review process generated by A&M System Provosts in collaboration with Dr. James Hallmark, Vice Chancellor of TAMUS Academic Affairs. (This FAQ was also linked to in the message from Interim Provost Lambert sent on Friday. December 5). Finally, you may also find the letter sent from Chancellor Hegar to TAMUS faculty insightful. This letter was shared by COLFA Admin via email on November 11.

Thank you, all, for your continued work for our programs and students.

All the best,

Jensen

# Exhibit C

# Implementation of 08.01 and 12.01 Changes
# FAQs

**Should universities implement/improve their course and syllabus review process?**

**Yes.**

- Where a regular review does not exist, universities should establish a process for regular review and approval of courses to assess the course's relevance to the program's curriculum, fidelity to the body of knowledge in the discipline, and alignment with post-graduation needs of the students enrolled in the class.
- Universities should also regularly check compliance with Educ. Code 51.974 to ensure that accurate course information is publicly available, searchable and easy to locate online.

**However,**

- A university-level course review will supplement and not supplant the system-level course review.

**Should there be variance in what is taught (and approved) based on the level of the course?**

**Yes. Curriculum is developmentally based. A freshman's academic experience should differ from an upper division student and that of a graduate student.**

- Undergraduate Core
  - Core curriculum courses must be foundational and necessary to prepare students for civic and professional life. (Policy 11.06, § 2; Edu. Code 51.315(b))
  - Core curriculum courses must also comply with applicable federal and state law and system policies. These courses must not *advocate* race or gender ideology, sexual orientation, or gender identity. (System Policy 08.01, § 2.1.(b))
  - If there is a circumstance in which a core curriculum course should *address* race or gender ideology, sexual orientation, or gender identity, the university must be vigilant to ensure:
    - the content is fundamental to a sound postsecondary education;
    - the course complies with all legal and policy requirements; and
    - the course does not *advocate* race or gender ideology, sexual orientation, or gender identity.
- Undergraduate Non-Core
  - The body of knowledge for the discipline and the workforce or graduate/professional study needs of the students after graduation should be considered in assessing the appropriateness of material for a course.
  - Advocating race or gender ideology, sexual orientation, or gender identity is prohibited, unless the course and the relevant course materials are approved in advance by the university president.

  - If there is a circumstance in which an undergraduate course should *address* race or gender ideology, sexual orientation, or gender identity, the university must be vigilant to ensure:
    - it is the student's choice to take this course and is not in some way "required", **<u>and/or</u>**
    - the course does not *advocate* race or gender ideology, sexual orientation, or gender identity.
- Graduate/Professional
  - Advocating race or gender ideology, sexual orientation, or gender identity is prohibited in all courses regardless of level, including graduate courses, unless the course and the relevant course materials are approved in advance by the University President.
  - These topics can and should be addressed/taught in appropriate disciplines when part of the discipline's body of knowledge.
  - Teaching legal and medical material (e.g., Title IX, case law, medical procedures, etc.) is not prohibited when it is appropriate to the course and is consistent with the body of knowledge for the discipline.
  - When in doubt, seek the approval of the university president under System Policy 08.01, § 2.1(b).

**Can faculty teach difficult and historically sensitive subjects, subjects that may evoke strong reactions?**

**Yes, such topics should be taught, as they are academically appropriate, empirically grounded, and essential components of the disciplinary knowledge. Use a reasonableness standard.**

- Teaching difficult subjects is expected and the system policy does not prohibit it if it is related to the classroom subject and meets other system policy requirements. Faculty are expected to teach historically significant, empirically established, and discipline-grounded topics, even when these topics may be emotionally difficult or sensitive for some students. For example:
  - System policy does not preclude a course on U.S. History including information on slavery and its many impacts, including racism. We would expect our faculty teaching U.S. History to include this material.
  - System policy does not preclude a course on the Holocaust presenting its history and impacts. We would expect our faculty teaching WWII History to include this material.
  - System Policy does not preclude a course on human sexuality including material on same sex relationships. We would expect our faculty teaching human sexuality to include this material.
  - System Policy does not preclude a course on gender from including material on different perspectives on gender, including perspectives that some may not find agreeable. We would expect our faculty teaching gender courses to include this material.

  - System Policy does not preclude a course on world religions. We would expect our faculty teaching world religions to include material on various world religions, including those less familiar in America.
  - System Policy does not preclude a course on political science from examining government actions. We would expect our faculty teaching political science courses to study government shutdowns, aid to foreign countries, alliances, etc.
- System Policy 12.01, § 1.2, prohibits a faculty member from introducing a controversial matter that has no relation to the classroom subject or teaching material that is inconsistent with the approved syllabus for the course. Teaching grounded disciplinary content is always allowed; imposing personal belief or ideological adherence is prohibited.

**What does it mean to "advocate?"**

- To *Advocate* is when teaching and course materials extend learning objectives in a way that requires students to hold certain beliefs, and/or to ridicule certain beliefs. For examples in this context, to advocate is:
  - To lead, encourage, or require a student to feel personal shame over treatment of slaves in America; or conversely, to justify slavery in America as acceptable.
  - To lead, encourage, or require students to hold certain beliefs on same sex relationships or criticize/ridicule their beliefs on such relationships; or conversely, to criticize/ridicule or shame individuals who are in same sex relationships or are supportive of same sex relationships.
  - To lead, encourage, or require students to hold certain beliefs on gender identity whether the required belief is in two genders assigned at birth, or belief in many self-identified genders.
  - To lead, encourage, or require students to adhere to or embrace a specific religion, any religion, or no religion.
  - To lead, encourage, or require students to hold specific positions on political policies and actions, or ridicule those who may believe certain positions.
- Students' beliefs on these matters (among others) will vary. The faculty can, should, and must teach difficult subjects for the students to know and understand different perspectives, but not for the student to hold specific beliefs on those subjects for purposes of grading, nor may students be ridiculed for holding beliefs contrary to that of others.

**What happens when a class veers off the assigned material?**

**Apply a reasonableness standard.**

- A student asks a question that is off topic: (all of these responses are acceptable)
  - Acknowledge the question and engage in a brief dialogue on the topic, perhaps including other students in the discussion.
  - Acknowledge the question and suggest willingness to discuss outside of class.
  - Acknowledge the question but redirect the focus of the class stay on the assigned topic.
- An event occurs the students find exciting or troubling but is unrelated to the course learning material. This could include sporting events, a speaker coming to campus, world events, traumatic events, etc.

    - Acknowledge the event and, to the best the faculty member is able and feels comfortable, allow the students to share their excitement and feelings for a reasonable period of time, but ultimately return to the assigned materials as soon as possible.
- An event occurs that is consistent with the course learning materials but was unanticipated and not included in the syllabus.?
    - The faculty member can adjust to use the event in the classroom. These are remarkable learning opportunities. Faculty should understand and recognize different beliefs and perspectives among their students, but the discussion and change of focus is allowable as long as it fills a curricular purpose and contributes to fulfilling the course's learning outcomes.

**What happens if a faculty member chooses to teach material that has been reviewed and ruled inappropriate for that course or level?**

**The faculty member would be subject to progressive disciplinary action consistent with a violation of System Policy.**

- Just as there will be differences in judgment among faculty members when reviewing course materials, there could be differences in judgment between faculty in a program and the university president. The president's decision should be informed by faculty with expertise in the body of knowledge of the discipline, but ultimately the university president is the decider by policy.
- Willful failure to follow a president's decision will result in disciplinary action appropriate to the scope and scale of the action.
- Shifts in course content may occur either due to student interest or events occurring locally, nationally, or internationally. Faculty should consult with their department heads regarding such shifts to assure fidelity to the purpose of the course.

**Is the faculty member accountable for student led and student selected projects that may focus on gender ideology, sexual orientation, or gender identity?**

**No. Not necessarily. Apply a reasonableness standard.**

- The faculty member must remain neutral and avoid nudging the student or encouraging the student to pursue such topics in a course that is not approved for such a focus. However, if the student chooses to focus on one or more of these topics and the project meets the expected learning outcomes for the course, the student's choice is to be respected and the faculty member is expected to support the student's choice and is not otherwise prohibited.

# Exhibit D

REVISED

Agenda Item No. 4.2

**AGENDA ITEM BRIEFING**

**Submitted by:** R. Brooks Moore, General Counsel
The Texas A&M University System

**Subject:** Approval of Revisions to Policy *08.01*, *Civil Rights Protections and Compliance* and Policy *12.01, Academic Freedom, Responsibility and Tenure*

**Proposed Board Action:**

Approve revisions to two system policies.

**Background Information:**

The purpose of this agenda item is to propose revisions to Policy *08.01, Civil Rights Protections and Compliance,* and *12.01, Academic Freedom, Responsibility and Tenure.* The Office of General Counsel has reviewed all revisions for legal sufficiency.

Listed below are the revisions unique to each of these policies.

<u>System Policy *08.01, Civil Rights Protections and Compliance*</u>

- Section 2.1(b) is revised to add the following: "No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity, unless the course and the relevant course materials are approved in advance by the member CEO."

<u>System Policy *12.01, Academic Freedom, Responsibility and Tenure*</u>

- Section 1.2 is revised to clarify that a faculty member will not teach material that is inconsistent with the approved syllabus for the course.

**A&M System Funding or Other Financial Implications:**

None.

**Strategic Plan Imperative(s) this Item Advances:**

The board's adoption, maintenance and revision of system policies advances all eight Strategic Plan Imperatives by providing policy direction to the member institutions and agencies.

