**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, LEONARD BRIGHT, VANITA REDDY, LANDON SADLER, and AARON GEORGE,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT L. ALBRITTON, JAY GRAHAM, DAVID C. BAGGETT, JOHN W. BELLINGER, JAMES R. BROOKS, MICHAEL A. HERNANDEZ III, WILLIAM MAHOMES JR., KELLEY SULLIVAN GEORGIADES, and SAM TORN, in their official capacities as members of the Texas A&M University System Board of Regents,<br><br>Defendants. | Civil Action No.: 4:26-cv-06268<br><br>**DECLARATION OF MARTIN PETERSON** |

Pursuant to 28 U.S.C. § 1746, I, Martin Peterson, declare the following:

1. I am a citizen of the United States. I am over eighteen (18) years of age and fully competent to make this declaration. I knowingly and voluntarily make this declaration. If called as a witness, I could and would testify competently under oath to the following facts based on my personal knowledge.

2. I have been a resident of Brazos County, Texas, since 2014.

3. I began working at Texas A&M University in 2014 as a tenured full professor in the Philosophy Department and holder of the Bovay Chair for the History and Ethics of Professional Engineering. (A true and correct copy of my recent resume is attached as Exhibit A.)

4. I have been a member of the AAUP since September 2025. I joined shortly after Texas A&M and Texas State University fired faculty members for what appears to be ideological reasons.

5. I have authored six books and approximately 100 articles. I am the 10th-most-cited scholar in my subfield worldwide, according to Leiter Reports.

6. I have served as Chair of the Academic Freedom Council ("AFC") since the fall of 2024. The AFC is a university committee that advises the Provost and President on matters related to academic freedom.

7. Texas A&M fired Dr. Melissa McCoul in September 2025 after a student claimed that her discussion of gender issues in a children's literature course was "illegal." Dr. McCoul has sued the University. The AFC wrote a memo criticizing the termination decision as a violation of Dr. McCoul's academic freedom.

8. Shortly after Dr. McCoul was fired, President Mark Welsh III resigned. He told me and several others on the day he resigned that he had not resigned voluntarily. He resigned under pressure from the University to fire Dr. McCoul more quickly.

9. The Board introduced System Policy 08.01 in November 2025 and revised it in December 2025. The Policy prohibits certain topics from being taught at Texas A&M, despite those topics having been taught at other universities across the nation and at Texas A&M for decades.

10. The University also announced that, going forward, all syllabi must face mandatory review by the department head and the dean before the start of each semester.

11. I submitted my syllabus for my spring semester course, PHIL 111, Contemporary Moral Issues, to my department head, Dr. Kristi Sweet, for the mandatory review on December

22, 2025. In my email to her, I raised concerns about the legality of the review. (A true and correct copy of this email is attached as Exhibit B.)

12. On January 6, 2026, Dr. Sweet informed me via email that the review was complete. She communicated that my syllabus violated System Policy 08.01. As a result, she gave me two options: (1) remove the modules on race ideology and gender ideology, and the Plato *Symposium* readings that may include these; or (2) I could be reassigned to teach a different course instead of teaching my course as planned. (A true and correct copy of this email is attached as Exhibit C.)

13. I felt the syllabus review and forced choice between those two alternatives violated my First Amendment rights, but I decided to remove the Plato reading from the syllabus rather than suffer reassignment or potential punishment. I replaced the censored materials with two lectures on academic freedom and free speech. I assigned the following reading: "Texas A&M, Under New Curriculum Limits, Warns Professor Not to Teach Plato", *The New York Times*, January 8, 2026. (A true and correct version of my original syllabus for PHIL 111 is attached as Exhibit D, and the revised version of the syllabus is attached as Exhibit E, and *The New York Times*, January 8, 2026, article is attached as Exhibit F.)

14. In the following days, many articles appeared worldwide about the University's decision to censor Plato in a philosophy course.

15. In response, the University issued the following statement saying that some of my colleagues had obtained permission to teach other Plato texts in other courses, although the decision to prevent me from discussing Plato remained in place: "Texas A&M University will teach numerous dialogues by Plato in a variety of courses this semester and will continue to do so in the future. In alignment with recent System policy, university administrators are reviewing all core curriculum courses to ensure they do not teach race or gender ideology."

16. Shortly after the press reported the censorship of certain texts by Plato in my course, Dr. Sweet told my colleague, Dr. Amir Jaima, that he would now receive permission to teach all parts of Plato's *Symposium*, including the parts I had assigned, in his course. This was despite Dr. Sweet previously instructing Dr. Jaima in a phone conversation to remove the parts of the *Symposium* that address gender issues and sexual orientation.

17. Dr. Sweet did not change her mind about her decision to censor Plato's *Symposium* in my course, despite the fact that it was relevant to the content covered in the course. At a faculty meeting on January 8, 2026, she explained that the same text by Plato violated System Policy 08.01 in my course on contemporary moral issues but not in Dr. Jaima's course on a different topic. She said that the "context" was different.

18. On January 16, 2026, I met with Interim President Tommy Williams and Provost Alan Sams to discuss the decision to censor Plato. The meeting took place at their request. They communicated that they were unhappy with the negative publicity stemming from their decision to censor Plato.

19. I faced censorship for a second time in February and March 2026. I asked my supervisors whether the new policy permitted the slides I used in 2024 for my PHIL 111 lecture on "sexual morality" (pp. 438–473 in Fiala & MacKinnon, Ethics: Theory and Contemporary Issues, 10th edition).

20. On February 25, my department head, Dr. Sweet, stated that "individual instructors are responsible for using their best judgment to ensure that lectures and classroom discussions comply with system policies and align with the approved syllabus." (A true and correct copy of this email is attached as Exhibit G).

21. Since I was still unsure whether my old slides from 2024 comported with the new policy, I reached out to Provost Alan Sams for guidance on February 26, who responded the next day: "it is not as simple as approving a slide or deck of slides as much of the compliance depends on the context, presentation, and discussion of the slides or lecture. Those things are the responsibility of the instructor. […] I encourage you to meet with Interim Dean North, along with his appropriate designees, and Department Head Sweet to have that discussion." (A true and correct copy of this email is attached as Exhibit H.)

22. The meeting with North and Sweet took place on March 2, but they couldn't clarify what I was allowed to say and not say in the classroom – the relevant part of policy 08.01 is notoriously vague. Although I was explicitly told that slide 7 in my slide deck ("Biology 101: biological sex is not binary") would be acceptable, I was also informed during the meeting and later via email that several other (unspecified) slides violated the policy.

23. Dean North had asked the Office of General Council (OGC) to review my slides. In an email sent on March 3, 2026, the day after the meeting, Dean North wrote that: "After further review of the slide deck in its entirety, OGC notes that it is evident that there are several other slides that clearly include matter prohibited in core curriculum courses. OGC advises that you adjust your planned course materials to ensure full compliance." (A true and correct copy of this email is attached as Exhibit I.)

24. When I asked for clarification, Dean North refused to specify which slides or parts of slides I was not allowed to show my students. On March 11, he emailed me that: "It is incumbent on you, as part of your academic responsibility, to modify your slides and classroom discussion to adhere to System policy 08.01. If you are unable to follow the policy for any reason, please advise

your department head, Kristi Sweet, who can assign another professor to teach the module." (A true and correct copy of this email is attached as Exhibit J.)

25. I responded on March 12 that "The problem is that the rule is so vague that I don't know how to apply it. What counts as a 'topic related to sexual orientation'? Everything is related to everything. I have been authorized by you to discuss consent to sex, so that is not prohibited, but doesn't consent to sex relate to sexual orientation? If not, why not? [...] You do not solve your legal problem by telling me that someone else can teach my class. Policy 08.01 applies to all faculty. The policy does not become less vague because you offer one person (me) to find another instructor; that offer has not been extended to all faculty." (A true and correct copy of this email is attached as Exhibit K.)

26. I eventually chose to self-censor my lecture. As my request for guidance was denied and the policy is unclear, I might have censored more than necessary – but I will never know, because the policy is so vague.

27. On April 9, 2026, I decided that I had had enough. As Texas A&M University has shown no willingness to respect my constitutional rights, I submitted my letter of resignation that day, effective July 31, 2026. (A true and correct copy of this email is attached as Exhibit L.)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 27, 2026

Martin Peterson

# Exhibit A

# Martin Peterson

Department of Philosophy, Texas A&M University
College Station, Texas 77843-4237
martinperterson@tamu.edu


AOS: Ethics of Technology, Normative Ethics

AOC: Decision Theory, Experimental Philosophy

## DEGREES

2003 Ph.D., Philosophy, KTH Royal Institute of Technology, Stockholm, Sweden

1998 M.A., Philosophy, Stockholm University, Stockholm, Sweden

## ACADEMIC EMPLOYMENT

Professor of Philosophy and Sue G. and Harry E. Bovay Jr. Professor of the History and Ethics of Professional Engineering, 2014 –, Texas A&M University.
Professor, 2013 – 2014, Associate Professor, 2009 – 2013, Eindhoven University of Technology.
Research Fellow, 2005 – 2008, University of Cambridge.
Assistant Professor (with tenure), up to 75% of full time, 2004 – 2008, Luleå University of Technology.
Research Fellow, followed by a position as Assistant Professor (with tenure), part time, 2003 – 2009, KTH Royal Institute of Technology.

## ADMINISTRATIVE AND PROFESSIONAL SERVICE

- Chair, Academic Freedom Council, Texas A&M University, 2024–present.
- Editor, Elements in Decision Theory and Philosophy, Cambridge University Press, 2018–present.
- Expert Witness (Engineering Ethics), Flint, MI Water Crisis cases.
- Director of Graduate Studies, Department of Philosophy, Texas A&M University, 2020–2023.
- Associate Director of Graduate Studies, Department of Philosophy, Texas A&M University, 2019–2020.
- Associate Head, Department of Philosophy, Texas A&M University, 2018–2019, 2023–2024.
- Committee on Academic Freedom, Responsibility and Tenure (CAFRT), Texas A&M University, 2024–present.
- University Faculty Development Leave Committee, Texas A&M University, 2024–present.
- Co-Chair, AI Ethics, Governance and Policy Group, Artificial Intelligence (AI) Strategy Council, Texas A&M University.

- Member, Endowed Positions Advisory Committee, College of Arts and Sciences, 2023–present.
- Member, Digital Learning Committee, College of Arts and Sciences, 2024–present.
- Member, TAMU Strategic AI Initiative Planning Committee, 2023–2024.
- Chair, Faculty Annual Evaluation Advisory Committee, Department of Philosophy, Texas A&M University, 2017–2018, 2023–2024, member 2024-2025.
- Chair, Search Committee for five T/TT positions, 2023–2024.
- Member, Search Committee for one T/TT position, 2024–2025.
- Tenure and Promotion Consultation, Virginia Tech, 2025.
- Chair, Book Prize committee, Melbern G. Glasscock Center for Humanities Research, 2025.
- Member, Academic Program Review Committee for the PhD, MA, and BA programs in philosophy at the University of Buffalo, 2025.
- Chair, Social Committee, Department of Philosophy, Texas A&M University, 2025–2025.
- Chair, Colloquium and Public Events Committee, Department of Philosophy, Texas A&M University, 2018–2019.
- Chair, Tenure on Arrival Committee, Department of Philosophy, Texas A&M University, 2017.
- Program Chair, SPT 2019 Conference (>300 speakers).
- Tenure and Promotion Consultation, Loyola University New Orleans, 2016.
- Organizer, Bovay Workshop Series on Applied Ethics, 2015–present.
- Member, Climate and Inclusion Committee, College of Liberal Arts, Texas A&M University, 2015–2017.
- Chair, Rules Committee, Department of Philosophy, Texas A&M University, 2014–2017.
- Director of Studies, St Edmund's College, University of Cambridge, 2006–2008.
- Member, Board of the Dutch Research School of Philosophy's Section for Ethics and Practical Philosophy, 2013–2014.
- Member, Management Team, 3TU Centre for Ethics and Technology, 2009–2014.
- Project Manager, Agora Project for Teaching Ethics to Engineering Students, 2009–2014.

## TEACHING

### Supervision of Graduate Students

| Date | Student Name | Role on Committee |
|---|---|---|
| Current | Mitchell Roberts | Chair |
| 2021 | Steve Dezort | Chair |
| 2021 | Dong An | Co-chair |
| 2020 | John Curran O'Day | Chair |

| | | |
|---|---|---|
| 2016 | Mostafa Mohajeri | Chair |
| 2011 | Johan E. Gustafsson | Co-chair |
| 2009 | Niklas Möller | Co-chair |
| 2009 | Kalle Gril | Co-chair |
| 2009 | Per Wikman-Swahn | Co-chair |
| 2008 | Nicolas Espinoza | Chair |
| 2008 | Barbro Fröding | Co-chair |
| 2008 | Jessica Nihlen-Fahlqvist | Co-chair |
| 2007 | Madeleine Hayenhjelm | Co-chair |
| 2007 | Eva Hedfors | Co-chair |

## RESEARCH AND CREATIVE ACTIVITY: PUBLICATIONS

### Books

1. Ethics in the Gray Area: A Gradualist Theory of Right and Wrong, Cambridge University Press, 2023.
2. Ethics for Engineers, Oxford University Press, 2019, 2nd ed. 2025. [Textbook]
3. The Ethics of Technology: A Geometric Analysis of Five Moral Principles, Oxford University Press, 2017.
4. The Dimensions of Consequentialism, Cambridge University Press, 2013.
5. An Introduction to Decision Theory, Cambridge University Press, 2009. 2nd ed. 2017. [Textbook]
6. Non-Bayesian Decision Theory, Springer, 2008.

