**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF TEXAS**

**HOUSTON DIVISION**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, LEONARD BRIGHT, VANITA REDDY, LANDON SADLER, and AARON GEORGE,

Plaintiffs,

v.

ROBERT L. ALBRITTON, JAY GRAHAM, DAVID C. BAGGETT, JOHN W. BELLINGER, JAMES R. BROOKS, MICHAEL A. HERNANDEZ III, WILLIAM MAHOMES JR., KELLEY SULLIVAN GEORGIADES, and SAM TORN, in their official capacities as members of the Texas A&M University System Board of Regents,

Defendants.

CIVIL ACTION NO. 4:26-cv-06268

**DECLARATION OF LEONARD BRIGHT IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Leonard Bright, declare as follows:

1. I am a citizen of the United States. I am over eighteen (18) years of age and fully competent to make this declaration. I knowingly and voluntarily make this declaration. If called as a witness, I could and would testify competently under oath to the following facts based on my personal knowledge. I am a Plaintiff in the above-captioned matter. I am suing on behalf of myself and as a member of the American Association of University Professors.

2. I am a Full Professor at Texas A&M University – College Station's Bush School of Government and Public Service. I teach courses in the Master of Public Service and

Administration degree program. I have worked at Texas A&M since 2011 and have been tenured for the entirety of my time at the University.

3. I have a Doctor of Philosophy (Ph.D.) in Public Administration and Policy from Portland State University, Hatfield School of Government and a Master of Public Administration (M.P.A.) from the University of Idaho. I have received several awards, including the Centex ASPA Distinguished Public Administration Educator Award, and have published dozens of academic works. A true and correct copy of my CV is attached as Exhibit A.

4. I am the President and a member of the American Association of University Professors ("AAUP") Chapter at Texas A&M – College Station. I have served as President for nine months. I have been a member of the AAUP since 2024. As President, I advocate for professors' academic freedom, tenure, and shared governance at the university. I also provide guidance to members on navigating their professional and legal responsibilities.

5. I learned that the Board of Regents was considering the new System Policy on November 8, 2025, when a colleague emailed me a copy of the agenda for the upcoming Board of Regents meeting. I was surprised that the faculty were not specifically informed of the upcoming consideration of such a monumental policy change. The next day, I emailed Dean Sherman of the Bush School to express my concerns: "I believe the entire Bush School faculty should be informed about this matter so they have the opportunity to express their support or concerns before the deadline for submitting testimony passes. This proposal represents a significant change to our academic freedom policies and will affect the entire School." A true and correct copy of this email is attached as Exhibit B. On November 14, 2025, I learned that the Board approved the Policy at its meeting.

6. In a December 5, 2025 email, Provost Alan Sams announced to the faculty that the Policy had been approved and that our syllabi and courses would be reviewed for violations. A true and correct copy of this email is attached as Exhibit C.

7. In the same email, Provost Sams also told faculty that his office was setting up a website with "Guidance and FAQs on Syllabus Course Review" about the Policy. This initial guidance defined advocacy as: "To advocate is to support or argue for a cause, policy, or group, or to plead in favor of it; when teaching and course materials extend learning objectives in a way that requires students to hold certain beliefs, and/or to ridicule certain beliefs." It also asserted that the Policy permitted "advocacy" with advanced University approval and made assurances that the Policy did not prohibit the teaching of the restricted topics. A true and correct copy of this document is attached as Exhibit D.

8. On December 8, 2025, Dean Sherman of the Bush School explained to faculty that the syllabus reviews would be arranged by the Deans and Department Heads. A true and correct copy of this document is attached as Exhibit E. Dean Sherman explained that the Bush School needed to complete its review and update of Spring 2026 semester syllabi by January 28, 2026, 16 days after the beginning of the semester. In apparent response to faculty questions about where to draw the line between advocacy versus teaching, he wrote: "I will defer to the definitions and explanations in the Provost's guidance. Suffice it to say, I'm betting that many of us know—or at least have an intuition—when we're beginning to advocate for something [versus] informing and teaching. It's important that we be aware of the difference and proceed accordingly. While advocacy on some issues (i.e., academic honesty and mental health) is an essential part of our work, the current guidance encourages some extra deliberation in how we approach more complex issues." Dean Sherman's intuition-based explanation of advocacy did

not provide me with any clarity and in fact added to my confusion regarding what the University would consider to be advocacy versus teaching. It also reinforced the idea that teaching about race, gender, and sexual orientation would be permissible under the Policy—an assertion which later guidance and policy would soon contradict.

9. Later in December 2025, I was initially informed by some of my colleagues that University took the "Guidance and FAQs on Syllabus Course Review" off the Provost's website. I then went and checked the website and saw myself that it had been taken down. Therefore, in January, when I had to submit my syllabi and prepare for my Spring courses, I had no guidance from the University level on what the Policy meant and how to follow it.

10. On January 6, 2026, I submitted my course, Ethics and Public Policy (PSAA 642), for review as required by the Censorship Policy, even though the Policy lacked specificity, clarity, and definite standards and the implementing guidance I was previously relying on had been rescinded.

11. Ethics and Public Policy is a graduate level course that I have taught for the past seven years. During that time, I have received no complaints about the course. The course is about the theory and practice of analyzing and responding to the ethical responsibilities and dilemmas of professional conduct. It addresses policy debates about a myriad of issues, using race, gender, and sexuality as examples of potential sources of known and unknown bias that influence how we address/understand each issue. The discussion of bias is essential for this course because, at the end of the day, ethics is fundamentally about how we treat other people. Our social identities and our perceptions of others' identities can influence this treatment, knowingly or unknowingly. As a graduate course, this class is traditionally populated by older students who have completed their undergraduate degrees and who—even more than

undergraduates—are academically prepared to participate in frank, detailed discussions about sensitive issues. Further, as a specifically seminar-style graduate course, Ethics and Public Policy's instructional method requires student dialogue, questions, and debate. I deliberately chose this format based on literature suggesting that traditional-style graduate ethics courses do not provide sufficient opportunities for students to engage deeply with complex ethical questions. Ethics education should involve more than learning concepts or preparing for examinations; it requires students to practice ethical reasoning through respectful dialectical dialogue with the instructor and their peers. This format requires flexibility to address relevant issues as they arise, meaning that the precise topics discussed in any particular class session cannot always be predetermined.

12. On January 9, 2026, I received an email from my Department Head, Dr. Taylor, informing me that my course was flagged as needing an exception because it had course content that included "material that relates to race ideology, gender ideology, or sexual orientation." A true and correct copy of my communications with Dr. Taylor is attached as Exhibit F. In this first email, Dr. Taylor did not specify what material had triggered the flag. Instead, Dr. Taylor noted the "breadth of the university's working definition of advocacy" required that I seek an exception for my graduate level course. Dr. Taylor asked me to respond to various questions including "Why is advocacy essential for this course?"

13. I was unaware of whether there was, at that time, a working definition of advocacy, since the Provost's "Guidance and FAQs on Syllabus Course Review" that provided it had been rescinded.

14. When I asked for clarification on which parts of my syllabus ran afoul of the Censorship Policy, Dr. Taylor pointed to "some of the readings from Week 5" of the syllabus

that were apparently "covered under system policy 08-01" and "clearly qualif[ied] for additional review," without specifying which readings or describing how they violated the Policy. Dr. Taylor added that, regardless of whether a professor was actually engaging in "advocacy," there was a "risk that students could interpret a faculty member's comments or reading assignments as leading or encouraging them to hold specific positions on political policies and actions, even if the faculty member has clearly and explicitly indicated that students are not required to hold such positions."

15. I responded with my concerns that interpreting "advocacy" from a subjective student point of view would leave professors vulnerable to a vague and arbitrary standard. Nonetheless, I explicitly disavowed that I would engage in any advocacy in the course by noting that my course would "not require students to hold, affirm, or renounce any belief, nor [would] it penalize students for their views." Further, I declared that: "1. The course does not engage in advocacy as defined 2. Students are evaluated on analysis, not belief [and] 3. Exposure to contested ideas is a required element of graduate education in this field." I then explained that since I wasn't advocating, I did not believe the course required an exception.

16. On January 12, 2026, I taught the first class of Ethics and Public Policy for the Spring 2026 semester, to approximately 10 enrolled graduate students.

17. The next day, on January 13, 2026, I received an email from the Bush School Dean Sherman informing me that the Bush School sent my Ethics and Public Policy syllabus to the Vice Provost for Academic Affairs ("Vice Provost") to get an opinion on whether an exception was required because of the Policy. A true and correct copy of this email, and the following email conversation, is attached as Exhibit G.

18. According to Dean Sherman, the Vice Provost determined that the course may need an exception, but for a completely different reason than Dr. Taylor had identified. Indeed, the Vice Provost noted that the Week 5 content did not require an exception as long as I disavowed "advocacy." Instead, the Vice Provost concluded that the syllabus' reference to "sexual orientation" in my "Professional Perspective and Academic Freedom Statement" indicated a potential violation of the Censorship Policy, requiring an exception.

19. The offending Professional Perspective and Academic Freedom Statement stated:

> "**Professional Perspective and Academic Freedom Statement**
>
> This course examines a range of theories, empirical research, and policy debates addressing the impact of race, gender, religion, sexual orientation, and other social identities on public policy and the professional ethical responsibilities of public servants. These topics are approached for the purpose of scholarly analysis, professional development, and critical evaluation of public administration practice.
>
> In the course of instruction, I may share my own professional perspectives on issues related to the course content and matters of public concern. These views are offered for educational purposes only and do not represent the official positions or views of Texas A&M University or any affiliated institution. Students are not expected to agree with the instructor's professional perspectives, and respectful disagreement and critical engagement are welcomed and encouraged."

A true and correct copy of my syllabus is attached as Exhibit H.

20. Dean Sherman noted that the Vice Provost explained that if the topic of sexual orientation would be "covered" during the course, either through discussion or course readings, the course would require an exception unless I opted to voluntarily exclude the topic from the class and remove it from the syllabus. If I did not opt to exclude the topic, I would be required to identify in the syllabus every instance in which the topic of sexual orientation would be "covered," so that my exception request could be assessed.

21. In response to Dean Sherman's email, I responded that, as a graduate level, seminar-style course, it was not possible to specify a particular day when a topic might arise, or

not arise, because these topics underly the course and would be relevant throughout it. Nevertheless, I reiterated my commitment to not advocate any particular viewpoint: "Because PSAA 642 is a graduate-level, discussion-centered course, it is neither possible nor pedagogically appropriate to specify with certainty the precise timing or manner in which these topics may arise. These issues may be addressed throughout the course as relevant to the subject matter, including through assigned readings, current-event analyses, book reviews, written assignments, and classroom discussion. At no point does the course require students to adopt, affirm, or reject particular beliefs regarding these topics. Students are evaluated solely on analytical rigor, use of evidence, and professional engagement."

22. Nevertheless, Dean Sherman insisted that, without identification of the days when sexual orientation would arise in the course, the course would not receive an exception. And without an exception, Dean Sherman stated that he would not authorize continuation of the course.

23. In response, I explained again to Dean Sherman that the topics of race, gender, and sexuality would be addressed throughout the course as relevant to the subject matter, including through assigned readings, current-event analyses, book reviews, written assignments, and classroom discussion. I did not identify specific days of the course because I knew that we may discuss race, gender, or sexuality on any given day of the course. And if I had specified a certain day but the topics were discussed on other days, I was worried that I would be penalized under System Policy 12.01, which prohibits faculty from introducing material that is inconsistent with the approved syllabus for the course.

24. The next day, January 14, 2026, Dean Sherman notified me that the course would be canceled immediately because I could not identify every instance when the prohibited topics would be discussed in class.

25. Dean Sherman also sent out a College-wide communication announcing the cancellation of Ethics and Public Policy and mentioning me by name. I believe the University's decision to publicly announce the cancellation of my course was not a routine administrative communication. By publicizing the cancellation and characterizing me as "declin[ing] to provide . . . information" the administration conveyed a message to the broader faculty that resistance to the Censorship Policy could result in similar consequences. A true and correct copy of this email is attached as Exhibit I.

26. The cancellation, and its public announcement, effectively placed a scarlet letter on me, by suggesting that I was not doing my job appropriately or fulfilling my responsibilities as a professor, and portraying me as uncooperative, which damaged my reputation in academia. In the days that followed, multiple students and faculty members communicated with me their frustrations and concern about my class's cancellation, and, in some cases, they expressed skepticism about me and my actions. This left me in the position of having to console students, explain what had actually occurred, and defend my professional judgment and integrity to colleagues and students with whom I had spent years building relationships.

27. My course was canceled and my speech was restricted because my syllabus noted the class would cover the prohibited topic of "sexual orientation" and because I could not preemptively identify every instance in which the subject may have arisen. But I do not believe it is possible to teach the course in an academically sound way while either removing that topic completely or confining its discussion to certain particular instances.

28. In my experience, graduate, seminar-style courses are more open-ended because they are comprised of older students seeking serious academic credentials and are necessarily discussion based. Different students bring different perspectives to the assigned materials, which are then discussed by all in the class, including me. Specifically, students are expected to identify a recent news topic of interest, provide a summary of the issue to the class, and explain why they believe it is relevant to ethics in public service and policy. My role in these discussions is generally to push students to think more deeply about the topic by identifying the central ethical questions involved and exploring why different individuals or groups may reasonably arrive at different conclusions. Therefore, the issue was not an unwillingness by me to identify the course's subject matter in advance. Rather, I was trying to convey to University leaders that in this seminar-style ethics course, discussions involving race, gender, and sexuality orientation were not finite or isolated instances that could be confined to particular readings or class sessions—they may instead remain relevant across multiple ethical questions and controversies and may appropriately arise throughout the semester as students apply course concepts to different contexts.

29. For example, in a past class, I asked each student to choose a book from a list I created, to review as part of the course. The purpose of the book review was to summarize the book's content and critically evaluate the author's purpose, thesis, arguments, and methods of analysis. The bulk of the review focused on what the student learned from the book, how persuasive the author's presentation and arguments were, and how the book contributed to the student's understanding of personal bias and ethical decision-making in public affairs. Students provided periodic updates on their books throughout the semester. I used these updates as opportunities for other students to ask questions, offer critiques, express support or

disagreement, and connect the ideas raised in the books to broader ethical questions. Students were also expected to draw upon their assigned books as reference points during general class discussions and debates. Thus, the books were not treated as isolated assignments; they became part of the ongoing intellectual dialogue of the course.

30. In past iterations of this course, multiple students have selected the book *Life Isn't Binary* by Meg-John Barker and Alex Iantaffi. The book examines how complex human experiences are often forced into rigid binary categories—such as good/bad, gay/straight, or male/female—and encourages readers to critically examine the assumptions underlying those categories. Students reading this book have drawn upon its arguments during class discussions to challenge, support, or complicate competing viewpoints about whether, and under what circumstances, sexual orientation should be considered in ethical analysis or public decision-making. There was no one day where this perspective would be raised—students were free to bring this perspective on any day—and I in turn would engage in that discussion. This illustrates why it would have been difficult, and pedagogically artificial, to confine discussions involving sexual orientation or related questions to a predetermined class session or finite portion of the syllabus. In a discussion-based graduate ethics course, these issues could arise organically throughout the semester from student readings, book presentations, current events, and the students' own questions and arguments.

31. In my past classes, we have also discussed the case of Kimberly Davis, the former county clerk for Rowan County, Kentucky, who gained national attention in 2015 after refusing, on religious grounds, to issue marriage licenses to same-sex couples following the legalization of same-sex marriage. The Davis case presents a classic public-service ethics dilemma involving potential conflict between an individual's deeply held personal or religious

values and the professional and legal obligations associated with holding public office. The central ethical question is not simply about same-sex marriage or sexual orientation. Rather, the case allows students to examine a broader and enduring question in public administration: To what extent should our personal values guide our actions as public servants when those values conflict with our legal, professional, or organizational responsibilities? Sexual orientation necessarily arises in discussing the Davis case because the underlying dispute involved same-sex couples. But the pedagogical purpose of examining the case was to use those facts to explore broader principles of public-service ethics, including role conflict, personal conscience, professional responsibility, impartiality, the rule of law, and the ethical obligations public servants owe to the citizens they serve.

32. In future classes, I might wish to address topics such as the killing of Renée Nicole Good, a 37-year-old queer woman and U.S. citizen who was shot and killed by an Immigration and Customs Enforcement (ICE) agent in Minneapolis on January 7, 2026; the killing of Alex Jeffrey Pretti, a 37-year-old American intensive care nurse employed by the U.S. Department of Veterans Affairs, who was shot and killed by U.S. Customs and Border Protection officers in Minneapolis on January 24, 2026; and the killing of Keith Porter Jr., a 43-year-old Black father of two, by an off-duty ICE agent on December 31, 2025.

33. These cases would have presented rich opportunities for examining fundamental questions of public-service ethics and immigration policy, including the use of governmental authority, the exercise of discretion, accountability, the value and treatment of human life, and the ethical obligations of public officials. They also could have prompted students to consider whether race, gender, sexual orientation, occupation, or other aspects of identity influenced how the individuals were perceived, treated, or subsequently characterized by government

officials and the public. The purpose would not have been to prescribe a particular conclusion, but to encourage students to identify and critically examine the ethical dimensions of government action and the ways in which questions of race, gender, and sexuality may intersect with broader principles of public-service ethics.

34. My class is seminar-style and is therefore discussion-based. Both my students and I present current topics for analysis, and the entire structure of the classes hinges on my ability to lecture and lead discussions on the topics presented. I must be able to respond to student-presented topics and ideas for the class to function and to successfully facilitate discussions. These discussions could happen every day of the course, and I will not tell my students that they cannot identify a news topic or book related to race, gender, or sexual orientation because it does not artificially fall on one pre-ordained day in the syllabus. These discussions also prepare my students for the real world, in which they will often be confronted by new and different ideas by others around them. Therefore, it is not possible to quarantine discussions of sexual orientation to a single day of class without harming the pedologically necessary exchange of ideas or my students' prospects for future success. And to do so would run contrary to professional norms.

35. I wish to teach Ethics and Public Policy and other courses in the future. However, I fear that this course and others will continue to be prohibited or censored under the Policy if they intend to include discussions of sexual orientation, race, gender, or gender identity.

36. I also do not understand how to comply with the Policy. As written, I find the policy to be vague, ambiguous, and lacking any definite standards that I can apply in a predictable manner. The varying interpretations of the Policy's application to my class by

different University officials, culminating in the class's cancellation, further compounded my uncertainty regarding what is or is not allowed under the Censorship Policy.

37. For example, the Policy itself does provide a definition of "advocacy." As a result, the System and the University have defined and redefined "advocacy," and administrators have relied on their own individual and "intuitive" understanding of "advocacy." I was also told that I may be engaging in prohibited "advocacy" based on a hypothetical student's individual perception of the term. I was separately told that disavowing advocacy may or may not be enough to assuage concerns under the Policy.

38. And even though I timely submitted my syllabus for review, identified topics of interest that may arise in my class, sought the input and clarifications of multiple University officials, explained the discussion-based pedagogy of my course, and explicitly disavowed advocacy, my entire course was still canceled. I do not know how I could have modified my class in a pedagogically sound manner and still have complied with the Policy.

39. After the cancellation of my class, I have since become aware of system-level guidance which provides a different definition of advocacy than the Provost's since-rescinded "Guidance and FAQs on Syllabus Course Review." It also indicates that no advocacy is allowed in graduate courses (even with advanced approval), and asserts that the mere teaching of the prohibited topics in graduate courses apparently requires advanced approval. Exhibit J.

40. After the cancellation of my class, I have also become aware that, on or around February 26, 2026, the Provost issued new guidance— "Guidance on Syllabus Course Reviews"—apparently to replace the Provost's previously rescinded guidance. This new guidance had a different definition of "advocacy" than the rescinded guidance, but the same definition as the system level guidance (Exhibit J). The new Provost's guidance, like the

system level guidance, also clarifies that no advocacy is allowed in graduate courses, or any courses, (even with advanced approval), and asserts that the mere teaching of the prohibited topics in graduate courses apparently requires advanced approval. A true and correct copy of this guidance is attached as Exhibit K.

41. The vague text of the Policy, along with these shifting and inconsistent guidances make it impossible for me to understand and implement the Policy.

42. Further, I was granted an exception for a class in the Spring of 2026, Foundations of Public Service (PSAA 601), where my syllabus stated that the class would discuss issues related to race, gender, and sexuality. This statement was substantially similar to the Professional Perspective and Academic Freedom Statement I included in my Ethics and Public Policy course, which ultimately led to its cancellation. The statement read:

> This course may address a range of theories, empirical research, and policy debates addressing the impact of <u>race, gender, religion, sexual orientation,</u> and other social identities on public policy and the professional responsibilities of public servants. These topics are approached for the purpose of scholarly analysis, professional development, and critical evaluation of public administration practice.
>
> In the course of instruction, I may share my own professional perspectives on issues related to the course content and matters of public concern. These views are offered for educational purposes only and do not represent the official positions or views of Texas A&M University or any affiliated institution. Students are not expected to agree with the instructor's professional perspectives, and respectful disagreement and critical engagement are welcomed and encouraged.

A true and correct copy of the syllabus is attached as Exhibit L (emphasis added).

43. I do not understand why this exception was granted, without me having to specify days in which sexual orientation or any other topic would arise, but my syllabus for Ethics and Public Policy that had an exceedingly similar syllabus statement was rejected. I have not been given any explanation about the standards that were applied for determining whether to grant an exception or why one course was entitled to an exception and the other was not.

44. I also have reason to believe that such exceptions will not be granted in the future. On March 16, 2026, I received an email, attached here as Exhibit M, from Dean Sherman to Bush School faculty noting that "an instructor cannot include blanket statements in a syllabus indicating that race ideology or gender ideology, or topics related to sexual orientation or gender identity, might come up at any point in a course. Information on specific readings, lectures, etc., related to these topics must be submitted for an exception request."

45. After receiving this email, I removed a statement from my Foundations of Public Service Fall 2026 syllabus indicating that discussions regarding a range of social identities, including gender identity and sexual orientation, may arise in class. I also added a disclaimer that "[b]ased on my understanding of this policy, this class engages in instruction, not advocacy, as defined by System Policy 08.01." A true and correct copy of this syllabus is attached as Exhibit N. The syllabus was approved, and I am set to teach two sections of Foundations of Public Service in the Fall.

46. However, based on the Policy's expanded ban on instruction, as opposed to just advocacy, as demonstrated by the new system-wide and provost guidance, I am unsure if such a disclaimer will be acceptable in the future.

47. Dean Sherman's March 16 email also instructed that professors can "engage" a student to answer their questions related to race ideology or gender ideology, or topics related to sexual orientation or gender identity, but that we cannot "dwell on the topic." I have no idea what the distinction between engaging a student's question and dwelling on a topic is or who would judge whether I spent too much time on that particular question. As a practical matter, this forces me to treat certain student inquiries differently than others and stifles even student-initiated discourse on matters relate to race, gender, and sexual orientation.

48. Based the Policy's expansion into teaching, Dean Sherman's March 16 email, and my resulting removal of "discussions regarding a range of social identities, including gender identity and sexual orientation" from my syllabus, I no longer know whether I may discuss or teach topics related to gender identity or sexual orientation in my Foundations of Public Service class. For example, I am unsure to what extent, if at all, I may mention news stories relevant to the curriculum that touch on these topics, answer student questions related to the topics, or allow or discuss student works related to these topics.

49. I also do not understand the meaning of "race and gender ideology" and "topics related to sexual orientation and gender identity." As I have explained to University officials, my courses grapple with the public policy efforts to address issues like racial equality, sexual orientation, and gender identity. Under the Censorship Policy, it seems that any mention of race, gender, or sexual orientation could be targeted based on students' perceptions and feelings and the arbitrary application of the Policy by University officials, which could lead to my future classes getting canceled or modified. For example, the definitions for "race and gender ideology" and "gender identity" do not provide me with notice of what content is prohibited. Any mention of race seems prohibited if it could possibly be interpreted to cause a member of a race to feel "shame" or "guilt," which would make teaching the impacts of slavery and racism in our public policy system impossible. Similarly, I worry that a discussion of the current policy debates regarding transgender people's rights would be deemed a violation of the policy, if it made a student feel that their opinions on gender were less "valuable," even if I am not stating that gender identity should replace notions of biological sex.