REVISED

Agenda Item No. 4.2

**THE TEXAS A&M UNIVERSITY SYSTEM**
Office of General Counsel
October 22, 2025

Members, Board of Regents
The Texas A&M University System

Subject: Approval of Revisions to Policy *08.01*, *Civil Rights Protections and Compliance* and Policy *12.01, Academic Freedom, Responsibility and Tenure*

I recommend adoption of the following minute order:

> **"The revisions to System Policies *08.01, Civil Rights Protections and Compliance*, and Policy *12.01, Academic Freedom, Responsibility and Tenure,* as shown in the attached exhibits, are approved, effective immediately. These revised policies apply beginning with the Spring Semester 2026."**

Respectfully submitted,

[SIGNED BY]

R. Brooks Moore
General Counsel

**Approval Recommended:**

[SIGNED BY]
Glenn Hegar
Chancellor

[SIGNED BY]
Susan Ballabina, Ph.D.
Executive Vice Chancellor

**Approved for Legal Sufficiency:**

[SIGNED BY]
R. Brooks Moore
General Counsel

# 08.01 Civil Rights Protections and Compliance

Revised November 13, 2025 (MO -2025)
Next Scheduled Review: November 13, 2030
Click to view Revision History.

## Policy Summary

This policy outlines the civil rights protections provided by The Texas A&M University System (system) to employees, students, applicants for employment and admission, and the public, and sets forth procedures and responsibilities for compliance with applicable laws and regulations.

## Definitions

Diversity, Equity, and Inclusion – means engaging in any of the following actions:

1. Influencing hiring or employment practices with respect to race, sex, color, or ethnicity, other than through the use of equal opportunity described in Section 1.1;
2. Promoting differential treatment of or providing special benefits to individuals in violation of Section 2.1;
3. Promoting policies or procedures about race, color, or ethnicity, except as expressly authorized by OGC in accordance with state law; or
4. Conducting trainings, programs, or activities about race, color, ethnicity, gender identity, or sexual orientation, other than those expressly authorized by OGC in accordance with state law.

Diversity, Equity, and Inclusion Office – means a member office, division, or other unit that is established for the purpose of engaging in a diversity, equity, and inclusion function.

Gender Ideology – means a concept that self-assessed gender identity should replace the biological category of sex or that biological sex has less value or legitimacy than self-assessed gender identity.

Race Ideology – means a concept that attempts to shame a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy or conspiracy, ascribe to them less value as contributors to society and public discourse because of their race or ethnicity, or assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world. This also includes course content that promotes activism on issues related to race or ethnicity, rather than academic instruction.

## Policy

REVISED

1. AUTHORITY AND SCOPE OF THE EQUAL OPPORTUNITY PROGRAM

1.1 The system provides equal opportunity for employment to all persons regardless of race, color, sex, religion, national origin, age, disability, genetic information, veteran status, or any other classification protected by federal, state or local law and strives to achieve full and equal employment opportunity throughout the system.

1.2 The System Ethics and Compliance Office (SECO), in coordination with the Office of General Counsel (OGC), is responsible for the system's compliance with civil rights laws and regulations. This includes, but is not limited to, addressing charges or complaints filed with federal, state and local agencies, and audits or compliance reviews of policies and procedures carried out by the U.S. Department of Labor, the Equal Employment Opportunity Commission, the Texas Workforce Commission's Civil Rights Division, the U.S. Department of Education's Office of Civil Rights, and other state and federal civil rights compliance agencies.

1.3 The system promotes equal employment opportunity through its procedures, training, compliance with applicable legal requirements, and other methods authorized by federal regulations.

2. PROHIBITED ACTIONS

2.1 Prohibited Discrimination or Instruction

a. System Employment. No individual will be subjected to discrimination in system employment on the basis of race, color, sex, religion, national origin, age, disability, genetic information, veteran status, or any other classification protected by federal, state or local law.

b. Other System Programs and Activities. No individual will, on the basis of any classification protected by state, federal, or local law, be excluded from participation in, or be denied the benefit of, or be subjected to discrimination under any system program or activity. No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity, unless the course and the relevant course materials are approved in advance by the member CEO.

2.2 Except as required by federal law, a member or member employee must not:

a. establish or maintain a diversity, equity, and inclusion office, or hire or assign an employee or contractor to perform diversity, equity, and inclusion functions; or

b. compel, require, induce, or solicit any person to provide a statement about diversity, equity, and inclusion or give preferential treatment to any person based on the provision of a statement about diversity, equity, and inclusion.

2.3 Except as required by federal law, a member or member employee must not require, as a condition of enrollment at the member or performing any member function, any person to participate in a diversity, equity, and inclusion training that includes a training, program, or activity about race, color, ethnicity, gender identity, or sexual orientation, unless developed and approved by OGC in accordance with state law.

2.4 Retaliatory action of any kind is prohibited when taken against a complainant, respondent, witness or other person participating in a discrimination investigation, complaint, hearing or suit. Such retaliatory action is regarded as a separate and distinct cause for complaint and possible disciplinary action, including dismissal or expulsion.

2.5 The prohibitions in Sections 2.2 and 2.3 do not apply to the following:

a) Academic course instruction;
b) An employee or student's scholarly research or creative work;
c) An activity of a student organization registered with or recognized by a member;

d) A guest speaker or performer on a short-term engagement;
e) Policies, practices, procedures, programs, or activities to enhance student academic achievement or postgraduate outcomes without regard to race, sex, color, or ethnicity;
f) Data collection; or
g) Student recruitment or admissions.

3. RESPONSIBILITIES

3.1 Each member chief executive officer (CEO) is responsible for equal opportunity and program accessibility in accordance with federal, state and local laws and regulations and system policy.

3.2 SECO, in coordination with OGC, serves as the liaison between members and federal, state and local compliance agencies. SECO is also responsible for the coordination of all civil rights reporting requirements for the system and its members under applicable state and federal regulations.

3.3 Each member CEO must appoint, a Title IX of the Education Amendments of 1972 Coordinator, a Section 504 of the Rehabilitation Act of 1973 Coordinator and other administrators who oversee the implementation of guidelines to ensure compliance with legal and regulatory provisions under this policy.

4. PROCEDURES

4.1 The administrators appointed under Section 3.3 must inform SECO as soon as a charge or complaint of discrimination or notice of civil rights audit, compliance review or other inquiry is received from a federal, state or local agency.

4.2 The system developed a regulation providing systemwide standards for the receipt and processing of complaints of discrimination.

4.3 A member may not spend state funds appropriated for a fiscal year until the system submits a report to the legislature and the Texas Higher Education Coordinating Board certifying the system's compliance with Texas Education Code Section 51.3525 during the preceding state fiscal year. SECO implements monitoring processes to assess member compliance with Texas Education Code Section 51.3525 throughout the state fiscal year. The System Internal Audit Department includes DEI compliance in its systemwide risk assessment as part of the annual audit plan process. Audits are conducted as necessary based on the annual risk assessment. SECO annually provides a report to the Board of

Regents (board) for the August regular meeting and the board approves SECO's submission of this report on behalf of the system. This section takes effect January 1, 2024 for money appropriated for the state fiscal year beginning September 1, 2024.

4.4 The board designates the chancellor or designee to provide legislative testimony in accordance with Texas Education Code Section 51.3525. This section takes effect January 1, 2024.

---

## Related Statutes, Policies, or Requirements

---

The Equal Pay Act of 1963
Title VI of the Civil Rights Act
Title VII of the Civil Rights Act of 1964, as amended
The Age Discrimination in Employment Act of 1967
Title IX of The Education Amendments of 1972
The Rehabilitation Act of 1973, as amended
The Americans with Disabilities Act of 1990, as amended
The Genetic Information Nondiscrimination Act of 2008
Executive Order 14173
Tex. Educ. Code Sec. 51.3525
Tex. Educ. Code § 51.354
Tex. Lab. Code Ch. 21, Employment Discrimination
Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended
Uniformed Services Employment and Reemployment Rights Act
System Policy *07.01, Ethics*

---

## Member Rule Requirements

---

A rule is not required to supplement this policy.

---

## Contact Office

---

Ethics and Compliance
(979) 458-6203

# 12.01 Academic Freedom, Responsibility and Tenure

Revised November 13, 2025 (MO -2025)
Next Scheduled Review: November 13, 2030
Click to view Revision History.

## Policy Summary

The relationship between faculty and the academic institution of The Texas A&M University System (system) for which they work is a balance between the responsibilities and obligations of the faculty with the requirements and demands of the system academic institution. This policy provides the basis upon which faculty may be hired, tenured, and dismissed. The responsibilities of the faculty are described as are the criteria by which they will be evaluated.

## Policy

The following policies on academic freedom, responsibility and tenure apply separately, but equally, to each of the universities (academic institutions) of the system.

1. ACADEMIC FREEDOM

1.1 Institutions of higher education exist for the common good. The common good depends upon an uninhibited search for truth and its open expression. Hence, it is essential that each faculty member be free to pursue scholarly inquiry and to voice and publish individual conclusions concerning the significance of evidence that the faculty member considers relevant. Each faculty member must be free from the corrosive fear that others, inside or outside the academic community, because their vision may differ, may threaten the faculty member's professional career or the material benefits accruing from it.

1.2 Each faculty member is entitled to full freedom in the classroom in discussing the subject that the faculty member teaches, but a faculty member will not introduce a controversial matter that has no relation to the classroom subject or teach material that is inconsistent with the approved syllabus for the course. Each faculty member is also a citizen of the nation, state, and community; and when speaking, writing, or acting as such, must be free from institutional censorship or discipline, subject to academic responsibility. In such instances, the faculty member should clearly state that the faculty member is not speaking for the system academic institution.