### Edited Volumes

7. The Prisoner's Dilemma, Cambridge University Press, 2015.
8. S. Roeser, R. Hillerbrand, P. Sandin, and M. Peterson, Handbook of Risk Theory: Epistemology, Decision Theory, Ethics, and Social Implications of Risk, Springer Netherlands, 2012.

### Articles and Chapters

1. M. Peterson, "Can Harsanyi's Theorem Defuse Sidgwick's Dualism?", Analysis, in press.

2. M. Peterson, "Dutilitarianism," Asian Journal of Philosophy, vol. 4, no. 1, p. 60, 2025.

3. M. Peterson, "Aligning Technology with Human Values: The Measurement Problem," Philosophy & Technology, vol. 38, no. 3, p. 118, 2025.

4. B. Fröding and M. Peterson, "Is an Eloquent Love Letter Written by AI Better than a Clunky One Written by Your Partner?," Philosophy & Technology, vol. 38, no. 2, p. 70, 2025.

5. M. Peterson, "Philosophy of Probability," in *International Encyclopedia of Statistical Science*, pp. 1899–1904, 2025.

6. M. Peterson and P. Gärdenfors, "How to Measure Value Alignment in AI," *AI and Ethics*, vol. 4, no. 4, pp. 1493–1506, 2024.

7. M. Peterson and B. Fröding, "Privacy in a Smart City," *Etikk i praksis – Nordic Journal of Applied Ethics*, pp. 49–63, 2024.

8. P. van Oossanen and M. Peterson, "Australia II: A Case Study in Engineering Ethics," *Science and Engineering Ethics*, vol. 30, no. 3, p. 16, 2024.

9. M. Peterson, "Value Change, Energy Systems, and Rational Choice: The Expected Center of Gravity Principle," Science and Engineering Ethics, vol. 29, no. 3, p. 13, 2023.

10. M. Peterson and P. Gärdenfors, "How to measure value alignment in AI," AI and Ethics, pp. 1-14, 2023.

11. Sabat, E. Nault, S. S. Fortney, M. B. Peterson, and D. Banerjee, "Diversity, Inclusion, and Equity in the Engineering Curriculum: Evaluating the Efficacy of a New Teaching Module," Advances in Engineering Education, vol. 11, no. 3, pp. 54-76, 2023.

12. M. Peterson, "What Do Technical Functions Supervene On?," Techne: Research in Philosophy & Technology, vol. 26, no. 3, 2022.

13. M. Peterson, "Moral rightness comes in degrees," Journal of the American Philosophical Association, vol. 8, no. 4, pp. 645-664, 2022.

14. M. Peterson, "Abortion Is Neither Right Nor Wrong," The Journal of Value Inquiry, vol. 56, no. 2, pp. 219-240, 2022.

15. S. Verheyen and M. Peterson, "Can we use conceptual spaces to model moral principles?," Review of Philosophy and Psychology, vol. 12, pp. 373-395, 2021.

16. M. Peterson, "Standard Decision Theory," Knauff, Markus, and Wolfgang Spohn, eds. The Handbook of Rationality. MIT Press, 2021.

17. M. Peterson and C. Seidel, "The Deontic Transfer Principle," Erkenntnis, vol. 86, pp. 1185-1195, 2021.

18. B. Fröding and M. Peterson, "Friendly AI," Ethics and Information Technology, vol. 23, pp. 207-214, 2021.

19. A. Jonsson and M. Peterson, "Consequentialism in infinite worlds," Analysis, vol. 80, no. 2, pp. 240-248, 2020.

20. P. Sandin and M. Peterson, "Is the precautionary principle a midlevel principle?," Ethics, Policy & Environment, vol. 22, no. 1, pp. 34-48, 2019.

21. M. Peterson, "The value alignment problem: a geometric approach," Ethics and Information Technology, vol. 21, pp. 19-28, 2019.

22. M. Peterson, "The St. Petersburg Paradox," The Stanford Encyclopedia of Philosophy, Edward N. Zalta & Uri Nodelman (eds.), 2019.

23. M. Peterson, "Interval values and rational choice," Economics & Philosophy, vol. 35, no. 1, pp. 159-166, 2019.

24. M. Peterson, "The ethics of technology: Response to critics," Science and Engineering Ethics, vol. 24, no. 5, pp. 1645-1652, 2018.

25. M. Peterson, "The Anti-Nihilist Wager," Dialectica, vol. 72, no. 4, pp. 597-602, 2018.

26. M. Peterson and P. Vallentyne, "Self-prediction and self-control," Self-Control, Decision Theory, and Rationality: New Essays, vol. 48, no. 10.3758, 2018.

27. M. Peterson, "Yes, the precautionary principle is incoherent," Risk Analysis, vol. 37, no. 11, pp. 2035-2038, 2017.

28. M. Peterson, "What is the Point of Thinking of New Technologies as Social Experiments?," Ethics, Policy & Environment, vol. 20, no. 1, pp. 78-83, 2017.

29. M. Peterson, "The ethics of technology: A geometric analysis of five moral principles," ed: Oxford University Press, 2017.

30. J. A. Carter and M. Peterson, "The modal account of luck revisited," Synthese, vol. 194, pp. 2175-2184, 2017.

31. R. Lowry and M. Peterson, "Pure Time Preference: Reply to Johansson and Rosenqvist," Pacific Philosophical Quarterly, vol. 97, no. 3, pp. 442-445, 2016.

32. M. Peterson, "The Dimensions of Consequentialism: Reply to Schmidt, Brown, Howard-Snyder, Crisp, Andric and Tanyi, and Gertken," Ethical Theory and Moral Practice, vol. 19, pp. 71-82, 2016.

33. M. Peterson, "The Decisional Value of Information," in The Routledge Handbook of Philosophy of Information: Routledge, 2016, pp. 153-163.

34. M. Peterson, "Radical Evaluative Ignorance," in Perspectives on Ignorance from Moral and Social Philosophy: Routledge, 2016, pp. 134-155.

35. M. Peterson, "Does Moral Rightness Come in Degrees?," The Philosophers' Magazine, no. 74, pp. 34-38, 2016.

36. M. Peterson, “Do pragmatic arguments show too much?,” European Journal for Philosophy of Science, vol. 6, pp. 165-172, 2016.

37. J. A. Carter, M. Peterson, and B. van Bezooijen, “Not knowing a cat is a cat: Analyticity and knowledge ascriptions,” Review of Philosophy and Psychology, vol. 7, pp. 817-834, 2016.

38. J. A. Carter and M. Peterson, “On the epistemology of the precautionary principle: Reply to Steglich-Petersen,” Erkenntnis, vol. 81, pp. 297-304, 2016.

39. M. Peterson, “Prospectism and the weak money pump argument,” Theory and Decision, vol. 78, pp. 451-456, 2015.

40. J. Adam Carter and M. Peterson, “On the epistemology of the precautionary principle,” Erkenntnis, vol. 80, pp. 1-13, 2015.

41. B. Fröding and M. Peterson, “How to be a Virtuous Recipient of a Transplant Organ,” in Organ Transplantation in Times of Donor Shortage: Challenges and Solutions: Springer International Publishing Cham, 2015, pp. 89-98.

42. R. Hillerbrand and M. Peterson, “Nuclear power is neither right nor wrong: The case for a tertium datur in the ethics of technology,” Science and Engineering Ethics, vol. 20, pp. 583-595, 2014.

43. M. Peterson, “Consequentialism,” The Encyclopedia of Political Thought, pp. 697-700, 2014.

44. M. Peterson and S. D. Zwart, “Introduction: Values and norms in modeling,” Studies in History and Philosophy of Science, vol. 46, pp. 1-2, 2014.

45. S. Diekmann and M. Peterson, “The role of non-epistemic values in engineering models,” Science and Engineering Ethics, vol. 19, pp. 207-218, 2013.

46. M. Peterson, “New technologies should not be treated as social experiments,” Ethics, Policy & Environment, vol. 16, no. 3, pp. 349-351, 2013.

47. M. Peterson, “A Generalization of the Pasadena Puzzle,” Dialéctica, vol. 67, no. 4, pp. 597-603, 2013.

48. M. Peterson and P. Sandin, “The last man argument revisited,” The Journal of Value Inquiry, vol. 47, pp. 121-133, 2013.

49. K. Vaesen, M. Peterson, and B. Van Bezooijen, “The reliability of armchair intuitions,” Metaphilosophy, vol. 44, no. 5, pp. 559-578, 2013.

50. B. Fröding and M. Peterson, “Why computer games can be essential for human flourishing,” Journal of Information, Communication and Ethics in Society, vol. 11, no. 2, pp. 81-91, 2013.

51. R. Lowry and M. Peterson, "Cost-benefit analysis and non-utilitarian ethics," Politics, Philosophy & Economics, vol. 11, no. 3, pp. 258-279, 2012.

52. S. Roeser, R. Hillerbrand, P. Sandin, and M. Peterson, Handbook of Risk Theory: Epistemology, Decision Theory, Ethics, and Social Implications of Risk, ed: Springer Netherlands, 2012.

53. N. Espinoza and M. Peterson, "Risk and Mid-Level Moral Principles," Bioethics, vol. 26, no. 1, pp. 8-14, 2012.

54. N. Espinoza and M. Peterson, "How to depolarise the ethical debate over human embryonic stem cell research (and other ethical debates too!)," Journal of Medical Ethics, vol. 38, no. 8, pp. 496-500, 2012.

55. M. Peterson, "Multi-Dimensional Consequentialism," Ratio, vol. 25, no. 2, pp. 177-194, 2012.

56. M. Peterson and N. Espinoza, "Risk and Degrees of Rightness," in Norms in Technology: Springer Netherlands Dordrecht, 2012, pp. 193-206.

57. M. Peterson and M. de Vries, "Do new technologies give rise to new ethical issues?: some reflections on nanotechnology," in Nanotechnologies: towards a shift in the scale of ethics? EME/CEI, 2012, pp. 87-100.

58. J. E. Gustafsson and M. Peterson, "A computer simulation of the argument from disagreement," Synthese, vol. 184, pp. 387-405, 2012.

59. E. Selinger, D. Ihde, I. van de Poel, M. Peterson, and P.-P. Verbeek, "Peter Paul Verbeek and a Postphenomenological Mirror," Philosophy & Technology, vol. 25, no. 4, pp. 610-616, 2012.

60. B. Fröding and M. Peterson, "Why virtual friendship is no genuine friendship," Ethics and Information Technology, vol. 14, pp. 201-207, 2012.

61. B. Fröding and M. Peterson, "Virtuous choice and parity," Ethical Theory and Moral Practice, vol. 15, no. 1, pp. 71-82, 2012.

62. M. Peterson, "The mixed solution to the number problem," in Ethics and Moral Philosophy: Brill, 2011, pp. 357-369.

63. M. Peterson, "Pandemic influenza and utilitarianism," Bioethics, vol. 25, no. 5, 2011.

64. M. Peterson, "Is there an ethics of algorithms?," Ethics and Information Technology, vol. 13, no. 3, 2011.

65. R. Lowry and M. Peterson, "Pure time preference," Pacific Philosophical Quarterly, vol. 92, no. 4, pp. 490-508, 2011.

66. M. Peterson, "A new twist to the St. Petersburg paradox," The Journal of Philosophy, vol. 108, no. 12, pp. 697-699, 2011.

67. M. Peterson and A. Spahn, "Can technological artefacts be moral agents?," Science and Engineering Ethics, vol. 17, pp. 411-424, 2011.

68. F. Kraemer, K. Van Overveld, and M. Peterson, "Is there an ethics of algorithms?," Ethics and Information Technology, vol. 13, pp. 251-260, 2011.

69. B. Frööding and M. Peterson, "Animal ethics based on friendship," Journal of Animal Ethics, vol. 1, no. 1, pp. 58-69, 2011.

70. B. Fröding and M. Peterson, "Animals and friendship: A reply to Rowlands," Journal of Animal Ethics, vol. 1, no. 2, pp. 187-189, 2011.

71. M. Peterson, "Some versions of the number problem have no solution," Ethical Theory and Moral Practice, vol. 13, pp. 439-451, 2010.

72. M. Peterson, "Can consequentialists honour the special moral status of persons?," Utilitas, vol. 22, no. 4, pp. 434-446, 2010.

73. M. Peterson, "A royal road to consequentialism?," Ethical Theory and Moral Practice, vol. 13, pp. 153-169, 2010.

74. M. Peterson and P. Sandin, "Guest editors' introduction: The philosophy of risk," Journal of Risk Research, vol. 13, No. 2, pp. 135–136, 2010.