50. I also do not understand the meaning of the word "topics" in the Policy. From my experience with Ethics and Public Policy, it seems like any amount of discussion or "coverage" rises to the level of a "topic." That conflicts with the English Department's interpretation that a "topic" "does not describe all possible subject matter that might come up for discussion or explanation, but a larger-scale, purposefully thematic choice of material and its intended treatment." A true and correct copy of the English Department guidance is attached as Exhibit O. Because I am unsure what would constitute a "topic," I am forced to be cautious to monitor and control even brief asides from myself and my students that may run afoul of the policy, even though this interrupts the flow and functionality of my classes.

51. I intend to continue teaching at Texas A&M and wish to provide the best possible educational environment for my students. Because I do not understand how to comply with the Policy, I do not know how to plan my courses moving forward. The Policy interferes with my right to speak freely in the classroom because I am not sure what it prohibits.

52. Further, in my role as President of the College Station Chapter of AAUP, I am generally aware of how policy changes are affecting our campus members. It is my job to be aware of how our members are feeling about policy changes and how it is affecting them in their jobs as professors. Knowing that is my role, members will reach out to communicate with me about their experiences with changes to policy and will sometimes ask for my guidance. But because of the Policy's vagueness and the significant uncertainties surrounding its implementation, I am unable to respond to members' questions with any clarity. In this role, I have also become aware of the trend of members' courses being stripped of their core-curriculum status, which reduces enrollment in those courses and could therefore lead to class cancellation. At least six courses were canceled pursuant to the Policy. And at least eight

courses were given conditional approvals, which meant that they had to take some kind of action to address the purported violation of the Policy. In order to receive approval to teach their courses, some professors had to prove they were not "advocating," others had to promise they were not advocating, and others had to change and/or remove material from their course. The outcomes for different courses seem completely arbitrary. It is not clear why some professors have had to make small changes and others have had to make big changes or have their courses canceled completely. Further, members reported to me that the uncertainties of the policy caused them to self-censor their course curriculum.

53. I declare under penalty of perjury that the foregoing is true and correct. Executed on August 27, 2026.

Leonard Bright 8/27/26

Leonard Bright

# Exhibit A

# LEONARD BRIGHT, PH.D.

## EDUCATIONAL HISTORY

Doctor of Philosophy (Ph.D.), Public Administration and Policy, Portland State University, Hatfield School of Government, Portland OR

Master of Public Administration (M.P.A.), University of Idaho, Moscow ID

Bachelor of Arts (B.A.) (with Honors), University of South Florida, Tampa FL

## EMPLOYMENT HISTORY

### Administrative Experience

2026-Pres District 2 Representative, American Association of University Professors (AAUP)

2025-Pres President, American Association of University Professors (AAUP)-Texas A&M Chapter

2023-2025 Vice President-East, American Association of University Professors (AAUP)-Texas Conference

2024-2025 Vice President, AAUP Texas A&M Chapter

2024-2025 Caucus Leader, Bush School Faculty Senate Caucus

2016-2018 Assistant Provost, Office of Graduate and Professional Studies, Texas A&M University, College Station TX

2013-2016 Assistant Dean of Graduate Education, Bush School of Government and Public Affairs, Texas A&M University, College Station TX

2011-2012 President, Southeastern Conference on Public Administration

2006-2011 President, Metropolitan Louisville American Society for Public Administration, Louisville KY

2004-2004 Acting Director, Master of Public Administration Program, Department of Political Science and Criminal Justice, University of South Alabama, Mobile AL

2003-2005 Assistant Director, Master of Public Administration Program, Department of Political Science and Criminal Justice, University of South Alabama, Mobile AL

**Teaching Experience**

2011-Pres Full Professor (Sept 2023-Pres)
Associate Professor (with Tenure Sept 2011-2023),
Bush School of Government and Public Service, Texas A&M University, College Station TX

2005-2011 Associate Professor (with Tenure)
Assistant Professor (Tenure –Track August 2005-June 2011),
Department of Urban and Public Affairs, University of Louisville, Louisville KY

2003-2005 Assistant Professor (Tenure-Track), Department of Political Science and Criminal Justice, University of South Alabama, Mobile AL

2001-2003 Hatfield Resident Fellow (Graduate Fellowship), Executive Leadership Institute, Portland State University, Portland OR

## TEACHING ACTIVITIES

**Course Subjects Taught**

Employee Motivation
Ethics and Public Policy
Human Resource Management
Introduction to Public Administration/Public Service
Leadership Theory & Practice
Managing Workplace Diversity
Non-Profit Management
Organization Theory & Behavior
Policy Analysis & Program Evaluation
Public Administration/Service Public
Management

**Capstones Supervised**

2014 The Brazos Valley Council of Governments Service Integration Report 2013-2014

2013 An Evaluation of Community Works Micro Financing Strategies in Cambodia

**Assistantships & Fellowships**

2001-2003 Hatfield Resident Fellow (Graduate Fellowship), Executive Leadership Institute, Portland State University, Portland OR.

1998-2000 Graduate Research Assistant, Public Administration Department, Portland State University, Portland OR.

1997-1997 Human Resource Intern, University of Idaho, Human Resource Department, Moscow ID.

1995-1996 Research Assistant, Department of Psychology, University of South Florida, Tampa FL.

**RESEARCH & CREATIVE ACTIVITY**

2025 Bright, L. *RIG'EM: A Case Study of Leadership Failure in the Tenure and Promotion Process.* The Bright Media Couple, LLC

2025 Bright, L (Editor), *Burned Out - Exploring the Causes, Consequences, and Solutions of Workplace Stress in Public Service Organizations*.

2024 Bright, L. (2024). Does Stress Type Matter? Clarifying the Relationships. *Organizational Culture: Cultural Change and Technology*, *14*, 65.

2023-Pres Bright, L, The Bright Professor: https://www.youtube.com/@TheBrightProfessor

2023 Bright, L., Does Stress Type Matter? Clarifying the Relationships between Public Service Motivation, Work-Related Stress, and Employee Attitudes, In M. Sarfraz, (Ed.), *Organizational Culture: Cultural Change and Technology*. IntechOpen. 9781837693191

2022 Bright, L., Public Service Motivation Education and Government Career Preferences: A Teaching Agenda. Stazyk & Davis (Eds). *The Handbook of Research on Motivation in Public Administration*. Edward Elgar. 9781789906806

2022 Bright, L., Why Does PSM Lead to Higher Work Stress? Exploring the Role that Organizational Identity Theory has on the Relationship between Public Service Motivation and External-Related Stress among Federal Government Employees. *Public Organization Review; 22*, 803–820

2021 Bright, L., Military Experience in Civilian Government Organizations: An Exploratory Study of its Effects on a Range of Work Attitudes and Behaviors, *Administrative Sciences, 11, 1-14*

2021 Bright, L., Does Person Organization Fit and Person-Job Fit Mediate the Relationship between Public Service Motivation and Work Stress among US Federal Employees? *Administrative Sciences, 11* (2), 1-37

2021 Bright, L., An Exploratory Study of the Consequences of Perceived Organizational Prestige on a Range of Work Attitudes and Behaviors among Public Employees: A Call to Future Research. *Public Administration Research, 10 (1*), 26-40

2021 Bright, L., Does Perceptions of Organizational Prestige Mediate the Relationship Between Public Service Motivation, Job Satisfaction, and the Turnover Intentions of Federal Employees? *Public Personnel Management*, *50 (3)*, 408-429

2018 Bright, L. Government Career Interests, Perceptions of Fit, and Degree Orientations: Exploring their Relationship in Public Administration Graduate Programs. *Teaching Public Administration 36 (1), 63-80*

2017 Bright, L. Are Individuals with High levels of Public Service Motivation Satisfied in MPA Programs? *Teaching Public Administration 35 (2),* 209-22

2016 Bright, L. Is Public Service Motivation a Better Explanation of Nonprofit Career Preferences than Government Career Preferences? *Public Personnel Management, 45 (4),* 405-424

2016 Bright, L. Public Service Motivation and Socialization in Graduate Education *Teaching Public Administration, 34* (3), 284-306

2016 Bright, & Graham, C. The Predictors of Student Satisfaction in Public Administration Graduate Degree Programs. *Journal of Public Affairs Education, 22*, 17-34,

2015 Bright, L, & Graham, C. Why Does Interest in Government Careers Decline among Public Affairs Graduate Students? *Journal of Public Affairs Education*, *21*, 575-594,

2013 Bright, L. Where Does Public Service Motivation (PSM) Count the Most in Government Work Environments? *Public Personnel Management, 42,* 5-26

2011 Bright, L. Does Public Service Motivation Affect the Occupation Choices of Public Employees? *Public Personnel Management, 40,* 11-24

2010 Bright, L. Why Age Matters in the Work Preferences of Public Employees? A Comparison of Three Age-Related Explanations. *Public Personnel Management, 39, 1*-14

2009 Bright, L. Why Do Public Employees Desire Intrinsic Workplace Opportunities? *Public Personnel Management, 38,* 15-37

2008 Bright, L. Does Public Service Motivation Really Make a Difference on The Job Satisfaction and Turnover Intentions of Public Employees? *American Review of Public Administration, 38,* 149-166

2007 Bright L. Does Person-Organization Fit Mediate the Relationship Between Public Service Motivation and the Job Performance of Public Employees? *Review of Public Personnel Administration, 27,* 361-379

2007 Bright, L., Bright, C., & Haley L. Nonprofit Outreach Services: Using Outreach to increase Nonprofit's Capacity and to Provide a Quality Educational Experience for Students. *Journal of Public Affairs Education, 13,* 323-331

2007 Bright, L. *Intrinsic Motivation in Public Sector Organizations*. In C. Wankel (Ed.), The Handbook of 21st Century Management, SAGE

2005 Bright, L. Public Employees with High Levels of Public Service Motivation: Who Are They, Where Are They, and What Do They Want*?* *Review of Public Personnel Administration, 25*, 138-155

**Book Reviews**

2006 Bright, L. Review of Morality Politics by Elaine Sharp. *Journal of Urban Affairs, 28,* 95-96.

**Invited Talks/Presentations**

2017 A Guide to Work Motivation in the Public Sector: A Lesson in Research, Federal Executive Board, Portland Oregon, September 28th, 2017

2017 Public Service Motivation Research, School of Public Administration, University of Nebraska Omaha, February 15, 2017

2016 Connecting Students to Government: Problem, Explanations, and Solutions, CenTex ASPA Chapter, Award Banquet, May 19, 2016

2013-2015 Leadership Symposium, Office of the Vice President and Associate Provost for Diversity, Texas A&M, College Station

2014 Investigation of the Relationships among Public Service Motivation, Program Characteristics, and Career Interest among Master Degree Students in Public Affairs Programs, Bush School Talks, Bush School of Government, Texas A&M, Monday, April 14, 2014

2006 Public Service Motivation Talk, School of Urban and Public Affairs Faculty Research Talks, Louisville KY, October, 15, 2006

2004 Michael Figures Leadership Experience, On behalf of State Senator Vivian Figures, University of South Alabama, Mobile AL

**Peer Reviewed Proceedings**

2005 L Bright, Why are age differences present in the work preferences of public employees? Academy of Management Proceedings, Public and Nonprofit Abstracts, 9

2005 L Bright, Why do public employees desire intrinsic workplace opportunities? Testing three hypotheses. Academy of Management Proceedings, Public & Nonprofit Paper Abstracts, 5

**Conference Presentations**

2021 Bright, PSM, PO-fit, PJ Fit, Stress, and Turnover among Federal Employees in a High Stress Occupation, 78th Annual Midwest Political Science Conference, April 14-18, 2021

2019 Bright, L, Teaching Public Service Motivation. Elevating Public Service Motivation Aspen Grove Conference, Brigham Young University, Sep 25-28, 2019.

2019 Bright, PSM, PO Fit, PJ fit and Stress Among Federal Employees, Southeastern Conference for Public Administration 2019 Annual Regional Conference, Baton Rouge, LA, September 5-7, 2019.

2018 Bright, L, The Influence of Perceived Organizational Prestige on the Work Attitudes, and Behaviors of Public Employees. 76th Annual Midwest Political Science Conference, April 5-8, 2018

2018 Bright, L, Public Service Motivation and Perceptions of Organizational Prestige among Federal Employees. 76th Annual Midwest Political Science Conference, April 5-8, 2018

2018 Bright, L, Does Military Experience Matter on the Work Attitudes and Behaviors of Public Employees? Comparing Veterans and Non-Veterans? American Society for Public Administration, Denver, Colorado March 9-13,

2017 Bright, L, Do Perceptions of Fit and Program Orientation Matter on the Career Preferences of Students in Public Administration Programs? Teaching Public Administration Conference. University of Nebraska at Omaha, Omaha, Nebraska, May 31-Jun 2, 2017

2016 Bright, L, Is Public Service Motivation a Better Predictor of Nonprofit Career Preferences? New Evidence from a National Study, American Society for Public Administration, Seattle, WA, March 18-27, 2016

2015 Bright, L, The Predictors of Student Satisfaction in Public Administration Graduate Degree Programs, Midwest Political Science Association Conference, Chicago, IL. April 16-19, 2015

2015 Bright, L, Why Do Interest in Government Careers Decline among Public Affairs Graduate Students, Midwest Political Science Association Conference, Chicago, IL. April 16-19, 2015

2014 Bright, L and Graham, B, National Investigation of Student Attitudes in Public Affairs Graduate Programs, National Association of Schools of Public Affairs and Administration, Albuquerque, NM, November 2014

2010 Bright, L. Intrinsic Motivation in the Public Sector. Southeastern Conference of Public Administration, Wilmington, NC. October 13-16, 2010

2008 Bright, L. Where Does Public Service Motivation (PSM) Count the Most in Government Work Environments? Southeastern Conference of Public Administration, Orlando, FL. September 2008

2007 Bright, L Intrinsic Motivation in the Public Sector: Conceptual Framework and Measurement Scale. American Society for Public Administration National Conference, Washington D.C., March 23-27, 2007

2006 Bright, L, Is Public Service Motivation a Uniquely Public Service Work Phenomenon? Exploring the Affects of PSM on the Occupation Choices, Job Satisfaction, Turnover Intentions, and Performance Ratings of Non-Managers in Public Sector Organizations Southern Industrial Relations and Human Resources Conference, Louisville Kentucky, October 26-28, 2006

2006 Bright, L., Of What Value is Public Service Motivation? Exploring the Impact of Public Service Motivation on the Person-Organization Fit, Satisfaction, Performance, and Turnover Intentions of Public Employees? Southern Industrial Relations and Human Resources Conference, Louisville Kentucky, October 26-28, 2006

2006 Bright, L., Is Public Service Motivation a Uniquely Public Sector Phenomenon? Comparing Public and Private Sector Employees.

Presenting at Southeastern Conference on Public Administration, Athens Georgia on September 27-30, 2006

2006 Bright, L., Of What Value is Public Service Motivation? Exploring the Impact of Public Service Motivation on the Person-Organization Fit, Satisfaction, Performance, and Turnover Intentions of Public Employees. Presenting at Southeastern Conference on Public Administration, Athens Georgia, September 27-30, 2006

2005 Bright, L, and Haley, L, Nonprofit Organizational Capacity Building: A Case Study of Why and How Academic Institutions Can Be of Service. To Be Presented at the Southeastern Conference on Public Administration, Little Rock Arkansas, October 5-8, 2005

2005 Bright, L, Why Do Public Employees Desire Intrinsic Workplace Opportunities? Comparing Three Hypotheses. Presented at the Academy of Management, Honolulu Hawaii, August 5-10, 2005.

2005 Bright, L. Why are Age Differences Present in the Work Preferences of Public Employees: Comparing Three Explanations. Presented at the Academy of Management, Honolulu, Hawaii, August 5-10, 2005.

2004 Bright, L., Age and the Work Preferences of Public Employees: Comparing the Effects of Cohort, Job level, and Organization Socialization Perspectives. Presented at the Southeastern Conference on Public Administration, Charlotte NC, October 3, 2004.

2004 Bright, L., An Empirical Investigation of the Intrinsic Reward Preferences of Washington County Oregon Employees. Presented at the Western Political Science Association, Portland OR, March 12, 2004

**Grant Funding**

2016 $43,000; Center for the Integration of Research Teaching and Service National Network; 25 Research Universities Preparing a National Faculty to Advance STEM Undergraduate Learning; Great Lakes Higher Education Corporation

2013 $1,500, Capstone Grant, An Analysis of Service Integration of Brazos Valley Council of Governments (BVCOG) Client Services, Brazos Valley Council of Governments (BVCOG)

2012 $13,000, Capstone Grant, Evaluation of CommunitiWorks Community-Based Financing Strategies in Cambodia, CommunitiWorks

2007 $1,800 African American Mini Research Grant Award, College of Arts and Sciences, University of Louisville, KY

| | |
|---|---|
| 2006 | $14,000: Research Grant, College of Arts and Science, University of Louisville, Louisville, KY |
| 2005 | $4,639 Summer Research Grant, Arts & Sciences Summer Research Award, College of Arts and Science, University of South Alabama |
| 2004 | $1,000 President Travel Grant, University of South Alabama |
| 2003 | $1,000 President Travel Grant, University of South Alabama |

## <u>SERVICE HISTORY</u>

### University

| | |
|---|---|
| 2024-2025 | Leader, Bush School Faculty Senate Caucus |
| 2024-2025 | Member, Faculty Senate, Texas A&M, College Station |
| 2023-2025 | Member, Committee on Academic Freedom, Responsibility, and Tenure, Texas A&M, College Station |
| 2023-2025 | Member, Committee on Academic Freedom, Responsibility, and Tenure, Texas A&M, College Station |
| 2023-2025 | Member, University Grievance Committee, Texas A&M, College Station |
| 2017- 2019 | Faculty Member, University Strategic Information Technology Committee, Texas A&M University, College Station |
| 2016-2018 | Institutional Co-Leader, Center for the integration of Research, Teaching, and Learning, Texas A&M, College Station |
| 2016-2018 | Member, Center for Teaching Excellence Faculty and Student Advisory Board, Texas A&M, College Station |
| 2015-2018 | Member, Development Strategies Council, Texas A&M, College Station |
| 2013-2016 | Chair and Member, Graduate Council, Texas A&M, College Station |
| 2014-2016 | Member, Undergraduate Curriculum Committee, Texas A&M, College Station |
| 2014-2016 | Member, Academic Operations Deans, Texas A&M, College Station |
| 2014-2016 | Member, Academic Operations Committee, Texas A&M, College Station |
| 2014-2016 | Member, QEP Advisory Committee, Texas A&M, College Station |

2013-2016 Member, Graduate Operations Committee, Texas A&M, College Station

2012-2016 Member, Honor Council, Texas A&M University, College Station

2016-2016 Member, Rhodes Scholarship Committee, National Fellowship and University Scholars, Texas A&M University, College Station

2014-2015 Vice-Chair, Graduate Council, Texas A&M, College Station

2015-2015 Member, Dean of Faculties Search Committee, Texas A&M, College Station

2013-2015 Member, University Grievance Committee, Texas A&M, College Station

2014-2015 Member, 2016 Graduation Convocation Speaker Committee, Texas A&M, College Station

2013-2015 Member, Faculty Senate Executive Committee, Texas A&M, College Station

2012-2015 Faculty Senator, George Bush School of Government and Public Service, Texas A&M, College Station

2012-2014 Member, Council on Strategic Budgeting, Texas A&M, College Station

2012-2014 Member, Student Rules and Regulations Committee, Texas A&M, College Station

2013-2013 Panel Member, Leadership Symposium, Office of the Vice President and Associate Provost for Diversity, Texas A&M, College Station

2012-2012 Member, University-Level Distinguished Achievement Awards, Graduate Mentoring, Texas A&M, College Station

2003-2005 Member, Host Committee for African American Faculty Candidates, University of South Alabama

2003-2005 Member, University Admissions and Records Committee, University of South Alabama

2003-2005 Member, African American Faculty Mentor Program, Student Affairs Department, University of South Alabama

**School/College**

2023-Pres Member, Bylaws Committee, Bush School of Government, Texas A&M, College Station

| | |
|---|---|
| 2020-2021 | Member, 2020-21 Bush School Committee for Faculty Development Leave, Texas A&M University, College Station |
| 2019-2020 | Member, Allen Building Task Force George Bush School of Government and Public Service, Texas A&M University, College Station |
| 2018-2018 | Leadership Working Group, Bush School of Government, Texas A&M, College Station |
| 2016-2016 | Member, Tier One Program Selection Committee, Dean of Faculties, Texas A&M, College Station |
| 2013-2016 | Member, Executive Committee, George Bush School of Government and Public Service, Texas A&M University, College Station |
| 2013-2016 | Chair, Bush School Graduate Instruction Committee, George Bush School of Government and Public Affairs, Texas A&M University, College Station |
| 2000-2004 | Member, College of Arts and Science Graduate Academic Standards Committee, University of South Alabama |

**Department, and Degree Program**

| | |
|---|---|
| 2011-Pres | Member, Tenure and Promotion Committee, Department of Public Service and Administration, George Bush School of Government and Public Service, Texas A&M University, College Station |
| 2021-2021 | Member, PSAA Department, Student Admissions Committee |
| 2019-2020 | Member, PSAA Department Annual Review Proposal Committee |
| 2018-2018 | Member, MPSA Harmonization Committee, Public Service and Administration Department, Texas A&M, College Station |
| 2018-2018 | MPSA Core Course Alignment Committee, Public Service and Administration Department, Texas A&M, College Station |
| 2012-2018 | Member, McGrew Research Award Committee, Public Service and Administration Department, Texas A&M, College Station |
| 2012-2015 | Faculty Senator, George Bush School of Government and Public Service, Texas A&M, College Station |
| 2012-2014 | Chair, Curriculum Committee, Master of Public Affairs and Administration Program, George Bush School of Government and Public Affairs, Texas A&M University, College Station |

2011-2015 Member, Admissions Committee, Master of Public Affairs and Administration Program, George Bush School of Government and Public Affairs, Texas A&M University, College Station

2012-2012 Member, Nonprofit Faculty Hiring Committee, George Bush School of Government and Public Affairs, Texas A&M University, College Station

2011-2011 Member, Assistant Director Hiring Committee, Leadership Program Certificate, George Bush School of Government and Public Affairs, Texas A&M University, College Station

2011-2011 Member, Nonprofit Faculty Hiring Committee, Leadership Program Certificate, George Bush School of Government and Public Affairs, Texas A&M University, College Station

2009-2011 Member, Admissions Committee, Ph.D. Urban and Public Affairs Program, University of Louisville

2009-2011 Member, Admissions Committee, Master of Public Administration, University of Louisville

2007-2011 Member, Urban and Public Affairs Ph.D. Comprehensive Exam Committee, University of Louisville

2007-2011 Program Faculty, Master of Urban Planning Program, University of Louisville

2005-2011 Program Faculty, Master of Public Administration Program, University of Louisville

2005-2011 Program Faculty, Doctorial Program, University of Louisville

2003-2005 Member, Budget Committee, Library Committee, and Grievance Committee, Department of Political Science, University of South Alabama

2003-2005 Member, MPA Program Development Committee, Department of Political Science, University of South Alabama

**Profession**

2012-2025 Member, CenTex Board of Directors, American Society for Public Administration, Austin, TX

2013-2019 Chair, Bush School's CenTex Award Committee, American Society for Public Administration, Austin, TX

| | |
|---|---|
| 2012-2013 | Past-President, Southeastern Conference for Public Administration |
| 2012-2013 | Chair, Strategic Imperative 4 Group, American Society on Public Administration |
| 2011-2013 | Chair, Paul Van Riper Award Committee, American Society on Public Administration |
| 2012-2012 | Member, Central Texas PSRW Awards Committee, CENTEX American Society for Public Administration, Austin, TX |
| 2011-2012 | President, Southeastern Conference for Public Administration |
| 2011-2012 | Vice Chair of SIG 4, American Society for Public Administration |
| 2010-2011 | President-Elect, Southeastern Conference for Public Administration Executive Board |
| 2008-2009 | Member, Board of Directors, ASPA Section on Personnel Administration and Labor Relations. |
| 2007-2008 | Member, American Society for Public Administration, Capacity Steering Group |
| 2006-2008 | Member, Executive Board of Directors, Southeastern Conference for Public Administration |
| 2008-2019 | Member, Review of Public Personnel Administration Review Board |

**Academic Conferences**

| | |
|---|---|
| 2021-2021 | Panel Chair, Public Service Motivation, Midwest Political Science Association, 78th Annual Midwest Political Science Conference, April 14-18, 2021 |
| 2012-2012 | Panel Chair, Public Administration Theory Network, South Padre Island, TX, May 17-21, 2012. |
| 2011-2011 | Panel Chair, Kentucky Political Science 2011 Conference, Bowling Green, KY, March 4-5, 2011. |
| 2010-2010 | Panel Moderator, Southeastern Conference of Public Administration, Wilmington, NC. October 13-16, 2010. |
| 2009-2009 | General Conference Chair, 2009 SECOPA Conference, Louisville, KY. |

2007-2007 Panel Chair, American Society for Public Administration National Conference, Washington D.C., March 23-27, 2007.