2. ACADEMIC RESPONSIBILITY OF FACULTY MEMBERS

The concept of academic freedom for faculty must be accompanied by an equally demanding concept of academic responsibility. Faculty members have a responsibility to the system academic institution, their profession, their students, and society at large. The rights and privileges of faculty members extended by society and protected by governing boards and

administrators through written policies and procedures on academic freedom and tenure, and as further protected by the courts, require reciprocally, the assumption of certain responsibilities by faculty members. Some of those are:

2.1 The fundamental responsibilities of faculty members as teachers and scholars include maintenance of competence in their field of specialization and the exhibition of professional competence in the classroom, studio, or laboratory and in the public arena through activities such as discussions, lectures, consulting, performances, exhibitions, publications, and participation in professional organizations and meetings.

2.2 Faculty members must recognize that the public will judge their profession and system academic institutions by their statements. Hence, faculty members should at all times strive to be accurate in their statements, exercise appropriate restraint, show respect for the opinions of others, and make every effort to indicate that they are not speaking or acting for the system academic institution when they are speaking or acting as private persons.

2.3 The constitutionally protected rights of faculty members, as citizens, to freedom of expression on matters of public concern must be balanced with the interest of the state, as an employer, in promoting the efficiency of the educational services it performs through its employees. A faculty member's comments are protected even though they may be highly critical in tone or content, or erroneous, but such statements are not protected free speech if they either substantially impede the faculty member's performance of daily duties or materially and substantially interfere with the regular operation of the system academic institution, department, or college. False statements made with knowledge of their falsity or in reckless disregard of the truth are not entitled to constitutional protection, and public statements may be so without foundation as to call into question the fitness of the faculty member to perform his or her professional duties.

2.4 Faculty members should be professional in their conduct in the classroom and in relationships with students. They should maintain respect for the student and for the student's posture as a learner and should be appropriately available to students for consultation on coursework.

2.5 Faculty members have the responsibility to provide timely and adequate notice of their intention to interrupt or terminate institutional services.

3. WRITTEN TERMS OF EMPLOYMENT

3.1 All new faculty members must be provided with an appointment letter stating the initial terms and conditions of employment. Any subsequent modifications or special understandings in regard to the appointment, which may be made on an annual basis, should be stated in writing and a copy given to the faculty member. All faculty members, unless the terms and conditions of their appointment letter state otherwise, are expected to engage in teaching, scholarship, and service. Essential job functions for a position may vary depending upon the nature of the department in which the faculty member holds expertise, external funding requirements attached to the position, licensing or accreditation requirements, and other circumstances. It is therefore important that essential job functions for each faculty position be listed in the initial appointment letter. For example, all of the following that are applicable should be listed: teaching

responsibilities, responsibilities for advising students, independent and/or collaborative research responsibilities, engaging in patient care, committee assignments, conditions imposed by external accrediting agencies, conditions for holding a named professorship or endowed chair, or a position that combines academic and administrative duties, and any other specific essential functions for the position in question. All appointment letters must indicate whether the appointment being offered is with tenure, tenure track, or non-tenure track.

3.2 The appointment letter for a faculty member with administrative duties must state the portion of the faculty member's salary that is associated with the administrative duties. The portion of the faculty member's salary not associated with the administrative duties must not exceed the salaries of other faculty with similar qualifications and performing similar duties. The appointment letter for faculty members with administrative duties must also state that the administrative duties may be removed without cause.

3.3 The system academic institution must notify faculty members annually, in writing, of their salary. Any other changes or additions to the appointment should also be included.

3.4 Faculty members are expected to fulfill the terms and conditions of employment for the following year unless they resign prior to 30 calendar days after receiving notice of the terms.

3.5 An annual performance review will be conducted for all faculty members regardless of their title in accordance with written procedures. The purpose of the annual performance review is to facilitate dialogue between the administration and faculty and provide a process to evaluate each faculty member's accomplishments in the context of departmental, college, university, and system goals. An unsatisfactory rating in any one area (e.g., teaching effectiveness, research, creative activities and other scholarly endeavors, or service) requires the implementation of a written short-term development plan for the faculty member, including performance improvement benchmarks.

3.6 Generally, all faculty members are entitled under Texas law to see their personnel files and to obtain a copy of the information in these files at their own expense.

4. TENURE POLICY

Tenure means the entitlement of faculty members to continue in their academic positions unless dismissed for good cause. Tenured faculty who remain in good standing will continue to enjoy those privileges customarily associated with tenure, including an expectation of continuing employment, appropriate compensation, a suitable office and workspace, serving as a principal investigator and conducting research, teaching classes, participating in faculty governance, and representing oneself as a tenured faculty member at their system academic institution. However, tenure will not be construed as creating a property interest[1] in any attributes of the faculty position beyond the faculty member's regular annual salary. A specific system of faculty tenure should undergird the integrity of each system academic institution. System academic institution tenure systems should have these elements:

---

[1] A property interest refers to the constitutionally protected interest that may not be taken by the state without affording due process as required by federal and state law.

4.1 Beginning with appointment to a tenure-track position, the probationary period for a faculty member must not exceed seven (7) years. This period may, at the system academic institution's option, include appropriate full-time service at other institutions of higher education, even if the inclusion of such service extends the total probationary period in the academic profession beyond the normal maximum of seven (7) years. However, any credit for prior service included within the seven-year probationary period must be agreed upon in writing at the time of employment. System academic institutions must develop a rule authorizing extension of the probationary period beyond seven (7) years to permit a possible "time-out" due to special conditions or in order to pursue special opportunities. Such extensions must be based on extraordinary circumstances and require written concurrence by the faculty member, department head, dean, and the chief academic officer, or the chief academic officer's designee. A person who is a member of the U.S. National Academy of Sciences and/or the U.S. National Academy of Engineering and/or the U.S. National Academy of Medicine at the time of employment by a system academic institution shall be eligible for tenure upon arrival at such institution and must be presented to the system Board of Regents (board) for its consideration, and a grant of tenure to such faculty member shall not be subject to a probationary period. Tenure is granted only by the affirmative action of the system board upon recommendation of the chief executive officer (CEO). At the conclusion of the probationary period, unless appropriately informed otherwise, the faculty member will not have tenure. Prior to the beginning of the last year of the probationary period, the system academic institution must notify the faculty member in writing of a decision regarding the granting or denial of tenure. The failure by the system academic institution to so notify will not be construed as a grant of de facto tenure. If the decision is not to award tenure, the faculty member is entitled to serve for two additional long semesters following the term or semester in which the notice is received.

4.2 Notice of non-reappointment, or of intention not to reappoint a non-tenured tenure track faculty member, should be given in writing in accordance with the following standards:

(a) not later than March 1 of the first academic year of probationary service, if the appointment expires at the end of that year; or, if a one-year appointment terminates during an academic year, at least three months in advance of its termination;

(b) not later than December 15 of the second year of probationary service, if the appointment expires at the end of that year; or, if an initial two-year appointment terminates during an academic year, at least six months in advance of its termination; and

(c) at least twelve months before the expiration of a probationary appointment after two or more years with the system academic institution.

4.3 Good cause for dismissal of a faculty member relates directly and substantially to the performance of professional duties and may include, but not be limited to, the following:

(a) professional incompetence;

(b) continuing or repeated failure to perform duties or meet responsibilities to the system academic institution or to students or associates;

(c) failure to successfully complete a post-tenure review professional development program;

(d) moral turpitude adversely affecting the performance of duties or the meeting of responsibilities to the system academic institution, or to students or associates;

(e) violation of system policies, system regulations, system academic institution rules, or laws substantially related to performance of faculty duties;

(f) conviction of a crime related to the fitness of a faculty member to engage in teaching, research, service/outreach, and/or administration;

(g) unprofessional conduct adversely affecting to a material and substantial degree the performance of duties or the meeting of responsibilities to the system academic institution, or to students or associates;

(h) falsification of academic credentials;

(i) bona fide financial exigency or the phasing out of institutional programs requiring reduction of faculty (see Section 9);

(j) the reduction or discontinuance of institutional programs based on educational considerations and requiring the termination of faculty members (see Section 9); or

(k) a finding of sexual harassment or other serious misconduct, in accordance with system policy.

4.4 A faculty member who is found responsible for sexual harassment or other serious misconduct may be summarily dismissed or suspended without pay pending dismissal in accordance with the procedures outlined in Section 8.2. A faculty member may be dismissed for other reasons, as outlined in Section 4.3, after the faculty member has received notice of the cause for dismissal and an opportunity for a hearing in accordance with the procedures set forth in Section 8.3. Non-tenure track faculty may present a grievance in accordance with Section 6.5.

5. ADMINISTRATIVE LEAVE

Faculty members may be placed on administrative leave with pay by the faculty member's dean, with the concurrence of the dean of faculties (or provost if there is no dean of faculties), pending an investigation into matters pertaining to the faculty member's job performance, including but not limited to, fiscal matters, improper conduct in teaching, research, or service, or an allegation of misconduct pursuant to System Regulation *08.01.01*, *Civil Rights Compliance*. Notification must be given in writing and include the reasons for placing the faculty member on administrative leave with pay and the terms of the leave. A faculty member placed on administrative leave with pay may appeal the decision to the provost by submitting an appeal in writing. The provost conducts the appeal and may appoint a person or persons to assist the provost in the appeal. The investigation process is not stayed by an appeal. The appeal should be completed within five (5) business days of receipt of the appeal. This provision is distinct from suspension during the pendency of termination proceedings. Placing a faculty member on administrative leave with pay is justified to aid in an investigation or if the welfare of the faculty member or that of students, colleagues, or other institutional employees is threatened by continuance, or if the continued presence of the faculty member would be disruptive of the regular operations of the system academic

institution. Any such leave should be with appropriate provisions for useful duties, including appropriate access to classrooms, laboratories, libraries, and other facilities. A tenured faculty member who has been placed on administrative leave with pay will be entitled to his or her regular annual salary.