75. M. Peterson, "Do WHO guidelines on pandemic influenza follow biomedical ethics? ": E-letter responses to Martin Enserink and Jocelyn Kaiser: Devilish dilemmas surround pandemic flu vaccine: Science 2009; 324: 702-705," 2009.

76. N. Espinoza and M. Peterson, "Incomplete preferences in disaster risk management," International Journal of Technology, Policy and Management, vol. 8, no. 4, pp. 341-358, 2008.

77. M. Peterson, "Utility," Nonbayesian Decision Theory: Beliefs and Desires as Reasons for Action, pp. 81-94, 2008.

78. M. Peterson, "The moral importance of selecting people randomly," Bioethics, vol. 22, no. 6, pp. 321-327, 2008.

79. M. Peterson and N. Espinoza, "Incomplete preferences in disaster risk management," International Journal of Technology Policy and Management vol. 8, 2008.

80. M. Peterson, "The precautionary principle should not be used as a basis for decision-making: Talking Point on the precautionary principle," EMBO reports, vol. 8, no. 4, pp. 305-308, 2007.

81. M. Peterson, "Should the precautionary principle guide our actions or our beliefs?," Journal of Medical Ethics, vol. 33, no. 1, pp. 5-10, 2007.

82. M. Peterson, "Parity, clumpiness and rational choice," Utilitas, vol. 19, no. 4, pp. 505-513, 2007.

83. M. Peterson, "On multi-attribute risk analysis," in Risk: philosophical perspectives: Routledge, 2007, pp. 78-93.

84. P. Wikman-Svahn, M. Peterson, and S. O. Hansson, "Principles of protection: a formal approach for evaluating dose distributions," Journal of Radiological Protection, vol. 26, no. 1, p. 69, 2006.

85. N. Möller, S. O. Hansson, and M. Peterson, "Safety is more than the antonym of risk," Journal of Applied Philosophy, vol. 23, no. 4, pp. 419-432, 2006.

86. M. Peterson, "The precautionary principle is incoherent," Risk Analysis, vol. 26, no. 3, pp. 595-601, 2006.

87. M. Peterson, "Indeterminate preferences," Philosophical Studies, vol. 130, pp. 297-320, 2006.

88. M. Peterson and S. O. Hansson, "Order-independent transformative decision rules," Synthese, vol. 147, pp. 323-342, 2005.

89. M. Peterson and S. O. Hansson, "Equality and priority," Utilitas, vol. 17, no. 3, pp. 299-309, 2005.

90. L. Sjöberg, M. Peterson, J. Fromm, Å. Boholm, and S. O. Hanson, "Neglected and overemphasized risks: the opinions of risk professionals," Journal of Risk Research, vol. 8, no. 7-8, pp. 599-616, 2005.

91. M. Peterson, "Transformative decision rules, permutability, and non-sequential framing of decision problems," Synthese, vol. 139, pp. 387-403, 2004.

92. M. Peterson, "From outcomes to acts: a non-standard axiomatization of the expected utility principle," Journal of Philosophical Logic, vol. 33, pp. 361-378, 2004.

93. M. Peterson, "Foreign aid and the moral value of freedom," Ethical Theory and Moral Practice, vol. 7, pp. 293-307, 2004.

94. M. Peterson and S. O. Hansson, "On the application of rights-based moral theories to siting controversies," Journal of Risk Research, vol. 7, no. 2, pp. 269-275, 2004.

95. M. Peterson, "Transformative decision rules: Foundations and applications," Ph.D. Diss., KTH Royal Institute of Technology, 2003.

96. M. Peterson, "Transformative decision rules," Erkenntnis, vol. 58, no. 1, pp. 71-85, 2003.

97. M. Peterson, "Risk, equality, and the priority view," Risk Decision and Policy, vol. 8, no. 1, pp. 17-23, 2003.

98. M. Peterson, "From consequentialism to utilitarianism," The Journal of Philosophy, vol. 100, no. 8, pp. 403-415, 2003.

99. M. Peterson, "What is a de minimis risk?," Risk Management, vol. 4, pp. 47-55, 2002.

100. M. Peterson, "The limits of catastrophe aversion," Risk Analysis, vol. 22, no. 3, pp. 527-538, 2002.

101. M. Peterson, "An argument for the principle of maximizing expected utility," Theoria, vol. 68, no. 2, pp. 112-128, 2002.

102. S. O. Hansson and M. Peterson, "Rights, risks, and residual obligations," Risk, Decision and Policy, vol. 6, no. 3, pp. 157-166, 2001.

103. M. Peterson, "Transformative decision rules and axiomatic arguments for the principle of Maximizing Expected Utility," Lic. Thesis, KTH Royal Institute of Technology, 2001.

## PUBLICATIONS IN OTHER LANGUAGES

41 publications in Swedish, 2 in Dutch, mostly Op-Eds and short journal articles.

## CONFERENCES ON MY WORK

In November 2013 the Philosophy Department at the University of Konstanz hosted a two-day conference on my book The Dimensions of Consequentialism, with comments by ten invited speakers. Six of the papers, and my reply, later appeared (in 2016) in a special issue of Ethical Theory and Moral Practice.

In March 2024 the Philosophy Department at Zhenjiang University organized a symposium on my book Ethics in the Gray Area with comments by leading Chinese and international scholars followed by a response by me.

## INVITED PRESENTATIONS 2020–2025

1. 2024-10-18, No Exceptions to the Precautionary Principle, Royal Swedish Academy of Letters, History and Antiquities, Stockholm, Sweden.
2. 2024-03-28, A Challenge for Relative Decision Theory, Colloquium, Dpt. of Phil, Sichuan University, Chengdu, China.
3. 2024-03-27, Dutilitarianism, Colloquium, Dpt. of Phil, Zhejiang University, Hangzhou, China.
4. 2024-03-26, Ethics in the Gray Area, Book symposium on my book, Hangzhou, China.
5. 2023-03-31, The Flint Water Crisis: Some Ethical Reflections, Tulane Engineering Forum (400 engineers), New Orleans, Keynote, 100, National.
6. 2022-11-17, "A Challenge for Relative Expected Utility Theory", Invited talk UT Austin, workshop on infinite value, Austin, Texas.

7. 2022-03-31, "Algorithms and Value Judgements: How can we make sure that AI systems treat like cases alike?", Invited talk, Carnegie Mellon University, Department of Philosophy and Department of Computer Science, Pittsburg, Pennsylvania.
8. 2021-04-15, "The Precautionary Principle and COVID-19", Invited lecture, Department of History and Philosophy of Science, University of Cambridge, via Zoom.
9. 2021-02-08, "The Ethical Failures Behind the Boeing 737 MAX Disasters", Invited lecture, Department of Aerospace Engineering, California Institute of Technology, via Zoom.
10. 2020-10-15, "Value Change and Energy Systems: A Normative Model", Invited keynote lecture "Changing Values and Energy Systems", Delft University of Technology, via Zoom.
11. 2020-09-02, "The Ethical Failures Behind the Boeing 737 MAX Disasters", Invited lecture to 250 engineers participating in Tulane Engineering Forum, via Zoom.

## GRANTS AND CONTRACTS

NSF — The Ethics of Diversity: Fortifying Ethical Infrastructure to Prevent and Address Sexual Harassment in STEM Research and Practice Settings — 2018–2023 — $443,000.
SRSA — Incomparable Risks — 2005–2007 — 340,000 EUR.
EPA — Ethical Aspects on Environmental Risks — 2004–2005 — 55,000 EUR.
SRC — The Lottery Approach to Distributive Ethics — 2005–2007 — 150,000 EUR.
SEMA — Prioritizing in Emergency Planning — 2006–2008 — 120,000 EUR.
SEPA — Ethical Aspects of Hunting — 2008 — 40,000 EUR.
SRC — Partial Norms — 2009–2011 — 230,000 EUR.

# Exhibit B

## Peterson, Martin B

| | |
|---|---|
| **From:** | Peterson, Martin B |
| **Sent:** | Monday, December 22, 2025 2:36 PM |
| **To:** | Sweet, Kristi |
| **Cc:** | North, Simon W |
| **Subject:** | RE: Syllabus Review, update |
| **Attachments:** | Syllabus PHIL 111 S 2026 _ Peterson.pdf |

Dear Dr. Sweet,

I hereby submit my S 2026 syllabus for PHIL 111, *Contemporary Moral Issues*, for mandatory censorship review.

The syllabus has not changed much since I last taught the course. I have made some minor adjustments to the module on Race and Gender Ideology and to the lecture on Sexual Morality. These topics are commonly covered in this type of course nationwide, and the material is discussed in depth in the assigned textbook (Fiala and MacKinnon, 10th edition). I also ask my students to read a few passages from Plato (Aristophanes' myth of the split humans and Diotima's Ladder of Love).

Please note that my course does not "advocate" any ideology; I teach students how to structure and evaluate arguments commonly raised in discussions of contemporary moral issues.

If you interpret System Rule 08.01 §2.1(b) as prohibiting these topics, I would like to remind you that the U.S. Constitution protects my course content. Texas A&M is a public institution bound by the First Amendment. The Supreme Court has noted that academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom" (*Keyishian v. Board of Regents*, 385 U.S. 589, 603 [1967]).

Another relevant precedent is *Sweezy v. New Hampshire*. Here is Chief Justice Earl Warren for the majority in 1957:

> "The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any straitjacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. **Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding;** otherwise, our civilization will stagnate and die." (354 U.S. 234, 250 [1957], my emph.)

Restrictions on teaching based on viewpoint discrimination are unconstitutional under nearly all circumstances. If faculty are required to seek prior administrative approval for classroom content, that raises serious concerns about "prior restraint." Courts have repeatedly distinguished between holding faculty accountable *after the fact* (for alleged misconduct) and imposing advance censorship of course content. Moreover, restrictions that single out specific perspectives as more problematic than others have repeatedly been found unconstitutional

(*Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 [1995]; *Healy v. James*, 408 U.S. 169 [1972]).

In *Garcetti v. Ceballos* (547 U.S. 410 [2006]), the Supreme Court discusses limits on public-employee speech. However, the Court explicitly set aside the question of whether its analysis applies to "speech related to scholarship or teaching" (id. at 425).

I also note that Texas A&M is a signatory to the 1940 *Statement of Principles on Academic Freedom and Tenure*, which affirms that faculty are entitled to "freedom in the classroom in discussing their subject … [and that] limitations of academic freedom because of religious or other aims of the institution should be clearly stated in writing at the time of the appointment." I was hired in 2014, when Texas A&M was an ideologically neutral institution, and I was not informed of any ideologically motivated limitations on academic freedom of the kind recently announced.

Even if you were to conclude that my syllabus conflicts with System Rule 08.01, constitutional protections for free speech and academic freedom would control. As a public institution, Texas A&M should not enforce policies that raise serious constitutional concerns. When a system rule appears to conflict with the First Amendment, administrators should in my opinion proceed with caution and seek legal guidance rather than mechanically apply the rule.

I have cc'ed Interim Dean North, as the questions raised in this message may warrant evaluation at the college or system level before a final determination is made.

Respectfully,

Martin Peterson
Sue G. and Harry E. Bovay Jr. Chair
Department of Philosophy
Texas A&M University
www.martinpeterson.org

---

**From:** Sweet, Kristi <k-sweet@tamu.edu>
**Sent:** Friday, December 19, 2025 5:17 PM
**To:** Peterson, Martin B <martinpeterson@tamu.edu>
**Subject:** Syllabus Review, update

Greetings Martin,

I am writing to you in advance of my general email to the faculty, as you are teaching a core curriculum course this semester, which may be affected by the Board of Regents' recent vote. I am writing individual faculty members who have communicated with me an intent to include potentially relevant material in a course, in order to communicate the system policy to them.

**The language that was passed by the BOR is now** posted. The relevant language is the following: "No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity. Upon prior written approval of the member CEO after review of the course and relevant course materials, specific non-core curriculum or graduate courses in some disciplines may teach race or gender ideology, or topics related to sexual orientation or gender identity. Such

approval may be granted in limited circumstances upon demonstration of a necessary educational purpose."

Put simply, this means that the Board of Regents has clarified that core curriculum courses, which includes PHIL 111 Contemporary Moral Issues, cannot include issues related to race ideology, gender ideology, or topics related to sexual orientation or gender identity. Any non-core course that includes such material will require an exemption, and all indications are that these will be under limited circumstances, namely, when the content is necessary for the integrity of the course.

I wanted to make you aware of this as soon as I had some direction from the College, who has been consulting with the university administration. I am still hopeful that faculty initially part of the priority review deadline of Dec. 22 will be able to get me their syllabus, but I understand if you request extra time.

If you have any questions about this policy clarification, please do not hesitate to reach out. I will do my best to answer, though the situation is still rather fluid.

Best,

Kristi

Kristi Sweet
Professor and Head
Department of Philosophy
Texas A&M University
Book Review Editor, *Kantian Review*

# Exhibit C

**Peterson, Martin B**

| | |
|---|---|
| **From:** | Sweet, Kristi |
| **Sent:** | Tuesday, January 6, 2026 7:39 PM |
| **To:** | Peterson, Martin B |
| **Cc:** | North, Simon W; Werner, Cynthia A; Harris, Stefanie |
| **Subject:** | Re: Syllabus Review, update |

Greetings Dr. Peterson,

Thank you for your email. The College leadership team and I have discussed your syllabus and the Provost office's requirements for compliance with the new system rule 08.01. You have two options going forward:

1. You may mitigate your course content to remove the modules on race ideology and gender ideology, and the Plato readings that may include these.
2. You may be reassigned to teach PHIL 482 501-514. Lecture times for this course are T/Th 8:00 - 9:15.