2006-2006 Moderator, Southern Industrial Relations and Human Resources Conference, Louisville KY, October 26-28, 2006.

2006-2006 Panel Chair, HRM an Individual Characteristics, Southeastern Conference for Public Administration, Athens GA, September 27-30, 2006.

2006-2006 Discussant, HRM and Individual Characteristics, Southeastern Conference for Public Administration, Athens GA, September 27-30, 2006.

2005-2005 Discussant, Southeastern Conference on Public Administration, Little Rock AK, October 5-8, 2005.

2005-2005 Manuscript Reviewer, 2005 Academy of Management, Honolulu HI, August 5-10, 2005.

**Community**

2012-2014 Member, Board of Directors, Communitiworks

2010-2010 Member, Urban League's Task Force on African American Educational Attainment, Louisville KY

2003-2003 Member, Campaign Workshop Task Force, Mobile Chamber of Commerce, Mobile AL

2004-2004 Speaker, Michael Figures Leadership Experience, On behalf of State Senator Vivian Figures, University of South Alabama, Mobile AL

2001-2002 Vice Chairman, Finance Committee, Gresham OR

2001-2002 Member, Budget Committee, Gresham OR

2001-2002 Member, Progress Board, Gresham OR

2000-2000 Member, Citizen Involvement Committee, Gresham OR

**ACHIEVEMENT AND AWARDS**

2017 Centex ASPA Distinguished Public Administration Educator Award

2013 ASPA's 2013 Chester A. Newland Presidential Citations of Merit

| | |
|---|---|
| 2012 | Richard Stadelmann Faculty Senate Service Award, Texas A&M Faculty Senate |
| 2007 | Outstanding Performance and Exemplary Achievement, Black Faculty/Staff Association, University of Louisville, KY |
| 2003 | Academic Excellence and Outstanding Service Award, Executive Leadership Institute, Portland OR |
| 1996 | Superior Academic Achievement Award, U of South Florida, Tampa |
| 1995 | Outstanding Student of the Year, U of South Florida, Tampa FL. |
| 1995 | Dean's List, University of South Florida, Tampa FL. |
| 1993 | Peter Miller Scholar, Peter Miller Foundation, Tampa FL |
| 1989 | The Mayor Award, City of Tampa FL |

# Exhibit B

Outlook

## Fw: BOR agenda item 4.2

**From** Bright, Leonard <lbright@tamu.edu>
**Date** Wed 8/19/2026 8:14 AM
**To** Leonard Bright (Non-TAMU) <drleonardbright@hotmail.com>

Leonard Bright, PhD
Professor
Bush School of Government
Texas A&M University, College Station
979-862-3028

Follow me @ www.drleonardbright.com, YouTube, LinkedIn, & X (Twitter)

TEXAS A&M UNIVERSITY
The Bush School
of Government & Public Service

---

**From:** Bright, Leonard <lbright@tamu.edu>
**Sent:** Sunday, November 9, 2025 6:50 PM
**To:** Sherman, John Bradley <johnsherman92@tamu.edu>
**Cc:** Hein, Mary E <m-hein@tamu.edu>; Dorsey, Leroy G <l-dorsey@tamu.edu>; Escobar-Lemmon, Maria <m_escobar@tamu.edu>; Taylor, Lori <lltaylor@tamu.edu>; Whitten, Guy D <g-whitten@tamu.edu>; Bearce, David <dhbearce@tamu.edu>
**Subject:** Re: BOR agenda item 4.2

Wow.  That is most surprising.  I had hoped that things would not go this way.  These are consequential times and one for the history books.

Leonard Bright, PhD
Professor
Bush School of Government
Texas A&M University, College Station
979-862-3028

Follow me @ www.drleonardbright.com, YouTube, LinkedIn, & X (Twitter)

TEXAS A&M UNIVERSITY
The Bush School
of Government & Public Service

---

**From:** Sherman, John Bradley <johnsherman92@tamu.edu>
**Sent:** Sunday, November 9, 2025 6:41 PM
**To:** Bright, Leonard <lbright@tamu.edu>
**Cc:** Hein, Mary E <m-hein@tamu.edu>; Dorsey, Leroy G <l-dorsey@tamu.edu>; Escobar-Lemmon, Maria <m_escobar@tamu.edu>; Taylor, Lori <lltaylor@tamu.edu>; Whitten, Guy D <g-whitten@tamu.edu>; Bearce, David <dhbearce@tamu.edu>
**Subject:** Re: BOR agenda item 4.2

Dr. Bright,

I just learned about it this weekend as well.

Best,

John

---

**From:** Bright, Leonard <lbright@tamu.edu>
**Sent:** Sunday, November 9, 2025 6:32 PM
**To:** Sherman, John Bradley <johnsherman92@tamu.edu>
**Cc:** Hein, Mary E <m-hein@tamu.edu>; Dorsey, Leroy G <l-dorsey@tamu.edu>; Escobar-Lemmon, Maria <m_escobar@tamu.edu>; Taylor, Lori <lltaylor@tamu.edu>; Whitten, Guy D <g-whitten@tamu.edu>; Bearce, David <dhbearce@tamu.edu>
**Subject:** BOR agenda item 4.2

Dean Sherman,

FYI: Were you aware of the proposal before the Board of Regents that would limit our ability to teach topics related to race and gender, scheduled for consideration at their November 13th meeting? I believe the entire Bush School faculty should be informed about this matter so they have the opportunity to express their support or concerns before the deadline for submitting testimony passes. This proposal represents a significant change to our academic freedom policies and will affect the entire School.

I look forward to hearing from you,

Leonard Bright, PhD
Professor
Bush School of Government
Texas A&M University, College Station
979-862-3028

Follow me @ www.drleonardbright.com, YouTube, LinkedIn, & X (Twitter)

TEXAS A&M UNIVERSITY
The Bush School
of Government & Public Service

# Exhibit C

Outlook

## ASAMS Syllabus Review and Guidance Email

**From** Dr. Alan Sams, Provost and Executive Vice President <provost@tamu.edu>
**Date** Fri 12/5/2025 6:33 PM
**To** Bright, Leonard <lbright@tamu.edu>

**View this email in a web browser**




**Provost and Executive Vice President**

*Sent on behalf of Alan Sams, Provost and Executive Vice President, to all Faculty, Staff and Graduate Students at Texas A&M University*

# Dear Colleagues,

I want to share important guidance related to recent revisions to **System Policies 08.01** (Civil Rights Protections and Compliance) and **12.01** (Academic Freedom, Responsibility and Tenure). These changes have implications for course content, syllabi and our institutional guidance for review and approval.

Texas A&M University remains firmly committed to providing a rigorous, high-quality education to our students, preparing our graduates as responsible and engaged citizens ready for successful careers in a global economy. And that education must be grounded in academic freedom and academic responsibility. We rely on the expertise of our faculty, instructors and graduate teaching assistants to teach complex subjects with intellectual integrity, disciplinary rigor and respect for our students as learners. At the same time, we must ensure that our instructional materials and syllabi comply with state law and Texas A&M University System requirements.

To ensure compliance with these requirements, we will implement a two-phase process for syllabus and course review, as well as the transition to Simple Syllabus

(syllabus building platform). The first phase of this process will begin now with a syllabus and course review led by deans working with their departments. While this process is separate from the Texas A&M System ongoing review of fall 2025 course descriptions and syllabi, it will better prepare us for when a similar review is anticipated during the spring 2026 semester. The second phase will launch in fall 2026 with the transition to Simple Syllabus.

We have developed a comprehensive **Guidance and FAQs** on syllabus and course review expectations, key definitions, examples and timelines — along with information about the phased implementation process and the transition to Simple Syllabus beginning in fall 2026. This resource outlines:

- Clarifications on policy language, including how "advocacy" is defined in an instructional context.
- Expectations for the review of spring 2026 syllabi and the required verification processes at the department and college levels.
- Questions to guide faculty and department heads in determining the appropriateness of course content relative to level, discipline, learning outcomes and student expectations.
- Frequently asked questions regarding academic freedom, teaching sensitive or historically significant topics, student-selected work and classroom scenarios that may arise.

Because of the breadth and variation of courses taught across the university, individual situations may require contextual judgment. Faculty should continue to consult with their department head and dean as the first point of guidance. As we receive additional clarification from the System, we will share updates promptly.

**Guidance and FAQs on Syllabus Course Review**

For additional information, I encourage you to join me for the **Faculty Affairs virtual Faculty Conversation Café on Monday, Dec. 8, 4–5 p.m.**

Finally, I want to thank you all for your continued outstanding work and collaboration. I know we have experienced a significant amount of change, and you want and deserve clarity as we prepare for the upcoming semesters. The university is committed to that. We also recognize that meeting the expectations of these System policy revisions requires a considerable amount of focused work in a very compressed timeline. We are deeply appreciative of the professionalism, flexibility and care you bring to this effort. Your leadership in the classroom and your dedication to our students remain central to our mission and to the success of Texas A&M University.

Sincerely,

**Alan**

**Alan Sams**

*Provost and Executive Vice President*

**provost.tamu.edu**

You are receiving this official university correspondence, sent on behalf of *Texas A&M University Provost*, because you are either an incoming, current or former student, affiliate, staff or faculty member of Texas A&M University.

This email was sent to: **lbright@TAMU.EDU**

---

1248 TAMU Texas A&M University | College Station, TX 77843 US

**Mass Email Policy**

# Exhibit D

# GUIDANCE AND FAQS ON SYLLABUS COURSE REVIEW

*For System Policies 08.01 and 12.01*

*On This Page*

- General Overview
- Relevant System Policy Sections
- Key Definitions
- Classroom Context
- Phase I
- Questions to Guide Syllabi and Course Review
- Phase II
- Implementation of 08.01 and 12.01 Changes
- Frequently Asked Questions

## General Overview

Texas A&M University remains committed to delivering a rigorous and high-quality education to our students, preparing our graduates as responsible and engaged citizens ready for successful careers in a global economy. Moreover, we hold strong to our commitment to academic freedom and to academic responsibility. We have hired excellent faculty who are experts, the best in their fields, and we rely on them to bring that expertise to their teaching. Our faculty, instructors and graduate teaching assistants want to be good teachers and provide an excellent education to our students.

The purpose of this memo is to provide general guidance on course content and syllabi regarding recent System policy changes to **08.01 Civil Rights Protections and Compliance** and **12.01 Academic Freedom, Responsibility and Tenure** and to provide more clarity on key terms, timelines, and some frequently asked questions. With the wide variety of courses and subjects at our large and complex university, there undoubtedly will be the need for interpretation for individual situations. Faculty are first directed to seek feedback and advice from their department head and dean. As we continue to receive updates and clarifications from the System, it will be shared quickly with you.

## Relevant System Policy Sections

08.01 Civil Rights Protections and Compliance, Section 2.1.b: "…No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity, unless the course and the relevant course materials are approved in advance by the member CEO."

12.01 Academic Freedom, Responsibility and Tenure, Section 1.2 "…but a faculty member will not introduce a controversial matter that has no relation to the classroom subject or teach material that is inconsistent with the approved syllabus for the course.…"

## Key Definitions

**Advocate:** To advocate is to support or argue for a cause, policy, or group, or to plead in favor of it[1]; when teaching and course materials extend learning objectives in a way that requires students to hold certain beliefs, and/or to ridicule certain beliefs.

**Teach:** Imparting information or skill so that others may learn; to cause to know something; to cause to know how; to guide the study of; to instruct by precept, example, or experience.[1]

**Gender Ideology:** means a concept that self-assessed gender identity should replace the biological category of sex or that biological sex has less value or legitimacy than self-assessed gender identity.[2]

**Race Ideology:** means a concept that attempts to shame a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy or conspiracy, ascribe to them less value as contributors to society and public discourse because of their race or ethnicity, or assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world. This also includes course content that promotes activism on issues related to race or ethnicity, rather than academic instruction.[2]

---

1. *Merriam Webster Dictionary*
2. ***08.01 Civil Rights Protections and Compliance***

## Classroom Context

The revised policy does not preclude courses from covering topics such as slavery or the civil rights movement in an American history course, covering the Holocaust in a European history course, covering varying definitions and theories regarding gender identity in a course related to gender, or material on same sex relationships in a course on sexuality, as examples. However, race and gender ideology content in any course should have a curricular or professional purpose in the course of that level, be of an appropriate preponderance in the course material, and should be an expected component of such a course by the discipline/profession, and in general terms by a lay person and by the student based on their reading of the title and course description in the catalog.

What the policy does preclude is requiring or encouraging students to hold certain beliefs, particularly regarding gender or race ideology or sexual orientation, or to feel shame for belonging to certain racial or ethnic groups, due to historical practices associated with said groups, such as the treatment of people enslaved. Furthermore, the revised policy precludes the expectation or requirement for students to hold specific positions on policies related to gender or race ideology or sexual orientation. Race and gender ideologies should only be covered in courses of an appropriate level and in appropriate ways, meaning in compliance with the policy and the guiding considerations in this document. Forcing a student to accept/adopt certain beliefs as the way to get a certain grade is considered advocacy.

This is not to say that instructors cannot present concepts and theories that are contrary to what a student believes. One of the things universities need to do is challenge students to be critical thinkers who are able to understand the new and different, as well as understand how that information is used to form or evaluate new theories and ideas. Teaching students to know and understand contrary concepts and facts, rather than it becoming what they believe, is a common part of teaching and is the fine balance teachers and learners need to reach.

It is important to note that students also have a clear understanding of the meaning of advocacy and are able to discern it from teaching. Therefore, this concept will be added to student orientation information as well as other opportunities to build awareness.

## Phase I

*Syllabus Review: Spring Semester Courses, 2026 (as feasible[3])*

Deans are to work with departments to:

1. Verify the accuracy of the syllabus for each course to be offered in the spring 2026, semester; ensuring the syllabus is current and its content reflects the course description and learning outcomes for the course.[3]
2. Ensure compliance with **Texas Education Code Chapter 51.974 (HB 2504)** for all undergraduate (classroom) courses[4]
3. Reinforce to all instructors that there is to be one and only one official syllabus for each course and section
4. Verify consistency across sections for all multi-section courses. There should be a single course description and set of learning outcomes across sections.

Reviews of course syllabi should be undertaken with the relevant faculty at the department (or equivalent) level with written verification provided to the dean by the department head (or equivalent) upon completion. In the event inconsistencies or course topics or material advocating race or gender ideology or sexual orientation are identified, adjustments should be made or a justification for the appropriateness of the content (i.e., level of the course, professional requirements, etc.) is to be provided for review and approval by the dean, provost, and president, with all reviews and approvals completed by January 28, 2026. See the following questions in this document to guide the review of syllabi and course content. If there are questions about a course, faculty are encouraged to seek guidance from their department head or dean. The Vice Provost for Academic Affairs can also be consulted, if needed.

---

3. *Given the limited time prior to the spring semester, deans and department heads are asked to use their best judgement in terms of the ordering of syllabi for review. Consideration should be given to completing the review of undergraduate syllabi covering material related to gender or race ideology, or sexual orientation, core curriculum courses, or the syllabi for multi-section courses prior to the beginning of the spring 2026 semester.*

4. *Not including **standard courses**.*

## Questions to Guide Syllabi and Course Review

Faculty, department heads and deans are expected to use their best informed judgment in considering the following questions:

1. Is the course material (as summarized on the syllabus) appropriate for the level of the course? For example, undergraduate (core or non-core), graduate, or professional.
2. Are the course materials and topics/examples used consistent with the course description and the learning outcomes?
3. Are the course materials and topics/examples used consistent with the field of study and established body of knowledge in the discipline?
4. If the material addresses race or gender ideology or sexual orientation, is the course required for students to take or do they have alternative choices to meet graduation requirements?
5. Are the topics covered in the course essential for students to be prepared to enter their chosen profession? Would someone in that field need or be expected to know that information?
6. Are there any requirements or grade expectations where a student must adopt or affirm a particular belief, specifically as it pertains to race or gender ideology or sexual orientation?
7. Are the required materials clearly slanted toward a particular ideology in subject, preponderance or presentation?
8. Are topics or readings outlined on the syllabus consistent with students' or the public's expectations of what would be in the course (as per a non-expert's reading of the course description)?

   *For Multi-Section Courses:*

9. Are the course title, course description, and learning outcomes the same across sections of a multi-section course?
10. Who is responsible for ensuring that all sections are being properly coordinated and following the descriptions and learning outcomes?

## Phase II

*Syllabus Review: Preparation for AY2026-27*

Beginning with the fall 2026 semester, the plan is that all course syllabi will be approved and created through Simple Syllabus to ensure compliance with university, System, state and federal mandates. To assist in this endeavor, the soft launch of Simple Syllabus is already ongoing, with the expectation that all course syllabi will be created in Simple Syllabus as of the fall 2026. The full implementation of Simple Syllabus will ensure that public syllabi are the same as those provided to students via an automatic Canvas integration. The curriculum vitae module will also be adopted in Simple Syllabus removing the need for the Howdy system of pdf uploads to comply with Texas Education Code Chapter 51.974 (HB 2504). Syllabi will be able to be reviewed and approved in the Simple Syllabus system.

---

Provided by the Texas A&M University System

## Implementation of 08.01 and 12.01 Changes

## Frequently Asked Questions

**Should universities implement/improve their course and syllabus review process?** *Expand +*

**Should there be variance in what is taught (and approved) based on the level of the course?** *Expand +*

**Can faculty teach difficult and historically sensitive subjects, subjects that may evoke strong reactions?** *Expand +*

**What does it mean to "advocate?"** *Expand +*

**What happens when a class veers off the assigned material?** *Expand +*

**What happens if a faculty member chooses to teach material that has been reviewed and ruled inappropriate for that course or level?** *Expand +*

**Is the faculty member accountable for student led and student selected projects that may focus on gender ideology, sexual orientation, or gender identity?** *Expand +*

**Do these policy changes place limitations on faculty discussions outside of course instruction? Such as conversations between colleagues on matters of public concern?** *Expand +*



© 2025 Texas A&M University | Statement | Accessibility

# Exhibit E

Outlook

## Moving Out on New Guidance from the Provost

**From** Sherman, John Bradley <johnsherman92@tamu.edu>
**Date** Mon 12/8/2025 9:32 AM
**To** Sherman, John Bradley <johnsherman92@tamu.edu>

1 attachment (208 KB)
ASAMS Syllabus Review and Guidance Email;

Bush School Faculty,

I wanted to take a moment to follow up on the Provost's attached email from Friday. I know many of you have questions on how all this will be implemented, and the leadership team and I are committed to working with you on the details of how we get this rolled out within our school.

**We'll need to review syllabi for courses that you will be teaching in Spring 2026 to ensure everything is accurate and aligns with existing course descriptions.** I know this is extra work on top of what you're already doing, and I appreciate your attention on this set of tasks. I'll need to affirm to the Provost by 28 January that we have reviewed and updated our syllabi for the spring semester. Your Department Head will be communicating deadlines to you and working through any specifics so that they can affirm to me *well before* my review. The section titled "Phase 1" of the syllabi review lays out the steps and considerations of what we'll need to do, and I'm certain that many of you will have questions. For example, if there's a mismatch between the existing course description—which we cannot change right now—and the syllabus, then you're going to need to update the syllabus. I suspect this will not be a widespread issue here, but there might be a handful of courses with dated descriptions and/or syllabi that we'll need to address. As you proceed on this review, please raise questions to your Department Heads and we'll work through them.

You will also note in the Provost's email that there are several Q&A's. **While there are indeed additional considerations about course content, I want you to focus as well on the breadth of topics that you *can* teach.** The list is extensive and includes issues that are critical to understanding the areas you cover in our three departments.

**There will be some specific material and course content that we might need to review, and we'll be thoughtful and collaborative with how we approach this.** I get it that this is a new process that might cause concern, and I want to thank you in advance for helping us navigate these tough issues.

**Finally, there are the issues of advocacy versus teaching.** I will defer to the definitions and explanations in the Provost's guidance. Suffice it to say, I'm betting that many of us know—or at least have an intuition—when we're beginning to advocate for something vice informing and teaching. It's important that we be aware of the difference and proceed accordingly. While advocacy on some issues (i.e., academic honesty and mental health) is an essential part of our work, the current guidance encourages some extra deliberation in how we approach more complex issues.

**I can't tell you how much I appreciate your willingness to hang in there and adapt to and move out on this new guidance.** You and your expertise are what makes our world-class instruction and research possible, and why our students continue to be ready to serve at all different levels of public service.

Thank you.

Best,

John

P.S. If you're able, I would encourage you to tune in to the virtual meeting that the Provost is hosting today in the **Faculty Affairs virtual Faculty Conversation Café on Monday, Dec. 8, 4–5 p.m.**

# Exhibit F

Outlook

## RE: syllabus review

**From** Bright, Leonard <lbright@tamu.edu>
**Date** Mon 1/12/2026 11:28 AM
**To** Taylor, Lori <lltaylor@tamu.edu>
**Cc** Brown, William A <wbrown@tamu.edu>; Marchbanks III, Miner P <marchbanks@tamu.edu>; Lippard, Elaine A <elippard@tamu.edu>; Leonard Bright <drleonardbright@hotmail.com>; 'tamuaaup@hotmail.com' <tamuaaup@hotmail.com>

Dr. Taylor,

I recognize your professional obligations and expect reciprocal respect for mine, including my responsibility to design and deliver graduate-level instruction consistent with disciplinary standards and academic freedom.

The determination that the Week 5 readings are not essential because they were not previously assigned is not a defensible academic criterion. Graduate education is not static, and faculty routinely revise readings to reflect current scholarship, professional norms, and real-world challenges. In public service education, equity, social justice, and administrative ethics are widely recognized as core competencies, not optional or ancillary topics.

The reliance on Item 9 and the supplied definition of "advocacy" is particularly troubling. The course does not require students to hold, affirm, or renounce any belief, nor does it penalize students for their views. The materials are analytical and scholarly in nature. The standard being applied here is not whether advocacy occurs, but whether students could subjectively perceive advocacy despite explicit assurances to the contrary. That is not a workable academic standard and effectively collapses the distinction between teaching and indoctrination.

The assertion that the course must be altered or canceled absent an exemption—despite no finding of actual advocacy—raises serious concerns about viewpoint discrimination, prior restraint, and the chilling of constitutionally protected academic speech. It also places faculty in the untenable position of defending standard disciplinary content against speculative interpretations rather than demonstrable policy violations.

Let me state this clearly:

1. The course does not engage in advocacy as defined.
2. Students are evaluated on analysis, not belief.
3. Exposure to contested ideas is a required element of graduate education in this field.

As a result, I will not seek an exemption because the course does not engage in advocacy as defined by policy, I have no wish to have "approval" to "advocate" for race or gender ideology as defined, and requesting one would mischaracterize standard graduate instruction as presumptively noncompliant.

Leonard Bright, PhD
Professor
Bush School of Government

Texas A&M University, College Station
979-862-3028

Follow me @ www.drleonardbright.com, YouTube, LinkedIn, & X (Twitter)

TEXAS A&M UNIVERSITY
The Bush School
of Government & Public Service

---

**From:** Taylor, Lori <lltaylor@tamu.edu>
**Sent:** Monday, January 12, 2026 9:48 AM
**To:** Bright, Leonard <lbright@tamu.edu>
**Cc:** Brown, William A <wbrown@tamu.edu>; Marchbanks III, Miner P <marchbanks@tamu.edu>; Lippard, Elaine A <elippard@tamu.edu>
**Subject:** RE: syllabus review

Dear Dr. Bright-

I recognize and respect your professional obligations, as I am sure you do mine. In my required review of your syllabus, I identified some of the readings from Week 5: Equity, Social Justice, and Administrative Ethics, as appearing to be covered under system policy 08-01. I then followed the matrix provided by TAMU regarding how to handle the situation. I have previously provided that matrix, but have attached it again.