6. NON-TENURE TRACK FACULTY

6.1 This section does not apply to Professional Track Faculty with multi-year appointments. (*See*, System Policy *12.07, Fixed Term Academic Professional Track Faculty*).

6.2 Appointments of non-tenure track faculty should be in writing and include specific beginning and ending dates for the appointment and clearly state that there is no implied guarantee or promise of future employment.

6.3 A system academic institution is not required to give a non-tenure track faculty member a reason for a decision not to reappoint for another appointment term or to provide a hearing. However, a system academic institution's rule for implementing this policy may provide that all or certain non-tenure track faculty members are entitled to appeal the institution's decision not to renew the faculty member's appointment or to dismiss the faculty member for cause.

6.4 Unless the academic institution's rule provides for an appeal, a non-tenure track faculty member whose appointment is not renewed may present a grievance in person to their dean or designee regarding the non-reappointment within 10 business days of receipt of the notice of non-reappointment. The dean or designee considers the grievance and renders a final decision in writing regarding the grievance within 10 business days of the presentation of the grievance.

6.5 Unless the academic institution's rule provides for an appeal, a non-tenure track faculty member who is dismissed for cause before the end of the term may present a grievance in person to the provost or designee regarding the dismissal within 10 business days of receipt of the notice of dismissal. The provost or designee considers the grievance and renders a final decision in writing regarding the grievance within 10 business days of the presentation of the grievance.

6.6 However, if a grievance or appeal related to the nonrenewal or dismissal of a non-tenure track faculty member includes an allegation(s) that the decision was based on discrimination, the provost, dean, or designee promptly reports the allegation(s) to the designated office in accordance with System Regulation *08.01.01*.

6.7 Any allegation(s) of discrimination will be exclusively adjudicated in accordance with the procedures outlined in System Regulation *08.01.01*. The grievance or appeal processes in this section are not stayed pending conclusion of the investigation, decision, and appeal processes outlined in System Regulation *08.01.01*.

7. NON-RENEWAL OF NON-TENURED TENURE TRACK FACULTY AT END OF AN APPOINTMENT TERM

Procedures in cases of non-renewal of non-tenured tenure track faculty members at the end of any appointment term (other than a one-year only appointment that has not been renewed) must have the following parts:

7.1 A system academic institution is not required to give a non-tenured tenure track faculty member a reason for a decision not to reappoint for another appointment term or to provide a hearing.

7.2 A non-tenured tenure track faculty member may present, in person, a grievance over non-renewal of the faculty member's employment at the system academic institution, including that the decision was made in retaliation for the faculty member's exercise of protected First Amendment rights. The board delegates the authority through the chancellor to the CEO to designate an individual within the system academic institution's administration to hear the faculty member's grievance. The system academic institution must adopt a method of promptly presenting, reviewing, and acting on grievances in accordance with this section.

7.3 In the alternative to a grievance in accordance with Section 7.2, a non-tenured tenure track faculty member may appeal a decision not to reappoint on the basis that the decision was made in violation of the academic freedom of the individual and/or for inadequate consideration of the faculty member's record of professional achievement. Such an appeal must be filed within 20 business days of the date on which the faculty member was given written notice of non-reappointment.

7.4 However, if a grievance or appeal related to the nonrenewal of a non-tenured tenure track faculty member includes an allegation(s) that the decision was based on discrimination, the CEO or designee promptly reports the allegation(s) to the designated office in accordance with System Regulation *08.01.01*.

7.5 Any allegation(s) of discrimination will be exclusively adjudicated in accordance with the procedures outlined in System Regulation *08.01.01*. The grievance or appeal processes in this section are not stayed pending conclusion of the investigation, decision, and appeal processes outlined in System Regulation *08.01.01*.

7.6 System academic institution appeal procedures must provide for preliminary consideration within 15 business days of the faculty member's notice of appeal of the allegations by a faculty committee to determine whether the faculty member has established a prima facie case that the decision was made in violation of the faculty member's academic freedom, or without adequate consideration of the faculty member's record of professional achievement. If the preliminary review committee determines that the faculty member has not alleged a prima facie case, the allegations will be dismissed and the decision not to reappoint stands. If the committee determines that the allegations do establish a prima facie case, the matter is referred for an evidentiary hearing under established system academic institution procedures. A prima facie case for purposes of this section means that the faculty member's evidence, alone and un-rebutted, would establish that a violation as defined in Section 7.3 may have occurred.

7.7 In any evidentiary hearing, the burden of proving that the decision was made in violation of academic freedom or without adequate consideration of the faculty member's record of professional achievement rests with the faculty member. The burden of proof must be

met by a preponderance of the evidence; i.e., that which is more convincing, more credible, and of greater weight than contrary evidence. Both the faculty member and the administration have the right of representation at this hearing. The system academic institution provides staff support to schedule and hold a hearing. If the appeal is filed before March 1, the hearing must be completed within 40 business days from the date the committee chair is notified of the appeal; the chair of the hearing committee may extend the time for completing the hearing by an additional 10 business days for good cause shown. If more than one appeal is filed in a given year, some appeals may be delayed until the first full academic term following the notice of appeal. The committee must complete its report within 10 business days of the completion of the hearing. The importance of conducting the hearing in a prompt manner guides the system academic institution and the hearing committee. Hearing committee members' departments assist as needed to accommodate the scheduling of the hearing.

8. DISMISSAL FOR CAUSE

8.1 Procedures. System academic institutions must establish proper procedures for dismissal of faculty for cause to address issues related to performance or misconduct. These dismissal procedures apply only to a faculty member who has tenure, a non-tenured tenure track faculty member, or a fixed-term professional track faculty member under System Policy *12.07* whose term appointment has not expired at the time of the dismissal. Such procedures must have the following parts:

8.1.1 A bona fide effort by appropriate administrative officers and/or other persons or committees should be made to achieve a satisfactory resolution of performance and/or misconduct issues through preliminary inquiry, discussion, or confidential mediation. During these proceedings, a faculty member has the right to an advisor, who may attend any meetings with the faculty member, but may communicate only with the faculty member. The advisor is not permitted to serve as an advocate for the faculty member in these preliminary proceedings.

8.1.2 Should these efforts fail to achieve a satisfactory resolution; the administration initiates a dismissal for cause or summary dismissal.

8.1.3 Unless a faculty member is summarily dismissed in accordance with the procedures outlined in Section 8.2, a faculty member may be reassigned or suspended with pay during the pendency of dismissal proceedings; however, suspension with pay is justified only if the welfare of the faculty member or that of students, colleagues or other institutional employees is threatened by continuance, or if the continued presence of the faculty member would be materially and substantially disruptive of the regular operations of the system academic institution. A suspension with pay should be with appropriate provisions for useful duties, including appropriate access to classrooms, laboratories, libraries, and other facilities.

8.2 Summary Dismissal or Suspended without Pay Pending Dismissal

8.2.1 A tenured faculty member may be subject to summary dismissal or suspension without pay pending dismissal if the stated cause for dismissal is a finding of serious misconduct that has been substantiated by an investigation conducted

in accordance with system policy. Serious misconduct includes, but is not limited to, sexual harassment, scientific misconduct, fraud, and violence or threat of violence in the workplace.

8.2.2 A non-tenured faculty member whose term appointment has not expired may be subject to summary dismissal or suspension without pay pending dismissal for good cause.

8.2.3 Prior to summary dismissal or suspension without pay pending dismissal, a faculty member will be provided with written notice of the charges, an explanation of the evidence, and an opportunity to respond to an administrator. A faculty member who is summarily dismissed or suspended without pay pending dismissal also has an opportunity for a post-termination evidentiary hearing appealing the dismissal in accordance with the procedures outlined in Section 8.3.

8.2.4 The faculty member and the administration each have the independent right to representation in this process.

8.2.5 The board delegates the authority through the chancellor to the CEO to designate an individual within the system academic institution's administration to hear a faculty member's response to the charges prior to summary dismissal or suspension without pay pending dismissal and determine, after considering the faculty member's response, whether or not to proceed with a summary dismissal or suspension without pay pending dismissal.

8.3 Hearing

8.3.1 A faculty member who is summarily dismissed or suspended without pay pending dismissal after the process described in Section 8.2 or a faculty member who receives a notice of dismissal for other reasons outlined in Section 4.3 may submit a notice of appeal to the system academic institution's CEO or designee within 10 business days of receipt of the notice of dismissal. The CEO or designee must notify the appropriate hearing committee within five (5) business days of the date the appeal has been filed. The system academic institution provides staff support to schedule a hearing.

8.3.2 However, if an appeal includes an allegation(s) that the decision was based on discrimination, the CEO or designee promptly reports the allegation(s) to the designated office in accordance with System Regulation *08.01.01*.

8.3.3 Any allegation(s) of discrimination will be exclusively adjudicated in accordance with the procedures outlined in System Regulation *08.01.01*. The appeal hearing process in this section is not stayed pending conclusion of the investigation, decision, and appeal processes outlined in System Regulation *08.01.01*.