Please let us know by end of business tomorrow how you would like to proceed.

Sincerely,

Kristi

---

**From:** Peterson, Martin B <martinpeterson@tamu.edu>
**Date:** Monday, December 22, 2025 at 7:35 AM
**To:** Sweet, Kristi <k-sweet@tamu.edu>
**Cc:** North, Simon W <swnorth@exchange.tamu.edu>
**Subject:** RE: Syllabus Review, update

Dear Dr. Sweet,

I hereby submit my S 2026 syllabus for PHIL 111, *Contemporary Moral Issues*, for mandatory censorship review.

The syllabus has not changed much since I last taught the course. I have made some minor adjustments to the module on Race and Gender Ideology and to the lecture on Sexual Morality. These topics are commonly covered in this type of course nationwide, and the material is discussed in depth in the assigned textbook (Fiala and MacKinnon, 10th edition). I also ask my students to read a few passages from Plato (Aristophanes' myth of the split humans and Diotima's Ladder of Love).

Please note that my course does not "advocate" any ideology; I teach students how to structure and evaluate arguments commonly raised in discussions of contemporary moral issues.

If you interpret System Rule 08.01 §2.1(b) as prohibiting these topics, I would like to remind you that the U.S. Constitution protects my course content. Texas A&M is a public institution bound by the First Amendment. The Supreme Court has noted that academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom" (*Keyishian v. Board of Regents*, 385 U.S. 589, 603 [1967]).

Another relevant precedent is *Sweezy v. New Hampshire*. Here is Chief Justice Earl Warren for the majority in 1957:

> "The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any straitjacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. **Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding;** otherwise, our civilization will stagnate and die." (354 U.S. 234, 250 [1957], my emph.)

Restrictions on teaching based on viewpoint discrimination are unconstitutional under nearly all circumstances. If faculty are required to seek prior administrative approval for classroom content, that raises serious concerns about "prior restraint." Courts have repeatedly distinguished between holding faculty accountable *after the fact* (for alleged misconduct) and imposing advance censorship of course content. Moreover, restrictions that single out specific perspectives as more problematic than others have repeatedly been found unconstitutional (*Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 [1995]; *Healy v. James*, 408 U.S. 169 [1972]).

In *Garcetti v. Ceballos* (547 U.S. 410 [2006]), the Supreme Court discusses limits on public-employee speech. However, the Court explicitly set aside the question of whether its analysis applies to "speech related to scholarship or teaching" (id. at 425).

I also note that Texas A&M is a signatory to the 1940 *Statement of Principles on Academic Freedom and Tenure*, which affirms that faculty are entitled to "freedom in the classroom in discussing their subject … [and that] limitations of academic freedom because of religious or other aims of the institution should be clearly stated in writing at the time of the appointment." I was hired in 2014, when Texas A&M was an ideologically neutral institution, and I was not informed of any ideologically motivated limitations on academic freedom of the kind recently announced.

Even if you were to conclude that my syllabus conflicts with System Rule 08.01, constitutional protections for free speech and academic freedom would control. As a public institution, Texas A&M should not enforce policies that raise serious constitutional concerns. When a system rule appears to conflict with the First Amendment, administrators should in my opinion proceed with caution and seek legal guidance rather than mechanically apply the rule.

I have cc'ed Interim Dean North, as the questions raised in this message may warrant evaluation at the college or system level before a final determination is made.

Respectfully,

Martin Peterson
Sue G. and Harry E. Bovay Jr. Chair

Department of Philosophy
Texas A&M University
www.martinpeterson.org

---

**From:** Sweet, Kristi <k-sweet@tamu.edu>
**Sent:** Friday, December 19, 2025 5:17 PM
**To:** Peterson, Martin B <martinpeterson@tamu.edu>
**Subject:** Syllabus Review, update

Greetings Martin,

I am writing to you in advance of my general email to the faculty, as you are teaching a core curriculum course this semester, which may be affected by the Board of Regents' recent vote. I am writing individual faculty members who have communicated with me an intent to include potentially relevant material in a course, in order to communicate the system policy to them.

**The language that was passed by the BOR is now** posted. The relevant language is the following: "No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity. Upon prior written approval of the member CEO after review of the course and relevant course materials, specific non-core curriculum or graduate courses in some disciplines may teach race or gender ideology, or topics related to sexual orientation or gender identity. Such approval may be granted in limited circumstances upon demonstration of a necessary educational purpose."

Put simply, this means that the Board of Regents has clarified that core curriculum courses, which includes PHIL 111 Contemporary Moral Issues, cannot include issues related to race ideology, gender ideology, or topics related to sexual orientation or gender identity. Any non-core course that includes such material will require an exemption, and all indications are that these will be under limited circumstances, namely, when the content is necessary for the integrity of the course.

I wanted to make you aware of this as soon as I had some direction from the College, who has been consulting with the university administration. I am still hopeful that faculty initially part of the priority review deadline of Dec. 22 will be able to get me their syllabus, but I understand if you request extra time.

If you have any questions about this policy clarification, please do not hesitate to reach out. I will do my best to answer, though the situation is still rather fluid.

Best,

Kristi

Kristi Sweet
Professor and Head
Department of Philosophy
Texas A&M University
Book Review Editor, *Kantian Review*

# Exhibit D

TEXAS A&M UNIVERSITY

Course Syllabus

# Syllabus

## Course Information

| | |
|---|---|
| Course Number: | PHIL 111 |
| Course Title: | Contemporary Moral Issues |
| Section: | Sections 500 - 508 |
| Time: | Monday and Wednesday 12:40 – 1:30 plus Friday recitation (time varies) |
| Location: | CHEM 100 – separate room for Friday recitation |
| Credit Hours: | 3 |

## Instructor Details

| | |
|---|---|
| Instructor: | Dr. Martin Peterson |
| Office: | YMCA 402B |
| Phone: | 979 845 7133 |
| E-Mail: | martinpeterson@tamu.edu |
| Office Hours: | 2-4 pm, Mondays |

## Course Description

Current course description: Contemporary Moral Issues. Representative ethical positions and their application to contemporary social problems; also taught at Galveston campus.

Updated course description: Philosophy challenges students to understand, articulate, and evaluate arguments from multiple points of view. Students evaluate the claims, presuppositions, and reasoning of various positions, including one's own, on contemporary social problems, and analyze those problems using ethical and social theories. Students examine how ideas, values, and other aspects of culture (including power and authority) shape and are shaped by human experience and institutions. Students practice respectful and thoughtful engagement on contentious matters, such as abortion, euthanasia, capital punishment, the relationship between ethics and religion, violence and war, animal ethics, sexual morality, gender issues, health care ethics, equality and discrimination, biotechnology and bioengineering, economic injustice, climate ethics and global hunger and poverty, among others.

## Course Prerequisites

None

## Special Course Designation

Core curriculum (CORE)

- Language, Philosophy and Culture (LPC)
- Culture/Discourse (CD)

## Course Learning Outcomes

Asterisks (*) below highlight CD course learning outcomes. Carats (^) highlight KLPC learning outcomes.

At the end of the course, students will be able to:

- identify, reconstruct, and critically evaluate arguments about moral value^
- interpret differing perspectives charitably*
- recognize practices and virtues conducive to constructive discourse in a multicultural and globalized society*
- demonstrate active listening to and respectful dialogue with others on difficult issues*
- articulate and evaluate perspectives on pressing social, moral, and political issues connected to themes of power, authority, privilege, oppression and discrimination*
- articulate and evaluate ideals and goals related to social and personal responsibility, tolerance, and accountability*^
- apply written and oral communication skills and visual interpretation skills.^

## Textbook and/or Resource Materials

Required:

- Fiala & MacKinnon, Ethics: Theory and Contemporary Issues, 10th edition, ISBN 9798214136110 or ISBN 9780357700006
- Plato, excerpts from Symposium: 180c–185c, 189c–193d, 210a–212b https://www.platonicfoundation.org/translation/symposium/

## Grading Policy

<u>Grade Scale</u>
A (excellent) 90% – 100%
B (good) 80% – <90%
C (acceptable) 70% – <80%
D (passing) 60% – <70%
F (failing) < 60%

<u>Graded Components</u>

- MindTap (Online Quizzes) 10%
- Audio and Visual Presentation 10%
- Very Short Paper 15%
- First Exam 20%
- Pretty Short Paper 25%
- Second Exam 20%

- On-line MindTap quizzes

There will be several graded online MindTap quizzes, which are due on Wednesdays at 11:59 PM. The quizzes are available in MindTap/Canvas.

- Audio and Visual Presentation

Students will work in groups of four, assigned by the TA, on a presentation that includes audio and visual components. Presentations must include visual aids. Students are expected to prepare their presentations outside class. Each student in the group must give part of the presentation in class. More detailed instructions will be provided during the semester.

- Exams

There will be two multiple-choice exams. Exams are cumulative. They will be given using an online test tool.

- Writing Assignments (to be written on your laptop in class)

Writing assignments are an opportunity for students to gain fluency with the theories, ideas, issues, and cases presented in the class and to develop their thoughts on these topics. Students will write two texts: a Very Short Paper (400 words), and a Pretty Short Paper (600 words).

## Late Work Policy

Late work is accepted only if satisfactory documentation (from a healthcare professional or equivalent) is provided to the instructor.

## Course Schedule

| Week | Dates | Topic | Readings / Notes |
|---|---|---|---|
| 1 | Jan 12–16 | M: Introduction<br>W Ethics vs. politics, law, religion | Ch. 1 pp. 1–20 |
| 2 | Jan 19–23 | M: MLK day<br>W: Consequentialism | MindTap due Jan 21<br>Ch. 4 pp. 70–83<br>Ch. 5 pp. 95–115 |
| 3 | Jan 26–30 | M: Duty Ethics<br>W: Virtue Ethics | MindTap due Jan 28<br>Ch. 6 pp. 116–142<br>Ch. 8 pp. 165–183 |
| 4 | Feb 2–6 | M: Resilience and Aggie Core Values (Andrew Christjoy)<br>W: Natural Rights | MindTap due Feb 4<br>Ch. 7 pp. 143–157 |
| 5 | Feb 9–13 | M: The Death Penalty<br>W: The Right to Bear Arms | MindTap due Feb 11<br>Ch. 17 pp. 475–505 |
| 6 | Feb 16–20 | M: Abortion, part 1<br>W: Abortion part 2 | MindTap due Feb 18<br>Ch. 11 pp. 253–292 |
| 7 | Feb 23–27 | M: The Ethics of War 1<br>W: The Ethics of War 2<br>**F: EXAM 1** (Midterm, in recitation) | MindTap due Feb 25<br>Ch. 18 pp. 509–537 |
| 8 | Mar 2–6 | M: Race and Gender Ideology 1<br>W: Race and Gender Ideology 2<br>**F: VERY SHORT PAPER** (in recitation) | MindTap due Mar 4<br>Ch. 13 pp. 329–367; |

| | | | |
|---|---|---|---|
| 9 | Mar 9–13 | SPRING BREAK | No classes |
| 10 | Mar 16–20 | M: Sexual Morality<br>W: Animal Ethics | MindTap due Mar 18<br>Ch. 14 pp. 438–473;<br>Ch. 20 pp 581–609 |
| 11 | Mar 23–27 | M: Environmental Ethics<br>W: Climate Ethics | Ch. 19 pp. 539–580; MindTap due Mar 23 |
| 12 | Mar 30–Apr 3 | M: Global Justice<br>W: Economic Justice<br>F: Reading day – no recitation | MindTap due Apr 1<br>Chs. 14 & 15 pp. 371–437; |
| 13 | Apr 6–10 | M: Metaethics<br>W: Ethics in the Gray Area | MindTap due Apr 8<br>Ch. 3 pp. 50–68; |
| 14 | Apr 13–17 | M: Privacy – why is it important?<br>W: The Ethics of Technology<br>**F: PRETTY SHORT PAPER** (in recitation) | |
| 15 | Apr 20–24 | M: Ethics in Large Organizations<br>W: Review for Exam 2<br>**F: EXAM 2** (in recitation) | |

## University Policies

*This section outlines the university-level policies that must be included in each course syllabus. The TAMU Faculty Senate established the wording of these policies.*

***NOTE****: Faculty members should not change the written statements. A faculty member may add separate paragraphs if additional information is needed.*

## Attendance Policy

The university views class attendance and participation as an individual student responsibility. Students are expected to attend class and to complete all assignments.

Please refer to Student Rule 7 in its entirety for information about excused absences, including definitions, and related documentation and timelines.

Attendance is required. The best way to master material for this class is to prepare properly, listen attentively, participate in activities, and ask questions when an idea is unclear. Students who arrive late, leave early, are clearly unprepared, or do not participate in group work may be counted as absent based on an assessment made by their TA.