Item 5 on the matrix asks: "Are topics (especially controversial ones) covered in the course essential for students to be prepared to enter their profession or discipline? Would someone in that field need or be expected to know that information?" and indicates that if the answer is "no" then faculty and departmental leadership should be able to justify the educational value of topics that are not essential. It is clear that material covered under System Policy 08-01 is controversial. Given that you did not include most of the Week 5 readings when you have taught this class in the past, I could not conclude that the material was essential and therefore requested your assistance in providing a justification.

Item 9 on the matrix asks "Does the course content include material that relates to race ideology, gender ideology, or sexual orientation?" and indicates that if the answer is "yes" then additional review should be done. The readings from Week 5 clearly qualify for additional review. That additional review asks two questions for graduate courses (see the attached matrix) and the following definition was provided to me to use when applying the first part of question 2 (is there advocacy?).

> "To Advocate is when teaching and course materials extend learning objectives in a way that requires students to hold certain beliefs, and/or to ridicule certain beliefs. For examples in this context, to advocate is:
> o To lead, encourage, or require a student to feel personal shame over treatment of slaves in America; or conversely, to justify slavery in America as acceptable.
> o To lead, encourage, or require students to hold certain beliefs on same sex relationships or criticize/ridicule their beliefs on such relationships; or conversely, to criticize/ridicule or shame individuals who are in same sex relationships or are supportive of same sex relationships.
> o To lead, encourage, or require students to hold certain beliefs on gender identity whether the required belief is in two genders assigned at birth, or belief in many self-identified genders.
> o To lead, encourage, or require students to adhere to or embrace a specific religion, any religion, or no religion.

- To lead, encourage, or require students to hold specific positions on political policies and actions, or ridicule those who may believe certain positions.

  Students' beliefs on these matters (among others) will vary. The faculty can, should, and must teach difficult subjects for the students to know and understand different perspectives, but not for the student to hold specific beliefs on those subjects for purposes of grading, nor may students be ridiculed for holding beliefs contrary to that of others."

I believe the final example is the most germane because of the risk that students could interpret a faculty member's comments or reading assignments as leading or encouraging them to hold specific positions on political policies and actions, even if the faculty member has clearly and explicitly indicated that students are not required to hold such positions.

The PSAA curriculum committee agreed with my assessment that an exemption should be sought for this course. Therefore, I requested your assistance in crafting the justification for such an exemption. As previously indicated, please provide me with your preferred wording for such a justification by COB on Monday, January 12, 2026.

It is my understanding that if an exemption is not granted, then you will need to either remove the readings in question or we will need to cancel the course and you and I will identify alternative duties for you this spring.

Best,

Lori L. Taylor
Professor and Head, Department of Public Service and Administration
Joe R. and Teresa Lozano Long Chair in Business and Government
Bush School of Government and Public Service
2063 ALLN | College Station, TX 77843-0000
ph: 979.458.3015 | lltaylor@tamu.edu

TEXAS A&M UNIVERSITY
The Bush School
of Government & Public Service

---

**From:** Bright, Leonard <lbright@tamu.edu>
**Sent:** Friday, January 09, 2026 6:24 PM
**To:** Taylor, Lori <lltaylor@tamu.edu>
**Cc:** Brown, William A <wbrown@tamu.edu>; Marchbanks III, Miner P <marchbanks@tamu.edu>; Lippard, Elaine A <elippard@tamu.edu>
**Subject:** Re: syllabus review

Dr. Taylor

I received your determination regarding my PSAA 640 Ethics course. I am writing to request formal clarification as to how you reached your determination as well as the scope and application of Texas A&M University policies and administrative guidance concerning race and

gender ideology as they apply to my courses. System policy 08.01 Civil Rights Protections and Compliance defines gender and race ideology as the following:

> *Gender Ideology – means a concept that self-assessed gender identity should replace the biological category of sex or that biological sex has less value or legitimacy than self-assessed gender identity.*
>
> *Race Ideology – means a concept that attempts to shame a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy or conspiracy, ascribe to them less value as contributors to society and public discourse because of their race or ethnicity, or assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world. This also includes course content that promotes activism on issues related to race or ethnicity, rather than academic instruction.*

System policy 08.01 2.1, further states that "*No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity.*"

As a tenured faculty member, I have a contractual and professional obligation to exercise independent academic judgment in the design and delivery of course content, consistent with established disciplinary standards and the university's stated commitments to academic freedom. At present, however, the relevant policy language and associated guidance are insufficiently specific to permit compliance with reasonable certainty. For example, there is no clear definition of the prohibited conduct such as "*advocating*" gender or race ideology as defined by system policy. There is no guidance that has been provided to me by the department, college, nor university.

In particular, key terms, prohibitions, and enforcement standards appear undefined or indeterminate, leaving unclear which instructional content or pedagogical approaches are considered impermissible when topics related to race, gender, or sexuality are presented for scholarly, historical, or critical examination. This lack of clarity creates a material risk of inconsistent application and inadvertent adverse consequences for faculty acting in good faith.

Accordingly, I respectfully request written clarification on the following as they apply to my courses:

- The specific instructional conduct or content that is prohibited, if any.
- The definition of "*advocacy*", its distinction from "*teaching*" with examples.
- Whether the presentation of contested, competing, or critical scholarly theories for pedagogical purposes constitutes a policy violation.
- The criteria used to evaluate academic context, disciplinary norms, and pedagogical intent in determining compliance.
- The mechanism by which interpretations of this policy are reviewed, approved, and applied consistently across units.
- The appeals process granted me for a neutral outside party to review your decision

I further request confirmation as to whether deviation from an administrative interpretation of this policy—absent any formal finding of misconduct, incompetence, or neglect of duty—may result in adverse employment actions, including but not limited to course cancellation, negative evaluation, limitations on teaching assignments, or implications for post-tenure review, and/or termination.

This request is made to document my good-faith effort to comply with university policy while preserving my tenure-protected rights and professional obligations. I respectfully ask that this

clarification be provided in writing so that the record accurately reflects both the guidance received and my reliance upon it.

Thank you for your attention to this matter. I look forward to your response.

Leonard Bright, PhD
Professor
Bush School of Government
Texas A&M University, College Station
979-862-3028

Follow me @ www.drleonardbright.com, YouTube, LinkedIn, & X (Twitter)

TEXAS A&M UNIVERSITY
The Bush School
of Government & Public Service

---

**From:** Taylor, Lori <lltaylor@tamu.edu>
**Sent:** Friday, January 9, 2026 3:17 PM
**To:** Bright, Leonard <lbright@tamu.edu>
**Cc:** Brown, William A <wbrown@tamu.edu>; Marchbanks III, Miner P <marchbanks@tamu.edu>; Lippard, Elaine A <elippard@tamu.edu>
**Subject:** syllabus review

Dear Dr. Bright-

As you know, I have been tasked with a syllabus review for all our department's spring 2026 courses with respect to system rule 8.01 (https://policies.tamus.edu/08-01.pdf ). I have consulted with the curriculum committee regarding your syllabus for PSAA 642, and they concur with my belief that the course content includes material that relates to race ideology, gender ideology, or sexual orientation. Given the breadth of the university's working definition of advocacy and presuming that you want to include these aspects in the course, we believe that we should seek an exemption under the rule. Therefore we will need to provide a justification demonstrating the necessary educational purpose for the inclusion of these materials.

The dean's deadline for submitting such justifications is tight. Would you please provide me with your preferred wording for such a justification by COB on Monday, January 12, 2026?

In your justification, please include the following information:

- How are topics covered in the course essential for students to be prepared to enter their profession? What is the evidence that someone in that field needs or would be expected to know the information?
- How are topics covered in the course consistent with the expected body of knowledge in the discipline?
- Why is advocacy essential for this course?
- Is this content required for accreditation purposes (relevant accrediting body and requirement citation needed)?

Please let me know if you have any questions.

Thank you,

Lori

Lori L. Taylor
Professor and Head, Department of Public Service and Administration
Joe R. and Teresa Lozano Long Chair in Business and Government

Bush School of Government and Public Service
2063 ALLN | College Station, TX 77843-0000
ph: 979.458.3015 | lltaylor@tamu.edu

TEXAS A&M UNIVERSITY
The Bush School
of Government & Public Service

# Exhibit G

Outlook

## FW: Exemption Review on Two of Your Courses

**From** Sherman, John Bradley <johnsherman92@tamu.edu>
**Date** Wed 1/14/2026 9:55 AM
**To** Bright, Leonard <lbright@tamu.edu>
**Cc** Escobar-Lemmon, Maria <m_escobar@tamu.edu>; Taylor, Lori <lltaylor@tamu.edu>; Shandley, Robert R <r-shandley@tamu.edu>; Dorsey, Leroy G <l-dorsey@tamu.edu>; Marchbanks III, Miner P <marchbanks@tamu.edu>

Dear Dr. Bright,

You have made it clear that you are not willing to provide necessary information required for us to submit an exemption request for your course (PSAA 642). Absent such an exemption, I have no choice but to direct the course's cancellation, which will be effective immediately. To say this gives me no pleasure is an understatement. To be clear, transparency does not equate to censorship. And I truly regret the impact of this cancellation on the nine students in your course.

Dr. Taylor will work with you to identify alternative duties for the spring semester. We are also actively working to assist those students who were registered for PSAA 642 to find alternative courses that suit their academic goals.

Respectfully,

John

---

**From:** Bright, Leonard <lbright@tamu.edu>
**Sent:** Tuesday, January 13, 2026 12:11 PM
**To:** Sherman, John Bradley <johnsherman92@tamu.edu>
**Cc:** Taylor, Lori <lltaylor@tamu.edu>; Escobar-Lemmon, Maria <m_escobar@tamu.edu>; Shandley, Robert R <r-shandley@tamu.edu>; Dorsey, Leroy G <l-dorsey@tamu.edu>; Smith, Sonny <so-smith@tamu.edu>; Marchbanks III, Miner P <marchbanks@tamu.edu>; Johnson, Michael D <mdjohnson@tamu.edu>; Dorsey, Alicia M <amdorsey@tamu.edu>; 'tamuaap@hotmail.com' <tamuaap@hotmail.com>
**Subject:** RE: Exemption Review on Two of Your Courses

Dean Sherman,

As I previously stated, the topics of race, gender, and sexuality will be addressed throughout the course as relevant to the subject matter, including through assigned readings, current-event analyses, book reviews, written assignments, and classroom discussion. At no point does the course require students to adopt, affirm, or reject particular beliefs regarding these topics. Students are evaluated solely on analytical rigor, use of evidence, and professional engagement.

Please let me know your final decision, so that I can prepare my next steps.

Leonard Bright, PhD
Professor

Bush School of Government
Texas A&M University, College Station
979-862-3028

Follow me @ www.drleonardbright.com, YouTube, LinkedIn, & X (Twitter)

TEXAS A&M UNIVERSITY
The Bush School
of Government & Public Service

---

**From:** Sherman, John Bradley <johnsherman92@tamu.edu>
**Sent:** Tuesday, January 13, 2026 11:49 AM
**To:** Bright, Leonard <lbright@tamu.edu>
**Cc:** Taylor, Lori <lltaylor@tamu.edu>; Escobar-Lemmon, Maria <m_escobar@tamu.edu>; Shandley, Robert R <r-shandley@tamu.edu>; Dorsey, Leroy G <l-dorsey@tamu.edu>; Smith, Sonny <so-smith@tamu.edu>; Marchbanks III, Miner P <marchbanks@tamu.edu>; Johnson, Michael D <mdjohnson@tamu.edu>; Dorsey, Alicia M <amdorsey@tamu.edu>
**Subject:** RE: Exemption Review on Two of Your Courses

Dr. Bright,

Based on your response below, it is not possible to determine the extent to which you intend to introduce topics of sexual orientation into your curriculum. **This specificity is necessary for the required exemption.** As stated in TAMUS 08.01:

*No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity. Upon prior written approval of the member CEO after review of the course and relevant course materials, specific non-core curriculum or graduate courses in some disciplines may teach race or gender ideology, or topics related to sexual orientation or gender identity. Such approval may be granted in limited circumstances upon demonstration of a necessary educational purpose.*

**Absent an exemption, I will not authorize continuation of this course.**

Please advise if you wish to modify your response and indicate how and where you intend to cover the topic of sexual orientation in this course so we can assess whether to endorse and submit an exemption request.

Best,

John

---

**From:** Bright, Leonard <lbright@tamu.edu>
**Sent:** Tuesday, January 13, 2026 10:21 AM
**To:** Sherman, John Bradley <johnsherman92@tamu.edu>
**Cc:** Taylor, Lori <lltaylor@tamu.edu>; Escobar-Lemmon, Maria <m_escobar@tamu.edu>; Shandley, Robert R <r-shandley@tamu.edu>; Dorsey, Leroy G <l-dorsey@tamu.edu>; Smith, Sonny <so-smith@tamu.edu>; Marchbanks III, Miner P <marchbanks@tamu.edu>; tamuaaup@hotmail.com
**Subject:** RE: Exemption Review on Two of Your Courses

Dean Sherman,

I have received your reply. As I stated in the syllabus for the purpose of transparency and to protect my responsibility, PSAA 642 examines:

> *"A range of theories, empirical research, and policy debates addressing the impact of race, gender, religion, sexual orientation, and other social identities on public policy and the professional ethical responsibilities of public servants. These topics are examined for purposes of scholarly analysis, professional development, and critical evaluation of public administration practice. In the course of instruction, I may share my own professional perspectives on issues related to course content and matters of public concern. Any such perspectives are offered solely for educational purposes and do not represent the official positions or views of Texas A&M University or any affiliated institution. Students are not expected to agree with the instructor's perspectives, and respectful disagreement and critical engagement are explicitly welcomed and encouraged."*

Based on my professional judgment and disciplinary expertise, issues of race, gender, and sexuality are not peripheral but integral to the study of administrative ethics and public service. Because PSAA 642 is a graduate-level, discussion-centered course, it is neither possible nor pedagogically appropriate to specify with certainty the precise timing or manner in which these topics may arise. These issues may be addressed throughout the course as relevant to the subject matter, including through assigned readings, current-event analyses, book reviews, written assignments, and classroom discussion. At no point does the course require students to adopt, affirm, or reject particular beliefs regarding these topics. Students are evaluated solely on analytical rigor, use of evidence, and professional engagement. The course therefore complies with applicable professional definitions of scholarly graduate level instruction.

This statement is provided to clarify the nature of the course content and to ensure an accurate record of instructional intent and practice.

Leonard Bright, PhD
Professor
Bush School of Government
Texas A&M University, College Station
979-862-3028

Follow me @ www.drleonardbright.com, YouTube, LinkedIn, & X (Twitter)

TEXAS A&M UNIVERSITY
The Bush School
of Government & Public Service

---

**From:** Sherman, John Bradley <johnsherman92@tamu.edu>
**Sent:** Tuesday, January 13, 2026 9:34 AM
**To:** Bright, Leonard <lbright@tamu.edu>
**Cc:** Taylor, Lori <lltaylor@tamu.edu>; Escobar-Lemmon, Maria <m_escobar@tamu.edu>; Shandley, Robert R <r-shandley@tamu.edu>; Dorsey, Leroy G <l-dorsey@tamu.edu>; Smith, Sonny <so-smith@tamu.edu>; Marchbanks III, Miner P <marchbanks@tamu.edu>
**Subject:** Exemption Review on Two of Your Courses

Dr. Bright,

Based on input from your department, informed by a review by the PSAA Curriculum Committee, we sent the syllabi for four courses to VPAA yesterday for an opinion on whether they will require an exemption. Two of these courses were ones you are teaching this semester, and VPAA highlighted the following:

For PSAA 601, which you and Sonny Smith (CCed) are both teaching, one of your assigned readings by Guy and Fendley titled "Inch by Inch: Gender Equity Since the Civil Rights Act of 1964," there are two paragraphs at the end of the article dealing with gender identity and sexual orientation. Based on feedback from VPAA, the inclusion of this reading will require an exemption request, which we will support given the scholarly nature of the work and the applicability of the reading to the course objectives. We will notify VPAA this afternoon that we will seek this exemption unless you opt to exclude this text from the curriculum.

For PSAA 642, which you are also teaching, VPAA notes that you make reference to sexual orientation in the Academic Freedom statement you include in the syllabus, but that it is not clear where such discussion will occur during the course. Please identify in the syllabus where the topic of sexual orientation will be covered through discussion or course readings. If it exists as such, then VPAA notes that an exemption will be required. We will submit such an exemption to VPAA this afternoon unless you opt to exclude this topic voluntarily. Likewise, if this topic is only included in the Academic Freedom statement but will not be covered in the course, then VPAA notes that references to sexual orientation must be removed from your Academic Freedom statement.

Additionally, regarding the material that you plan to cover in week 5 of the course in the section titled "Equity, Social Justice, and Administrative Ethics," VPAA notes that this topic will not require an exemption as long as you reiterate that you are not advocating or seeking to make students believe certain things. As dean, I expect you to abide closely by this guidance. Thank you.

Please let me know if you have any questions.

Best,

John

# Exhibit H

# Bush School of Government and Public Service

## Public Service and Administration

## PSAA 642 Syllabus

Section 601 (31738)
Ethics and Public Policy
Spring 2026 - College Station

## Course Information

**Meeting Times:** Meeting Type: LEC
Meeting Days: M
Start Time: 08:30AM
End Time: 11:20AM
Start Date: 01/12/2026
End Date: 05/05/2026
**Meeting Location:** ALLN 1041

**Credit Hours:** 3

## Instructor Details

Leonard Bright
**Email:** lbright@tamu.edu
**Office Location:** 2061
**Phone:** 9798623028
**Office Hours**
By Appointment and Open Door

## Catalog Description

Ethics and Public Policy. (3-0). Credit 3. Theory and practice for analyzing and responding to the ethical responsibilities and dilemmas for professional conduct; ethical dimensions of analysis and decision making for policy makers and public administrators. Prerequisites: Graduate classification and approval of MPSA or MPIA director.

## Course Prerequisites

**Prerequisite/Corequisite(s):** Graduate classification and approval of MPSA or MPIA director.

## Course Learning Outcomes

### Professional Perspective and Academic Freedom Statement

This course examines a range of theories, empirical research, and policy debates addressing the impact of race, gender, religion, sexual orientation, and other social identities on public policy and the professional ethical responsibilities of public servants. These topics are approached for the purpose of scholarly analysis, professional development, and critical evaluation of public administration practice.

In the course of instruction, I may share my own professional perspectives on issues related to the course content and matters of public concern. These views are offered for educational purposes only and do not represent the official positions or views of Texas A&M University or any affiliated institution. Students are not expected to agree with the instructor's professional perspectives, and respectful disagreement and critical engagement are welcomed and encouraged.

Upon completion of this course, the learner will be able to:

- Apply ethical frameworks to administrative decision-making
    - Identify ethical dilemmas in public organizations

- Balance efficiency, equity, legality, and accountability
- Demonstrate professional ethical judgment
- Communicate ethical analyses effectively

## Special Course Designation

None

## Textbook and/or Resource Materials

**This material Is: Required**
Cooper, The Responsible Administrator

**This material Is: Required**
Other readings assigned are available online through TAMU's library, Canvas, or Amazon.

## Grading Policy

### Grading Scale

90 – 100 A: Demonstrates consistently exceptional performance. Demonstrates a clear, thorough understanding of the material. Assignments are professional, clear, substantive, and well written.

80 – 89.99 B: Meets requirements of the course. Solid performance demonstrates proficiency and understanding of the material. Assignments are written and edited at a level that is acceptable.

70 – 79.99 C: Demonstrates a minimal understanding of the material or satisfies the minimal requirements of assignments. Assignments may be poorly written or edited, or their logic may befaulty. Quality of work may be uneven.

60 – 69.99 D: Performance indicates a substandard understanding of the material. Most assignments lack the quality that is expected of a student in graduate school. Research is inadequate, as is thepresentation of the ideas orally or in writing.

< 60 F: Checked Out!

## Assignments

**Case Study Memos (60%)**

Public servants are routinely called upon act ethically and provide advice and counsel to agency executives and politicians regarding critical policy and administrative issues. With this in mind, students will provide a 2-3 page written response to several ethics and policy cases presented in class. These responses should identify the core administrative/ethic issue(s), diagnose the social, political, and/oradministrative cause(s) using concepts from the class, and provide a set of recommendations foraddressing the issues. See Canvas for additional instructions and due dates.

**Group Case Study Development (10%)**

Student will work as a group to develop an original case study that explores an ethical dilemma and present it to the class. The analysis of this case study should explain how this case qualifies as an ethical problem in public service, why this issue is important, what does it teach us, what implications does this problem pose, and why is this case a model for what WE should orshould not do in similar situations? See Canvas Assignments for additional instructions and due dates.

**Individual Assignments/Projects (20%)**

Ethical Courage or Wrongdoing Analysis:

Each student will identify an individual public official, a civil servant, political appointee or elected official, or nonprofit manager, who has taken an ethical stance orfailed to do so, “blown the whistle” on wrongdoing, or is otherwise an example of what to do or not to do. While students can use an individual who has committed an illegal act, more interesting examples arethose which have ethical bearings exclusively. This analysis should explain

why this individual's actsserve as models for what WE should or should not do. See Canvas Assignments for additional instructions and due dates.

Book Review:

Each student will be assigned a book to review for this class. The purpose of this book review is to summarize the content of the book, and evaluate critically the author's purpose, thesis, contentions, and methods of analysis. Hence, the bulk of the body of the review essay will be on what you learned from reading the book, how convincing was the author's presentation of his/her thesis, a commentary on the book's contribution to your understanding of the influence of personal bias/blindspots on ethical conduct in public affairs organizations and decision making.See Canvas Assignments for additional instructions and due dates.

**Attendance and Participation (10%)**

Attendance and participation: This grading dimension will measure class attendance and quality (not quantity) of classroom engagement. Quality engagement is only possible when students read all assigned readings prior to the start of the class and engage in the class when they attend.See Canvas Assignments for additional instructions and due dates.

Weekly Current Events:

Students are encouraged to post and analyze various newspaper accounts (or pictures) of possible ethics dilemmas in a government or nonprofit organizations from major new ssources such as Washington Post, Los Angeles Times, New York Times, Wall Street Journal, MotherJones, TheGrio, CNN and etc. throughout the term. The news articles must highlight either an ethical ssue/problem or commentary on the current state of ethics in the organization. Last minute uploads of multiple articles towards the end of the semester will not receive full credit. See Canvas Assignments for additional instructions and due dates.

Discussion Questions: From time to time, discussion topics will be posted on Canvas. Students are required to post an original response and offer additional comments to the

responses of at least two other classmates.See Canvas Assignments for additional instructions and due dates.

## Late Work Policy

Work submitted by a student as makeup work for an excused absence is not considered late work and is exempt from the late work policy (Student Rule 7).

## Course Specific Late Work Policy

Late work is any assignment turned in after the deadline without an official documented university excuse (See TAMU Student Rule 7). Be sure to adhere to all the course deadlines. Late work will receive a 10% penalty each day it is late. The late days/hours late will be rounded up to the next whole number. For example, if a student submits an assignment 1.3 days late, the late penalty will treat the student as 2 days late.

## Course Schedule

Week 1, January 12: Introduction to the Course

Adams and Balfour Introduction

Cooper Chapter 1

Week 2, January 19: MLK Day: No Class

Week 3, January 26: The Ethical Analysis Framework

Cooper Chapter 2

Graham (2004) Ethics, Truth, and Reason

Waldo (1955) The Value Problem in Public Administration

Week 4, Feburary 2: Ethics and the Law

Schleef (1997) Empty Ethics and Reasonable Responsibility

Horner (2003) Morality, Ethics, and Law Introductory Concepts

Wendel, W. B. (2005). Legal ethics and the separation of law and morals.

Week 5, February 9: Equity, Social Justice, and Administrative Ethics

Ellis (2025) What is DEI and Why is it Dividing America?

Delgado and Stefancic (1998) Critical Race Theory, Past, Present, and Future

Dixson and Anderson (2018)Where are We Critical Race Theory in Education 20 Years Later

Rawls, A Theory of Justice

Week 6, February 16: Ethics in Public Administration Theory

Adams and Balfour Chapter 1

Locke (1995) Ethics in American Government: A Look Backward

Richardson & Nigro (1987) Administrative Ethics and Founding Thought

Bailey (1964) Ethics and the Public Service.