8.3.4 The hearing committee must promptly schedule a hearing to be completed within 40 business days of being notified by the CEO or designee. The chair of the hearing committee may extend the time for completing the hearing 10

business days for good cause shown or longer for extenuating circumstances caused by the administration. The system academic institution and the hearing committee must conduct the hearing in a prompt manner. Hearing committee members' departments assist as needed to accommodate the scheduling of the hearing. The burden of proof is on the system academic institution to establish, by a preponderance of the evidence, the existence of good cause for dismissal and/or suspension without pay pending dismissal. The proceedings will be stenographically transcribed and copies made available to either party upon request.

8.3.5 The faculty member and the administration each have the independent right to representation.

8.3.6 The hearing committee must complete its report within 10 business days of the completion of the hearing. The hearing committee formulates explicit findings with respect to each of the grounds for dismissal and/or suspension without pay pending dismissal presented and recommends whether or not, in its judgment, there is good cause for dismissal and/or suspension without pay pending dismissal. The committee's findings and recommendations must be conveyed in writing to the CEO and to the faculty member.

8.3.7 If the faculty member's appointment is proposed to be terminated by the CEO, the full report of the hearing committee, the record of the hearing, the CEO's recommendation, and other relevant documentation available to both the faculty member and the system academic institution will be delivered to the chancellor, or designee, who carries out a review of the documentation. In the event that the chancellor identifies the need for information not contained in the documentation, the chancellor may choose to give the system academic institution and the faculty member an opportunity to present their arguments and take questions from the chancellor. The chancellor has a maximum of 20 business days in which to conduct the review. Upon completion of the review, the chancellor makes a final determination as to the dismissal and/or suspension without pay pending dismissal.

8.3.8 In the event that the review identifies information that is probative of the dismissal, and that was not made available to the faculty review committee and/or the CEO, the chancellor may return the matter to the system academic institution CEO. Upon return to the CEO, the hearing committee has 10 business days in which to conduct a follow-up hearing to evaluate the new information and render its findings and recommendations. The CEO then reviews the hearing committee's findings and recommendations and takes action as appropriate following the guidelines in Section 8.3.5.

8.3.9 A faculty member's termination from employment will be effective as determined by the chancellor, upon a finding by the chancellor, pursuant to these procedures, that there is good cause for the faculty member's dismissal. This decision is final.

9. TENURE, FINANCIAL EXIGENCY, AND TERMINATION OR REDUCTION OF PROGRAMS

9.1 Cases of bona fide financial exigency or the reduction or discontinuance of an institutional program based on educational considerations may permit exceptions to tenure regulations.

9.2 Definitions

9.2.1 Bona fide financial exigency means a pressing need to reorder the nature and magnitude of financial obligations in such a way as to restore or preserve the financial stability of any system academic institution. A bona fide financial exigency may exist without the entire system academic institution being affected.

9.2.2 Financial stability means the ability of a system academic institution to provide from current income the funds necessary to meet current expenses, including current debt payments and sound reserves, without invading or depleting capital.

9.2.3 Evidence of financial exigency may include but is not limited to, substantially declining enrollments, substantial revenue cutbacks, and substantial ongoing operating budget deficits.

9.2.4 Educational considerations that could result in the reduction or discontinuance of a program may include, but are not limited to:

(a) a substantial decrease in program enrollment;

(b) the need to shift substantial resources to other programs; or

(c) a substantial modification or redirection of a unit's mission.

9.3 Administration

9.3.1 When the system academic institution CEO believes that a state of bona fide financial exigency exists, the CEO informs the chancellor. If the chancellor concurs with this assessment, the chancellor informs the board. If the board finds that such conditions exist, a state of bona fide financial exigency will exist within that system academic institution.

9.3.2 When faculty dismissals are contemplated on grounds of financial exigency or program termination or reduction, there should be early, careful, and meaningful sharing of information and views with appropriate faculty representatives on the reasons indicating the need to terminate programs. Recommendations from such faculty representatives will be sought on alternatives available to the system academic institution to ensure continuation of a strong academic program and to minimize the losses sustained by affected students and faculty members.

9.3.3 Faculty members who are being considered for termination on the basis of a bona fide financial exigency or a program termination or reduction should be given opportunities for appointment in related areas at their system academic institution provided:

(a) they are qualified professionally to teach in those areas;

(b) positions are available; and

(c) the affected dean and department head or director concur.

9.3.4 Any tenured faculty member or faculty member whose term appointment has not expired, who is selected for termination on the basis of a bona fide financial exigency or a program termination or reduction necessitating a reduction in staff, must be given the following information:

(a) a written statement of the basis for the initial decision to lay off;

(b) a description of the manner in which the initial decision was made; and

(c) information and data upon which the decision makers relied.

9.3.5 The faculty member selected for termination must be given an opportunity to respond in a hearing before an appropriate faculty committee. In this hearing, the burden of proof rests with the system academic institution to demonstrate by some credible evidence that a bona fide financial exigency exists or that educational considerations led to the reduction or discontinuance of a program. The faculty committee formulates findings whether or not, in its judgment, a bona fide financial exigency exists or that educational considerations led to the reduction or discontinuance of a program. The faculty committee's findings and recommendations, if any, must be conveyed in writing to the CEO and to the faculty member.

9.3.6 Any faculty member reassigned to another position or terminated has the right to reappointment to their previous position if it is re-established within two (2) calendar years.

## Related Statutes, Policies, or Requirements

Tex. Educ. Code § 51.354

Tex. Educ. Code § 51.942

System Regulation *12.01.01, Institutional Rules for Implementing Tenure*

System Policy *12.06, Post-Tenure Review of Faculty and Teaching Effectiveness*

System Policy *12.07, Fixed Term Academic Professional Track Faculty*

## Member Rule Requirements

A rule is required to supplement this policy. See Section 4.1.

## Contact Office

Academic Affairs
(979) 458-6072

# Exhibit E

Office of the Chancellor

THE TEXAS A&M UNIVERSITY SYSTEM

November 13, 2025

Colleagues,

Today, the Board of Regents approved updates to two System policies regarding course content and academic responsibility. I want to speak directly to you about why these changes were made, what they mean, and — just as importantly — what they do not change.

First, let me be clear: these policy updates do not limit scholarly inquiry, research, or the ability to teach complex or controversial subjects. Faculty retain the freedom to explore and discuss challenging ideas — while ensuring that course material is aligned with the approved syllabus and the academic foundations of the discipline. That has always been part of responsible instruction; the policies now state it clearly and reinforce the balance between academic freedom and academic responsibility.

What has changed is how we document purpose and alignment. The Board's action has clarified expectations that the Presidents will affirm the academic grounding of instruction, particularly in areas where public discussion is often shaped by political framing, rather than scholarship.

These policy updates are part of the Academic Review and Transparency Initiative I announced earlier this fall. Under that initiative, every course is reviewed as part of our regular academic planning cycle, using consistent, evidence-based criteria:

- The academic body of knowledge underlying the discipline
- Enrollment trends and student demand
- Alignment with workforce needs and career pathways
- Student learning outcomes and program sustainability

This is not a one-time review. It is a discipline of continuous improvement and academic stewardship.

As a public university system, we must demonstrate clarity of purpose, transparency, and excellence grounded in scholarship rather than activism of any kind.

I understand that change can raise questions. I am committed to continued discussion with you, your leadership teams, students and faculty, grounded in respect for professional expertise, student success, and our shared responsibility to steward the trust placed in us by the people of Texas.

Thank you for the work you do every day — teaching, mentoring, researching, caring for communities, and shaping the next generation of leaders. Our System is strong because of you. With clarity and purpose, we will keep it that way.

Sincerely,
Glenn Hegar
Chancellor
The Texas A&M University System

# Exhibit F

## DEI Compliance Review Search Terms

Appendix A

| Programs, Activities, Training Sessions, Websites, and Social Media Platforms* | | |
|---|---|---|
| Keywords to Include in Review | | Keywords to Exclude |
| Tier I | Tier II | |
| Diversity | Race | Biodiversity |
| Diverse | Religion | Neurodiversity |
| Equity | Sex | Multicultural |
| DEI | Gender | |
| | | |
| | | |
| DEIA | Gender Identity | |
| Accessibility | Culture | |
| Engagement | Color | |
| Inclusion | Ethnicity | |
| Inclusivity | Accountability | |
| Advocacy | Climate | |
| Belongingness | Anti- | |
| Bias | Underrepresented | |
| Marginalized | Underserved | |

| Job Titles/Descriptions, Position Postings* | |
|---|---|
| Keywords to Include in Review | Keywords to Exclude |
| Diversity | Biodiversity |
| Equity | Neurodiversity |
| Inclusion | |
| DEI | |
| Underrepresented | |
| Underserved | |
| DEIA | |

* Some of these terms could apply, but not always. Not that they are prohibited categorically, but that they may be concerning based on the context. So they may need further review by University Compliance. For instance, a scholarship that says its open to those from "underserved" populations, and upon closer inspection it's a stand in for race, ethnicity, etc., then that should be addressed. Reviewers should be evaluating the results of their searches to determine whether the context of the particular word of phrase is in reference to and possibly poses a potential violation of Anti-DEI law.

Contrast that with something that discusses social work students doing outreach to underserved communities, meaning those economically underserved and in need of concerted efforts.