Proper preparation includes bringing a copy of assigned texts to the meeting. Students must attend the class meetings for which they are registered unless they have coordinated in advance with their TA or their absence was such that prior planning was not possible.

In addition to absences that are considered excused by the university (which includes one job interview that meets Student 7 criteria, and absences due to academic conferences when the student is a presenter), **two additional** absences related to job interviews or academic conferences will be considered excused for the purpose of the course. Documentation must be submitted to the TA before the intended absence, preferably a week in advance.

**In addition to the aforementioned absences that are considered excused for the purpose of the course, students can miss three meetings without penalty, and no make-up assignment is required. Further absences each result in a 2% deduction from the student's course grade. The attendance record in the Canvas Grade Book is considered final two weeks after the date of the activity.**

## Makeup Work Policy

Students will be excused from attending class on the day of a graded activity or when attendance contributes to a student's grade, for the reasons stated in Student Rule 7, or other reason deemed appropriate by the instructor.

Please refer to Student Rule 7 in its entirety for information about makeup work, including definitions, and related documentation and timelines.

Absences related to Title IX of the Education Amendments of 1972 may necessitate a period of more than 30 days for make-up work, and the timeframe for make-up work should be agreed upon by the student and instructor" (Student Rule 7, Section 7.4.1).

"The instructor is under no obligation to provide an opportunity for the student to make up work missed because of an unexcused absence" (Student Rule 7, Section 7.4.2).

Students who request an excused absence are expected to uphold the Aggie Honor Code and Student Conduct Code. (See Student Rule 24.)

## Academic Integrity Statement and Policy

"An Aggie does not lie, cheat or steal, or tolerate those who do."

"Texas A&M University students are responsible for authenticating all work submitted to an instructor. If asked, students must be able to produce proof that the item submitted is indeed the work of that student. Students must keep appropriate records at all times. The inability to authenticate one's work, should the instructor request it, may be sufficient grounds to initiate an academic misconduct case" (Section 20.1.2.3, Student Rule 20).

**Texas A&M at College Station**
*You can learn more about the Aggie Honor System Office Rules and Procedures, academic integrity, and your rights and responsibilities at aggiehonor.tamu.edu.*

**Texas A&M at Galveston**
*You can learn more about the Honor Council Rules and Procedures as well as your rights and responsibilities at tamug.edu/HonorSystem.*

**Texas A&M at Qatar**
*You can learn more about academic integrity and your rights and responsibilities at Texas A&M University at Qatar by visiting the [Aggie Honor System] website.*

## Notice of Nondiscrimination

Texas A&M University is committed to providing safe and non-discriminatory learning, living, and work environments for all members of the University community. The University provides equal opportunity to all employees, students, applicants for employment or admission, and the public regardless of race, color, sex (including pregnancy and related conditions), religion, national origin, age, disability, genetic information, or veteran status. Texas A&M University will promptly, thoroughly, and fairly investigate and resolve all complaints of discrimination, harassment (including sexual harassment), complicity and related retaliation based on a protected class in accordance with System Regulation 08.01.01, University Rule 08.01.01.M1, Standard Administrative Procedure (SAP) 08.01.01.M1.01, and applicable federal and state laws. In accordance with Title IX and its implementing regulations, Texas A&M does not discriminate on the basis of sex in any educational program or activity, including admissions and employment. The following person has been designated to handle inquiries and complaints regarding the non-discrimination policies: Jennifer M. Smith, TAMU Associate VP & Title IX Coordinator at YMCA Ste 108, College Station, TX 77843, 979-458-8407, or email civilrights@tamu.edu. For other reporting options, visit https://ocrcas.ed.gov/contact-ocr to locate the address and phone number of the office that serves your area, or call 1-800-421-3481.

## Civil Rights, Free Speech, and Title IX Policies

Texas A&M University is committed to fostering a learning environment that is safe and productive for all. University policies and federal and state laws prohibit discrimination and harassment based on an individual's race, color, sex, (including pregnancy and related conditions), religion, national origin, age, disability, genetic information, veteran status, or any other legally protected characteristic. This includes forms of sex-based violence, such as sexual assault, sexual harassment, sexual exploitation, dating/domestic violence, and stalking.

Students can report discrimination/harassment, access supportive resources, or learn more about their options for resolving complaints on the University's Civil Rights & Title IX webpage.

Students should be aware that all university employees (except medical or mental health providers) are mandatory reporters, which means that if they observe, experience or become aware of an incident that they reasonably believe to be discrimination/harassment alleged to have been committed by or against a person who was a student or employee at the time of the incident, the employee must report the incident to the university.

## Americans with Disabilities Act (ADA) Policy

Texas A&M University is committed to providing equitable access to learning opportunities for all students. If you experience barriers to your education due to a disability or think you may have a disability, please contact the Disability Resources office on your campus (resources listed below)

Disabilities may include, but are not limited to attentional, learning, mental health, sensory, physical, or chronic health conditions. All students are encouraged to discuss their disability related needs with Disability Resources and their instructors as soon as possible.
To request academic accommodations, contact the designated ADA office based on your location:

- Texas A&M University, College of Nursing, College of Dentistry, Irma Lerma Rangel College of Pharmacy College Station, College of Medicine, School of Public Health, Institute of Biosciences and Technology, EnMed Program, Bush School in Washington DC, Mays Business School – CityCentre, TAMU Engineering Academies, Texas A&M University Higher Education Center at McAllen and Texas A&M University at Galveston should contact Disability Resources at (979) 845-1637 or disability@tamu.edu.
- Texas A&M University School of Law should contact the Office of Student Affairs at (817) 212-4111 or law-disability@law.tamu.edu to request accommodations.
- Irma Lerma Rangel College of Pharmacy in Kingsville should contact the Disability Resource Center at Texas A&M University - Kingsville at (361) 593-3024 or drc.center@tamuk.edu to request accommodations.
- Texas A&M University College of Veterinary Medicine & Biomedical Sciences in Canyon should contact the Office of Student Accessibility at West Texas A&M University – Canyon at (806) 651-2335 or osa@wtamu.edu.
- Texas A&M University at Qatar (TAMUQ) should contact the campus psychologist, Dr. Steve Wilson +974-4423-0047 or stephen.wilson@qatar.tamu.edu.

If you are experiencing difficulties with your approved accommodations, contact the office responsible for approving your accommodations or the Texas A&M ADA Coordinator Julie Kuder at ADA.Coordinator@tamu.edu or (979) 458-8407.

## Pregnancy Accommodations

Texas A&M provides reasonable accommodations to students due to pregnancy and/or related conditions, such as childbirth, recovery and lactation. Students should contact the University's Pregnancy Coordinator as soon as they become aware of the need for accommodation. Depending on the circumstances, accommodations could include extended time to complete assignments or exams, changes in course sequence, or modifications to the physical classroom environment. Texas A&M will also allow a voluntary leave of absence, ensure the availability of lactation space, and maintain grievance procedures to provide for the prompt and equitable resolution of complaints of sex discrimination. For information regarding pregnancy accommodations, email TIX.Pregnancy@tamu.edu.

## Statement on Mental Health and Wellness

Texas A&M University recognizes that mental health and wellness are critical factors influencing a student's academic success and overall wellbeing. Students are encouraged to engage in healthy self-care practices by utilizing the resources and services available through University Health Services on its mental health webpage. The TELUS Health Student Support app provides access to professional counseling in multiple languages anytime, anywhere by phone or chat, and the 988 Suicide & Crisis Lifeline offers 24-hour emergency support at 988 or 988lifeline.org.

**Texas A&M College Station**

Students needing a listening ear can contact University Health Services (979.458.4584) 24-hour emergency help is also available through the 988 Suicide & Crisis Lifeline (988) or at 988lifeline.org.

**Texas A&M at Galveston**
*Students who need someone to talk to can call (409) 740-4736 from 8:00 a.m. to 5:00 p.m. weekdays or visit tamug.edu/counsel for more information. For 24-hour emergency assistance during nights and weekends, contact the TAMUG Police Dept at (409) 740-4545. 24-hour emergency help is also available through the 988 Suicide & Crisis Lifeline (988) or at 988lifeline.org.*

**Texas A&M at Qatar**
*Texas A&M University at Qatar students wishing to discuss concerns in a confidential setting are encouraged to visit the Health and Wellness website for more information.*

## Statement on the Family Educational Rights and Privacy Act (FERPA)

FERPA is a federal law designed to protect the privacy of educational records by limiting access to these records, to establish the right of students to inspect and review their educational records and to provide guidelines for the correction of inaccurate and misleading data through informal and formal hearings. Currently enrolled students wishing to withhold any or all directory information items can do so within howdy.tamu.edu using the Directory Information Withholding Form. The complete FERPA Notice to Students and the student records policy is available on the Office of the Registrar webpage.
Items that can never be identified as public information are a student's social security number, citizenship, gender, grades, GPR or class schedule. All efforts will be made in this class to protect your privacy and to ensure confidential treatment of information associated with or generated by your participation in the class.

Directory items include name, UIN, local address, permanent address, email address, local telephone number, permanent telephone number, dates of attendance, program of study (college, major, campus), classification, previous institutions attended, degrees honors and awards received, participation in officially recognized activities and sports, medical residence location and medical residence specialization.

## Campus-Specific Policies

*Campuses may establish their own policies and minimum syllabus requirements. As long as these policies and requirements do not contradict the university level requirements, Campuses can add them in this section. Please remove this section if not needed.*

## College and Department Policies

*College and departmental units may establish their own policies and minimum syllabus requirements. As long as these policies and requirements do not contradict the university level requirements, colleges and departments can add them in this section. Please remove this section if not needed.*

## Optional Syllabus Statements

**Free Speech and Civil Discourse**

Texas A&M recognizes that the pursuit of truth through open and robust discourse is critical to academic inquiry. However, as a community of scholars, the university has an aspirational expectation that such discourse will be conducted in accordance with Aggie Core Values. In this "marketplace of ideas," we encourage civil dialogue creating an environment that allows individuals to express their ideas and to have their ideas challenged in respectful and responsible ways. Students can learn more about Freedom of Expression and Free Speech on the University's website about the First Amendment.

# Exhibit E

TEXAS A&M UNIVERSITY

Course Syllabus

This syllabus has been censored by Texas A&M University. Censored material is marked in red; newly added material is marked in blue.

# Syllabus

## Course Information

| | |
|---|---|
| Course Number: | PHIL 111 |
| Course Title: | Contemporary Moral Issues |
| Section: | Sections 500 - 508 |
| Time: | Monday and Wednesday 12:40 – 1:30 plus Friday recitation (time varies) |
| Location: | CHEM 100 – separate room for Friday recitation |
| Credit Hours: | 3 |

## Instructor Details

| | |
|---|---|
| Instructor: | Dr. Martin Peterson |
| Office: | YMCA 402B |
| Phone: | 979 845 7133 |
| E-Mail: | martinpeterson@tamu.edu |
| Office Hours: | 2-4 pm, Mondays |

## Course Description

Current course description: Contemporary Moral Issues. Representative ethical positions and their application to contemporary social problems; also taught at Galveston campus.

Updated course description: Philosophy challenges students to understand, articulate, and evaluate arguments from multiple points of view. Students evaluate the claims, presuppositions, and reasoning of various positions, including one's own, on contemporary social problems, and analyze those problems using ethical and social theories. Students examine how ideas, values, and other aspects of culture (including power and authority) shape and are shaped by human experience and institutions. Students practice respectful and thoughtful engagement on contentious matters, such as abortion, euthanasia, capital punishment, the relationship between ethics and religion, violence and war, animal ethics, sexual morality, gender issues, health care ethics, equality and discrimination, biotechnology and bioengineering, economic injustice, climate ethics and global hunger and poverty, among others.

## Course Prerequisites

None

## Special Course Designation

Core curriculum (CORE)

- Language, Philosophy and Culture (LPC)

- Culture/Discourse (CD)

## Course Learning Outcomes

Asterisks (*) below highlight CD course learning outcomes. Carats (^) highlight KLPC learning outcomes.

At the end of the course, students will be able to:

- identify, reconstruct, and critically evaluate arguments about moral value^
- interpret differing perspectives charitably*
- recognize practices and virtues conducive to constructive discourse in a multicultural and globalized society*
- demonstrate active listening to and respectful dialogue with others on difficult issues*
- articulate and evaluate perspectives on pressing social, moral, and political issues connected to themes of power, authority, privilege, oppression and discrimination*
- articulate and evaluate ideals and goals related to social and personal responsibility, tolerance, and accountability*^
- apply written and oral communication skills and visual interpretation skills.^

## Textbook and/or Resource Materials

Required:

- Fiala & MacKinnon, Ethics: Theory and Contemporary Issues, 10th edition, ISBN 9798214136110 or ISBN 9780357700006
- ~~Plato, excerpts from Symposium: 180c–185c, 189c–193d, 210a–212b https://www.platonicfoundation.org/translation/symposium/~~
- "Texas A&M, Under New Curriculum Limits, Warns Professor Not to Teach Plato", *The New York Times*, January 8, 2026.