Wakefield (1976) Ethics and the Public Service: A Case for Individual Responsibility

Public Administration Review (1993). Forum: Public Administration and the Constitution. Read articles by: Spicer and Terry, Rohr, Stivers, Wise and Lowi.

Week 7, February 23: Postmodernity and Ethics

Adams and Balfour Chapter 2

Cooper Chapter 3

Rosenbloom (1983) Public Administrative Theory and the Separation of Powers

Business Ethics as a Postmodern Phenomenon

Week 8, March 2: Public Sector Leadership and Moral Responsibility

Cooper Chapter 4

Frederickson and Hart (1985). The Public Service and the Patriotism of Benevolence.

Den Hartog (2015) Ethical Leadership

Week 9, March 9: **Spring Break: No Class**

Week 10, March 16: Ethics of Public Personnel Management

Adams and Balfour Chapter 3

Cooper Chapter 5

Bruce (2002). Personal Ethics and Administrative Action

GBES (2021) State of Ethics and Compliance in the Workplace

ERC (2013): Generational Differences in Workplace Ethics

Trevino, Hartman and Brown (2000). Moral Person and Moral Manager

Week 11, March 23: Organizational Rationality and the Masks of Administrative Evil

Adams and Balfour Chapter 8

Copper Chapters 6-8

Robinson (2007) Ethics Training and Development in the Military

Cook (2008) Revolt of the Generals: A Case Study in Professional Ethics

Hoffman et al. (2012) Ten Masks of Administrative Evil

Ethical Courage or Wrongdoing Analysis Due

Week 12, March 30: Ethics and Public Policy Issues

Adams and Balfour Chapters 6 & 7

Jamieson (1992) Ethics, Public Policy, and Global Warming

Walters (1991) Human Gene Therapy. Ethics and Public Policy

Finn and Wright (2012). Unmanned Aircraft Systems: Surveillance, Ethics, and Privacy

Hardell & Carlberg (2020) Health Risks From Radiofrequency Radiation.

Eubanks (2018) Automating Inequality

Marwala (2025) The Algorithmic Problem in Artificial Intelligence Governance

Week 13, April 6: Civility and The Ethical Practice of Lying

Civility in America Report

Barber (2020). Lying, Misleading, and Dishonesty

Pasquerella & Killilea (2005). The Ethics of Lying in the Public Interest

Richard, Lajeunesse, Lussier (2010). Therapeutic Privilege

Week 14, April 13: Politics and Corruption

Gilman (1995). Presidential Ethics and Ethics of the Presidency

Newbold (2005). Statesmanship and Ethics

Carolyn Ball (2009). What is Transparency?

Heumann, et al (2014) The World of Whistleblowing

Pfiffner (2005). Torture and Public Policy

Week 15, April 20: Codes of Ethics

Chandler (1983) The Problem of Moral Reasoning in American Public Administration

Bowman and Knox (2008). Ethics in Government

Blake, et al. (1998) The Nature and Scope of State Government Ethics Codes

Svara (2014) Who are the Keepers of the Code?

Bromley and Orchard (2016) Managed Morality

Odeh (2023) Professional Codes of Ethics for Public Administrators: What Are They Really Telling Us?

OECD Public Integrity Handbook

Week 16, April 27: Conclusion of Class

## Additional Course Information

### Professional Perspective and Academic Freedom Statement

This course examines a range of ethical theories, empirical research, and policy debates addressing the impact of race, gender, religion, sexual orientation, and other social identities on public policy and the professional responsibilities of public servants. These topics are approached for the purpose of scholarly analysis, professional development, and critical evaluation of public administration practice.

In the course of instruction, I may share my own professional perspectives on issues related to the course content and matters of public concern. These views are offered for educational purposes only and do not represent the official positions or views of Texas A&M University or any affiliated institution. Students are not expected to agree with the instructor's professional perspectives, and respectful disagreement and critical engagement are welcomed and encouraged.

## AI Statement

According to the Texas A&M University Definitions of Academic Misconduct, plagiarism is the appropriation of another person's ideas, processes, results or words without giving appropriate credit (**aggiehonor.tamu.edu**). You should credit your use of anyone else's words, graphic images, or ideas using standard citation styles. Artificial Intelligence (AI) text generators and natural language processing tools (colloquially, chatbots - such as ChatGPT), audio, computer code, video, and image generators should not be used for

any work for this class without explicit permission of the instructor and appropriate attribution. This includes, but is not limited to:

- Creating or revising drafts
- iEditing your work
- Reviewing a peer's work

This policy excludes pre-existing software additions such as spelling and grammar checkers, which are acceptable.

## Technology Support

### Technology Services (IT) - Main Campus

Hours: 24/7
Phone: (979) 845-8300
Email: helpdesk@tamu.edu
Call/Chat/Email/visit: https://it.tamu.edu/help

### Canvas LMS Technical Support

Hours: 24/7/365
Phone: (877) 354-4821
Email: support@instructure.com

Support is available by clicking the Help button at the far left in the Canvas global navigation menu.
Canvas Resources are also linked on the home page of every Canvas course.

## University Policies

This section outlines the university-level policies that must be included in each course syllabus. The TAMU Faculty Advisory Council established the wording of these policies.

## Academic Integrity Statement and Policy

*"An Aggie does not lie, cheat or steal, or tolerate those who do."*

"Texas A&M University students are responsible for authenticating all work submitted to an instructor. If asked, students must be able to produce proof that the item submitted is indeed the work of that student. Students must keep appropriate records at all times. The inability to authenticate one's work, should the instructor request it, may be sufficient grounds to initiate an academic misconduct case" (Section 20.1.2.3, Student Rule 20).

You can learn more about the Aggie Honor System Office Rules and Procedures, academic integrity, and your rights and responsibilities at aggiehonor.tamu.edu.

## University Attendance Policy

The university views class attendance and participation as an individual student responsibility. Students are expected to attend class and to complete all assignments.

Please refer to Student Rule 7 in its entirety for information about excused absences, including definitions, and related documentation and timelines.

## Makeup Work Policy

Students will be excused from attending class on the day of a graded activity or when attendance contributes to a student's grade, for the reasons stated in Student Rule 7, or other reason deemed appropriate by the instructor.

Please refer to Student Rule 7 in its entirety for information about makeup work, including definitions, and related documentation and timelines.

Absences related to Title IX of the Education Amendments of 1972 may necessitate a period of more than 30 days for make-up work, and the timeframe for make-up work should be agreed upon by the student and instructor" (Student Rule 7, Section 7.4.1).

"The instructor is under no obligation to provide an opportunity for the student to make up work missed because of an unexcused absence" (Student Rule 7, Section 7.4.2).

Students who request an excused absence are expected to uphold the Aggie Honor Code and Student Conduct Code. (See Student Rule 24.)

## Notice of Nondiscrimination

Texas A&M University is committed to providing safe and non-discriminatory learning, living, and work environments for all members of the University community. The University provides equal opportunity to all employees, students, applicants for employment or admission, and the public, regardless of race, color, sex (including pregnancy and related conditions), religion, national origin, age, disability, genetic information, or veteran status.

Texas A&M University will promptly, thoroughly, and fairly investigate and resolve all complaints of discrimination, harassment (including sexual harassment), complicity, and related retaliation based on a protected class in accordance with System Regulation 08.01.01, University Rule 08.01.01.M1, Standard Administrative Procedure (SAP) 08.01.01.M1.01, and applicable federal and state laws. In accordance with Title IX and its implementing regulations, Texas A&M does not discriminate on the basis of sex in any educational program or activity, including admissions and employment.

The following person has been designated to handle inquiries and complaints regarding the non-discrimination policies: Jennifer M. Smith, TAMU Associate VP & Title IX Coordinator at YMCA Ste 108, College Station, TX 77843, 979-458-8407, or email civilrights@tamu.edu. For other reporting options, visit the U.S. Department of Education Office for Civil Rights Complaint Assessment System to locate the address and phone number of the office that serves your area, or call 1-800-421-3481.

## Civil Rights, Free Speech, and Title IX Policies

Texas A&M University is committed to fostering a learning environment that is safe and productive for all. University policies and federal and state laws prohibit discrimination and harassment based on an individual's race, color, sex, (including pregnancy and related conditions), religion, national origin, age, disability, genetic information, veteran status, or any other legally protected characteristic. This includes forms of sex-based violence, such as sexual assault, sexual harassment, sexual exploitation, dating/domestic violence, and stalking.

Students can report discrimination/harassment, access supportive resources, or learn more about their options for resolving complaints on the University's Civil Rights & Title IX webpage.

Students should be aware that all university employees (except medical or mental health providers) are mandatory reporters, which means that if they observe, experience or become aware of an incident that they reasonably believe to be discrimination/harassment alleged to have been committed by or against a person who was a student or employee at the time of the incident, the employee must report the incident to the university.

## Americans with Disabilities Act (ADA) Policy

Texas A&M University is committed to providing equitable access to learning opportunities for all students. If you experience barriers to your education due to a disability or think you may have a disability, please contact the Disability Resources office on your campus (resources listed below). Disabilities may include, but are not limited to, attentional, learning, mental health, sensory, physical, or chronic health conditions. All students are encouraged to discuss their disability-related needs with Disability Resources and their instructors as soon as possible.

To request academic accommodations, contact the designated ADA office based on your location:

- Texas A&M University, College of Nursing, College of Dentistry, Irma Lerma Rangel College of Pharmacy College Station, College of Medicine, School of Public Health, Institute of Biosciences and Technology, EnMed Program, Bush

School in Washington DC, Mays Business School – CityCentre, TAMU Engineering Academies, Texas A&M University Higher Education Center at McAllen and Texas A&M University at Galveston should contact Disability Resources at (979) 845-1637 or disability@tamu.edu.

- Texas A&M University School of Law should contact the Office of Student Affairs at (817) 212-4111 or law-disability@law.tamu.edu to request accommodations.
- Irma Lerma Rangel College of Pharmacy in Kingsville should contact the Disability Resource Center at Texas A&M University-Kingsville at (361) 593-3024 or drc.center@tamuk.edu to request accommodations.
- Texas A&M University College of Veterinary Medicine & Biomedical Sciences in Canyon should contact the Office of Student Accessibility at West Texas A&M University – Canyon at (806) 651-2335 or osa@wtamu.edu.

If you are experiencing difficulties with your approved accommodations, contact the office responsible for approving your accommodations or the Texas A&M ADA Coordinator Julie Kuder at ADA.Coordinator@tamu.edu or (979) 458-8407.

## Pregnancy Accommodations

Texas A&M provides reasonable accommodations to students due to pregnancy and/or related conditions, such as childbirth, recovery, and lactation. Students should contact the University's Pregnancy Coordinator as soon as they become aware of the need for accommodation. Depending on the circumstances, accommodations could include extended time to complete assignments or exams, changes in course sequence, or modifications to the physical classroom environment.

Texas A&M will also allow a voluntary leave of absence, ensure the availability of lactation space, and maintain grievance procedures to provide for the prompt and equitable resolution of complaints of sex discrimination. For information regarding pregnancy accommodations, email TIX.Pregnancy@tamu.edu.

## Statement on Mental Health and Wellness

Texas A&M University recognizes that mental health and wellness are critical factors influencing a student's academic success and overall wellbeing. Students are encouraged to engage in healthy self-care practices by utilizing the resources and services available through University Health Services. The TELUS Health Student Support app provides access to professional counseling in multiple languages anytime, anywhere by phone or chat, and the 988 Suicide & Crisis Lifeline offers 24-hour emergency support at 988 or 988lifeline.org.

**Texas A&M College Station**

Students needing a listening ear can contact University Health Services at 979.458.4584. Call 911 or visit your nearest emergency room if you are currently experiencing a life-threatening situation or if your safety is at risk. 24-hour emergency help is also available through the 988 Suicide & Crisis Lifeline (988) or at 988lifeline.org.

## Statement on the Family Educational Rights and Privacy Act (FERPA)

FERPA is a federal law designed to protect the privacy of educational records by limiting access to these records, to establish the right of students to inspect and review their educational records, and to provide guidelines for the correction of inaccurate and misleading data through informal and formal hearings.

Currently enrolled students wishing to withhold any or all directory information items can do so within howdy.tamu.edu using the Directory Information Withholding Form. The complete FERPA Notice to Students and the student records policy is available on the Office of the Registrar webpage.

Items that can never be identified as public information are a student's social security number, citizenship, gender, grades, GPR, or class schedule. All efforts will be made in this class to protect your privacy and to ensure confidential treatment of information associated with or generated by your participation in the class.

Directory items include name, UIN, local address, permanent address, email address, local telephone number, permanent telephone number, dates of

attendance, program of study (college, major, campus), classification, previous institutions attended, degrees, honors and awards received, participation in officially recognized activities and sports, medical residence location, and medical residence specialization.

## Free Speech and Civil Discourse

Texas A&M recognizes that the pursuit of truth through open and robust discourse is critical to academic inquiry. However, as a community of scholars, the university has an aspirational expectation that such discourse will be conducted in accordance with Aggie Core Values. In this "marketplace of ideas," we encourage civil dialogue creating an environment that allows individuals to express their ideas and to have their ideas challenged in respectful and responsible ways. Students can learn more about Freedom of Expression and Free Speech on the University's website about the First Amendment.

# Exhibit I

Outlook

## Decision to Cancel Bush School Course

**From** Sherman, John Bradley <johnsherman92@tamu.edu>
**Date** Wed 1/14/2026 9:56 AM
**To** Sherman, John Bradley <johnsherman92@tamu.edu>

Dear Bush School Team,

I am sure that you continue to monitor the news regarding the course audit process that we are undertaking as required by System Policy 08.01. As I shared with you in my Monday email, we sent several syllabi forward to the Vice Provost for Academic Affairs (VPAA) to get an opinion on whether an exemption was required. We have been reassured that an exemption request was not needed for most cases, and the faculty member will be teaching the course the way they designed it. All of this included much work and thought by our faculty to review your own syllabi. I greatly appreciate the effort they put into this task.

VPAA advised us that an exemption request would be required for two Bush School courses. In one case, not only was the material questioned important and germane to the course, but the syllabus also provided all needed information and context. I am therefore requesting an exemption to allow the instructors to teach the two sections of the course as originally designed.

For the other, PSAA 642, Ethics in Public Policy, we were not able to identify the specific information we needed to submit an exemption request and thus must cancel the course. It is important to note that Dr. Leonard Bright, the instructor for this course, was not asked to change the course topics, nor was he asked to remove readings. Instead, he was asked repeatedly to provide information on his planned instructions on the topics identified in System Policy 08.01. He declined to provide this information, which made it impossible for us to request an exemption. Consequently, System policy requires me to cancel the course.

I take no pleasure in making the decision to cancel this course and it is not one that I took lightly. Put simply, as employees of the System, we are required to follow its policies. We recognize this necessary action has consequences for our students. Please rest assured that we are actively working to assist those who were registered for PSAA 642 to find alternative courses that suit their academic goals. I would ask that you please accommodate them if they chose to enroll in your course.

I share this information with you to underscore the fact that I want us to continue to teach hard topics and to engage with controversial issues. But I also expect us to follow the process laid out for the approval of syllabi and to ensure alignment between our syllabi and our course descriptions. Put simply, transparency does not equal censorship. I wanted to share this information directly with you because I am committed to being up front with you.

I know this was a new and difficult task and the leadership team and I greatly appreciate your cooperation. This sort of review is the new normal, but we will work with you to streamline the process in the future so you can continue to provide world-class instruction to our students. Our mission demands no less.

Respectfully,

John

# Exhibit J

# Implementation of 08.01 and 12.01 Changes
# FAQs
(Updated January 14, 2026)

**Should universities implement/improve their course and syllabus review process?**

**Yes.**

- Where a regular review does not exist, universities should establish a process for regular review and approval of courses to assess the course's relevance to the program's curriculum, fidelity to the body of knowledge in the discipline, and alignment with post-graduation needs of the students enrolled in the class.
- Universities should also regularly check compliance with Educ. Code 51.974 to ensure that accurate course information is publicly available, searchable and easy to locate online.

**However,**

- A university-level course review will supplement and not supplant the system-level course review.

**Should there be variance in what is taught (and approved) based on the level of the course?**

**Yes. Curriculum is developmentally based. A freshman's academic experience should differ from an upper division student and that of a graduate student.**

- Undergraduate Core
  - Core curriculum courses must be foundational and necessary to prepare students for civic and professional life. (Policy 11.06, § 2; Edu. Code 51.315(b))
  - Core curriculum courses must also comply with applicable federal and state law and system policies. These courses must not teach or *advocate* race or gender ideology, sexual orientation, or gender identity. (System Policy 08.01, § 2.1.(b)) See definitions at the end of this document.
- Undergraduate Non-Core
  - The body of knowledge for the discipline and the workforce or graduate/professional study needs of the students after graduation should be considered in assessing the appropriateness of material for a course.
  - Advocating race or gender ideology, sexual orientation, or gender identity is prohibited
  - If there is a circumstance in which an undergraduate non-core course should *address* race or gender ideology, sexual orientation, or gender identity the course and the relevant course materials must be approved in advance by the university president and
    - it is the student's choice to take this course and is not in some way "required", **<u>and/or</u>**
    - the course does not *advocate* race or gender ideology, sexual orientation, or gender identity.

- Graduate/Professional
  - Advocating race or gender ideology, sexual orientation, or gender identity is prohibited in all courses regardless of level, including graduate courses.
  - These topics can and should be addressed/taught in appropriate disciplines when part of the discipline's body of knowledge and approved in advance by the university's president.
  - Teaching legal and medical material (e.g., Title IX, case law, medical procedures, etc.) is not prohibited when it is appropriate to the course and is consistent with the body of knowledge for the discipline.
  - When in doubt, seek the approval of the university president under System Policy 08.01, § 2.1(b).

**Can faculty teach difficult and historically sensitive subjects, subjects that may evoke strong reactions?**

**Yes, such topics should be taught, as they are academically appropriate, empirically grounded, and essential components of the disciplinary knowledge. Use a reasonableness standard.**

- Teaching difficult subjects is expected and the system policy does not prohibit it if it is related to the classroom subject and meets other system policy requirements. Faculty are expected to teach historically significant, empirically established, and discipline-grounded topics, even when these topics may be emotionally difficult or sensitive for some students. For example:
  - System policy does not preclude a course on U.S. History including information on slavery and its many impacts, including racism. We would expect our faculty teaching U.S. History to include this material.
  - System policy does not preclude a course on the Holocaust presenting its history and impacts. We would expect our faculty teaching WWII History to include this material.
  - System Policy does not preclude a course on human sexuality including material on same sex relationships. We would expect our faculty teaching human sexuality to include this material.
  - System Policy does not preclude a course on gender from including material on different perspectives on gender, including perspectives that some may not find agreeable. We would expect our faculty teaching gender courses to include this material.
  - System Policy does not preclude a course on world religions. We would expect our faculty teaching world religions to include material on various world religions, including those less familiar in America.
  - System Policy does not preclude a course on political science from examining government actions. We would expect our faculty teaching political science courses to study government shutdowns, aid to foreign countries, alliances, etc.
- System Policy 12.01, § 1.2, prohibits a faculty member from introducing a controversial matter that has no relation to the classroom subject or teaching material that is inconsistent with the approved syllabus for the course. Teaching grounded disciplinary

content is always allowed; imposing personal belief or ideological adherence is prohibited.

**What does it mean to "advocate?"**

- To *Advocate* is when teaching and course materials extend learning objectives in a way that requires students to hold certain beliefs, and/or to ridicule certain beliefs. For examples in this context, to advocate is:
  - To lead, encourage, or require a student to feel personal shame over treatment of slaves in America; or conversely, to justify slavery in America as acceptable.
  - To lead, encourage, or require students to hold certain beliefs on same sex relationships or criticize/ridicule their beliefs on such relationships; or conversely, to criticize/ridicule or shame individuals who are in same sex relationships or are supportive of same sex relationships.
  - To lead, encourage, or require students to hold certain beliefs on gender identity whether the required belief is in two genders assigned at birth, or belief in many self-identified genders.
  - To lead, encourage, or require students to adhere to or embrace a specific religion, any religion, or no religion.
  - To lead, encourage, or require students to hold specific positions on political policies and actions, or ridicule those who may believe certain positions.
- Students' beliefs on these matters (among others) will vary. The faculty can, should, and must teach difficult subjects for the students to know and understand different perspectives, but not for the student to hold specific beliefs on those subjects for purposes of grading, nor may students be ridiculed for holding beliefs contrary to that of others.

**What happens when a class veers off the assigned material?**

**Apply a reasonableness standard.**

- A student asks a question that is off topic: (all of these responses are acceptable)
  - Acknowledge the question and engage in a brief dialogue on the topic, perhaps including other students in the discussion.
  - Acknowledge the question and suggest willingness to discuss outside of class.
  - Acknowledge the question but redirect the focus of the class stay on the assigned topic.
- An event occurs the students find exciting or troubling but is unrelated to the course learning material. This could include sporting events, a speaker coming to campus, world events, traumatic events, etc.
  - Acknowledge the event and, to the best the faculty member is able and feels comfortable, allow the students to share their excitement and feelings for a reasonable period of time, but ultimately return to the assigned materials as soon as possible.
- An event occurs that is consistent with the course learning materials but was unanticipated and not included in the syllabus.
  - The faculty member can adjust to use the event in the classroom. These are remarkable learning opportunities. Faculty should understand and recognize different beliefs and perspectives among their students, but the discussion and

change of focus is allowable as long as it fills a curricular purpose and contributes to fulfilling the course's learning outcomes.

**What happens if a faculty member chooses to teach material that has been reviewed and ruled inappropriate for that course or level?**

**The faculty member would be subject to progressive disciplinary action consistent with a violation of System Policy.**

- Just as there will be differences in judgment among faculty members when reviewing course materials, there could be differences in judgment between faculty in a program and the university president. The president's decision should be informed by faculty with expertise in the body of knowledge of the discipline, but ultimately the university president is the decider by policy.
- Willful failure to follow a president's decision will result in disciplinary action appropriate to the scope and scale of the action.
- Shifts in course content may occur either due to student interest or events occurring locally, nationally, or internationally. Faculty should consult with their department heads regarding such shifts to assure fidelity to the purpose of the course.

**Is the faculty member accountable for student led and student selected projects that may focus on gender ideology, sexual orientation, or gender identity?**

**No. Not necessarily. Apply a reasonableness standard.**

- The faculty member must remain neutral and avoid nudging the student or encouraging the student to pursue such topics in a course that is not approved for such a focus. However, if the student chooses to focus on one or more of these topics and the project meets the expected learning outcomes for the course, the student's choice is to be respected and the faculty member is expected to support the student's choice and is not otherwise prohibited.

DEFINITIONS:

Gender Ideology – means a concept that self-assessed gender identity should replace the biological category of sex or that biological sex has less value or legitimacy than self-assessed gender identity.

Race Ideology – means a concept that attempts to shame a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy or conspiracy, ascribe to them less value as contributors to society and public discourse because of their race or ethnicity, or assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world. This also includes course content that promotes activism on issues related to race or ethnicity, rather than academic instruction.

# Exhibit K

TEXAS A&M UNIVERSITY

TEXAS A&M UNIVERSITY
Office of the Provost

# GUIDANCE ON SYLLABUS COURSE REVIEWS

*For System Policies 08.01 and 12.01 - Updated February 26, 2026*

## General

This web page provides general guidance on course content and syllabi regarding compliance with Texas A&M University System policies **08.01 Civil Rights Protections and Compliance** (updated Dec. 18, 2025) and **12.01 Academic Freedom, Responsibility and Tenure** (updated Nov. 13, 2025). It includes key terms, timelines and frequently asked questions. Regular updates will be provided here and through email regarding the progress of the reviews and to share any clarifications from the System.

With the wide variety of courses and subjects at our large and complex university, there undoubtedly will be the need for interpretation for individual situations. Faculty are first directed

*On This Page*

General

Relevant System Policy Sections

Key Definitions

Classroom Context

# Relevant System Policy Sections

**08.01 Civil Rights Protections and Compliance, Section 2.1.b:** "…No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity. Upon prior written approval of the member CEO after review of the course and relevant course materials, specific non-core curriculum or graduate courses in some disciplines may teach race or gender ideology, or topics related to sexual orientation or gender identity. Such approval may be granted in limited circumstances upon demonstration of a necessary educational purpose."