# Exhibit G

Outlook

**Syllabus follow-up**

**From** Branscombe, Dr. Jensen <BRANSCOMBE@tarleton.edu>
**Date** Wed 07/01/2026 10:43
**To** George, Dr. Aaron <AGEORGE@tarleton.edu>

Hello Aaron,

I know I messaged you yesterday about your syllabi being approved, but the upper administration is also reviewing syllabi and flagged your 4311 syllabus due to a couple of the reading assignments. I spoke with the dean yesterday to provide an explanation for why those readings were included and he sent it forward to the provost for approval.

The decision of the provost is to make changes to two of the reading assignments in order for the class to proceed. The readings in question are your primary source *The Gay Manifesto* and the book *White Flight*.

Our options for proceeding are for you to change those readings and related content in class. Or, if you are not comfortable doing that, we will need to cancel the class and find another one for you to teach.

Please let me know your thoughts. We can have a follow up conversation to discuss these options if you prefer. Just let me know.

Thanks,
Jensen

# Exhibit H

Outlook

## Re: Urgent / System Policy Violation in HIST 1302

**From** El-Badawi, Emran <EELBADAWI@tarleton.edu>
**Date** Fri 1/16/2026 1:03 PM
**To** Branscombe, Dr. Jensen <BRANSCOMBE@tarleton.edu>; George, Dr. Aaron <AGEORGE@tarleton.edu>
**Cc** Sword, Dr. Ben <SWORD@tarleton.edu>

Thanks, both.

—Emran

**EMRAN EL-BADAWI**
*Dean*
College of Liberal and Fine Arts

**TARLETON STATE UNIVERSITY**
**MEMBER OF THE TEXAS A&M UNIVERSITY SYSTEM**
Box T-0190, Stephenville, TX 76402
**O** 254-968-9141 | F 254-968-9784
eelbadawi@tarleton.edu | tarleton.edu

**From:** Branscombe, Dr. Jensen <BRANSCOMBE@tarleton.edu>
**Date:** Wednesday, January 14, 2026 at 8:04 AM
**To:** George, Dr. Aaron <AGEORGE@tarleton.edu>, El-Badawi, Emran <EELBADAWI@tarleton.edu>
**Cc:** Sword, Dr. Ben <SWORD@tarleton.edu>
**Subject:** Re: Urgent / System Policy Violation in HIST 1302

Good morning,

Thank you for submitting those changes, Dr. George. I have reviewed and approved your three syllabi for HIST 1302.

-Jensen

---

**From:** George, Dr. Aaron <AGEORGE@tarleton.edu>
**Sent:** Tuesday, January 13, 2026 11:04:11 PM
**To:** El-Badawi, Emran <EELBADAWI@tarleton.edu>
**Cc:** Branscombe, Dr. Jensen <BRANSCOMBE@tarleton.edu>; Sword, Dr. Ben <SWORD@tarleton.edu>
**Subject:** Re: Urgent / System Policy Violation in HIST 1302

Hello,

Thank you for your patience. I have made the changes that I believe will fix the issue, and I have sent my syllabi to Dr Branscombe for approval.

Aaron George
Sent from my iPhone

On Jan 13, 2026, at 18:20, El-Badawi, Emran <EELBADAWI@tarleton.edu> wrote:

Thank you for this quick update. Please let me know as soon as the edits are made.

Gratefully,

<image001.png>

**EMRAN EL-BADAWI**
*Dean*
College of Liberal and Fine Arts
<image002.png>

**TARLETON STATE UNIVERSITY**
**MEMBER OF THE TEXAS A&M UNIVERSITY SYSTEM**
Box T-0190, Stephenville, TX 76402
**O** 254-968-9141 | F 254-968-9784
eelbadawi@tarleton.edu | **tarleton.edu**

---

**From:** Branscombe, Dr. Jensen <BRANSCOMBE@tarleton.edu>
**Date:** Tuesday, January 13, 2026 at 6:12 PM
**To:** El-Badawi, Emran <EELBADAWI@tarleton.edu>, George, Dr. Aaron <AGEORGE@tarleton.edu>
**Cc:** Sword, Dr. Ben <SWORD@tarleton.edu>
**Subject:** Re: Urgent / System Policy Violation in HIST 1302

Good afternoon, Dr. El-Badawi,

My apologies for jumping in here ahead of Dr. George, but he had a late afternoon class and is currently on his commute home. He and I spoke and so I wanted to send a quick update as it will be later this evening before Dr. George is able to respond.

Dr. George has agreed to review his HIST 1302 syllabus for any potential policy violations and will make any necessary changes required to allow the course to run.

I've asked that he send a follow up message once he has made these changes later tonight. I will review and approve the syllabi.

Please let me know if any additional action is needed at this time.

Thank you
Jensen

**From:** El-Badawi, Emran <EELBADAWI@tarleton.edu>
**Sent:** Tuesday, January 13, 2026 5:25:32 PM
**To:** George, Dr. Aaron <AGEORGE@tarleton.edu>
**Cc:** Branscombe, Dr. Jensen <BRANSCOMBE@tarleton.edu>; Sword, Dr. Ben <SWORD@tarleton.edu>
**Subject:** Urgent / System Policy Violation in HIST 1302

Dr. George —

The president received a student complaint about a policy violation in HIST 1302 (syllabus attached). Please be advised that TAMUS policy 08.01 prohibits teaching what is dubs "gender ideology, or topics related to sexual orientation or gender identity" (https://policies.tamus.edu/08-01.pdf). The student has moved to a different class.

You are kindly requested to make the necessary changes to the course immediately to bring it back in line with policy, or risk having the course cancelled. This is urgent given we are already in the first week of classes.

Gratefully,

—Emran

<image001.png>

**EMRAN EL-BADAWI**
*Dean*
College of Liberal and Fine Arts
<image002.png>

**TARLETON STATE UNIVERSITY**
**MEMBER OF THE TEXAS A&M UNIVERSITY SYSTEM**
Box T-0190, Stephenville, TX 76402
**O** 254-968-9141 | F 254-968-9784
**eelbadawi@tarleton.edu** | **tarleton.edu**

# Exhibit I

**History 1302 United States History II**
**HIST 1302-160**
Spring 2026
Dr. Aaron George, ageorge@tarleton.edu
Class Time: Tuesday, Thursday, 3:30-4:50 in Business 179
Office Hours:
T/TR: 1:00-1:50 pm, by appointment (let me know you plan to come by) in 363 O. A. Grant

**Introduction:** History 1302 is intended as a survey of the important themes of American history from the end of Reconstruction to the present. This course will move chronologically through the political, cultural, and intellectual history of the United States. In particular, this course focuses on the ways the 14th Amendment changed the relationship between Americans and their government, and the ways the role of the government expanded to protect the rights of groups such as African Americans, LGBT Americans, and women. While no course can (or should) cover everything, the hope is that this course will leave students conversant and literate in the history of the United States.

This course is not intended to be a chronicle of "true facts," nor is it based on memorization of times and dates. In a world where Google and Wikipedia exist, the job of historians is no longer to teach students what happened, but to instead teach them how to evaluate the significance of what did happen. As a result, the focus of this course will be comprehension and analysis. This means that, on the one hand, dates and names will be de-emphasized in the context of the course; however, demonstrating your ability to analyze and synthesize the significance of important topics will be paramount.

For these reasons, this course forgoes a textbook in favor of a series of historical studies. In a history course, it is important to learn how historians write about the past; these books provide valuable examples of the types of arguments historians construct. However, because there is no other place to look up events discussed in class, this means that watching the lectures, and diligent note-taking, is integral to understanding the material. Skipping any of the material will make it difficult to do well on any of the assignments.

**Learning Objectives:** History courses develop students' knowledge of how past events influence today's society and help them understand how human beings view themselves. I expect that by the end of this course, students should be able to demonstrate the learning through the following framework:

**Level One- Defining, Describing, Explaining**

Students will be able to answer fact-based questions based on their knowledge of key terms and events. In this class, these questions will be similar to the following:

-What does the 14th Amendment say?
-What was the New Deal?
-When did World War II happen?

**Level Two- Analyzing, Comparing, Connecting**

Students will be able to draw connections between different sources and events and be able to demonstrate that they can connect historical sources to important trends from their time period. They should also be able to compare different explanations of historical events. In this class, examples of these questions would be as such:

-Compare the populist and the progressive movements.
-How were gay soldiers treated differently during World War II than straight soldiers? How were black soldiers treated differently?
-What does "The Long Telegram" tell us about how Americans understood the Soviet Union during the Cold War?

**Level Three- Evaluating, Interpreting, Synthesizing**

Students will be able to advance historical arguments, evaluate other historical arguments, and demonstrate the significance and importance of historical events. In this class, examples of these questions would be as such:

-What were the important events of the seventies?
-Why is the Cold War important to study?
-Is America today in a second Gilded Age? Why or why not?

**Requirements:** Students will be expected to attend lecture after having done the readings and be ready to discuss those readings on discussion days.

There will be three required texts that students must purchase:

*American Colossus,* by HW Brands
*Arc of Justice,* by Kevin Boyle
*Fault Lines,* by Kevin Kruse and Julian Zelizer

Grades will be based upon four different types of assignments:

-Three (3) Reading Guides, one for each assigned book (16 x 3 = 48 points, 16% of final grade),
-Three (3) Discussions, each worth ten points (10 x 3 = 30 points, or 9% of final grade)
-Two (2) Exams: A Midterm and Final Exam (80 points each, 160 total, or 53% of final grade)
-Five (5) Timed Writes, administered at the beginning of class, with the lowest score dropped (16 x 4 = 64 points, or 21% of final grade)

This will be for a total of 302 points. In addition, there will be extra credit available for engaging the class with thoughtful questions or comments.