## Grading Policy

Grade Scale
A (excellent) 90% – 100%
B (good) 80% – <90%
C (acceptable) 70% – <80%
D (passing) 60% – <70%
F (failing) < 60%

Graded Components
- MindTap (Online Quizzes) 10%
- Audio and Visual Presentation 10%

- Very Short Paper 15%
- First Exam 20%
- Pretty Short Paper 25%
- Second Exam 20%

- On-line MindTap quizzes

There will be several graded online MindTap quizzes, which are due on Wednesdays at 11:59 PM. The quizzes are available in MindTap/Canvas.

- Audio and Visual Presentation

Students will work in groups of four, assigned by the TA, on a presentation that includes audio and visual components. Presentations must include visual aids. Students are expected to prepare their presentations outside class. Each student in the group must give part of the presentation in class. More detailed instructions will be provided during the semester.

- Exams

There will be two multiple-choice exams. Exams are cumulative. They will be given using an online test tool.

- Writing Assignments (to be written on your laptop in class)

Writing assignments are an opportunity for students to gain fluency with the theories, ideas, issues, and cases presented in the class and to develop their thoughts on these topics. Students will write two texts: a Very Short Paper (400 words), and a Pretty Short Paper (600 words).

## Late Work Policy

Late work is accepted only if satisfactory documentation (from a healthcare professional or equivalent) is provided to the instructor.

## Course Schedule

| Week | Dates | Topic | Readings / Notes |
|---|---|---|---|
| 1 | Jan 12–16 | M: Introduction<br>W Ethics vs. politics, law, religion | Ch. 1 pp. 1–20 |
| 2 | Jan 19–23 | M: MLK day<br>W: Consequentialism | MindTap due Jan 21<br>Ch. 4 pp. 70–83<br>Ch. 5 pp. 95–115 |
| 3 | Jan 26–30 | M: Duty Ethics<br>W: Virtue Ethics | MindTap due Jan 28<br>Ch. 6 pp. 116–142<br>Ch. 8 pp. 165–183 |
| 4 | Feb 2–6 | M: Resilience and Aggie Core Values (Andrew Christjoy)<br>W: Natural Rights | MindTap due Feb 4<br>Ch. 7 pp. 143–157 |
| 5 | Feb 9–13 | M: The Death Penalty<br>W: The Right to Bear Arms | MindTap due Feb 11<br>Ch. 17 pp. 475–505 |
| 6 | Feb 16–20 | M: Abortion, part 1 | MindTap due Feb 18 |

| | | | |
|---|---|---|---|
| | | W: Abortion part 2 | Ch. 11 pp. 253–292 |
| 7 | Feb 23–27 | M: The Ethics of War 1<br>W: The Ethics of War 2<br>**F: EXAM 1** (Midterm, in recitation) | MindTap due Feb 25<br>Ch. 18 pp. 509–537 |
| 8 | Mar 2–6 | ~~M: Race and Gender Ideology 1~~<br>~~W: Race and Gender Ideology 2~~<br>M: Free Speech<br>W: Academic Freedom<br>**F: VERY SHORT PAPER** (in recitation) | ~~MindTap due Mar 4~~<br>~~Ch. 13 pp. 329–367;~~<br>"Texas A&M, Under New Curriculum Limits, Warns Professor Not to Teach Plato", *The New York Times*, January 8, 2026. |
| 9 | Mar 9–13 | SPRING BREAK | No classes |
| 10 | Mar 16–20 | M: Sexual Morality<br>W: Animal Ethics | MindTap due Mar 18<br>Ch. 14 pp. 438–473;<br>Ch. 20 pp 581–609 |
| 11 | Mar 23–27 | M: Environmental Ethics<br>W: Climate Ethics | Ch. 19 pp. 539–580; MindTap due Mar 23 |
| 12 | Mar 30–Apr 3 | M: Global Justice<br>W: Economic Justice<br>F: Reading day – no recitation | MindTap due Apr 1<br>Chs. 14 & 15 pp. 371–437; |
| 13 | Apr 6–10 | M: Metaethics<br>W: Ethics in the Gray Area | MindTap due Apr 8<br>Ch. 3 pp. 50–68; |
| 14 | Apr 13–17 | M: Privacy – why is it important?<br>W: The Ethics of Technology<br>**F: PRETTY SHORT PAPER** (in recitation) | |
| 15 | Apr 20–24 | M: Ethics in Large Organizations<br>W: Review for Exam 2<br>**F: EXAM 2** (in recitation) | |

## University Policies

*This section outlines the university-level policies that must be included in each course syllabus. The TAMU Faculty Senate established the wording of these policies.*

***NOTE****: Faculty members should not change the written statements. A faculty member may add separate paragraphs if additional information is needed.*

### Attendance Policy

The university views class attendance and participation as an individual student responsibility. Students are expected to attend class and to complete all assignments.

Please refer to Student Rule 7 in its entirety for information about excused absences, including definitions, and related documentation and timelines.

Attendance is required. The best way to master material for this class is to prepare properly, listen attentively, participate in activities, and ask questions when an idea is unclear. Students who arrive late, leave early, are clearly unprepared, or do not participate in group work may be counted as absent based on an assessment made by their TA.

Proper preparation includes bringing a copy of assigned texts to the meeting. Students must attend the class meetings for which they are registered unless they have coordinated in advance with their TA or their absence was such that prior planning was not possible.

In addition to absences that are considered excused by the university (which includes one job interview that meets Student 7 criteria, and absences due to academic conferences when the student is a presenter), **two additional** absences related to job interviews or academic conferences will be considered excused for the purpose of the course. Documentation must be submitted to the TA before the intended absence, preferably a week in advance.

**In addition to the aforementioned absences that are considered excused for the purpose of the course, students can miss three meetings without penalty, and no make-up assignment is required. Further absences each result in a 2% deduction from the student's course grade. The attendance record in the Canvas Grade Book is considered final two weeks after the date of the activity.**

## Makeup Work Policy

Students will be excused from attending class on the day of a graded activity or when attendance contributes to a student's grade, for the reasons stated in Student Rule 7, or other reason deemed appropriate by the instructor.

Please refer to Student Rule 7 in its entirety for information about makeup work, including definitions, and related documentation and timelines.

Absences related to Title IX of the Education Amendments of 1972 may necessitate a period of more than 30 days for make-up work, and the timeframe for make-up work should be agreed upon by the student and instructor" (Student Rule 7, Section 7.4.1).

"The instructor is under no obligation to provide an opportunity for the student to make up work missed because of an unexcused absence" (Student Rule 7, Section 7.4.2).

Students who request an excused absence are expected to uphold the Aggie Honor Code and Student Conduct Code. (See Student Rule 24.)

## Academic Integrity Statement and Policy

"An Aggie does not lie, cheat or steal, or tolerate those who do."

"Texas A&M University students are responsible for authenticating all work submitted to an instructor. If asked, students must be able to produce proof that the item submitted is indeed the work of that student. Students must keep appropriate records at all times. The inability to authenticate one's work,

should the instructor request it, may be sufficient grounds to initiate an academic misconduct case" (Section 20.1.2.3, Student Rule 20).

**Texas A&M at College Station**
*You can learn more about the Aggie Honor System Office Rules and Procedures, academic integrity, and your rights and responsibilities at aggiehonor.tamu.edu.*

**Texas A&M at Galveston**
*You can learn more about the Honor Council Rules and Procedures as well as your rights and responsibilities at tamug.edu/HonorSystem.*

**Texas A&M at Qatar**
*You can learn more about academic integrity and your rights and responsibilities at Texas A&M University at Qatar by visiting the Aggie Honor System website.*

## Notice of Nondiscrimination

Texas A&M University is committed to providing safe and non-discriminatory learning, living, and work environments for all members of the University community. The University provides equal opportunity to all employees, students, applicants for employment or admission, and the public regardless of race, color, sex (including pregnancy and related conditions), religion, national origin, age, disability, genetic information, or veteran status. Texas A&M University will promptly, thoroughly, and fairly investigate and resolve all complaints of discrimination, harassment (including sexual harassment), complicity and related retaliation based on a protected class in accordance with System Regulation 08.01.01, University Rule 08.01.01.M1, Standard Administrative Procedure (SAP) 08.01.01.M1.01, and applicable federal and state laws. In accordance with Title IX and its implementing regulations, Texas A&M does not discriminate on the basis of sex in any educational program or activity, including admissions and employment. The following person has been designated to handle inquiries and complaints regarding the non-discrimination policies: Jennifer M. Smith, TAMU Associate VP & Title IX Coordinator at YMCA Ste 108, College Station, TX 77843, 979-458-8407, or email civilrights@tamu.edu. For other reporting options, visit https://ocrcas.ed.gov/contact-ocr to locate the address and phone number of the office that serves your area, or call 1-800-421-3481.

## Civil Rights, Free Speech, and Title IX Policies

Texas A&M University is committed to fostering a learning environment that is safe and productive for all. University policies and federal and state laws prohibit discrimination and harassment based on an individual's race, color, sex, (including pregnancy and related conditions), religion, national origin, age, disability, genetic information, veteran status, or any other legally protected characteristic. This includes forms of sex-based violence, such as sexual assault, sexual harassment, sexual exploitation, dating/domestic violence, and stalking.

Students can report discrimination/harassment, access supportive resources, or learn more about their options for resolving complaints on the University's Civil Rights & Title IX webpage.

Students should be aware that all university employees (except medical or mental health providers) are mandatory reporters, which means that if they observe, experience or become aware of an incident that they reasonably believe to be discrimination/harassment alleged to have been committed by or against a person who was a student or employee at the time of the incident, the employee must report the incident to the university.

## Americans with Disabilities Act (ADA) Policy

Texas A&M University is committed to providing equitable access to learning opportunities for all students. If you experience barriers to your education due to a disability or think you may have a disability, please contact the Disability Resources office on your campus (resources listed below) Disabilities may include, but are not limited to attentional, learning, mental health, sensory, physical, or chronic health conditions. All students are encouraged to discuss their disability related needs with Disability Resources and their instructors as soon as possible.

To request academic accommodations, contact the designated ADA office based on your location:

- Texas A&M University, College of Nursing, College of Dentistry, Irma Lerma Rangel College of Pharmacy College Station, College of Medicine, School of Public Health, Institute of Biosciences and Technology, EnMed Program, Bush School in Washington DC, Mays Business School – CityCentre, TAMU Engineering Academies, Texas A&M University Higher Education Center at McAllen and Texas A&M University at Galveston should contact Disability Resources at (979) 845-1637 or disability@tamu.edu.
- Texas A&M University School of Law should contact the Office of Student Affairs at (817) 212-4111 or law-disability@law.tamu.edu to request accommodations.
- Irma Lerma Rangel College of Pharmacy in Kingsville should contact the Disability Resource Center at Texas A&M University - Kingsville at (361) 593-3024 or drc.center@tamuk.edu to request accommodations.
- Texas A&M University College of Veterinary Medicine & Biomedical Sciences in Canyon should contact the Office of Student Accessibility at West Texas A&M University – Canyon at (806) 651-2335 or osa@wtamu.edu.
- Texas A&M University at Qatar (TAMUQ) should contact the campus psychologist, Dr. Steve Wilson +974-4423-0047 or stephen.wilson@qatar.tamu.edu.

If you are experiencing difficulties with your approved accommodations, contact the office responsible for approving your accommodations or the Texas A&M ADA Coordinator Julie Kuder at ADA.Coordinator@tamu.edu or (979) 458-8407.

## Pregnancy Accommodations

Texas A&M provides reasonable accommodations to students due to pregnancy and/or related conditions, such as childbirth, recovery and lactation. Students should contact the University's Pregnancy Coordinator as soon as they become aware of the need for accommodation. Depending on the circumstances, accommodations could include extended time to complete assignments or exams, changes in course sequence, or modifications to the physical classroom environment. Texas A&M will also allow a voluntary leave of absence, ensure the availability of lactation space, and maintain grievance procedures to provide for the prompt and equitable resolution of complaints of sex

discrimination. For information regarding pregnancy accommodations, email TIX.Pregnancy@tamu.edu.

## Statement on Mental Health and Wellness

Texas A&M University recognizes that mental health and wellness are critical factors influencing a student's academic success and overall wellbeing. Students are encouraged to engage in healthy self-care practices by utilizing the resources and services available through University Health Services on its mental health webpage. The TELUS Health Student Support app provides access to professional counseling in multiple languages anytime, anywhere by phone or chat, and the 988 Suicide & Crisis Lifeline offers 24-hour emergency support at 988 or 988lifeline.org.

**Texas A&M College Station**

Students needing a listening ear can contact University Health Services (979.458.4584) 24-hour emergency help is also available through the 988 Suicide & Crisis Lifeline (988) or at 988lifeline.org.