**12.01 Academic Freedom, Responsibility and Tenure, Section 1.2:** "Each faculty member is entitled to full freedom in the classroom in discussing the subject that the faculty member teaches, but a faculty member will not introduce a controversial matter that has no relation to the classroom subject or teach material that is inconsistent with the approved syllabus for the course"

# Key Definitions

**Advocate:** When teaching and course materials extend learning objectives in a way that requires students to hold certain beliefs, and/or to ridicule certain beliefs.

**Teach:** Imparting information or skill so that others may learn; to cause to know something; to cause to know how; to guide the study of; to instruct by precept, example, or experience.[1]

**Gender Ideology:** A concept that self-assessed gender identity should replace the biological category of sex or that biological sex has less value or legitimacy than self-assessed gender identity.[2]

**Race Ideology:** A concept that attempts to shame a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy or conspiracy, ascribe to them less value as contributors to society and public discourse because of their race or ethnicity, or assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world. This also includes course content that promotes activism on

Compliance Review Process for System Policies 08.01 and 12.01

Summer/Fall 2026: What To Expect

Requests for Exceptions

Frequently Asked Questions

issues related to race or ethnicity, rather than academic instruction.[2]

1. *Merriam-Webster Dictionary*

2. *08.01 Civil Rights Protections and Compliance*

# Classroom Context

The revised policy does not preclude courses from covering topics such as slavery or the Civil Rights Movement in an American history course.

What the policy does preclude is requiring or encouraging students to hold certain beliefs, particularly regarding gender or race ideology or sexual orientation, or to feel shame for belonging to certain racial or ethnic groups due to historical practices associated with said groups, such as the treatment of enslaved people.

This is not to say that instructors cannot present concepts and theories that are contrary to what a student believes. One of the things universities need to do is challenge students to be critical thinkers who are able to understand the new and different, as well as understand how that information is used to form or evaluate new theories and ideas. Teaching students to know and understand contrary concepts and facts, rather than it becoming what they believe, is a common part of teaching and is the fine balance teachers and learners need to reach.

It is important that students also have a clear understanding of the meaning of advocacy and are able to discern it from teaching. Therefore, this concept will be added to student orientation information as well as other opportunities to build awareness.

# Compliance Review Process for System Policies 08.01 and 12.01

Prior to each semester, deans are required to certify that all courses have been reviewed for compliance with System Policies 08.01 and 12.01. Additionally, courses must meet other state requirements. The following outlines the steps required at the university level to support this compliance. Deans may establish additional processes within their college or school to support this effort based on the unique needs of their programs.

1. Review all courses to ensure the syllabus is current and its content reflects the course description and learning outcomes for the course (per System Policy 12.01).
2. Review all courses to ensure:
   a. No courses advocate for race ideology or gender ideology, or topics related to sexual orientation or gender identity
   b. No core curriculum courses teach race ideology or gender ideology, or topics related to sexual orientation or gender identity
   c. Non-core curriculum or graduate courses that teach race ideology or gender ideology, or topics related to sexual orientation or gender identity have been reviewed and granted an exception by the university president (per System Policy 08.01).
3. Verify there is one set of learning outcomes and a consistent course description (reflecting the current catalog) for all multi-section courses
4. Ensure the official syllabus is the only syllabus and it is readily available to all students

# Summer/Fall 2026: What To Expect

While the vast majority of courses at Texas A&M do not teach race ideology or gender ideology, or topics related to sexual orientation or gender identity (and therefore are not subject to the potential need for an exception under System Policy 08.01), if you teach a course that addresses one of these topics, your

course may require an exception. We recommend prioritizing these courses in the review process.

For the 2026 summer and fall semesters, the university will use the following process, and deans will provide their faculty with specific deadlines and guidance within this framework:

- **Feb. 18:** Deans briefed and aligned on timeline for syllabi review
- **Feb. 23:** High-level information and timing shared broadly with faculty
- **Feb. 26:** Updated guidance provided to deans and faculty
- **March 16:** Simple Syllabus will be pre-populated with approved course descriptions, so faculty may begin completing syllabi. Courses that may require an exception to System Policy 08.01 should be prioritized for review.
- **March 18**: Deans submit summer course exception requests under System Policy 08.01
- **March 26**: Deans certify all summer syllabi comply with System Policy 08.01 and 12.01. This also marks the opening of pre-registration for summer and fall.
- **March 30**: Deans submit fall course exception requests under System Policy 08.01.
- **April 13**: Summer and fall open registration begins.
- **April 20**: Deans certify all fall syllabi comply with System Policy 08.01 and 12.01. At this point, all syllabi should have already been uploaded to Simple Syllabus.
- **May 19**: Course Catalog publishes.
- **Aug. 24:** Deadline for approval of *Simple CVs** in Simple Syllabus. First day of fall classes.

* A '*Simple CV*' within Simple Syllabus will be automatically generated for all faculty teaching a course this semester. The information included will be pulled from Interfolio and Compass and will only need faculty to review the information for accuracy and click submit. More information will be shared when the technical implementation is complete.

Immediately prior to the beginning of the fall semester, we will have established with the deans a brief window in which the university will consider requests for exceptions in extenuating circumstances (e.g., a new course is added to the schedule or a new instructor hired).

### *For Summer:*

Simply review your syllabus, share it with your department head in the established process for your college or school. It does not have to be done in Simple Syllabus, but can be if that is your preference. Courses that may require an exception to System Policy 08.01 should be prioritized for review. If your course requires an exception, your dean or department head will be communicating with you directly.

### *For Fall:*

Review your syllabus, complete it in **Simple Syllabus**. The system will automatically notify your department head, and their review may begin. Courses that may require an exception to System Policy 08.01 should be prioritized for review. If your course requires an exception, your dean or department head will be communicating with you directly.

## Requests for Exceptions

Under System Policy 08.01, exceptions can be requested for any non-core curriculum undergraduate courses or graduate courses if there is a clear educational necessity for including content related to gender ideology, race ideology, or topics related to sexual orientation, or gender identity. Requests for exceptions are reviewed in the following ways:

1. **Preliminary Review:** Submissions are reviewed by Office of the Provost administrators to ensure the documentation is complete and requires further review for an exception to be granted.
2. **Faculty/Administrator Committee Review:** Completed requests are then reviewed by an ad hoc committee of faculty

and faculty administrators. Each syllabus and any supporting documentation provided is reviewed by three reviewers.

a. They review each submission on the strength of the argument that an exception is warranted and that it meets a clear educational purpose consistent with the field.

b. Based on their review, they provide a recommendation on whether the course should be submitted for an exception.

c. The committee has the opportunity to provide commentary for consideration as well.

3. **Provost Review and Recommendation:** The Provost reviews the feedback and recommendations provided by the reviewers, along with the original submission, before providing a recommendation to the President for a final decision.

4. **President Decision:** The president reviews the committee and provost recommendations to inform a final decision.

IMPLEMENTATION OF 08.01 AND 12.01 FREQUENTLY ASKED QUESTIONS

# Frequently Asked Questions

Updated February 26, 2026

### How was the review process handled for the 2026 spring semester?

*Expand +*

### Should there be variance in what is taught (and approved) based on the level of the course?

*Expand +*

**How often will my course need to be reviewed?**

*Expand +*

**If my course is given an exception, how long will it last?**

*Expand +*

**If topics such as race ideology, gender ideology,or topics related to sexual orientation or gender identity, are in my course what resources are available to help me lead meaningful discussions?**

*Expand +*

**Will students be able to see syllabi for courses they are considering or required to take prior to registering for them?**

*Expand +*

**What is the difference between advocating and teaching?**

*Expand +*

**What should students do if they believe the course they're enrolled in is advocating for a specific point of view?**

*Expand +*

**What can advisors share with students regarding this process and its implications?**

*Expand +*

**When will decisions be made about any courses that need to be cancelled?**

*Expand +*

**Will exceptions be allowed for students who do not want to take a required course that has been granted an exception?**

*Expand +*

TEXAS A&M UNIVERSITY

The Office of the Provost

**Home**

**About**

**Portfolio**

*QUICK LINKS*

**Administration**

**Go to Texas A&M University Main Page**

*CONTACT US*

**Contact the Office**

**Request a Visit from the Provost**

© 2026 **Texas A&M University** | **Statement** | **Accessibility**

# Exhibit L

# Bush School of Government and Public Service

TEXAS A&M UNIVERSITY

## Public Service and Administration

## PSAA 601 Syllabus

Section 700 (46979)
FOUNDATIONS OF PUB SERV
Spring 2026 - College Station

## Course Information

**Meeting Times:** Meeting Type: LEC
Meeting Days:
Start Time: N/A
End Time: N/A
Start Date: 01/12/2026
End Date: 05/05/2026
**Meeting Location:** ONLINE ONLINE

**Credit Hours:** 3

## Instructor Details



Leonard Bright
**Email:** lbright@tamu.edu
**Office Location:** Online
**Phone:** Message Me in Canvas

Office Hours
Available by appointment only. If you would like to visit with me by phone or online, send me a message through the Message center in your course. We'll find a time that will work for both of us.

## Catalog Description

Foundations of Public Service. (3-0). Credit 3. Different perspectives on management and leadership in public service; provides overview of how public and nonprofit organizations work; discusses ethical dilemmas that occur in public service careers. Prerequisite: PSAA majors only.

## Course Prerequisites

**Prerequisite/Corequisite(s):** PSAA majors only.

## Course Learning Outcomes

### Essential Elements

Upon completion of this course, the learner will be able to:

- Examine how public administrators use a combination of formal and informal leadership strategies.
- Explore and describe the role played by citizens in the creation, implementation, and practice of public programs.
- Develop a general appreciation for core management functions performed by public organizations such as budgeting and human resources administration.
- Develop a general appreciation of theory and practice in public management.
- Understand the changes and developments in study and practice of American public administration from the founding period to the present.
- Understand how disciplines such as history, political science, philosophy, and organizational science have come to influence and shape modern public administration.
- Apply the material learned in class to the dilemmas and challenges faced by public managers.
- Understand how public organizations can benefit from diversity and respond to the needs of a diverse society.

## Special Course Designation

None

## Textbook and/or Resource Materials




**This material Is: Required**
Reframing Organizations
**ISBN:** 9781119855125
**Authors:** Lee G. Bolman, Terrence E. Deal
**Publisher:** John Wiley & Sons
**Publication Date:** 2021-09-15
**Edition:** 7th ed




**This material Is: Required**
Introducing Public Administration
**ISBN:** 9781032042893
**Authors:** Jay M. Shafritz, Christopher P. Borick, Edward W. Russell, Albert C. Hyde
**Publication Date:** 2022-01-01
**Edition:** 10th ed

## Additional Instructional Materials

**This Material is: Required**
Harvard Business Coursepack

Notes:

### Required Harvard Business Coursepack.

1. Freedman, David H. 1992. "Is Management Still a Science?" Harvard Business Review, November-December.
2. Kaplan, Robert S., and David P. Norton. 1992. "The Balanced Scorecard: Measures that Drive Performance." Harvard Business Review,

January–February: 71–79.
3. Kotter, John. 2013. "Management Is 'Still' Not Leadership." Harvard Business Review, February.

## Grading Policy

Weighted Grading Table

| Group | Weight | Deadlines |
|---|---|---|
| Discussion Questions | 20% | Check each week for details |
| Case Study Analysis Paper | 20% | Day 07 of Week 06 |
| News Brief Project | 20% | Day 07 of Week 08 |
| Group Analysis Paper | 40% | Group Project Proposal Final Draft: Day 7 of week 05. Peer Reviews: Due Day 7 of week 14 Formal Group Project Report and Recorded Group Project Presentation: Day 7 of Week 13 |
| **Total** | **100%** | |

**Texas A&M University Grading Scale:**

A = 90-100 %, B = 80-89 %, C = 70-79 %, D = 60-69 %, F = 59% or lower

# Discussion Questions:

Class discussion takes place in the "Discussion" area of this course. Typically, two discussion questions are assigned for each week. You are expected to:

- Post an original response that is substantive, thoughtful, and supported with citations, using APSA style, and then,
- Post substantive and thoughtful responses to at least two of your peers' posts.
- Accomplish both of the previous actions within the designated deadlines.

Note: You will not see your peers' posts until you have posted your initial response.

You, your peers, and the instructor will be actively involved in the discussion board. The

discussion board is the equivalent to an online classroom. In other words, if you were in a face-to-face classroom, you would be expected to participate in discussions. This is the same except that you are required to write your responses and cite your sources using APSA style. This is a very important part of your learning experience.

## General Requirements for All Assignments

For all assignments, you are expected to use American Political Science Association (APSA) style.

- Double-space (not 1.5)
- 12-point, Times New Roman font
- 1 ½ inch margins on all sides
- All pages numbered
- Include a reference section
- Completely cite all of your sources (including author, date, and page numbers)

All discussion posts and papers must be well written and edited. This is a graduate-level course, so your work must be graduate-level as well. The content must be thoughtful, informed, and include analysis. You are expected to use APSA style citations from the APSA Style Manual, Revised 2018 Edition to support your arguments and points. Deadlines are critical. Be sure to submit your work by the due dates/times posted in each week. All of these expectations are considered by your instructor when grading your work.

**Note**: *Wikipedia is not an acceptable research source and should not be cited.*

## Assignment Grading Criteria:

**A Range:** The paper is clear, engaging, original, and focused; ideas and content are richly developed with details and examples. Organization and form enhance the central idea and theme; ideas are presented coherently to move the reader through the text. The voice of the writer is compelling and conveys the writer's meaning through effective sentence structure and precise word choices. The writer successfully moves the paper through academic constructs and experiential documentation to critical analysis. The paper demonstrates a clear balance of these three components.

**B Range:** The paper is reasonably clear, focused, and well supported; ideas are

adequately developed through details and examples. Organization and form are appropriate, and ideas are generally presented coherently. The voice of the writer contributes to the writer's meaning through appropriate and varied sentence structure and word choices. Surface features do not interfere with understanding or distract from meaning. The writer has clearly brought the reader through properly cited academic constructs and experiential documentation, but has not fully developed the area of critical analysis.

**C Range:** The paper has some focus and support; ideas and content may be developed with limited details and examples. The writing may be somewhat disorganized or too obviously structured. The voice of the writer is generally absent; basic sentence structure and limited vocabulary convey a simple message. Surface feature errors may reduce understanding and interfere with meaning. The content areas of academic constructs are limited and large generalizations are made. Critical analysis is all but absent from the paper.

**D Range:** The paper has little focus and development; few details and examples support ideas and content. There is little discernible shape and no direction. The writer's tone is flat. Awkward sentence structure and inadequate vocabulary interfere with understanding. Limited control of surface features makes paper difficult to read. Critical analysis is absent, and segments of the paper are given to rambling descriptions of life experience without academic context.

## Late Work Policy

Work submitted by a student as makeup work for an excused absence is not considered late work and is exempt from the late work policy (Student Rule 7).

## Course Specific Late Work Policy

Late work is any assignment turned in after the deadline without an official documented university excuse (See TAMU Student Rule 7). Be sure to adhere to all the course deadlines. Late work will receive a 10% penalty each day it is late. The late days/ hours late will be rounded up to the next whole number. For example, if a student submits an assignment 1.3 days late, the late penalty will treat the student as 2 days late.

# Course Schedule

## Spring 2026 Schedule:

Table indicating the dates of Weeks 01 and 02

| Intentionally Blank | Day 1 | Day 2 | Day 3 | Day 4 | Day 5 | Day 6 | Day 7 |
|---|---|---|---|---|---|---|---|
| Week 01 | Mon-Jan-12 | Tue-Jan-13 | Wed-Jan-14 | Thu-Jan-15 | Fri-Jan-16 | Sat-Jan-17 | Intentionally Blank |
| Week 02 | Sun-Jan-18 | MLK Holiday | Tue-Jan-20 | Wed-Jan-21 | Thu-Jan-22 | Fri-Jan-23 | Sat-Jan-24 |

***EMPSA Residency Week January 26, 2026 to January 30, 2026***

Table indicating the dates of Weeks 04 through 08

| Intentionally Blank | Day 1 | Day 2 | Day 3 | Day 4 | Day 5 | Day 6 | Day 7 |
|---|---|---|---|---|---|---|---|
| Week 04 | Sun-Feb-01 | Mon-Feb-02 | Tue-Feb-03 | Wed-Feb-04 | Thu-Feb-05 | Fri-Feb-06 | Sat-Feb-07 |
| Week 05 | Sun-Feb-08 | Mon-Feb-09 | Tue-Feb-10 | Wed-Feb-11 | Thu-Feb-12 | Fri-Feb-13 | Sat-Feb-14 |
| Week 06 | Sun-Feb-15 | Mon-Feb-16 | Tue-Feb-17 | Wed-Feb-18 | Thu-Feb-19 | Fri-Feb-20 | Sat-Feb-21 |
| Week 07 | Sun-Feb-22 | Mon-Feb-23 | Tue-Feb-24 | Wed-Feb-25 | Thu-Feb-26 | Fri-Feb-27 | Sat-Feb-28 |
| Week 08 | Sun-Mar-01 | Mon-Mar-02 | Tue-Mar-03 | Wed-Mar-04 | Thu-Mar-05 | Fri-Mar-06 | Sat-Mar-07 |

***Sunday, March 08 – Saturday, March 14, Spring Break. NO CLASSES.***

Table indicating the dates of Weeks 09 through 15

| Intentionally Blank | Day 1 | Day 2 | Day 3 | Day 4 | Day 5 | Day 6 | Day 7 |
|---|---|---|---|---|---|---|---|
| Week 09 | Sun-Mar-15 | Mon-Mar-16 | Tue-Mar-17 | Wed-Mar-18 | Thu-Mar-19 | Fri-Mar-20 | Sat-Mar-21 |
| Week 10 | Sun-Mar-22 | Mon-Mar-23 | Tue-Mar-24 | Wed-Mar-25 | Thu-Mar-26 | Fri-Mar-27 | Sat-Mar-28 |
| Week 11 | Sun-Mar-29 | Mon-Mar-30 | Tue-Mar-31 | Wed-Apr-01 | Thu-Apr-02 | Fri-Apr-03 | Sat-Apr-04 |

| Intentionally Blank | Day 1 | Day 2 | Day 3 | Day 4 | Day 5 | Day 6 | Day 7 |
|---|---|---|---|---|---|---|---|
| Week 12 | Sun-Apr-05 | Mon-Apr-06 | Tue-Apr-07 | Wed-Apr-08 | Thu-Apr-09 | Fri-Apr-10 | Sat-Apr-11 |
| Week 13 | Sun-Apr-12 | Mon-Apr-13 | Tue-Apr-14 | Wed-Apr-15 | Thu-Apr-16 | Fri-Apr-17 | Sat-Apr-18 |
| Week 14 | Sun-Apr-19 | Mon-Apr-20 | Tue-Apr-21 | Wed-Apr-22 | Thu-Apr-23 | Fri-Apr-24 | Sat-Apr-25 |
| Week 15 | Sun-Apr-26 | Mon-Apr-27 | Tue-Apr-28 | Wed-Apr-29 | Thu-Apr-30 | Fri-May-01 | Sat-May-02 |

**IMPORTANT:** Texas A&M on-ground classes will be held as indicated on the official **Texas A&M University Calendar.**

*Please note that after the course ends, you will no longer have access to the course or content. It is your responsibility to ensure you keep a copy of any discussion posts and assignments.

## Week 01 Welcome and Introduction Public Service and Administration

### Learning Resources:

Read from your required textbook(s):

1. Shafritz. Et. al. 2023. Introducing Public Administration. New York, NY: Routledge Taylor & Francis Group.

- Chapter 1: “Defining Public Administration”

Access the following in the online Course Reserves:

1. Tocqueville, Alexis de. 1835: translation 1899. Democracy in America. New York: D. Appleton, Volume 1 Part II, Chapters 1, 2, 5, 6.
2. Waldo, Dwight. 1955. The Administrative State: A Study of the Political Theory of American Public Administration. n. New York: Random House, Part I, Chapters 1-3, Part II, Chapters 4, 6, 7.
3. Wilson, Woodrow. 1887. "The Study of Public Administration." Political Science Quarterly, 197-222; reprinted 50. 1941)

## Week 02 The Architecture and Institutions of Government

### Learning Resources:

Read from your required textbook(s):

1. Bolman, Lee G., Terrance E. Deal. 2021. Reframing Organizations: Artistry, Choice, and Leadership. Hoboken, NJ: Wiley Publications.

- Chapter 1: "Introduction: The Power of Reframing"
- Chapter 2: "Simple Ideas, Complex Organizations"

2. Shafritz, et. al. 2023. Introducing Public Administration. New York, NY: Routledge Taylor & Francis Group.

- Chapter 4: "The Architecture and Institutions of Government"

Access the following in the online Course Reserves:

1. Blumberg, Stephen. 1981. "Seven Decades of Public Administration: A Tribute to Luther Gulick." Public Administration Review 41(1): 33–44.
2. Madison, James. 1788a. The Federalist No. 51. In The Federalist Papers. Edited by George W. Carey and James McClellan. New York: The New American Library, 2003.
3. Madison, James. 1788b. The Federalist No. 57. In The Federalist Papers. Edited by George W. Carey and James McClellan. New York: The New American Library, 2003.

## Week 03 Federalism and Intergovernmental Relations

### Learning Resources:

Read from your required textbook(s):

1. Shafritz, et. al. 2023. Introducing Public Administration. New York, NY: Routledge Taylor & Francis Group.

- Chapter 4: "The Architecture and Institutions of Government" (re-read)
- Chapter 5: "Intergovernmental Relations"

Access the following in the online Course Reserves:

1. Agranoff, R. 2011. "Federalist No. 44: What Is the Role of Intergovernmental Relations in Federalism?" Public Administration Review 71(S1): S68–S77.
2. Conlan, T. 2006. "From Cooperative to Opportunistic Federalism." Public Administration Review 66(5): 663–676.
3. Hamilton, Alexander. 1788. The Federalist No. 17. In The Federalist Papers. Edited by George W. Carey and James McClellan. New York: The New American Library, 2003.
4. Madison, James. 1788. The Federalist No. 10. In The Federalist Papers. Edited by George W. Carey and James McClellan. New York: The New American Library, 2003.

## Week 04 The Political and Administrative Environment of Public Policy Formation, Implementation, and Evaluation

### Learning Resources:

Read from your required textbook(s):

1. Bolman, Lee G., Terrance E. Deal. 2021. Reframing Organizations: Artistry, Choice, and Leadership. Hoboken, NJ: Wiley Publications.

- Chapter 9: “Power, Conflict, and Coalition”
- Chapter 10: “The Manager as Politician 201”
- Chapter 11: “Organizations as Political Arenas and Political Agents”

2. Shafritz, et. al. 2023. Introducing Public Administration. New York, NY: Routledge Taylor & Francis Group.

- Chapter 2: “The Political, Social, and Economic Environment of Public Policy and its Administration”

Read from Course Reserves:

1. Etzioni, Amitai. 1967. "Mixed Scanning: A 'Third' Approach to Decision Making." Public Administration Review 27(5): 385–392.
2. Lindblom, Charles E. 1959. "The Science of Muddling Through." Public Administration Review 19(Spring): 79–88.
3. Madison, James. 1789. The Federalist No. 10, 14, 51. In The Federalist Papers. Edited by George W. Carey and James McClellan. New York: The New American Library, 2003.

## Week 05 Social and Societal Equity

### Learning Resources:

Read from your required textbook(s):

1. Bolman, Lee G., Terrance E. Deal. 2021. Reframing Organizations: Artistry, Choice, and Leadership. Hoboken, NJ: Wiley Publications.

- Chapter 9: "Power, Conflict, and Coalition"
- Chapter 10: "The Manager as Politician"
- Chapter 11: "Organizations as Political Arenas and Political Agents"

2. Shafritz, et. al. 2023. Introducing Public Administration. New York, NY: Routledge Taylor & Francis Group.

- Chapter 3: "The Social Equity Imperative in Public Administration" (Written by Jennifer Shea)"

Access the following in the online Course Reserves:

1. Ewoh, A. I. E. 2013. "Managing and Valuing Diversity." Public Personnel Management 42(2): 122.
2. Frederickson, H. George. 1990. "Public Administration and Social Equity." Public Administration Review 50(March/April): 228-237.
3. Guy, M. E., and Fenley, V. M. 2014. "Inch by Inch: Gender Equity Since the Civil Rights Act of 1964." Review of Public Personnel Administration 34(1): 40-58.
4. Riccucci, Norma M. 2009. "The Pursuit of Social Equity in the Federal Government: A Road Less Traveled?" Public Administration Review 69(3): 373-382.