**Reading Guides:** Each of the three books assigned in this course has a written guide, meant to be filled out and answered as the book is read. These guides are intended to help students recognize the important parts of each chapter and assist with more effective note taking. In

addition, if these are handwritten, they may be used on exams and will provide an invaluable resource on those exams. Each of these guides will be due on the day we discuss the book in class. They must include page numbers along with each of the answers given, or that answer will be disregarded. **These must be completed on your own; if I find that two reading guides have near-identical answers, both will receive zero.** They will each be worth sixteen points, and graded accordingly:

| | 8 | 7 | 6 | 4 | 0 |
|---|---|---|---|---|---|
| Reading Guide-Accuracy | Student thoughtfully responded to the reading guide; Answers were accurate and reflected points made by the book. | Student showed some thoughtful responses to the reading; answers were sometimes weakly responsive to questions asked. | Notes only demonstrated some comprehension of the reading. | Many answers were inaccurate or confused. | Student did not turn in a reading guide. |
| Reading Guide-Comprehensiveness | Student's notes show clear evidence of comprehensive reading of the assigned book; answers were thorough. | Reading guide may have been brief in places, but still answered the questions satisfactorily. | Notes on readings were brief and in some places, incomplete. | Reading guide was turned in; however, reading guide was substantially incomplete. | Student did not turn in a reading guide. |

**Extra Credit:** In order to increase engagement in the course, students will have the opportunity to earn up to 16 extra credit points over the course of the semester by asking questions in class. In order to do this, before class begins, send these questions to me over email; if you do, please send them with the subject line [Extra Credit Question] and your class section so that I have them organized and I do not lose any.

1) Your name
2) The question
3) How this relates to lecture or the reading.

These questions must be substantive and not fact-based questions; students must show they are thinking about connections between the material and not just asking for clarification. I will still answer clarifying questions, but only substantive questions will receive extra credit points.

**Midterm and Final Exams:**

The primary measure of student learning in this class will be a midterm and final, both administered in class. These exams will ask make a claim concerning material covered in class and ask the students to provide four examples (three from class, one from reading) as evidence for that question. For instance, a possible question may be, "Provide four examples of how America changed after World War II." The student will then have the entire span of a class period for the midterm or the final meeting time for the final.

Both of these exams will be open note as long as those notes are handwritten and not typed. Students must purchase a blue book prior to the exam time to take this exam, and students are strongly encouraged to bring their books (or printed out chapters from Canvas) and their reading guides, as the question will connect directly to examples found in the reading guides.

Each of these exams is worth 96 points and is graded by the rubric found at the end of this syllabus.

**Timed Writes:**

Over the course of the semester, in five class periods, I will administer a timed write to test students' knowledge of lecture materials. These quizzes will be substantially similar to the final exams: you must provide one example (instead of four) and explain what it is, how it answers the question, and the example's significance. Students will have ten minutes to write this example, and any handwritten notes will be available to them. The lowest score out of five will be dropped, making four quizzes, each worth 16 points, for a total of 64 points.

They will be graded on the following rubric:

| Dimension | 8 | 7 | 6 | 4 | 0 |
|---|---|---|---|---|---|
| Explanation | • Fully explains the "What," "Where/When" and "Why" of the subject matter.<br>• Is specific and accurate.<br>• If a book example, relates the page number; if a lecture example, clearly relates to material provided in class. | • Partially explains the "What," "Where/When" and "Why" of the subject matter.<br>• Is mostly specific and accurate.<br>• If a book example, may not relate the page but still be clearly drawn from specifics in the reading; if a lecture example, is identifiable as part of the lecture themes. | • Example may not be fully explained: "What," "Where/When" or "Why" of the subject matter.<br>• May be vague.<br>• If a book example, may not obviously come from one place. If a lecture example, may not relate to a single lecture. | • Explanation is vague and underdeveloped.<br>• Explanation only tangentially relates to the book or lecture material. | • Exampl e is not present. |
| Analysis | • Student explains how the example relates to the prompt.<br>• Student fully explains how the example is | • Student explains how the example relates to the prompt.<br>• Student may not successfully explain the importance or significance of | • Student explains how the example relates to the prompt.<br>• An explanation of the significance of the example or its relationship to course | • Student's analysis is lacking: example is lacking any meaningful attempt to relate it to the prompt or a discussion of its significance. | Example is not present. |

| | | | | | |
|---|---|---|---|---|---|
| | significant or important.<br>• The student relates the example to course themes.<br>• Example is easy to follow. | example, but an attempt is made.<br>• There is an attempt to relate the example to course themes.<br>• Example is mostly easy to follow. | themes is substantially absent.<br>• Example is not always clear and easy to follow. | | |

**Grading Scale:** There are a total of 302 points in the class. The grading scale is as follows:

A 90 – 100%
B 80-89.99%
C 70 – 79.99%
D 60 -69.99%
F 59.99% and below
In addition, a student cannot pass the class without turning in the final paper.

Students should be advised that Canvas may not provide reliable overall grade estimates; if a student is unsure about their grade, they should consult me directly.

**Other Important Information:**

**Electronics Policy:** I reserve the right to disallow any and all electronics usage in class if I feel it is interfering with student learning. In particular, cell phones should never be out and in use in class; if I see cell phones being used, I will give one warning and then eject students from the classroom. Cell phones are a distraction to both the student and to me, and as a result should be not in use except between classes.

***Student Success Statement*** **- ADA**
It is the policy of Tarleton State University to comply with the Americans with Disabilities Act (www.ada.gov) and other applicable laws. If you are a student with a disability seeking accommodations for this course, please contact the Center for Access and Academic Testing, at 254.968.9400 or caat@tarleton.edu. The office is located in Math 201. More information can be found at www.tarleton.edu/caat or in the University Catalog.

**Academic misconduct:** Tarleton State University expects its students to maintain high standards of personal and scholarly conduct. Students guilty of academic dishonesty are subject to disciplinary action. Academic dishonesty includes, but is not limited to, cheating on an examination or other academic work, plagiarism, collusion, and the abuse of resource materials. **ALL WORK IN THIS CLASS SHOULD BE YOUR OWN,** and coping material from other students or other sources (online or otherwise) may result in an automatic zero for that assignment or for the course. In cases

of suspected misconduct, I will communicate with the student in good faith to determine the circumstances and intent of the suspected work. After this conversation, the case may be forwarded to the head of the department, where it will be sent to the appropriate Dean of Students, who may decide to impose further academic sanctions.

For a more in-depth look at the process of reporting and disciplining academic misconduct, please see this site: https://www.tarleton.edu/stulife/judicial/academicconduct.html

**AI Policy**: Humanities classes are fundamentally classes that teach the act of thinking, reasoning, and developing arguments. This is work that cannot be farmed out to computers or to any sort of AI: the answers one writes on papers are less important than the act of *writing* them. As a result, all use of AI, for any reasons, is prohibited and deeply offensive to the core concepts of this discipline.

In addition, using any sort of AI assistance to do your assignments in class fundamentally violates the principles of academic honesty that Tarleton State University stands for. In addition to being a form of plagiarism, using AI is a willful attempt to try and deceive your professor and pass off work that is not yours as your own thoughts. As a result, in addition to being considered plagiarism, any use of AI assistance in this class will result not only in a zero for the assignment, but a zero in the class. No exceptions.

Furthermore, any similarity between a student response and an answer generated by AI with be considered proof of AI use. In other words, if I type in a question to ChatGPT and it returns an answer relevantly similar to one provided by the student, that will be enough evidence to give a student a zero for an assignment.

**Students with Disabilities:** It is the policy of Tarleton State University to comply with the Americans with Disabilities Act (www.ada.gov) and other applicable laws. If you are a student with a disability seeking accommodations for this course, please contact the Center for Access and Academic Testing, at 254.968.9400 or caat@tarleton.edu. The office is located in Math 201. More information can be found at www.tarleton.edu/caat or in the University Catalog.

**Class Schedule:**

**Week One:**

1/13: Introduction

1/15: Radical Reconstruction (The 1860s)

**Reading:** Brands: *The Capitalist Revolution, The First Triumvirate*

**Week Two:**

1/20: Equal Protection (The 1870s)

1/22: The Gilded Age (The 1880s)

**Reading:** Brands: *The Conquest of the South, Toil and Trouble*

**Week Three:**

1/27: Life, Liberty and Property (The 1890s)

1/29: A Nation for the People (The Populists)

**Reading:** Brands: *Lakota's Last Stand, Below the El*

**Week Four:**

2/3: A Middle Class Revolution (The Progressive Movement)

2/5: The Great Depression

**Reading:** Brands: *Meet Jim Crow, School for Scandal*

**Week Five:**

2/10: The New Deal

2/12: Freedom from Fear (The End of the New Deal and the Beginning of War)

**Reading:** Brands: *Imperial Dreams, The Wages of Capitalism*

**Week Six:**

2/17: To Fight a War (World War II in the United States)

2/19: **Discussion:** *American Colossus*

**Reading:** Brands: *The Apotheosis of Pierpont Morgan, The Democratic Counterrevolution*

**Due by Thursday before Class:** *American Colossus* Reading Guide

**Week Seven:**

2/24: The Common Man at War

2/26: **Midterm Exam**

**Reading:** Boyle: *Prologue, Where Death Waits, (Optional: Ain't Slavery No More)*

**Week Eight:**

3/3: The Origins of the Cold War (Part One)

3/5: The Origins of the Cold War (Part Two)

**Reading:** Boyle: *Migration, Uplift Me, Pride, White Houses*

**Week Nine:**

3/10: The Red and Lavender Scares

3/12: There Comes a Time (Civil Rights) (Part One)