**Texas A&M at Galveston**

*Students who need someone to talk to can call (409) 740-4736 from 8:00 a.m. to 5:00 p.m. weekdays or visit tamug.edu/counsel for more information. For 24-hour emergency assistance during nights and weekends, contact the TAMUG Police Dept at (409) 740-4545. 24-hour emergency help is also available through the 988 Suicide & Crisis Lifeline (988) or at 988lifeline.org.*

**Texas A&M at Qatar**

*Texas A&M University at Qatar students wishing to discuss concerns in a confidential setting are encouraged to visit the Health and Wellness website for more information.*

## Statement on the Family Educational Rights and Privacy Act (FERPA)

FERPA is a federal law designed to protect the privacy of educational records by limiting access to these records, to establish the right of students to inspect and review their educational records and to provide guidelines for the correction of inaccurate and misleading data through informal and formal hearings. Currently enrolled students wishing to withhold any or all directory information items can do so within howdy.tamu.edu using the Directory Information Withholding Form. The complete FERPA Notice to Students and the student records policy is available on the Office of the Registrar webpage.
Items that can never be identified as public information are a student's social security number, citizenship, gender, grades, GPR or class schedule. All efforts will be made in this class to protect your privacy and to ensure confidential treatment of information associated with or generated by your participation in the class.

Directory items include name, UIN, local address, permanent address, email address, local telephone number, permanent telephone number, dates of attendance, program of study (college, major, campus), classification, previous institutions attended, degrees honors and awards received, participation in officially recognized activities and sports, medical residence location and medical residence specialization.

## Campus-Specific Policies

*Campuses may establish their own policies and minimum syllabus requirements. As long as these policies and requirements do not contradict the university level requirements, Campuses can add them in this section. Please remove this section if not needed.*

## College and Department Policies

*College and departmental units may establish their own policies and minimum syllabus requirements. As long as these policies and requirements do not contradict the university level requirements, colleges and departments can add them in this section. Please remove this section if not needed.*

## Optional Syllabus Statements

**Free Speech and Civil Discourse**

Texas A&M recognizes that the pursuit of truth through open and robust discourse is critical to academic inquiry. However, as a community of scholars, the university has an aspirational expectation that such discourse will be conducted in accordance with Aggie Core Values. In this “marketplace of ideas,” we encourage civil dialogue creating an environment that allows individuals to express their ideas and to have their ideas challenged in respectful and responsible ways. Students can learn more about Freedom of Expression and Free Speech on the University’s website about the First Amendment.

# Exhibit F

The New York Times | https://www.nytimes.com/2026/01/07/us/tamu-plato-race-gender.html

# *Texas A&M, Under New Curriculum Limits, Warns Professor Not to Teach Plato*

The university is reviewing courses under new rules restricting teaching about race and gender. Administrators told a philosophy professor to cut some lessons on Plato to comply.

Listen · 9:39 min



**By Alan Blinder**

Jan. 7, 2026

Martin Peterson, a philosophy professor at Texas A&M University, was thunderstruck when he was told on Tuesday that he needed to excise some teachings of Plato from his syllabus. It was one way, his department head wrote in an email, that Dr. Peterson's philosophy class could comply with new policies limiting discussion of race and gender.

Days before the start of the spring semester, one of the nation's largest public universities is racing to interpret and enforce the A&M system's rules. Some professors are reconsidering syllabuses at the direction of administrators, or are unsure whether they will be able to lead certain classes. Course sections are being canceled or potentially reclassified, threatening students' schedules.

And professors are worried that they are losing the academic freedom they prize.

"A philosophy professor who is not allowed to teach Plato?" Dr. Peterson said in an interview on Wednesday. "What kind of university is that? Is that really what they want?"

"How," he added, "can we possibly teach philosophy without being allowed to discuss Plato, even if some of Plato's ideas are a little bit controversial?"

Texas A&M, which is in College Station, said in a statement on Wednesday that the university would "teach numerous dialogues by Plato in a variety of courses this semester and will continue to do so in the future." Other, approved sections of the same course, the university said, "include works by Plato but do not include modules on race and gender ideology."

In recent months, bowing to conservative critics in the State Capitol, the university system's regents have eagerly endorsed new limits on academic instruction.

Under policies approved late last year, courses may not "advocate race or gender ideology, or topics related to sexual orientation or gender identity." In select instances, after "demonstration of a necessary educational purpose," some graduate and "noncore" undergraduate courses may teach on those topics.

Universities across the country routinely say that classes cannot be used for political purposes. But the push by the A&M regents reflects a noisy debate in Texas, the nation's most populous conservative state, over its public universities. Republican elected officials — often echoing the Trump administration's grievances about American higher education — have argued that universities were too often veering away from academic instruction and into liberal proselytizing around, for example, diversity, equity and inclusion.

Brian Harrison, a Republican state representative and Texas A&M alumnus who has championed the pressure campaign in Austin, said it was "misleading and false" for professors to suggest that Plato had been banned. He added that critics' objections were "dishonest, disingenuous and cynical" efforts to "hype up any actual or perceived issues."

**Sign up for the Race/Related Newsletter** Join a deep and provocative exploration of race, identity and society with New York Times journalists. Get it sent to your inbox.

But, he said, "What we're seeing here is just actually further evidence that inmates have been running the asylums in Texas public universities for far too long."

Since November 2024, Texas A&M has shut down its minor in L.G.B.T.Q. studies and seen its then-president's job threatened by the governor over a D.E.I. conference. Last September, a lecturer was fired after a contentious lesson in a children's literature class — the university president stepped down afterward — and now, professors in an array of academic disciplines are trying to decipher what they will be allowed to teach when classes resume next week.

It was not clear how many professors, courses or students could be affected. Classes at large universities like Texas A&M often enroll dozens or hundreds of students.

The course Dr. Peterson was planning to teach — Philosophy 111, or Contemporary Moral Issues — would examine "representative ethical positions and their application to contemporary social problems," according to the university's academic catalog. Students can use the course to fulfill one of their core curriculum requirements.

Dr. Peterson's original syllabus called for modules focused on debates around abortion, capital punishment, economic justice, and race and gender ideology, among other topics. When Dr. Peterson, who has been at Texas A&M since 2014, submitted his syllabus for review last month, he told his department head that his "course does not 'advocate' any ideology." Instead, he wrote in an email he shared with The New York Times, "I teach students how to structure and evaluate arguments commonly raised in discussions of contemporary moral issues."

On Tuesday, Dr. Peterson got a response from Kristi Sweet, the philosophy program's head. University officials had discussed his syllabus, she wrote, and the new A&M policies. Dr. Sweet gave the professor two choices.

Either Dr. Peterson could "mitigate" his course's "content to remove the modules on race ideology and gender ideology, and the Plato readings that may include these," Dr. Sweet wrote, or Dr. Peterson could be reassigned to an ethics and

engineering course.

According to the syllabus, Dr. Peterson's planned Plato readings included passages about Diotima's Ladder of Love and Aristophanes' myth involving split humans.

Many conservatives have pressed for universities to devote more attention to classical education and the foundations of Western thought. But the dust-up at Texas A&M suggests that even ancient texts are not immune to modern flare-ups.

Dr. Sweet said on Wednesday that she had no comment on the exchanges with Dr. Peterson. In an interview, Dr. Peterson said he would reluctantly alter the course and replace the disputed modules with "lectures on free speech and academic freedom."

But he was angry, he said, as well as bothered by the sense that students would receive a less rigorous, challenging education in his classroom.

The university asserted that Dr. Peterson added the contested coursework after the regents acted last year, but the professor insisted that he wasn't "trying deliberately to be provocative" when he included the Plato texts.

"I'm aware that many members of the Board of Regents probably disagree with Plato," Dr. Peterson said. "They may not be aware of that, because they haven't read Plato — who knows? — but it's still a valuable alternative perspective."

Dr. Peterson, who chairs the university's Academic Freedom Council, added, "We cannot have just one perspective in the classroom. Then there's nothing to discuss. There's nothing to learn. It's indoctrination. It's Soviet-style education."

Two other faculty members at Texas A&M, who spoke on the condition of anonymity because they feared retaliation, said they had no plans to change their syllabuses and that they were not sure whether they would be permitted to teach.

In one email sent this week, A&M officials wrote that they were canceling a sociology course because they had "concluded that we cannot teach this course in its present form and comply" with system policies.

Those system policies took shape last year. At a November meeting, Sam Torn, the regent who chairs the Committee on Academic and Student Affairs, argued that it had “become clear” that some Texas A&M courses had strayed from the curriculum that system leaders imagined.

Although frustrations had been bubbling for months, the debate over A&M classes exploded in September, after a lecturer teaching a children’s literature course displayed a “gender unicorn,” which educators often use to explain the differences between gender expression and gender identity. In a widely circulated video — promoted by Mr. Harrison and other Republicans in Texas — a student addressed the lecturer and said, “I’m not entirely sure this is legal to be teaching because, according to our president, there’s only two genders.”

The instructor, Melissa McCoul, eventually replied, “You are under a misconception that what I’m saying is illegal.” The university quickly fired Dr. McCoul.

A faculty appeals panel ruled unanimously in November that A&M was “not justified” when it dismissed Dr. McCoul, but a university system official refused last month to reinstate her. Dr. McCoul’s lawyer has signaled plans to bring a legal challenge.

As that episode drew public attention last year, regents moved to tighten the system’s rules around what could be taught throughout the A&M system, which has about 165,000 students at a dozen campuses and a health sciences center.

On Wednesday, as word of disputes like Dr. Peterson’s spread, critics of the Texas A&M policies said free-speech clashes became inevitable after the board’s moves. The College Station campus’s chapter of the American Association of University Professors said the move against Dr. Peterson “raises serious legal concerns.”

The group said its misgivings went beyond the Constitution.

“Silencing 2,500-year-old ideas from one of the world’s most influential thinkers betrays the mission of higher education and denies students the opportunity to engage critically with the foundations of Western thought,” the group said. “A

research university that censors Plato abandons its obligation to truth, inquiry, and the public trust — and should not be regarded as a serious institution of higher learning."

**Alan Blinder** is a national correspondent for The Times, covering education.

---

A version of this article appears in print on , Section A, Page 20 of the New York edition with the headline: Texas A&M Tells Philosophy Professor Not to Teach Plato

# Exhibit G

**Peterson, Martin B**

---

| | |
|---|---|
| **From:** | Sweet, Kristi |
| **Sent:** | Wednesday, February 25, 2026 4:34 PM |
| **To:** | Peterson, Martin B |
| **Cc:** | Radzik, Linda C; Miller, Glen; North, Simon W; Werner, Cynthia A; Harris, Stefanie |
| **Subject:** | Re: PHIL 111, slides on sexual morality |

Greetings Dr. Peterson,

Your syllabus for PHIL 111 was approved in the certification process that was completed in January. In that process, the Head's responsibility was to review and certify that all syllabuses for PHIL courses being taught in the Spring 2026 semester are compliant with system policies.

In the course of the semester, individual instructors are responsible to use their best judgment in ensuring that lectures and classroom discussions are compliant with system policies and consistent with the approved syllabus.

Sincerely,

Kristi

---

**From:** Peterson, Martin B <martinpeterson@tamu.edu>
**Date:** Tuesday, February 24, 2026 at 8:39 AM
**To:** Sweet, Kristi <k-sweet@tamu.edu>
**Cc:** Radzik, Linda C <lradzik@tamu.edu>, Miller, Glen <glenmiller@tamu.edu>
**Subject:** PHIL 111, slides on sexual morality

Dr. Sweet,

Please find attached the slides I used in F 2024 for my PHIL 111 lecture on "sexual morality." The module on sexual morality passed your censorship review in January. Am I permitted to use the same slides as in F 2024? I am particularly keen to hear the university's view on slide 7 -- "Biology 101: Biological sex is not binary." I look forward to your response.

Sincerely,

Martin Peterson

# Exhibit H

**Peterson, Martin B**

**From:** Office of the Provost
**Sent:** Friday, February 27, 2026 8:32 PM
**To:** Peterson, Martin B
**Cc:** North, Simon W; Werner, Cynthia A; Sweet, Kristi; Powers, Timothy C
**Subject:** RE: PHIL 111, "Biological sex is not binary"

Dr. Peterson:

System Policy 08.01 prohibits teaching race ideology, gender ideology, or topics related to sexual orientation or gender identity in a core curriculum course. Philosophy 111 is a core curriculum course and must adhere to the policy.

In its process, the university reviews syllabi for policy compliance. I am afraid it is not as simple as approving a slide or deck of slides as much of the compliance depends on the context, presentation and discussion of the slides or lecture. Those things are the responsibility of the instructor. The department and college leadership can discuss course materials and teaching approaches to help the instructor make those decisions. However, that discussion is more than approving a slide. It needs to involve the instructor's consideration of educational purpose, context, presentation and discussion. I encourage you to meet with Interim Dean North, along with his appropriate designees, and Department Head Sweet to have that discussion.

They will be in touch to schedule that meeting with you.

Thank you,

Alan
Provost & Executive Vice President

---

**From:** Peterson, Martin B <martinpeterson@tamu.edu>
**Sent:** Thursday, February 26, 2026 7:58 AM
**To:** Office of the Provost <provost@tamu.edu>
**Cc:** Sams, Alan R <asams@tamu.edu>; Powers, Timothy C <tim_powers@tamu.edu>; North, Simon W <swnorth@exchange.tamu.edu>; Werner, Cynthia A <werner@tamu.edu>
**Subject:** PHIL 111, "Biological sex is not binary"

Dear Provost Sams,

I am reaching out to request guidance on policies 08.01 and 12.01.99.M1. I have attached the slides I used in F 2024 for my PHIL 111 lecture on "sexual morality." The lecture was listed on the syllabus approved in the January censorship review (in which my discussion of Plato was censored; I gave the censored lecture last night at a well-attended event organized by a student organization).