## Week 06 Public Sector Ethics and Accountability

### Learning Resources:

Read from your required textbook(s):

1. Shafritz, Jay M., E.W. Russell, Christopher R. Borick, and Albert Hyde. 2023. Introducing Public Administration. 10th ed. New York, NY: Routledge Taylor & Francis Group.

- Chapter 6: “Honor, Ethics, and Accountability”

Access the following in the online Course Reserves:

1. International City/County Management Association. 2023. Code of Ethics (Tenants). Updated 2023.
2. Texas City Management Association. Code of Ethics with Guidelines and Rules of Procedure for Enforcement and Behavioral Guidelines for Professional Relationships.

## Week 07 Leadership In Public Administration

### Learning Resources:

Read from your required textbook(s):

1. Bolman, Lee G., and Terrence E. Deal. 2017. Reframing Organizations: Artistry, Choice, and Leadership. 6th ed. Hoboken, NJ: Wiley Publications.

- Chapter 17: “Reframing Leadership”
- Chapter 18: “Reframing Change in Organizations”
- Chapter 19: “Reframing Ethics and Spirit”
- Chapter 20: “Bringing It All Together: Change and Leadership in Action”

2. Shafritz, et. al. 2023. Introducing Public Administration. New York, NY: Routledge Taylor & Francis Group.

- Chapter 14: “Leadership and Followership in Public Administration”

Access the following in the online Course Reserves:

1. Follett, M.P. 1926. "The Giving of Orders." In Classics of Public Administration, edited by Jay M. Shafritz and Albert C. Hyde, 76–83. 9th ed. Belmont, CA: Wadsworth, 2016.
2. Kotter, John. 2013. "Management Is 'Still' Not Leadership." Harvard Business Review, February.

## Week 08 Managing in The Public Sector

### Learning Resources:

Read from your required textbook(s):

1. Shafritz, et. al. 2023. Introducing Public Administration. New York, NY: Routledge Taylor & Francis Group.

- Chapter 9: “Public Management and Information Technology”

Access the following in the online Course Reserves:

1. Barnard, Chester I. 1938. The Functions of the Executive. Cambridge, MA: Harvard University Press. Parts II and III.
2. Hyde, Albert C. 1991. "Productivity Management for Public Sector Organizations." In Public Management: The Essential Readings, edited by J.S. Ott, A.C. Hyde, and J.M. Shafritz, 112–122. Chicago: Lyceum Books/Nelson-Hall.
3. Kaplan, Robert S., and David P. Norton. 1992. "The Balanced Scorecard: Measures that Drive Performance." Harvard Business Review, January–February: 71–79.

## Week 09 Strategic Management, Planning, and Government Regulation

### Learning Resources:

Read from your required textbook(s):

1. Shafritz, et. al. 2023. Introducing Public Administration. New York, NY: Routledge Taylor & Francis Group.

- Chapter 10: “Futuring, Planning, and Government Regulation”

Access the following in the online Course Reserves:

1. Johnsen, Age. 2023. "Strategic Planning in Turbulent Times: Still Useful?" Public Policy and Administration 38(4): 445–465.
2. Mintzberg, Henry. The Rise and Fall of Strategic Planning. New York: Free Press, 1994. Chapters 2 and 4.

## Week 10 Organizational Theory

### Learning Resources:

Read from your required textbook(s):

1. Bolman, Lee G., Terrance E. Deal. 2021. Reframing Organizations: Artistry, Choice, and Leadership. Hoboken, NJ: Wiley Publications.

- Chapter 3: "Getting Organized"
- Chapter 4: "Structure and Restructuring"
- Chapter 5: "Organizing Groups and Teams"

2. Shafritz, et. al. 2023. Introducing Public Administration. New York, NY: Routledge Taylor & Francis Group.

- Chapter 7: "Public Administration and Organization Theory"

Access the following in the online Course Reserves:

1. Edwards, Raymond. 2018. "An Elaboration of the Administrative Theory of the 14 Principles of Management by Henri Fayol." International Journal for Empirical Education and Research 1(1): 1-15. January.
2. Freedman, David H. 1992. "Is Management Still a Science?" Harvard Business Review, November-December.
3. Simon, Herbert. 1952. "Comments on the Theory of Organizations." The American Political Science Review 46(4): 1130-1139.
4. Udy Jr, S.H. 1959. "Bureaucracy and Rationality in Weber's Organization Theory: An Empirical Study." American Sociological Review 24: 791-795.

## Week 11 Bureaucracy and Organizational Behavior

### Learning Resources:

Read from your required textbook(s):

1. Bolman, Lee G., Terrance E. Deal. 2021. Reframing Organizations: Artistry, Choice, and Leadership. Hoboken, NJ: Wiley Publications.

- Chapter 12: "Organizational Symbols and Culture"
- Chapter 13: "Culture in Action"

- Chapter 14: “Organization as Theater”

2. Shafritz, et. al. 2023. Introducing Public Administration. New York, NY: Routledge Taylor & Francis Group.

- Chapter 8: “Organizational Behavior”

Access the following in the online Course Reserves:

1. Follett, M.P. 1926. "The Giving of Orders." In Classics of Public Administration, edited by Jay M. Shafritz and Albert C. Hyde, 76–83. 9th ed. Belmont, CA: Wadsworth, 2016.
2. Guy, Mary. 1992. "The Feminization of Public Administration." In Public Management in an Interconnected World, edited by Timney Bailey Mary and Richard T. Mayer, 101–115. New York: Greenwood Press.
3. Maslow, Abraham H. 1943. "A Theory of Human Motivation." Psychological Review 50(4): 370–396.

## Week 12 Human Resources Management and Labor Relations

### Learning Resources:

Read from your required textbook(s):

1. Bolman, Lee G., Terrance E. Deal. 2021. Reframing Organizations: Artistry, Choice, and Leadership. Hoboken, NJ: Wiley Publications.

- Chapter 6: “People and Organizations”
- Chapter 7 “Improving Human Resource Management”
- Chapter 8: “Interpersonal and Group Dynamics”

2. Shafritz, et. al. 2023. Introducing Public Administration. New York, NY: Routledge Taylor & Francis Group.

- Chapter 11: “Human Resources Management and Labor Relations”

Access the following in the online Course Reserves:

1. Behn, D. R. 1998. "What Right Do Public Managers Have to Lead?" Public Administration Review 58(3): 209-224.
2. Riccucci, N. M., and Getha-Taylor, H. 2009. "Managing the 'New Normalcy' with Values-Based Leadership: Lessons from Admiral Loy." Public Administration

Review 59(2): 200-206.

3. Williams, B. N., and Kellough, J. E. 2006. "Leadership with an Enduring Impact: The Legacy of Chief Burtell Jefferson of the Metropolitan Police Department of Washington D.C." Public Administration Review 66(6): 813-822.

## Week 13 Public Budgeting and Financial Management

### Learning Resources:

Read from your required textbook(s):

1. Shafritz, et. al. 2023. Introducing Public Administration. New York, NY: Routledge Taylor & Francis Group.

- Chapter 12: “Public Budgeting and Financial Management (Written by Carletta Sims)”

Access the following in the online Course Reserves:

1. Romer, Christina D., and David H. Romer. 2007. "Starve the Beast or Explode the Deficit? The Effects of Tax Cuts on Government Spending." Working paper, University of California, Berkeley, NSF.
2. Samuelson, Paul A. 1958. "Aspects of Public Expenditure Theories." The Review of Economics and Statistics 40(4): 332-338.
3. Thurmond, James. 1989. "I'm a Taxpayer! A Satirical Perspective on Public Service." Handout.

## Week 14 Program Evaluation and Audit

### Learning Resources:

Read from your required textbook(s):

1. Shafritz, et. al. 2023. Introducing Public Administration. New York, NY: Routledge Taylor & Francis Group.

- Chapter 13: “Program Evaluation and Audit”

### Week 15 The Future of Public Service and Administration

**Learning Resources:**

1. None

Access the following in the online Course Reserves:

1. National Academy of Public Administration. 2023. "Grand Challenges in Public Administration.

## Additional Course Information

### Professional Perspective and Academic Freedom Statement

This course may address a range of theories, empirical research, and policy debates addressing the impact of race, gender, religion, sexual orientation, and other social identities on public policy and the professional responsibilities of public servants. These topics are approached for the purpose of scholarly analysis, professional development, and critical evaluation of public administration practice.

In the course of instruction, I may share my own professional perspectives on issues related to the course content and matters of public concern. These views are offered for educational purposes only and do not represent the official positions or views of Texas A&M University or any affiliated institution. Students are not expected to agree with the instructor's professional perspectives, and respectful disagreement and critical engagement are welcomed and encouraged.

## AI Statement

According to the Texas A&M University Definitions of Academic Misconduct, plagiarism is the appropriation of another person's ideas, processes, results or words without giving appropriate credit (aggiehonor.tamu.edu). You should credit your use of anyone else's words, graphic images, or ideas using standard citation styles. Artificial Intelligence (AI) text generators and natural language processing tools (colloquially, chatbots - such as ChatGPT), audio, computer code, video, and image generators should not be used for any work for this class without explicit permission of the

instructor and appropriate attribution. This includes, but is not limited to,
i. Creating or revising drafts
ii. Editing your work
iii. Reviewing a peer's work
This excludes pre-existing software additions such as spelling and grammar checkers, which are acceptable.

## Technology Support

#### Technology Services (IT) - Main Campus

Hours: 24/7
Phone: (979) 845-8300
Email: helpdesk@tamu.edu
Call/Chat/Email/visit: https://it.tamu.edu/help

#### Canvas LMS Technical Support

Hours: 24/7/365
Phone: (877) 354-4821
Email: support@instructure.com

Support is available by clicking the Help button at the far left in the Canvas global navigation menu.
Canvas Resources are also linked on the home page of every Canvas course.

## The Bush School Online Advising Center

- Phone: **1.979.862.7810**
- Bush School Online Advising Center E-mail

## College and Department Policies

### PSAA Statement of Respect

The Department of Public Service and Administration (PSAA) expects everyone to demonstrate respect for the different experiences, beliefs, and values expressed by fellow students and instructors, and to engage in reasoned discussions that refrain

from derogatory comments or dehumanizing language about other people, cultures, groups, or viewpoints. This applies both inside and outside of the classroom and includes electronic venues such as GroupMe.

Intellectual argument and disagreement are a fundamental element of both the academic world and the policy process. Disagreement does not, in and of itself, mean disrespect. However, the way that disagreement is expressed can be disrespectful. The Bush School will not tolerate unprofessional, insensitive, or disrespectful behavior, such as:

a. Using dehumanizing, derogatory, or coarse language, at any time
b. Dismissing ideas based on the characteristics of the speaker/writer
c. Expressing threat or intent to harm, even if meant "as a joke"

## University Policies

This section outlines the university-level policies that must be included in each course syllabus. The TAMU Faculty Advisory Council established the wording of these policies.

## Academic Integrity Statement and Policy

*"An Aggie does not lie, cheat or steal, or tolerate those who do."*

"Texas A&M University students are responsible for authenticating all work submitted to an instructor. If asked, students must be able to produce proof that the item submitted is indeed the work of that student. Students must keep appropriate records at all times. The inability to authenticate one's work, should the instructor request it, may be sufficient grounds to initiate an academic misconduct case" (Section 20.1.2.3, Student Rule 20).

You can learn more about the Aggie Honor System Office Rules and Procedures, academic integrity, and your rights and responsibilities at aggiehonor.tamu.edu.

## University Attendance Policy

The university views class attendance and participation as an individual student responsibility. Students are expected to attend class and to complete all assignments.

Please refer to Student Rule 7 in its entirety for information about excused absences,

including definitions, and related documentation and timelines.

## Makeup Work Policy

Students will be excused from attending class on the day of a graded activity or when attendance contributes to a student's grade, for the reasons stated in Student Rule 7, or other reason deemed appropriate by the instructor.

Please refer to Student Rule 7 in its entirety for information about makeup work, including definitions, and related documentation and timelines.

Absences related to Title IX of the Education Amendments of 1972 may necessitate a period of more than 30 days for make-up work, and the timeframe for make-up work should be agreed upon by the student and instructor" (Student Rule 7, Section 7.4.1).

"The instructor is under no obligation to provide an opportunity for the student to make up work missed because of an unexcused absence" (Student Rule 7, Section 7.4.2).

Students who request an excused absence are expected to uphold the Aggie Honor Code and Student Conduct Code. (See Student Rule 24.)

## Notice of Nondiscrimination

Texas A&M University is committed to providing safe and non-discriminatory learning, living, and work environments for all members of the University community. The University provides equal opportunity to all employees, students, applicants for employment or admission, and the public, regardless of race, color, sex (including pregnancy and related conditions), religion, national origin, age, disability, genetic information, or veteran status.

Texas A&M University will promptly, thoroughly, and fairly investigate and resolve all complaints of discrimination, harassment (including sexual harassment), complicity, and related retaliation based on a protected class in accordance with System Regulation 08.01.01, University Rule 08.01.01.M1, Standard Administrative Procedure (SAP) 08.01.01.M1.01, and applicable federal and state laws. In accordance with Title IX and its implementing regulations, Texas A&M does not discriminate on the basis of sex in any educational program or activity, including admissions and employment.

The following person has been designated to handle inquiries and complaints regarding the non-discrimination policies: Jennifer M. Smith, TAMU Associate VP & Title IX Coordinator at YMCA Ste 108, College Station, TX 77843, 979-458-8407, or email civilrights@tamu.edu. For other reporting options, visit the U.S. Department of Education Office for Civil Rights Complaint Assessment System to locate the address and phone number of the office that serves your area, or call 1-800-421-3481.

## Civil Rights, Free Speech, and Title IX Policies

Texas A&M University is committed to fostering a learning environment that is safe and productive for all. University policies and federal and state laws prohibit discrimination and harassment based on an individual's race, color, sex, (including pregnancy and related conditions), religion, national origin, age, disability, genetic information, veteran status, or any other legally protected characteristic. This includes forms of sex-based violence, such as sexual assault, sexual harassment, sexual exploitation, dating/domestic violence, and stalking.

Students can report discrimination/harassment, access supportive resources, or learn more about their options for resolving complaints on the University's Civil Rights & Title IX webpage.

Students should be aware that all university employees (except medical or mental health providers) are mandatory reporters, which means that if they observe, experience or become aware of an incident that they reasonably believe to be discrimination/harassment alleged to have been committed by or against a person who was a student or employee at the time of the incident, the employee must report the incident to the university.

## Americans with Disabilities Act (ADA) Policy

Texas A&M University is committed to providing equitable access to learning opportunities for all students. If you experience barriers to your education due to a disability or think you may have a disability, please contact the Disability Resources office on your campus (resources listed below). Disabilities may include, but are not limited to, attentional, learning, mental health, sensory, physical, or chronic health conditions. All students are encouraged to discuss their disability-related needs with Disability Resources and their instructors as soon as possible.

To request academic accommodations, contact the designated ADA office based on your location:

- Texas A&M University, College of Nursing, College of Dentistry, Irma Lerma Rangel College of Pharmacy College Station, College of Medicine, School of Public Health, Institute of Biosciences and Technology, EnMed Program, Bush School in Washington DC, Mays Business School – CityCentre, TAMU Engineering Academies, Texas A&M University Higher Education Center at McAllen and Texas A&M University at Galveston should contact Disability Resources at (979) 845-1637 or disability@tamu.edu.
- Texas A&M University School of Law should contact the Office of Student Affairs at (817) 212-4111 or law-disability@law.tamu.edu to request accommodations.
- Irma Lerma Rangel College of Pharmacy in Kingsville should contact the Disability Resource Center at Texas A&M University-Kingsville at (361) 593-3024 or drc.center@tamuk.edu to request accommodations.
- Texas A&M University College of Veterinary Medicine & Biomedical Sciences in Canyon should contact the Office of Student Accessibility at West Texas A&M University – Canyon at (806) 651-2335 or osa@wtamu.edu.

If you are experiencing difficulties with your approved accommodations, contact the office responsible for approving your accommodations or the Texas A&M ADA Coordinator Julie Kuder at ADA.Coordinator@tamu.edu or (979) 458-8407.

## Pregnancy Accommodations

Texas A&M provides reasonable accommodations to students due to pregnancy and/or related conditions, such as childbirth, recovery, and lactation. Students should contact the University's Pregnancy Coordinator as soon as they become aware of the need for accommodation. Depending on the circumstances, accommodations could include extended time to complete assignments or exams, changes in course sequence, or modifications to the physical classroom environment.

Texas A&M will also allow a voluntary leave of absence, ensure the availability of lactation space, and maintain grievance procedures to provide for the prompt and equitable resolution of complaints of sex discrimination. For information regarding pregnancy accommodations, email TIX.Pregnancy@tamu.edu.

## Statement on Mental Health and Wellness

Texas A&M University recognizes that mental health and wellness are critical factors influencing a student's academic success and overall wellbeing. Students are encouraged to engage in healthy self-care practices by utilizing the resources and services available through University Health Services. The TELUS Health Student Support app provides access to professional counseling in multiple languages anytime, anywhere by phone or chat, and the 988 Suicide & Crisis Lifeline offers 24-hour emergency support at 988 or 988lifeline.org.

**Texas A&M College Station**

Students needing a listening ear can contact University Health Services at 979.458.4584. Call 911 or visit your nearest emergency room if you are currently experiencing a life-threatening situation or if your safety is at risk. 24-hour emergency help is also available through the 988 Suicide & Crisis Lifeline (988) or at 988lifeline.org.

## Statement on the Family Educational Rights and Privacy Act (FERPA)

FERPA is a federal law designed to protect the privacy of educational records by limiting access to these records, to establish the right of students to inspect and review their educational records, and to provide guidelines for the correction of inaccurate and misleading data through informal and formal hearings.

Currently enrolled students wishing to withhold any or all directory information items can do so within howdy.tamu.edu using the Directory Information Withholding Form. The complete FERPA Notice to Students and the student records policy is available on the Office of the Registrar webpage.

Items that can never be identified as public information are a student's social security number, citizenship, gender, grades, GPR, or class schedule. All efforts will be made in this class to protect your privacy and to ensure confidential treatment of information associated with or generated by your participation in the class.

Directory items include name, UIN, local address, permanent address, email address, local telephone number, permanent telephone number, dates of attendance, program of study (college, major, campus), classification, previous institutions attended, degrees, honors and awards received, participation in officially recognized activities and sports,

medical residence location, and medical residence specialization.

## Free Speech and Civil Discourse

Texas A&M recognizes that the pursuit of truth through open and robust discourse is critical to academic inquiry. However, as a community of scholars, the university has an aspirational expectation that such discourse will be conducted in accordance with Aggie Core Values. In this "marketplace of ideas," we encourage civil dialogue creating an environment that allows individuals to express their ideas and to have their ideas challenged in respectful and responsible ways. Students can learn more about Freedom of Expression and Free Speech on the University's website about the First Amendment.

# Exhibit M

# Fw: Moving Out on Syllabi Review for Summer and Fall Semesters

**From:** Bright, Leonard lbright@tamu.edu
**To:** drleonardbright@hotmail.com
**Date:** Sun, Jul 26, 2026, 1:58 PM

Leonard Bright, PhD

Professor
Bush School of Government
Texas A&M University, College Station
979-862-3028

---

**From:** Sherman, John Bradley <johnsherman92@tamu.edu>
**Sent:** Monday, March 16, 2026 7:12 AM
**To:** Sherman, John Bradley <johnsherman92@tamu.edu>
**Subject:** Moving Out on Syllabi Review for Summer and Fall Semesters

Bush School Faculty,

Howdy! I hope everyone was able to get some rest last week over spring break.

As required by System Policy 08.01, we're starting another round of syllabi review, this one for the summer and fall semesters. I need to submit exception requests for summer courses by 18 March and for fall courses by 30 March, so we have a tight timeline. Your Department Heads have shared information with you on the process, and the Provost's office is maintaining a webpage with definitions, frequently asked questions, and other relevant topics.

As we conduct this review, I would like to highlight the following:

- **Content in courses that involve *teaching* race ideology or gender ideology, or topics related to sexual orientation or gender identity, can only be included with an exception.**
    - Such content cannot be inserted into a class at will by the instructor during the semester and instead must be related to material or content that has been approved for an

exception.
    - Similarly, an instructor cannot include blanket statements in a syllabus indicating that race ideology or gender ideology, or topics related to sexual orientation or gender identity, might come up at any point in a course. Information on specific readings, lectures, etc., related to these topics must be submitted for an exception request.
    - Finally, **no courses can *advocate*** for race ideology or gender ideology, or topics related to sexual orientation or gender identity, and core undergraduate course cannot involve teaching of these topics.
- If a student asks a question on race ideology or gender ideology, or topics related to sexual orientation or gender identity, outside of where an exception has been granted, an instructor can engage the student to answer his or her question. The key will be to not dwell on the topic and move on with the curriculum as specified in the syllabus.
- You are ultimately responsible for adhering to System policy *throughout the semester* as you teach your respective courses.
- I will submit exception requests if there are solid reasons for doing so. I will work with your Department Heads, our Associate Deans, and others in making this determination.
    - In consultation with your Department Heads and the Associate Deans, I submitted syllabi from each department for the spring semester review and found that most did not require an exception. We now have a better idea of what sort of content will require an exception.
    - Exceptions granted for the fall semester will be good for the remainder of the academic year if the course is not updated to include any of the topics specified in 08.01.

There are many tasks that are on our plate right now, including the move to Simple Syllabus and ensuring our content is accessible, and this syllabi review comes on top of these activities. As such, I know this is a heavy lift. Still, we must perform this review smartly and expeditiously so we can keep moving forward on everything else we've got going on, most importantly on preparing tomorrow's public servants.

I truly appreciate you keeping up the press to get this done. Thank you!

Best,

John

---

# Exhibit N

# Bush School of Government and Public Service

TEXAS A&M UNIVERSITY

## Public Service and Administration

## PSAA 601 Syllabus

Section 600 (57086)
FOUNDATIONS OF PUB SERV
Fall 2026 - College Station

## Course Information

**Meeting Times:** Meeting Type: LEC
Meeting Days: M
Start Time: 08:30AM
End Time: 11:20AM
Start Date: 08/24/2026
End Date: 12/10/2026
**Meeting Location:** ALLN 3033
**Credit Hours:** 3

## Instructor Details



Leonard Bright
**Email:** lbright@tamu.edu
**Office Location:** 2061
**Phone:** 9798623028

Office Hours
Wednesdays 10-1pm (See Canvas calendar for scheduling) **or** By Appointment

Preferred Contact Method
Email

## Catalog Description

Foundations of Public Service. (3-0). Credit 3. Different perspectives on management and leadership in public service; provides overview of how public and nonprofit organizations work; discusses ethical dilemmas that occur in public service careers. Prerequisites: Graduate classification; approval of MPSA director or PSAA department head; PSAA majors only.

## Additional Course Details

**Syllabus Statement and Professional Philosophy**

It is my professional view that issues related to race, gender, and sexuality are integral to the study and practice of public service. Public servants operate in diverse communities and must be prepared to engage that diversity in order to provide effective, equitable, and professional service. Under ordinary circumstances, a graduate-level course of this nature would incorporate examination of these topics and their relationship to core subject matter openly and freely.

However, Texas A&M University System Board of Regents Policy 08.01 establishes constraints on how such topics may be addressed in academic courses. The policy states: "No system academic course will advocate race or gender ideology, or topics related to sexual orientation or gender identity. Upon prior written approval of the member CEO after review of the course and relevant course materials, specific non-core curriculum or graduate courses in some disciplines may teach race or gender ideology, or topics related to sexual orientation or gender identity. Such approval may be granted in limited circumstances upon demonstration of a necessary educational purpose."

In addition, the Bush School has directed that instructors "cannot include blanket statements in a syllabus indicating that race ideology or gender ideology, or topics related to sexual orientation or gender identity, might come up at any point in a course." Instead, if I wish to teach these topics, I must seek an exception to advocate for "race ideology," which is defined as instruction that "shames a particular race or ethnicity, accuses them of being oppressors in a

racial hierarchy or conspiracy, ascribes to them less value as contributors to society and public discourse because of their race or ethnicity, or assigns them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world," or for "gender ideology," which is defined as "a concept that self-assessed gender identity should replace the biological category of sex or that biological sex has less value or legitimacy than self-assessed gender identity." Based on my understanding of this policy, this class engages in instruction, not advocacy, as defined by System Policy 08.01.