**Reading:** Boyle: *(Optional: Letter of Your Law), Freedmen, Sons of God.*

**Week Ten:**

3/17: **Spring Break!**

3/19: **Spring Break!**

**Reading:** Boyle, *Americans, The Prodigal Son.*

**Week Eleven:**

3/24**: Discussion:** ***Arc of Justice***

**Reading:** Boyle: *Prejudice, Judgement Day, Epilogue*

3/26: Catch Up

**Due by Tuesday Before Class:** ***Arc of Justice Reading Guide***

**Week Twelve:**

3/31: There Comes a Time (Civil Rights) (Part Two)

4/2: The Second Reconstruction (Lyndon Johnson and the Civil Rights Act)

**Reading:** Kruse: *Introduction, A Crisis of Confidence*

**Week Thirteen:**

4/7: The Long Dark Night of Lyndon Baines Johnson (The Vietnam War)

4/9: Revolution

**Reading:** Kruse: *A Crisis of Identity, A Crisis of Equality*

**Week Fourteen:**

4/14: 1968

4/16: Law and Order (Liberalism and Conservatism After the Sixties)

**Reading:** Kruse: *Fighting Right, Dividing America*

**Week Fifteen:**

4/21: The Crimes of Richard Nixon

4/23: "Government is the Problem" (Carter, Reagan, and Beyond)

**Reading:** Kruse: *The Roaring 1990s, Scandalized*

**Week Sixteen:**

4/28: **Discussion: *Fault Lines***

**Reading: None, other than finishing *Fault Lines***

**Due by Tuesday Before Class:** *Fault Lines* Reading Guide.

**Final Date: April 30th, 3:30-5:30 pm**

## Sample Midterm Rubric:

| Dimension | 8 | 7 | 5.5 | 4 | 3 |
|---|---|---|---|---|---|
| Explanation #1 | • Fully explains the "What," "Where/When" and "Why" of the subject matter.<br>• Is specific and accurate.<br>• Correctly identifies a debate and what each side argues. | • Partially explains the "What," "Where/When" and "Why" of the subject matter.<br>• Is mostly specific and accurate.<br>• Identifies a debate, though may be unclear about what it concerns. | • Example may not be fully explained: "What," "Where/When" or "Why" of the subject matter.<br>• May be vague.<br>• Only loosely may be considered a debate. | • Explanation is vague and underdeveloped.<br>• Explanation only tangentially relates to the prompt. | • Example is not present. |
| Analysis #1 | • Student identifies how this debate is significant and relevant to early America.<br>• Student correctly identifies how it affects early America. | • Student attempts to identify how this debate is significant and relevant to early America.<br>• Student vaguely explains how the debate affects early America. | • Student has either explained how the example is relevant to early America or attempted to explain its consequences. This may not be completely clear. | • Student's analysis is lacking in both providing significance and providing consequences. | Example is not present. |
| Explanation #2 | • Fully explains the "What," "Where/When" and "Why" of the subject matter.<br>• Is specific and accurate.<br>• Correctly identifies a debate and what each side argues.<br>• | • Partially explains the "What," "Where/When" and "Why" of the subject matter.<br>• Is mostly specific and accurate.<br>• Identifies a debate, though may be unclear about what it concerns. | • Example may not be fully explained: "What," "Where/When" or "Why" of the subject matter.<br>• May be vague.<br>• Only loosely may be considered a debate. | • Explanation is vague and underdeveloped.<br>• Explanation only tangentially relates to the prompt. | Example is not present. |
| Analysis #2 | • Student identifies how this debate is significant and relevant to early America.<br>• Student correctly identifies how it affects early America. | • Student attempts to identify how this debate is significant and relevant to early America.<br>• Student vaguely explains how the debate affects early America. | • Student has either explained how the example is relevant to early America or attempted to explain its consequences. This may not be completely clear. | • Student's analysis is lacking in both providing significance and providing consequences. | Example is not present. |
| Explanation #3 | • Fully explains the "What," "Where/When" and "Why" of the subject matter.<br>• Is specific and accurate.<br>• Correctly identifies a debate and what each side argues. | • Partially explains the "What," "Where/When" and "Why" of the subject matter.<br>• Is mostly specific and accurate.<br>• Identifies a debate, though may be unclear about what it concerns. | • Example may not be fully explained: "What," "Where/When" or "Why" of the subject matter.<br>• May be vague.<br>• Only loosely may be considered a debate. | • Explanation is vague and underdeveloped.<br>• Explanation only tangentially relates to the prompt. | Example is not present. |
| Analysis #3 | • Student identifies how this debate is significant and relevant to early America.<br>• Student correctly identifies how it affects early America. | • Student attempts to identify how this debate is significant and relevant to early America.<br>• Student vaguely explains how the debate affects early America. | • Student has either explained how the example is relevant to early America or attempted to explain its consequences. This may not be completely clear. | • Student's analysis is lacking in both providing significance and providing consequences. | Example is not present. |

| | | | | | |
|---|---|---|---|---|---|
| Explanation #4 (Book) | • Fully explains the "What," "Where/When" and "Why" of the subject matter.<br>• Is specific and accurate, and has a page number.<br>• Correctly identifies a debate and what each side argues.<br>• | • Partially explains the "What," "Where/When" and "Why" of the subject matter.<br>• Is mostly specific and accurate and cites a page number.<br>• Identifies a debate, though may be unclear about what it concerns. | • Example may not be fully explained: "What," "Where/When" or "Why" of the subject matter.<br>• May be vague or not cite a page number.<br>• Only loosely may be considered a debate. | • Explanation is vague and underdeveloped.<br>• Explanation only tangentially relates to the prompt. | Example is not present. |
| Analysis #4 (Book) | • Student identifies how this debate is significant and relevant to early America.<br>• Student correctly identifies how it affects early America. | • Student attempts to identify how this debate is significant and relevant to early America.<br>• Student vaguely explains how the debate affects early America. | • Student has either explained how the example is relevant to early America or attempted to explain its consequences. This may not be completely clear. | • Student's analysis is lacking in both providing significance and providing consequences. | Example is not present. |
| Thoroughness | • All examples are fully explained and demonstrate the student's ability to thoroughly explain key moments in American History<br>• All examples are from specific parts of class material. | • At least one example may not be thoroughly explained.<br>• At least one example may not be from a specific part of class material. | • Multiple examples are not thoroughly explained.<br>• Multiple examples are not from a specific part of class material. | • Examples are either very brief and incomplete or are not drawn from class material. | |
| Course Themes | • All four examples reflect the themes of the course.<br>• All four examples demonstrate that the student understands the key events and ideas from the course. | • At least three examples reflect the themes of the course.<br>• At least three examples demonstrate that the student understands the key events and ideas from the course. | • Multiple examples do not reflect the themes of the course.<br>• Multiple examples do demonstrate that the student understands the key events and ideas from the course. | • Examples are inaccurate and do not reflect course themes. | |

# Exhibit J

Outlook

**TAMUS Rule 08.01 follow-up**

**From** Branscombe, Dr. Jensen <BRANSCOMBE@tarleton.edu>
**Date** Thu 15/01/2026 17:17
**To** History, Geography & GIS <historygeographygis@tarleton.onmicrosoft.com>; HSGG adjuncts and VI <hsggadjunctsandvi@tarleton.onmicrosoft.com>

Dear colleagues,

I wanted to pass along an update on TAMUS Rule 08.01 that was drafted last November and revised in December. If you have not reviewed the rule recently, the wording in section 2.1b was amended after the fall semester ended: https://policies.tamus.edu/08-01.pdf

Following this change, Tarleton's administration has altered its interpretation of the rule. Regardless of *advocacy*, the following topics may not be addressed in any core curriculum course:

-race ideology (see rule linked to above for definition)
-gender ideology (see rule linked to above for definition)
-sexual orientation
-gender identity

These topics may only be discussed in an upper-level course with written approval from the president.

I am hoping we will see some communication directly from our dean or provost on this, but in the meantime, I wanted to make sure you were all aware of the change in the rule and its interpretation on campus. The FAQ document we received (that I forwarded in my December 8 email) is no longer applicable.

Take care, everyone, and follow up with me if you have questions or would like to discuss further.

Thank you. I hope everyone enjoys the upcoming long weekend.

-Jensen

# Exhibit K

Outlook

**Do The Right Thing**

**From** Vice President for the Division of Student Engagement and Success <vpses@tarleton.edu>
**Date** Wed 2/18/2026 5:04 PM
**To** George, Dr. Aaron <AGEORGE@tarleton.edu>

# Do The Right Thing

The Texas A&M University System is committed to upholding the highest ethical standards and principles. If you have factual information suggesting misconduct by any A&M System member, employee, student or other affiliate we want you to report it.

Reportable issues include, but are not limited to: fraud, theft, misuse of A&M System resources or information, safety violations, conflicts of interest, NCAA violations, inappropriate conduct,harassment or illegal discrimination, non-compliance with the Texas Anti-Diversity, Equity and Inclusion Law, and general student and/or employee misconduct. We have also recently added a new reportable category concerning inaccuracies or misalignment between course description, syllabi, or instructional content.

Reports may be submitted through the Risk, Fraud & Misconduct Hotline, a confidential telephone and web-based reporting system. You may call 1-888-501-3850 or select Raise a Concern at the top of the page using the EthicsPoint Hotline.

Reports can be submitted anonymously. The hotline is independently operated and available 24 hours a day, 7 days a week.

Janet Gordon
System Ethics and Compliance Officer
The Texas A&M University System