I would like to know whether I am permitted to use the attached slides. I am particularly keen to hear the university's view on slide 7 -- "Biology 101: Biological sex is not binary." I have asked my DH and Dean for guidance, but my DH has told me that she and the College are not willing to offer any guidance. That is why I am reaching out to you.

Policy 08.01 states that I am not allowed to teach "topics related to sexual orientation or gender identity" without an approved exception. Because I teach a core course, I cannot request an exception. However, 12.01.99.M1 states that "Each faculty member is entitled to full freedom in the classroom in discussing the subject being taught."

As far as I can tell, 08.01 and 12.01.99.M1 contradict each other. I do not have "full freedom in the classroom" to discuss "the subject being taught" if I am not allowed to discuss "topics related to sexual orientation or gender identity", since those topics are clearly relevant to my lecture on sexual morality (which is "the subject being taught"). I cannot find anything in the section on academic responsibility (section 2.2) that resolves the conflict, but I note that the First Amendment of the U.S. Constitution, as interpreted by the courts, seems to protect my academic speech in the classroom.

Thank you for your leadership. I am very grateful for everything you do for the university!

Respectfully,

Martin Peterson

Martin Peterson
Sue G. and Harry E. Bovay Jr. Chair
Department of Philosophy
Texas A&M University
www.martinpeterson.org

# Exhibit I

**Peterson, Martin B**

**From:** North, Simon W
**Sent:** Tuesday, March 3, 2026 2:56 PM
**To:** Peterson, Martin B
**Cc:** Werner, Cynthia A; Sweet, Kristi
**Subject:** Meeting Summary

Martin,

Thank you for meeting with Cynthia Werner, Kristi Sweet, and me yesterday. I wanted to follow up on our meeting briefly with a summary of the main points we discussed.

We discussed the role of administrators and faculty once the semester is underway. During the semester, faculty are responsible to ensure that their lectures and class discussions are in compliance with all system policies. If, in their efforts to teach responsibly and comply with system policies faculty members come to have questions, they may seek advisement from their Head and/or College leadership. This advisement is meant to be part of the fold of a faculty member's own deliberations about how responsibly to proceed.

We passed along advisement from OGC about your proposed slide deck. System Policy 08.01 prohibits teaching race ideology, gender ideology, or topics related to sexual orientation or gender identity in a core curriculum course. Your Philosophy course is a core curriculum course and must adhere to the policy. In your email, you asked specifically about slide 7. OGC advised that slide 7 itself does not appear to violate the policy. They further observed, however, that the source you are using on slide 7 has done prolific work related to sexual orientation and gender ideology. OGC advises that if you were planning to use that to teach gender ideology or topics related to sexual orientation or gender identity, you will be violating the policy. OGC is also clear, though, that teaching the facts associated with chromosomal differences is not a violation of the policy.

After further review of the slide deck in its entirety, OGC notes that it is evident that there are several other slides that clearly include matter prohibited in core curriculum courses. OGC advises that you adjust your planned course materials to ensure full compliance.

In the meeting, we also discussed that if you are concerned that you are unclear about the policy in this matter and wish for someone else to teach the lesson that day, we believe we can arrange that for you.

Regards,
Simon

Simon W. North
John W. Bevan Professor of Chemistry
Interim Dean
College of Arts and Sciences
377 Houston Street, 4th Floor
College Station, TX 77843-3357
979-458-6947
ArtSci-dean@tamu.edu

# Exhibit J

**Peterson, Martin B**

| | |
|---|---|
| **From:** | North, Simon W |
| **Sent:** | Wednesday, March 11, 2026 10:21 PM |
| **To:** | Peterson, Martin B |
| **Subject:** | RE: Meeting Summary |

Martin,

Gender ideology, or topics related to sexual orientation or gender identity discussions, are not permitted in core classes. It is incumbent on you, as part of your academic responsibility, to modify your slides and classroom discussion to adhere to System policy 08.01. If you are unable to follow the policy for any reason, please advise your department head, Kristi Sweet, who can assign another professor to teach the module.

Regards,
Simon

Simon W. North
John W. Bevan Professor of Chemistry
Interim Dean
College of Arts and Sciences
377 Houston Street, 4th Floor
College Station, TX 77843-3357
979-458-6947
ArtSci-dean@tamu.edu

---

**From:** Peterson, Martin B <martinpeterson@tamu.edu>
**Sent:** Thursday, March 5, 2026 12:00 PM
**To:** North, Simon W <swnorth@exchange.tamu.edu>
**Cc:** Werner, Cynthia A <werner@tamu.edu>; Sweet, Kristi <k-sweet@tamu.edu>
**Subject:** Re: Meeting Summary

Simon,

I would like to ask you to specify exactly what I need to remove from my March 16 slide deck. Perhaps you could ask OGC to simply blacken out the impermissible words/sentences?

It will be difficult to hold me accountable for a ”civil rights violation” if you are unwilling or unable to tell me in advance what words I am not permitted to include in my slide deck.

I of course understand that it will also be important what I *say* in the lecture, you don’t have to tell me that. I am asking exclusively about prohibited words/sentences in the slide deck.

No response is also a response.

Best,

Martin

On Mar 3, 2026, at 7:55 AM, North, Simon W <swnorth@exchange.tamu.edu> wrote:

Martin,

Thank you for meeting with Cynthia Werner, Kristi Sweet, and me yesterday. I wanted to follow up on our meeting briefly with a summary of the main points we discussed.

We discussed the role of administrators and faculty once the semester is underway. During the semester, faculty are responsible to ensure that their lectures and class discussions are in compliance with all system policies. If, in their efforts to teach responsibly and comply with system policies faculty members come to have questions, they may seek advisement from their Head and/or College leadership. This advisement is meant to be part of the fold of a faculty member's own deliberations about how responsibly to proceed.

We passed along advisement from OGC about your proposed slide deck. System Policy 08.01 prohibits teaching race ideology, gender ideology, or topics related to sexual orientation or gender identity in a core curriculum course. Your Philosophy course is a core curriculum course and must adhere to the policy. In your email, you asked specifically about slide 7. OGC advised that slide 7 itself does not appear to violate the policy. They further observed, however, that the source you are using on slide 7 has done prolific work related to sexual orientation and gender ideology. OGC advises that if you were planning to use that to teach gender ideology or topics related to sexual orientation or gender identity, you will be violating the policy. OGC is also clear, though, that teaching the facts associated with chromosomal differences is not a violation of the policy.

After further review of the slide deck in its entirety, OGC notes that it is evident that there are several other slides that clearly include matter prohibited in core curriculum courses. OGC advises that you adjust your planned course materials to ensure full compliance.

In the meeting, we also discussed that if you are concerned that you are unclear about the policy in this matter and wish for someone else to teach the lesson that day, we believe we can arrange that for you.

Regards,
Simon

Simon W. North
John W. Bevan Professor of Chemistry
Interim Dean
College of Arts and Sciences
377 Houston Street, 4th Floor
College Station, TX 77843-3357
979-458-6947
ArtSci-dean@tamu.edu

# Exhibit K

**Peterson, Martin B**

---

**From:** Peterson, Martin B
**Sent:** Thursday, March 12, 2026 7:41 AM
**To:** North, Simon W
**Subject:** RE: Meeting Summary

Simon,

The problem is that the rule is so vague that I don't know how to apply it. What counts as a “topic related to sexual orientation”? Everything is related to everything. I have been authorized by you to discuss consent to sex, so that is not prohibited, but doesn’t consent to sex relate to sexual orientation? If not, why not?

Vague statutes are legally problematic. According to the vagueness doctrine accepted by the US Supreme Court for the past century (Connally v. General Construction Co. 1926), a statute is unconstitutionally vague if people “of common intelligence must necessarily guess at its meaning." Policy 08.01 meets this criterion of vagueness.

You do not solve your legal problem by telling me that someone else can teach my class. Policy 08.01 applies to all faculty. The policy does not become less vague because you offer one person (me) to find another instructor; that offer has not been extended to all faculty.

Besides the vagueness problem, policy 08.01 also violates my First Amendment rights at a public university, as you already know but seem to care very little about.

Best,

Martin

---

**From:** North, Simon W <swnorth@exchange.tamu.edu>
**Sent:** Wednesday, March 11, 2026 4:21 PM
**To:** Peterson, Martin B <martinpeterson@tamu.edu>
**Subject:** RE: Meeting Summary

Martin,

Gender ideology, or topics related to sexual orientation or gender identity discussions, are not permitted in core classes. It is incumbent on you, as part of your academic responsibility, to modify your slides and classroom discussion to adhere to System policy 08.01. If you are unable to follow the policy for any reason, please advise your department head, Kristi Sweet, who can assign another professor to teach the module.

Regards,

Simon

Simon W. North
John W. Bevan Professor of Chemistry
Interim Dean
College of Arts and Sciences
377 Houston Street, 4th Floor
College Station, TX 77843-3357
979-458-6947
ArtSci-dean@tamu.edu

---

**From:** Peterson, Martin B <martinpeterson@tamu.edu>
**Sent:** Thursday, March 5, 2026 12:00 PM
**To:** North, Simon W <swnorth@exchange.tamu.edu>
**Cc:** Werner, Cynthia A <werner@tamu.edu>; Sweet, Kristi <k-sweet@tamu.edu>
**Subject:** Re: Meeting Summary

Simon,

I would like to ask you to specify exactly what I need to remove from my March 16 slide deck. Perhaps you could ask OGC to simply blacken out the impermissible words/sentences?

It will be difficult to hold me accountable for a ”civil rights violation” if you are unwilling or unable to tell me in advance what words I am not permitted to include in my slide deck.

I of course understand that it will also be important what I *say* in the lecture, you don’t have to tell me that. I am asking exclusively about prohibited words/sentences in the slide deck.

No response is also a response.

Best,

Martin

> On Mar 3, 2026, at 7:55 AM, North, Simon W <swnorth@exchange.tamu.edu> wrote:
>
> Martin,
> Thank you for meeting with Cynthia Werner, Kristi Sweet, and me yesterday. I wanted to follow up on our meeting briefly with a summary of the main points we discussed.
>
> We discussed the role of administrators and faculty once the semester is underway. During the semester, faculty are responsible to ensure that their lectures and class discussions are in compliance with all system policies. If, in their efforts to teach responsibly and comply with system policies faculty members come to have questions, they may seek advisement from their Head and/or College leadership. This advisement is meant to be part of the fold of a faculty member’s own deliberations about how responsibly to proceed.

We passed along advisement from OGC about your proposed slide deck. System Policy 08.01 prohibits teaching race ideology, gender ideology, or topics related to sexual orientation or gender identity in a core curriculum course. Your Philosophy course is a core curriculum course and must adhere to the policy. In your email, you asked specifically about slide 7. OGC advised that slide 7 itself does not appear to violate the policy. They further observed, however, that the source you are using on slide 7 has done prolific work related to sexual orientation and gender ideology. OGC advises that if you were planning to use that to teach gender ideology or topics related to sexual orientation or gender identity, you will be violating the policy. OGC is also clear, though, that teaching the facts associated with chromosomal differences is not a violation of the policy.

After further review of the slide deck in its entirety, OGC notes that it is evident that there are several other slides that clearly include matter prohibited in core curriculum courses. OGC advises that you adjust your planned course materials to ensure full compliance.

In the meeting, we also discussed that if you are concerned that you are unclear about the policy in this matter and wish for someone else to teach the lesson that day, we believe we can arrange that for you.

Regards,
Simon

Simon W. North
John W. Bevan Professor of Chemistry
Interim Dean
College of Arts and Sciences
377 Houston Street, 4th Floor
College Station, TX 77843-3357
979-458-6947
ArtSci-dean@tamu.edu

# Exhibit L

**COLLEGE OF ARTS & SCIENCES**

DEPARTMENT OF PHILOSOPHY

**Martin Peterson**
**Sue G. and Harry E. Bovay Jr. Professor**

TEXAS A&M UNIVERSITY

04/09/2026

Dear Interim Dean North,

I am writing to notify you that I will resign from my tenured position at Texas A&M University, effective July 31, 2026.

I have met many inspiring colleagues and friends at Texas A&M, and it has been a great pleasure to teach thousands of students. However, I strongly oppose the Board of Regents' new censorship policy. No other serious research university maintains a policy on "prohibited instruction." As Chair of the Academic Freedom Council, I regard this as an outright violation of one of the most basic principles of academic freedom. Faculty—not a politically appointed board—should control the curriculum.

I admire the many federal prosecutors across the country who have chosen to resign rather than carry out illegal or immoral orders. To my knowledge, no department head, dean, or other administrator at Texas A&M has taken *any* meaningful action to defend academic freedom. As John Stuart Mill points out in *On Liberty*, certain ideas must be "fully, frequently, and fearlessly discussed"; otherwise, they will "be held as a dead dogma, not a living truth." Because faculty no longer control the curriculum, Texas A&M is quickly becoming an institution of dead dogmas.

Sincerely,

Martin Peterson
Sue G. and Harry E. Bovay Jr. Chair
Department of Philosophy
Texas A&M University
martinpeterson@tamu.edu
(979)847-6132