## Course Prerequisites

**Prerequisite/Corequisite(s):** Graduate classification; approval of MPSA director or PSAA department head; PSAA majors only.

## Course Learning Outcomes

Upon completion of this course, the learner will be able to:

- Examine how public administrators use a combination of formal and informal leadership strategies to gain influence and power within their organizations.
- Explore and describe the role played by citizens in the creation, implementation, and practice of public programs.
- Develop a general appreciation for core management functions performed by public organizations such as budgeting and human resources administration.
- Develop a general appreciation for the role of practical theories of organization in public management.
- Understand the changes and developments in study and practice of American public administration from the founding period to the present.
- Understand how disciplines such as history, political science, philosophy, and organizational science have come to influence and shape modern public administration.
- Apply the material learned in class to the dilemmas and challenges faced by public managers.
- Understand how public organizations can benefit from diversity and respond to the needs of a diverse society.

## Special Course Designation

None

## Textbook and/or Resource Materials




**This material Is: Required**
Foundations of Public Service
**ISBN:** 9781032110066
**Authors:** Douglas F Morgan, Taylor & Francis Group, Richard T Green, Craig W Shinn, Kent S Robinson, Margaret E Banyan
**Publisher:** Routledge
**Publication Date:** 2021-09-30

**This material Is: Required**
Reframing Organizations
**ISBN:** 9781119855125
**Authors:** Lee G. Bolman, Terrence E. Deal
**Publisher:** Jossey-Bass
**Publication Date:** 2021

Notes:
Any Edition

**This material Is: Required**
Assigned Readings on Syllabus

Notes:
Any other assigned readings will be made available on Canvas

## Grading Policy

### Grading Scale:

Final grades in this course will be based on a 100-point scale. The total number of points a student earns throughout the term will determine the final letter grade, according to the following scale:

A = 90–100%

B = 80–89%

C = 70–79%

D = 60–69%

F = Below 60%

**Assignments**

**Individual Case Response Memos (60%):**

Students will be required to complete four case study assignments. Two components are required for each assigned case:

1. A memo response, and
2. A separate rationale response explaining the reasoning behind the approach taken.

These assignments will be completed in class and will require the LockDown Browser. The LockDown Browser secures the testing environment within Canvas. While using it to access the assignment, students will be unable to print, copy, navigate to other websites, open additional applications, or exit the assignment until it has been submitted for grading.

Students with approved accommodation requests may also use Respondus Monitor to complete these assignments remotelly. Respondus Monitor uses a webcam to record students during the test. Recordings may be reviewed by the instructor if academic misconduct is suspected. Students must have a functioning webcam installed on their device.

Please refer to Canvas and class lectures for further instructions.

**Agency Group Profiles (20%)**:

Students will be assigned to a group that will follow a federal department or independent agency throughout the term. Each group will collect current commentary and news from sources such as newspapers, journal articles, magazines, or the internet that directly or indirectly impact their assigned

agency. This information will be used to complete several short assignments (3–5 pages each). These assignments should include commentary and highlight major concepts from class readings and lectures. Students will be required to give periodic updates on their assignment to the class. Please refer to Canvas for additional instructions.

**Attendance (10%):**

Students are required to attend all class sessions. Attendance will be taken at the beginning of each class. Students who arrive late will not receive full credit for attendance.

**Participation (10%):**

This component of the grade reflects the quality—not the quantity—of classroom engagement. Meaningful participation is only possible when students have completed all assigned readings prior to class and actively engage during sessions. Weekly discussion topics will be posted on Canvas. To receive full credit, students must post an original response and comment on the posts of at least two classmates.

## Late Work Policy

Work submitted by a student as makeup work for an excused absence is not considered late work and is exempt from the late work policy (Student Rule 7).

## Course Specific Late Work Policy

Late work is any assignment turned in after the deadline without an official documented university excuse (See TAMU Student Rule 7). Be sure to adhere to all the course deadlines. Late work will receive a 10% penalty each day it is late. The late days/hours late will be rounded up to the next whole number. For example, if a student submits an assignment 1.3 days late, the late penalty will treat the student as 2 days late.

## Course Schedule

1. Week 1: Course Introduction Read: U.S. Constitution.

2. Week 2: Defining Public Administration; Read: Morgan Chapters 1 & 2; Bolman Chapters 1 & 2; Friedrich (1940). Public Policy and the Nature of Administrative Responsibility; Finer (1941). Administrative Responsibility in Democratic Government; The Federalist Papers; Frederickson, H. George (1990). “Public Administration and Social Equity.” Meier, Kenneth J., & Nigro, Lloyd G. (1976). “Representative Bureaucracy and Policy Preferences: A Study in the Attitudes of Federal Executives.
3. Week 3:
4. Week 4: Historical Legacy of American Public Administration Part 1; Read: Morgan Chapters 4, 5, & 6
5. Week 5: Historical Legacy of American Public Administration Part 2
6. Week 6: Administrative Discretion and Democracy Read: Morgan Chapter 3; Bolman Chapter 10; Keiser & Soss (1998). With Good Cause: Bureaucratic Discretion and the Politics of Child Support Enforcement; I am part of the Resistance (New York Times)
7. Week 7: Administrative Responsibility and Ethics Read: Morgan Chapter 7; Frederickson & Hart (1985). The Public Service and the Patriotism of Benevolence; Dobel (1990). Integrity in Public Service.
8. Week 8: Public Organization Theory and Management Part 1 Read: Morgan Chapter 8; Bolman Chapters 3 & 4; Naff, Katherine C., & Kellough, J. Edward (2003). “Ensuring Employment Equity.”
9. Week 9: Public Organization Theory and Management Part 2 Read: Morgan Chapters 9 & 10; Bolman Chapters 6 & 7; Bright (2007). Does Person-Organization Fit Mediate the Relationship Between Public Service Motivation and the Job Performance of Public Employees?
10. Week 10: Public Organization Theory and Management Part 3
11. Week 11: Administrative Law and Policy Making Read: Morgan Chapter 13
12. Week 12: Budgeting and Performance Management Read: Morgan Chapter 11
13. Week 13: Administrative Reforms and Movements: Read: Morgan Chapters 12 & 13; Bolman Chapter 18; Kettl Chapters 6 & 7 Frederickson (1996). Comparing the Reinventing Government Movement with the New Public Administration; Blessett, Brandi, et al. (2019). “Social Equity in Public Administration: A Call to Action.”

14. Week 14: The Future of Public Service Read: Morgan Chapters 14 & 15; American Society for Public Administration (ASPA). Code of Ethics.
15. Week 15: TBA

## Additional Course Information

**Assignments**

All assignments are to be typed in MS Word, 12-point font, Arial or Times Roman, and double-spaced with 1-inch margins. Assignments are also expected to be in Standard English with minimal grammar and spelling errors. Late assignments for reasons not governed by Student Rule 7 will be penalized 10% per day, unless otherwise noted by the professor.

**Audio/ Video Recordings**

Class sessions may not be recorded. Exceptions can be made to assist students with special needs.

**Changes to the Course Syllabus**

In accordance with departmental guidance, course readings, lectures, and discussions may be adjusted to reflect relevant current events. Students will be notified of any changes as far in advance as reasonably possible.

## AI Statement

According to the Texas A&M University Definitions of Academic Misconduct, plagiarism is the appropriation of another person's ideas, processes, results or words without giving appropriate credit (**aggiehonor.tamu.edu**). You should credit your use of anyone else's words, graphic images, or ideas using standard citation styles. Artificial Intelligence (AI) text generators and natural language processing tools (colloquially, chatbots - such as ChatGPT), audio, computer code, video, and image generators should not be used for any work for this class without explicit permission of the instructor and appropriate attribution. This includes, but is not limited to:

- Creating or revising drafts

- iEditing your work
- Reviewing a peer's work

This policy excludes pre-existing software additions such as spelling and grammar checkers, which are acceptable.

## University Policies

This section outlines the university-level policies that must be included in each course syllabus. The TAMU Faculty Advisory Council established the wording of these policies.

## Academic Integrity Statement and Policy

*"An Aggie does not lie, cheat or steal, or tolerate those who do."*

"Texas A&M University students are responsible for authenticating all work submitted to an instructor. If asked, students must be able to produce proof that the item submitted is indeed the work of that student. Students must keep appropriate records at all times. The inability to authenticate one's work, should the instructor request it, may be sufficient grounds to initiate an academic misconduct case" (Section 20.1.2.3, Student Rule 20).

You can learn more about the Aggie Honor System Office Rules and Procedures, academic integrity, and your rights and responsibilities at aggiehonor.tamu.edu.

## University Attendance Policy

The university views class attendance and participation as an individual student responsibility. Students are expected to attend class and to complete all assignments.

Please refer to Student Rule 7 in its entirety for information about excused absences, including definitions, and related documentation and timelines.

## Makeup Work Policy

Students will be excused from attending class on the day of a graded activity or when attendance contributes to a student's grade, for the reasons stated in Student Rule 7, or other reason deemed appropriate by the instructor.

Please refer to Student Rule 7 in its entirety for information about makeup work, including definitions, and related documentation and timelines.

Absences related to Title IX of the Education Amendments of 1972 may necessitate a period of more than 30 days for make-up work, and the timeframe for make-up work should be agreed upon by the student and instructor" (Student Rule 7, Section 7.4.1).

"The instructor is under no obligation to provide an opportunity for the student to make up work missed because of an unexcused absence" (Student Rule 7, Section 7.4.2).

Students who request an excused absence are expected to uphold the Aggie Honor Code and Student Conduct Code. (See Student Rule 24.)

## Notice of Nondiscrimination

Texas A&M University is committed to providing safe and non-discriminatory learning, living, and work environments for all members of the University community. The University provides equal opportunity to all employees, students, applicants for employment or admission, and the public, regardless of race, color, sex (including pregnancy and related conditions), religion, national origin, age, disability, genetic information, or veteran status.

Texas A&M University will promptly, thoroughly, and fairly investigate and resolve all complaints of discrimination, harassment (including sexual harassment), complicity, and related retaliation based on a protected class in accordance with System Regulation 08.01.01, University Rule 08.01.01.M1, Standard Administrative Procedure (SAP) 08.01.01.M1.01, and applicable federal and state laws. In accordance with Title IX and its implementing regulations, Texas A&M does not discriminate on the basis of sex in any educational program or activity, including admissions and employment.

The following person has been designated to handle inquiries and complaints regarding the non-discrimination policies: Jennifer M. Smith, TAMU Associate VP & Title IX Coordinator at YMCA Ste 108, College Station, TX 77843, 979-458-8407, or email civilrights@tamu.edu. For other reporting options, visit the U.S. Department of Education Office for Civil Rights Complaint Assessment System to locate the address and phone number of the office that serves your area, or call 1-800-421-3481.

## Civil Rights, Free Speech, and Title IX Policies

Texas A&M University is committed to fostering a learning environment that is safe and productive for all. University policies and federal and state laws prohibit discrimination and harassment based on an individual's race, color, sex, (including pregnancy and

related conditions), religion, national origin, age, disability, genetic information, veteran status, or any other legally protected characteristic. This includes forms of sex-based violence, such as sexual assault, sexual harassment, sexual exploitation, dating/domestic violence, and stalking.

Students can report discrimination/harassment, access supportive resources, or learn more about their options for resolving complaints on the University's Civil Rights & Title IX webpage.

Students should be aware that all university employees (except medical or mental health providers) are mandatory reporters, which means that if they observe, experience or become aware of an incident that they reasonably believe to be discrimination/harassment alleged to have been committed by or against a person who was a student or employee at the time of the incident, the employee must report the incident to the university.

## Americans with Disabilities Act (ADA) Policy

Texas A&M University is committed to providing equitable access to learning opportunities for all students. If you experience barriers to your education due to a disability or think you may have a disability, please contact the Disability Resources office on your campus (resources listed below). Disabilities may include, but are not limited to, attentional, learning, mental health, sensory, physical, or chronic health conditions. All students are encouraged to discuss their disability-related needs with Disability Resources and their instructors as soon as possible.

To request academic accommodations, contact the designated ADA office based on your location:

- Texas A&M University, College of Nursing, College of Dentistry, Irma Lerma Rangel College of Pharmacy College Station, College of Medicine, School of Public Health, Institute of Biosciences and Technology, EnMed Program, Bush School in Washington DC, Mays Business School – CityCentre, TAMU Engineering Academies, Texas A&M University Higher Education Center at McAllen and Texas A&M University at Galveston should contact Disability Resources at (979) 845-1637 or disability@tamu.edu.
- Texas A&M University School of Law should contact the Office of Student Affairs at (817) 212-4111 or law-disability@law.tamu.edu to request accommodations.
- Irma Lerma Rangel College of Pharmacy in Kingsville should contact the Disability Resource Center at Texas A&M University-Kingsville at (361) 593-3024 or drc.center@tamuk.edu to request accommodations.

- Texas A&M University College of Veterinary Medicine & Biomedical Sciences in Canyon should contact the Office of Student Accessibility at West Texas A&M University – Canyon at (806) 651-2335 or osa@wtamu.edu.

If you are experiencing difficulties with your approved accommodations, contact the office responsible for approving your accommodations or the Texas A&M ADA Coordinator Julie Kuder at ADA.Coordinator@tamu.edu or (979) 458-8407.

## Pregnancy Accommodations

Texas A&M provides reasonable accommodations to students due to pregnancy and/or related conditions, such as childbirth, recovery, and lactation. Students should contact the University's Pregnancy Coordinator as soon as they become aware of the need for accommodation. Depending on the circumstances, accommodations could include extended time to complete assignments or exams, changes in course sequence, or modifications to the physical classroom environment.

Texas A&M will also allow a voluntary leave of absence, ensure the availability of lactation space, and maintain grievance procedures to provide for the prompt and equitable resolution of complaints of sex discrimination. For information regarding pregnancy accommodations, email TIX.Pregnancy@tamu.edu.

## Statement on Mental Health and Wellness

Texas A&M University recognizes that mental health and wellness are critical factors influencing a student's academic success and overall wellbeing. Students are encouraged to engage in healthy self-care practices by utilizing the resources and services available through University Health Services. The TELUS Health Student Support app provides access to professional counseling in multiple languages anytime, anywhere by phone or chat, and the 988 Suicide & Crisis Lifeline offers 24-hour emergency support at 988 or 988lifeline.org.

**Texas A&M College Station**

Students needing a listening ear can contact University Health Services at 979.458.4584. Call 911 or visit your nearest emergency room if you are currently experiencing a life-threatening situation or if your safety is at risk. 24-hour emergency help is also available through the 988 Suicide & Crisis Lifeline (988) or at 988lifeline.org.

## Statement on the Family Educational Rights and Privacy Act (FERPA)

FERPA is a federal law designed to protect the privacy of educational records by limiting access to these records, to establish the right of students to inspect and review their educational records, and to provide guidelines for the correction of inaccurate and misleading data through informal and formal hearings.

Currently enrolled students wishing to withhold any or all directory information items can do so within howdy.tamu.edu using the Directory Information Withholding Form. The complete FERPA Notice to Students and the student records policy is available on the Office of the Registrar webpage.

Items that can never be identified as public information are a student's social security number, citizenship, gender, grades, GPR, or class schedule. All efforts will be made in this class to protect your privacy and to ensure confidential treatment of information associated with or generated by your participation in the class.

Directory items include name, UIN, local address, permanent address, email address, local telephone number, permanent telephone number, dates of attendance, program of study (college, major, campus), classification, previous institutions attended, degrees, honors and awards received, participation in officially recognized activities and sports, medical residence location, and medical residence specialization.

# Exhibit O

COLLEGE OF ARTS & SCIENCES

Department of English

TEXAS A&M UNIVERSITY

# Department of English Understanding of Course Content Eligibility under TAMU System Policy 08.01's Phrase "Topics Related to Sexual Orientation or Gender Identity"

> No system academic course will advocate race or gender ideology, or **topics related to sexual orientation or gender identity**. Upon prior written approval of the member CEO after review of the course and relevant course materials, specific non-core curriculum or graduate courses in some disciplines may teach race or gender ideology, or **topics related to sexual orientation or gender identity**. Such approval may be granted in limited circumstances upon demonstration of a necessary educational purpose.
>
> —TAMU System Policy 08.01 (hereafter "08.01" or "the rule")

Communication from the College of Arts and Sciences has indicated that the phrase highlighted above will not be applied to heteronormative orientation and identity.

## I. Purpose and Scope

This document is intended to guide department instructors and administrators in (1) planning courses, (2) deciding whether exception requests to the President (the "approval" referenced in the rule) are needed, (3) certifying syllabuses, and (4) responding to any complaints that arise while a course is in progress. It will serve as a basis for department-level adjudication of complaints and will provide initial explanation, to higher administrative levels, of our discipline-specific reasoning about the subject matter and teaching of ENGL courses. While discussion here concentrates on the teaching of literature-heavy courses[1]—a large curricular area broadly affected by the rule's phrasing—we note that the reasoning offered also applies to other curricular areas of English, such as rhetoric and creative writing.

In addressing the practical implications of 08.01 for teaching in the Department of English, this document focuses on the phrasing that is highlighted above, and particularly its second instance, where the verb governing the phrase shifts from "advocate" to "teach." ENGL courses are not likely to "advocate" any of the rule's identified subject matter, according to University clarifications of "advocate" that involve tying credit requirements to students' personal belief; nor are ENGL courses in general likely to teach "race ideology" or "gender ideology" as those terms have been defined by the System. Thus those parts of 08.01 do not greatly affect the planning and teaching of ENGL courses, and cases which those parts of the rule would identify as needing exception requests would arise individually.

By contrast, the highlighted phrasing, as governed by the verb "teach," has pertinence to the routine execution of a large number of ENGL courses and thus requires close consideration.

---

[1] We understand the terms "literature" and "text" to include works of film as well as written and printed media.

349 Liberal Arts and Arts & Humanities Building
4227 TAMU
College Station, TX 77843-4227

Tel. 979-845-3452 Fax 979-862-2292
english.tamu.edu

# II. Key Points in Discipline-Specific Application of the Rule

The eligibility of course content and classroom activity in view of the prohibition of, or approval required for, the teaching of "topics related to [LGBTQ] sexual orientation or gender identity" rests on the phrase "teach … topics related to." There are two essential issues: what it means to "teach" something that is *contained within* fictional representation or literary reference; and how the word "topic" is best applied in relation to course design and classroom treatment of fictional representations or literary references.

While these issues will be articulated here in ways that make sense specifically within our academic discipline, the perspective put forward below aligns with case-by-case guidance received from the College in spring 2026 as to which courses did or did not require exception requests, and also with the heuristic for determining eligibility offered by the Office of the Provost.

### A. Teaching Literary Content

In the ordinary practices and frames of reference of our discipline, to teach a text containing *instances of, reference to, or representation of X* is fundamentally different from *teaching about X*. For example, an instructor who is teaching Shakespeare's plays *A Midsummer Night's Dream* or *The Tempest* is not *teaching about* fairies or shipwreck castaways, although fairies and castaways are major characters in the two plays respectively. Similarly, an instructor teaching *As You Like It* is not typically *teaching about* non-normative gender presentation, although deliberate confusions of gender drive important plot elements of the play; these confusions are simply a fact of the story, not the subject of instruction. Likewise, an instructor teaching Shakespeare's sonnet cycle is not *teaching about* bisexual attraction, although several of the sonnets, including one or two of the most famous poems in the English language, explore a tense love triangle that includes homoerotic desire between two men; these attractions are simply a feature of the emotional situation the poems describe, not the subject of instruction.

In the department's understanding, consistent with the universal practices of our discipline for college-level teaching, *As You Like It* or the sonnets of Shakespeare would be an appropriate inclusion in any course, Core or non-Core, whose catalog description a Shakespeare play or poems are well-suited to satisfying. The same reasoning applies to any text whose inclusion in a particular course is well-motivated by its aptness to satisfying that course's catalog description.

Any literary work is a complex whole in which one might identify innumerable content elements. This fact, together with the distinction between teaching a literary text and making some particular thing it references the subject of instruction, means that the mere presence of some LGBTQ literary content is not enough to violate 08.01. In the department's understanding, and consistent with guidance received during spring 2026, the rule's restrictions become prohibitive when LGBTQ literary content is so central to one or more works selected, or when the instructor intends to give it such emphasis in course design or classroom activity, that it can be reasonably perceived as what is being *taught about*: that is, it becomes a *topic*.

### B. Teaching Topics

We understand the word "topic" to denote a thematic emphasis for a course or for a significant portion of a course. It does not describe all possible subject matter that might come up for discussion or explanation, but a larger-scale, purposefully thematic choice of material and its intended treatment.[2]

In judging the threshold at which a concept or element of literary content becomes *topical*, the fuller shape of the course matters greatly. In a Shakespeare course that covers several plays, each text—for instance, *A Midsummer Night's Dream* or *The Tempest*—is itself one of the course's several topics, in that each play would receive substantial, foregrounded treatment for a portion of the course. It would not, however, be reasonable to identify any single content element of one play (fairies, shipwreck survivors) as a topic of the course. Similarly, *As You Like It* or Shakespeare's sonnet cycle would be among the topics of a Shakespeare course, but no single element of their content (non-normative gender presentation, bisexual desire) would automatically be topical.

---

[2] This distinction is supported by the existing designation of certain courses as variable-topic or special topics courses, with individual iterations to be explicitly defined by a thematic focus; and by the already-recognized allowance that some such courses may be repeated when on a different pre-identified topic. We understand the concept of topicality explained here to be in agreement with the criterion of "preponderance" disseminated by the Office of the Provost.

Literary content elements become topical if the instructor selects materials on the basis of that content so as to create a larger-scale thematic focus. Such a focus is obvious in the declaration of topics for variable-topic courses, but may also occur within other courses that do not have formally declared topics. For instance, if an instructor of ENGL 231 (Survey of English Literature I) clustered *A Midsummer Night's Dream* together with the Middle English romance *Sir Launfal* and excerpts from Spenser's *Faerie Queene*—all texts that feature intersections of the fairy realm with the human world—and chose to organize substantial lecture and discussion of all three works thematically around this content, it would then be reasonable to regard literary fairies as a topic of that portion of the course. A course that grouped *The Tempest*, Defoe's *Robinson Crusoe*, and Homer's *Odyssey* for the purpose of examining literary treatments of shipwreck survivors would be topicalizing that common content element, and likewise, non-normative gender presentation in *As You Like It* or bisexual attraction in Shakespeare's sonnets would become topical if those texts were grouped with others having similar content for the purpose of creating a thematic focus in reading, lecture, and discussion.

# III. Exception Requests, Syllabus Certification, and Department Adjudication of Complaints

According to the perspectives outlined above, a few existing ENGL courses are clearly about, or are sure to include, "topics related to [LGBTQ] sexual orientation or gender identity," based on their course titles and catalog descriptions, and will automatically require an exception request. Exception requests would similarly be needed for any variable-topic course whose declared and department-approved topic is sure to include some thematic emphasis on LGBTQ gender identity or sexual orientation, or which will employ the established methodologies of LGBTQ studies.

In all other cases—courses that do not have variable topics, or whose declared topics do not plainly require seeking an exception—instructors should ask themselves these questions when planning the course and constructing its syllabus:

- Are course materials selected for the purpose of teaching subject matter "related to [LGBTQ] sexual orientation and gender identity" rather than for their aptness to satisfying the catalog description and stated learning outcomes?
- Does LGBTQ content, as the teaching of this course will address it, reach a threshold of thematic emphasis at which it could reasonably be identified as a "topic" of the course or of a significant portion of the course?

If the instructor's answer to both questions is "no," there is probably no need to seek a Presidential exception. If the instructor's answer to either question is "yes," a Presidential exception should be sought. Under 08.01, exceptions may be granted for non-core and graduate courses.

In cases that the instructor feels may be perceived as questionable, even if the Head does not believe that a Presidential exception is needed, the instructor may seek an exception for the reassurance of higher-level advance approval. The Head will facilitate the exception request just as if it were unquestionably necessary.

In syllabus certification, if the Department Head concurs with the instructor's "no" answer to both questions, the syllabus can be certified as compliant with 08.01. If an exception request is underway and not yet resolved, certification must be provisional, pending the results of the request.

In case of a complaint during the course, the Head will carefully consider the claims of the complainant, consult with the instructor, and then decide, according to information credibly offered and the heuristic guidance of the Office of the Provost, whether instruction has been consistent with negative answers to the questions above, and with the outcome of an exception request if one was made.