UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, LEONARD BRIGHT, VANITA REDDY, LANDON SADLER, AND AARON GEORGE,

Plaintiffs,

v.

ROBERT L. ALBRITTON, JAY GRAHAM, DAVID C. BAGGETT, JOHN W. BELLINGER, JAMES R. BROOKS, MICHAEL A. HERNANDEZ III, WILLIAM MAHOMES JR., KELLEY SULLIVAN GEORGIADES, AND SAM TORN, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE TEXAS A&M UNIVERSITY SYSTEM BOARD OF REGENTS,

Defendants.

Civil Action No. 4:26-cv-06268

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Contents ........ ii

Table of Authorities ........ iv

Introduction ........ 1

Argument ........ 2

I. Plaintiffs have standing. ........ 2

A. AAUP has associational standing. ........ 2

B. The individual plaintiffs have standing. ........ 3

1. The individual plaintiffs have suffered injury. ........ 3

2. Plaintiffs' injuries are traceable to Defendants. ........ 4

II. Plaintiffs' claims are ripe. ........ 7

III. Defendants are subject to suit under *Ex parte Young*. ........ 8

IV. Plaintiffs are likely to succeed on their First Amendment claim. ........ 10

A. The First Amendment prohibits viewpoint discrimination in university classrooms and prior restraints. ........ 10

1. The First Amendment protects academic freedom for faculty. ........ 11

2. *Garcetti* does not apply and the Censorship Policy fails under *NTEU*. ........ 16

3. Professors' classroom instruction is not government speech. ........ 19

B. Plaintiffs are likely to succeed on their vagueness claim. ........ 20

1. The vagueness doctrine is strict in the area of free expression. ........ 20

2. The Policy fails to give fair notice. ........ 23

3. Shifting, conflicting guidance proves arbitrary enforcement. ........ 24

4. The Policy's vagueness inflicts ongoing, irreparable chill. ........ 25

V. The remaining factors weigh in favor of a preliminary injunction. ........ 25

A. Plaintiffs are suffering irreparable harm. ........ 25

B. The balance of the equities and public interest favor an injunction. .................... 28

C. The requested injunction is necessary for complete relief to the plaintiffs. ............ 28

Conclusion ........................................................................................................................ 30

Certificate of Service ......................................................................................................... 32

## TABLE OF AUTHORITIES

Cases | Page(s)

*ADT, LLC v. Capital Connect, Inc.*,
145 F. Supp. 3d 671 (N.D. Tex. 2015) ........ 26

*Alleman v. Harness*,
2026 WL 2195900 (M.D. La. July 30, 2026) ........ 27

*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014) ........ 27

*Bakken v. United States Military Acad.*,833 F. Supp. 3d 460 (S.D.N.Y. 2026) ........ 26

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ........ 3

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) ........ 7, 8, 26, 27, 28

*Borden v. Sch. Dist. of Twp. of East Brunswick*,
523 F.3d 153 (3d Cir. 2008) ........ 14

*Buchanan v. Alexander*,
919 F.3d 847 (5th Cir. 2019) ........ 2, 7, 11, 12, 13, 18

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005) ........ 19

*Citizens United v. FEC*,
558 U.S. 310 (2010) ........ 29

*Clapper v. Amnesty Int'l USA*,568 U.S. 398 (2013) ........ 3

*Cohen v. San Bernardino Valley Coll.*,
92 F.3d 968 (9th Cir. 1996) ........ 12

*Ctr. for Individual Freedom v. Carmouche*,
449 F.3d 655 (5th Cir. 2006) ........ 25

*Elrod v. Burns*,
427 U.S. 347 (1976) ........ 26

*Epperson v. Arkansas*,
393 U.S. 97 (1968) ........ 15

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*,
624 F.3d 332 (6th Cir. 2010) ........ 14

*Expedi, Inc. v. Rebound Int'l, LLC*,
No. 4:20-CV-3897, 2021 WL 3702169 (S.D. Tex. May 13, 2021)........................................ 27

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)........................................................................................................ 20

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....................................................................................................... 3, 7

*Ford Motor Co. v. Tex. Dep't of Transp.*,264 F.3d 493 (5th Cir. 2001)..................................... 20

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)................................................................................................. 15, 16

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)........................................................................................................ 21

*Heim v. Daniel*,
81 F.4th 212 (2d Cir. 2023) ............................................................................................ 18

*Hotze v. Hollins*,
No. 4:20-CV-03709, 2020 WL 6437668 (S.D. Tex. Nov. 2, 2020) ....................................... 27

*Houston Chronicle v. City of League City*,
488 F.3d 613 (5th Cir. 2007) ............................................................................................ 4

*Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*,
848 F.2d 544 (5th Cir. 1988) .......................................................................................... 21

*Iancu v. Brunetti*,
588 U.S. 388 (2019)........................................................................................................ 11

*Jackson v. Wright*,
82 F.4th 362 (5th Cir. 2023) ...................................................................... 5, 6, 7, 8, 9, 10

*Jackson Federation of Teachers v. Fitch ("JFT")*,
2026 WL 3167654 (5th Cir. Oct. 22, 2026)...................................................... 2, 13, 16, 21, 22

*Janus v. AFSCME, Council 31*,
585 U.S. 878 (2018)........................................................................................................ 17

*Johnson v. United States*,
576 U.S. 591 (2015)........................................................................................................ 22

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)........................................................................................................ 16

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967)...................................................................... 11, 12, 13, 15, 20, 22, 25

*Kilborn v. Amiridis*,
131 F.4th 550 (7th Cir. 2025) .......... 15, 16, 18

*Kilborn v. Amiridis*,
135 F.4th 1100 (7th Cir. 2025) .......... 15

*Kirkland v. Northside Indep. Sch. Dist.*,
890 F.2d 794 (5th Cir. 1989) .......... 18

*La Union del Pueblo Entero v. Abbott*,151 F.4th 273 (5th Cir. 2025).......... 3

*Laird v. Tatum*,408 U.S. 1 (1972).......... 3

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) .......... 19

*Magee v. City of S. Padre Island*,
No. B-09-227, 2011 WL 10646506 (S.D. Tex. Mar. 10, 2011) .......... 23

*Marks Org., Inc. v. Joles*,
784 F. Supp. 2d 322 (S.D.N.Y. 2011).......... 26

*McClelland v. Katy Indep. Sch. Dist.*,
63 F.4th 996 (5th Cir. 2023) .......... 21

*McDonald v. Trs. of Ind. Univ.*,
186 F.4th 917 (7th Cir. 2026) .......... 15

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007).......... 4

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) .......... 12, 18

*Merriott v. City of Bossier City*,
179 F.4th 393 (5th Cir. 2026) .......... 20

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024).......... 8, 11

*Moore v. City of Van, Tex.*,
238 F. Supp. 2d 837 (E.D. Tex. 2003).......... 27

*Moore v. Innova Sols., Inc.*,
No. 3:24-CV-2181-B, 2026 WL 693819 (N.D. Tex. Mar. 12, 2026).......... 3

*Mullis v. Lumpkin*,
47 F.4th 380 (5th Cir. 2022) .......... 14

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958) ..... 30

*NetChoice, L.L.C. v. Fitch*,
134 F.4th 799 (5th Cir. 2025) ..... 2

*Newman v. Plains All Am. Pipeline, L.P.*,23 F.4th 393 (5th Cir. 2022) ..... 14

*Nichols v. Univ. of S. Miss.*,
669 F. Supp. 2d 684 (S.D. Miss. 2009) ..... 16, 17

*North Carolina v. Covington*,
581 U.S. 486 (2017) ..... 30

*Northshore Dev., Inc. v. Lee*,
835 F.2d 580 (5th Cir. 1988) ..... 29

*Oller v. Roussel*,
609 F. App'x 770 (5th Cir. 2015) ..... 16

*Oller v. Roussel*,
No. 6:11-CV-002207, 2014 WL 4204836 (W.D. La. Aug. 22, 2014) ..... 16

*Opulent Life Church v. City of Holly Springs*,
697 F.3d 279 (5th Cir. 2012) ..... 27

*Pernell v. Fla. Bd. of Governors of State Univ.*,
181 F.4th 1135 (11th Cir. 2026) ..... 10, 12, 16, 18, 19

*Pickering v. Bd. of Educ.*,
391 U.S. 563 (1968) ..... 17

*Pugel v. Bd. of Trs. of the Univ. of Ill.*,
378 F.3d 659 (7th Cir. 2004) ..... 18

*Regents of Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978) ..... 14

*Reges v. Cauce*,
175 F.4th 1014 (9th Cir. 2026) ..... 12, 18

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
589 U.S. 423 (2020) ..... 27

*Roake v. Brumley*,
170 F.4th 292 (5th Cir. 2026) ..... 8

*Roark & Hardee LP v. City of Austin*,
522 F.3d 533 (5th Cir. 2008) ..... 20

*Robinson v. Damphousse*,
No. 1:26-CV-00705-ADA, 2026 WL 1333453 (W.D. Tex. May 13, 2026) ............................ 26

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
490 U.S. 477 (1989)............................................................................................. 22

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)............................................................................................... 26

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)............................................................................................. 19

*Roy v. City of Monroe*,
950 F.3d 245 (5th Cir. 2020) ................................................................................ 21

*Serv. Emps. Int'l Union, Local 5 v. City of Houston*,
595 F.3d 588 (5th Cir. 2010) ................................................................................ 21

*Sessions v. Dimaya*,
584 U.S. 148 (2018)............................................................................................. 22

*Shamloo v. Miss. State Bd. of Trs. of Insts. of Higher Learning*,
620 F.2d 516 (5th Cir. 1980) ........................................................... 20, 21, 22, 24

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020) ............................................................................ 4, 8

*Students Engaged in Advancing Tex. v. Paxton*,177 F.4th 665 (5th Cir. 2026) .......................... 29

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)............................................................................................... 4

*Sweezy v. New Hampshire*,354 U.S. 234 (1957)............................................................. 15

*Texas v. United States*,
523 U.S. 296 (1998)............................................................................................... 7

*Tripathy v. Lockwood*, No.,
22-949-PR, 2022 WL 17751273 (2d Cir. Dec. 19, 2022)........................................... 26

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)....................................................................................... 28, 29

*Trump v. New York*,
592 U.S. 125 (2020)............................................................................................... 7

*United States v. Hansen*,
599 U.S. 762 (2023)............................................................................................. 29

*United States v. Nat'l Treasury Emps. Union* ("*NTEU*"),513 U.S. 454 (1995)...................... 10, 17

*United States v. Walker*,
302 F.3d 322 (5th Cir. 2002) ........................................................................................ 14

*Urofsky v. Gilmore*,216 F.3d 401 (4th Cir. 2000)......................................................................... 14

*Vaughan v. Anderson Reg'l Med. Ctr.*,
849 F.3d 588 (5th Cir. 2017) ........................................................................................ 14

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)........................................................................................................ 28

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988)........................................................................................................ 25

*Virginia v. Hicks*,
539 U.S. 113 (2003)........................................................................................................ 29

*Welty v. Dunaway*,Nos. 25-5738/5739, 2026 WL 2874671 (6th Cir. Sept. 24, 2026) ................ 29

*Women's Med. Ctr. of Nw. Hous. v. Bell*,
248 F.3d 411 (5th Cir. 2001) ................................................................................ 20, 22

*Woodlands Pride v. Paxton*,
168 F.4th 293 (5th Cir. 2026) ............................................................................ 4, 8, 21

*Wozniak v. Conry*,
236 F.3d 888 (7th Cir. 2001) ........................................................................................ 14

Statutes

Tex. Const. art. II, § 1 ........................................................................................................ 9

Tex. Educ. Code § 51.352(d)(2)-(4) ........................................................................................ 6

Tex. Educ. Code § 51.352(g) ................................................................................................ 6

Tex. Educ. Code § 85.21(a) ................................................................................................... 9

## INTRODUCTION

Plaintiffs' Motion for Preliminary Injunction established that Defendants enacted the Censorship Policy, mandated its implementation, issued guidance, and maintain hiring and firing power over officials tasked with enforcement, Dkt. 26 at 3–6, 16–18; that Plaintiffs were directly censored by the Policy, *id.* at 8–13; that the Policy bans ideas based on their viewpoint, *e.g.,* professors can teach *Barbie* but not *Moonlight*, Phyllis Schlafly but not *A Gay Manifesto*, *id.* at 22; that "[n]early every word of the Censorship Policy carries contested, subjective meanings,"—neither professors nor their advisors know what violates it, *id.* at 29–31; and that has manifested in contradictory, confusing guidance and arbitrary enforcement, *e.g.* one department declared that the Policy reaches only LGBTQ, not heteronormative themes, another advisor has tethered the definition of advocacy to students' subjective feelings, and another professor was told that some of his slides violated the policy, but not which ones, *id.* at 30–33. Defendants contest none of this.

Instead, Defendants rely on unsupported legal theories. First, Defendants claim that Plaintiffs lack standing because censorship is not an injury and their injuries are not traceable to Defendants. But censorship injures Plaintiffs' First Amendment rights, and controlling case law establishes that such injuries are traceable to Defendants because of their control over university-level officials. For similar reasons, the *Ex parte Young* exception to sovereign immunity applies.

On the merits, Defendants admit that the Censorship Policy limits what professors can say in the classroom based on viewpoint but assert that professors are mere mouthpieces of the State, which may dictate every word of classroom discussion. Controlling Supreme Court and Fifth Circuit precedent forecloses that view. The Fifth Circuit, in a precedential ruling on the merits of a university professor's First Amendment academic freedom claim, recognized that "[t]he Supreme Court has established that academic freedom is a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. Accordingly,

classroom discussion is protected activity." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (internal quotation marks and citations omitted).

The Fifth Circuit's recent opinion in *Jackson Federation of Teachers v. Fitch* ("*JFT*"), No. 25-60496, 2026 WL 3167654 (5th Cir. Oct. 22, 2026), does not and cannot displace *Buchanan*. There, the court reassigned the case because the district court had relied on artificial intelligence and included hallucinated citations. Its non-precedential guidance on remand treats K-12 and university classrooms the same and suggests professors have no First Amendment right in classroom speech—but that guidance is not central to the holding, and under the rule of orderliness, the prior precedent of *Buchanan* controls. *See infra* Part IV.A.1.

On vagueness, Defendants do not contest the facts showing that the Policy fails to give fair notice and has been enforced arbitrarily and discriminatorily, arguing only that their ad hoc, standardless review process mitigates these defects.

On the equities, Defendants argue that Plaintiffs waited too long to bring their suit, but Plaintiffs acted promptly from when they were injured, especially given the need to investigate a chaotic rollout. And, regardless, First Amendment harms are *per se* irreparable. Defendants argue that relief should be limited to Plaintiffs, but such an approach is ill-fitted for a First Amendment facial challenge, particularly given that AAUP members are spread across all A&M campuses.

## ARGUMENT

### I. Plaintiffs have standing.

#### A. AAUP has associational standing.

Plaintiffs' Motion established that AAUP has associational standing because "(1) its individual members would have standing to bring the suit; (2) [it] seeks to vindicate interests germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804 (5th Cir. 2025).

Defendants do not contest that Plaintiffs meet the second and third factors for associational standing. *See* Dkt. 26 at 14–15; *see generally* Dkt. 36; *Moore v. Innova Sols., Inc.*, No. 3:24-CV-2181-B, 2026 WL 693819, at *4 (N.D. Tex. Mar. 12, 2026) ("In this Circuit, a party who fails to respond to an argument generally waives and abandons the issue."). As to the first factor, it is uncontested that every named Plaintiff is an AAUP member, Dkt. 26-9 ¶¶1, 4 (Bright); Dkt. 26-5 ¶¶1, 3 (Reddy); Dkt. 26-1 ¶¶1, 4 (Sadler); Dkt. 26-4 ¶¶2, 4 (George). As shown below, each has standing. Further, other members of AAUP have also been injured by the Policy. Dkt. 26 at 8.

### B. The individual plaintiffs have standing.

#### 1. The individual plaintiffs have suffered injury.

There is no dispute that the Policy has censored the named Plaintiffs. Defendants do not contest that each Professor was forced to stop teaching at least one class. Dkt. 26-9 ¶¶24–27 (Bright); Dkt. 26-5 ¶¶12–15 (Reddy); Dkt. 26-1 ¶¶18–21 (Sadler); Dkt. 26-4 ¶¶25–26 (George). Professors Sadler and George were also forced to remove materials from other syllabi, and the Policy bars discussion of any issues outside the approved syllabus. Dkt. 26-1 ¶¶13–14 (Sadler); Dkt. 26-4 ¶¶10–12, 18–19, 24 (George); Dkt. 26 at 4 (System Policy 12.01 § 1.2).

Nothing more is required: silencing Plaintiffs' speech is an Article III injury. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6, 67–68 (1963) (informal censorship actionable; publishers had standing); *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) ("Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish."). This actual censorship distinguishes Defendants' cases, where there was no enforcement and the threats were too uncertain or attenuated to confer standing.[1]

---

[1] *See, e.g., Laird v. Tat*um, 408 U.S. 1, 13-14 (1972)*; Clapper v. Amnesty Int'l U*SA, 568 U.S. 398, 410 (2013)*; La Union del Pueblo Entero v. Abbo*tt, 151 F.4th 273, 286-87 (5th Cir. 2025).

It also refutes Defendants' argument that Plaintiffs allege only speculative chill—though chill would suffice. "[C]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330-31 (5th Cir. 2020) (quoting *Houston Chronicle v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007)); *Woodlands Pride v. Paxton*, 168 F.4th 293, 301 n.5 (5th Cir. 2026) ("In a facial vagueness challenge, chilled speech remains 'a constitutional harm adequate to satisfy the injury-in-fact requirement.'" (citation omitted)).

Defendants also suggest censorship is no injury absent discipline. Dkt. 36 at 8. But "where threatened action by *government* is concerned, [the Supreme Court does] not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). That Plaintiffs complied rather than risk discipline, including termination, Dkt. 1 ¶19, does not defeat their injury, because such "threat-eliminating behavior [is] effectively coerced." *MedImmune*, 549 U.S. at 129.

Plaintiffs also allege a threat of future injury: the Policy remains on the books, their classes remain canceled, their materials remain banned, and they still cannot tell what the Policy proscribes. Dkt. 26-9 ¶¶ 48–51 (Bright); Dkt. 26-5 ¶¶ 18–25 (Reddy); Dkt. 26-1 ¶¶ 18–26 (Sadler); Dkt. 26-4 ¶¶ 24–26, 31 (George). Past censorship makes their fear of future censorship reasonable. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (citation omitted) ("past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical'").

**2. Plaintiffs' injuries are traceable to Defendants.**

Plaintiffs' Opposition to the Motion to Dismiss refuted Defendants' traceability argument. Dkt. 37 at 5–6. Defendants do not address the relevant facts established in the Motion, including:

- The Board of Regents unanimously adopted and amended the Policy and directly enforces it—including through promulgating guidance on its interpretation and implementation. Dkt. 26-2 at 68 (Cook Decl. Ex. K), 88 (Cook Decl. Ex. O), 102

(Cook Decl. Ex. R); *see also* Dkt. 26-3 ¶7 & Ex. C (Lakkimsetti) (noting that interpretation of gender identity as meaning nonbinary and trans, and sexual orientation to concern people who are not heterosexual came from the "BoR/central admin").

- The Board also "expanded" and promotes a System-wide reporting mechanism to allow students, or any member of the public, to report alleged violations of the Policy. Decl. of J. Aycock, Ex. C; *see also* Dkt. 26-4 ¶32 & Ex. K (George).

- The Board controls—including through hiring and firing power—the other officials who enforce the Policy, including each campus chief executive whom the Board has tasked with personally approving any course that would address the forbidden subjects. Dkt. 26 at 4, 16, 18.

Defendants' declarations do not contradict these facts. Dr. Michael Johnson describes the College Station syllabus review but says nothing about the Board Defendants' role. Dkt. 36-2.

Vice Chancellor for Academic Affairs Dr. James Hallmark does not dispute Plaintiffs' facts about Defendants' involvement in the Policy. He concedes the Board adopted it. Dkt. 36-1 ¶4. And his testimony that the system-wide Chancellor's office—which reports directly to the Board, *see* Dkt. 26-2 at 90 (Cook Decl. Ex. P)—"oversee[s]" programs at "A&M System's member institutions" and is responsible for "system-wide initiatives" is consistent with the Board's system-wide control. Dkt. 36-1 ¶2.

Nor does Dr. Hallmark deny that the Board has promulgated guidance mandating how university presidents must enforce the Policy. *E.g.*, Dkt. 26-2 at 102 (Cook Decl. Ex. R) (non-core courses "**must not** teach or *advocate* race or gender ideology, sexual orientation, or gender identity.") (first emphasis added, second emphasis in the original). Plaintiffs' uncontested evidence shows that Dr. Hallmark himself sent the first System implementation guidance to the CEO of each Texas A&M System member institution. Dkt. 26-2 at 68 (Cook Decl. Ex. K).

Under these facts, *Jackson v. Wright*'s traceability analysis controls. 82 F.4th 362, 368–69 (5th Cir. 2023); *see* Dkt. 37 at 5–6; *contra* Dkt. 38 at 2–3. There, a professor complained that UNT

campus-level officials (a department chair, a Dean, and a Provost) removed him from his role with an academic journal. *Jackson*, 82 F.4th at 365–66. The Fifth Circuit held these officials' actions traceable to the Board because of its "direct governing authority" over them, "including authority to countermand the decisions of the subordinate UNT officials." *Id.* at 368–69. In their Reply in support of their Motion to Dismiss, Defendants claim *Jackson* is inapposite because the Board cannot countermand university-level decisions at Texas A&M. Dkt. 38 at 2–3. They offer no factual support for this false contention, which is notably absent from Dr. Hallmark's declaration. The Board has broad, undisputed authority over the universities and member CEOs, including the power to hire and fire them. *See* Dkt. 26 at 16; System Policy 01.03, § 1; Tex. Educ. Code § 51.352(d)(2)-(4); *id.* § 51.352(g); *see also* System Policy 02.01, § 1.3(b)-(c); System Policy 01.03, § 2. The Board can question any decision regarding a class or instructor and can fire any member CEO who declines to heed its direction.

Indeed, the Board publicly demonstrated its ability to intervene in individual decisions in the months before adopting the Policy, when recordings of an A&M lecturer discussing gender identity in a lesson circulated online.[2] Chancellor Glenn Hegar immediately stated: "I will work with the Board of Regents to make certain that the A&M System takes the disciplinary action necessary to ensure this does not happen again at one of our campuses."[3] The lecturer was fired the next day, despite the campus president's earlier representation that "firing" the lecturer was "not happening."[4]

---

[2] Decl. of J. Aycock, Ex. A, Jessica Priest, *Video of Clash Over Gender-Identity Content in Texas A&M Children's Lit Class Leads to Firing, Removals*, Tex. Tribune (Sept. 9, 2025), https://perma.cc/R7JL-ZEZY.

[3] Decl. of J. Aycock, Ex. B, Glenn Hegar, @Glenn_Hegar, X (Sept. 8, 2025, 7:00 PM), https://x.com/Glenn_Hegar/status/1965203549945811437.

[4] Priest, *supra* note 2.

In *Jackson*, this "direct governing authority over" university-level officials, 82 F.4th at 368, sufficed for traceability; so too here. Indeed, by enacting the Policy and guiding its implementation, the Board is far more connected to the Policy than the *Jackson* Board, which took no affirmative action against the professor and merely had notice of his removal from the journal. *Id. See also Buchanan*, 919 F.3d at 854–55 (holding professor should have sued the university's governing board, as opposed to other lower-level university employees and officials, because "[t]he proper defendants to a facial challenge are the parties responsible for creating or enforcing the challenged law or policy").

Further, Defendants do not contest that even if the other enforcing officials were independent third parties, traceability would still be satisfied. "[P]laintiffs have standing to sue government entities that injure them through another entity." *Book People, Inc. v. Wong*, 91 F.4th 318, 330 & n.59 (5th Cir. 2024) (collecting cases);*see also* Dkt. 37 at 6.

Finally, Defendants' failure to contest redressability, *see* Dkt. 36 at 8–9, underscores that Plaintiffs' injuries are traceable. *See All. for Hippocratic Med.*, 602 U.S. at 380–81 (redressability and traceability are "flip sides of the same coin" and "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury.").

## II. Plaintiffs' claims are ripe.

Defendants' ripeness argument rests on the false premise that the "Challenged Policies . . . have not been enforced by any Defendants against [Plaintiffs] or anyone else." Dkt. 36 at 10; *but see* Dkt. 37 at 6–7. The Policy is in force, and there is no speculation about its enforcement: Plaintiffs and others have had their classes canceled, syllabi stripped, and voices censored. Dkt. 26 at 8–13; *see supra* Part I.B.1. Plaintiffs' injuries are not "dependent on 'contingent future events,'" *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

And this is not an "abstract disagreement," as in *Roake v. Brumley*, a pre-enforcement challenge to a Louisiana statute setting minimum requirements for Ten Commandments posters in classrooms, which the court held left "numerous essential questions unanswered." 170 F.4th 292, 297–98 (5th Cir. 2026) (en banc) (per curiam).

Like *Roake*, *Moody v. NetChoice*, *LLC*, 603 U.S. 707 (2024), was a pre-enforcement challenge, but it says nothing about ripeness. The *Moody* Court remanded for the balancing a facial First Amendment challenge requires. *Id.* at 744-45. The social-media content-moderation laws required factual development because the "online world is variegated and complex." *Id.* at 725. No such "complex" facts are presented by a university speech code, which courts often analyze. *See, e.g.*, *Fenves*, 979 F.3d at 338–39 (noting "the consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague"). *Moody* also does not reach Plaintiffs' vagueness claim, *Woodlands Pride*, 168 F.4th at 307–08 (applying *Moody* to overbreadth but not vagueness), or Plaintiffs' as-applied claims, which rest on enforcement against Plaintiffs themselves.

## III. Defendants are subject to suit under *Ex parte Young*.

Defendants' attempt to avoid *Ex parte Young* fails for the reasons in Plaintiffs' Opposition to the Motion to Dismiss. Dkt. 37 at 7–10. First, the Policy has been enforced: Plaintiffs' uncontested evidence shows that university officials censored Plaintiffs. *See supra* Part I.B.1. Defendants cite no authority suggesting that only "termination" or "disciplinary proceedings" qualify as enforcement. *See* Dkt. 36 at 13. Second, Defendants have an adequate "connection with the enforcement of the" challenged policy, *Book People*, 91 F.4th at 334 (internal quotation marks and citation omitted), because two "guideposts" are fulfilled: (1) a mere "scintilla" of enforcement; and (2) more than a "general duty" to implement the "laws of the state." *Jackson*, 82 F.4th at 367 (internal quotation marks and citations omitted).

As to the first guidepost, *Jackson*, which controls, held that the UNT Regents "ha[d] the required 'scintilla of enforcement' due to their governing authority over UNT," as evidenced by their policies. 82 F.4th at 367. Defendants do not refute that they govern the entire A&M System, Tex. Educ. Code § 85.21(a), and they are far more involved in enforcement than the *Jackson* Regents: they adopted the Policy, issued rounds of guidance, control its implementation and the campus presidents who carry it out, and established a System-wide mechanism for reporting violations. *See supra* Part I.B.2.

*Jackson* also controls the second guidepost. Defendants do not address the holding that the board had "more than 'the general duty to see that the laws of the state are implemented'" because it had "direct governing authority over the UNT officials that [were] allegedly continuing to violate [plaintiff's] First Amendment rights, including authority to countermand the decisions of the subordinate UNT officials." *Jackson*, 82 F.4th at 367–68. As established with respect to traceability, Defendants have the same "direct governing authority," *id.* at 368, over those who implement the Policy.

This direct governing authority also refutes Defendants' comparison of the Board "to members of the Texas Legislature." Dkt. 36 at 13. While members of the Texas Legislature and members of the Executive Branch belong to "distinct departments, each of which shall be confided to a separate body," Tex. Const. art. II, § 1, the Board directly oversees the university system. In other words, there is no "separation of powers" within the System.

Third, Plaintiffs have shown "*ongoing* violations of federal law" by Defendants since 2025, *contra* Dkt. 36 at 13–14, through ongoing enforcement actions by the Board, including its continual direction and oversight of implementation, issuance of interpretive guidance, and promotion of a System-wide reporting mechanism. *See supra* Part I.B.2. *Jackson* rejected a similar

objection and held the plaintiff was "properly request[ing] only prospective relief[.]" 82 F.4th at 368.

## IV. Plaintiffs are likely to succeed on their First Amendment claim.

### A. The First Amendment prohibits viewpoint discrimination in university classrooms and prior restraints.

Plaintiffs do not dispute that public universities can, and indeed must, control their curricula—deciding what courses to offer is necessary to any institution of higher education. But that is not what this Policy does.

Plaintiffs' Motion established that the Censorship Policy is a viewpoint-discriminatory ban on teaching certain ideas about "Race Ideology," "Gender Ideology," sexual orientation, and gender identity in the classroom while allowing advocacy of opposing views and is therefore an unconstitutional abridgment of Plaintiffs' First Amendment rights. Dkt. 26 at 18–24. The First Amendment does not permit public universities to employ viewpoint-based restrictions in the classroom: "[v]iewpoint-based restrictions designed to compel or ban a set of beliefs are dangerous in any setting, and they are especially pernicious in the classroom context." *Pernell v. Fla. Bd. of Governors of State Univ.*, 181 F.4th 1135, 1149 (11th Cir. 2026), *petition for cert. filed*, No. 26-475 (U.S. Oct. 5, 2026). Moreover, the Policy imposes a prior restraint by subjecting professors' instruction to pre-approval and prohibiting their classroom speech before it happens. Dkt. 26 at 24–25. The Policy fails strict scrutiny because the state lacks a legitimate interest in preventing adult students from being exposed to disfavored ideas. *Id.* at 26. And to the extent the employee speech doctrine applies, the Policy fails under *United States v. Nat'l Treasury Emps. Union ("NTEU")*, 513 U.S. 454 (1995), because faculty and students have a strong interest in the free exchange of ideas at a university and the state lacks a legitimate interest in banning disfavored viewpoints in the classroom. *Id.* at 26–28.

The Censorship Policy is a prior restraint that bars professors from all unapproved "advocacy" of "race or gender ideology, or topics related to sexual orientation or gender identity" in academic courses without barring any advocacy *against* those things. Dkt. 1 ¶¶77–90; Dkt. 26 at 21–25. Because the criteria for violation of the Policy are based entirely on viewpoint, Dkt. 26 at 21–24, the sweep of the Policy is entirely unconstitutional. *See Moody*, 603 U.S. at 723–25 (setting forth two-step process for assessing facial First Amendment challenges to state laws). Defendants do not deny that the Policy is viewpoint-based, nor do they assert that there are any non-viewpoint-based applications of the Policy. *See Iancu v. Brunetti*, 588 U.S. 388, 398–99 (2019) (explaining that in *Matal v. Tam* "[t]he Court's finding of viewpoint bias ended the matter").

### 1. **The First Amendment protects academic freedom for faculty**.

The Supreme Court has declared academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy ***over the classroom***." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (emphasis added). Based on this binding precedent, the Fifth Circuit holds that university "classroom discussion is protected activity." *Buchanan*, 919 F.3d at 852 (citation omitted). In *Buchanan*, the Fifth Circuit considered a First Amendment claim regarding a terminated professor's "use of profanity and discussion of her sex life and the sex lives of her students." *Id.* at 853. Relying on *Keyishian,* the court held that classroom discussion is protected, *id.* at 852, but that "even this protection has limits: Students, teachers, and professors are not permitted to say anything and everything simply because the words are uttered in the classroom context." *Id.* The court differentiated speech that serves an academic purpose and speech that does not. In conducting a *Pickering* analysis, *Buchanan* reasoned that the First Amendment did not protect profanity and personal discussions of the professor's sex life because they were unrelated to the "subject matter or purpose of training Pre-K–Third grade

teachers," and "in the college classroom context, speech that does not serve an academic purpose is not of public concern." *Id.* at 853. It then distinguished *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968 (9th Cir. 1996), on the basis that the controversial classroom discussions there were "at least tangentially related" to teaching college-level English. *Buchanan,* 919 F.3d at 854 (citations omitted). Thus, *Buchanan* teaches that the First Amendment protects professors' classroom discussion that serves an academic purpose, but not discussion unrelated to any academic purpose.

Contrary to Defendants' claims, it is well-established that academic speech is special and unique considerations apply, because "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian*, 385 U.S. at 603. Indeed, "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'" *Id.* (citation omitted).

Yet Defendants' response never mentions *Keyishian* and omits *Buchanan*'s core reasoning. Circuit courts nationwide have made clear that the First Amendment affords university professors the right to speak freely on matters germane to their academic disciplines in the classroom. Dkt. 26 at 18–21 (citing *Pernell*, 181 F.4th at 1149 (holding that Florida's Stop W.O.K.E. Act violates professors' First Amendment academic freedom rights); *Reges v. Cauce*, 175 F.4th 1014 (9th Cir. 2026) (holding that a professor's parody land acknowledgment on his syllabus was protected by academic freedom and the First Amendment); *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021) (holding that academic freedom and the First Amendment protect a professor's choice of how to respectfully address students)).

The Fifth Circuit's recent opinion in *JFT*, 2026 WL 3167654, does not mandate a different result because any contrary view is not part of the core holding and, under the rule of orderliness, is subordinate to prior Fifth Circuit decisions. In *JFT*, the court vacated a preliminary injunction against a law that, among other things, prohibited educators from endorsing or promoting DEI in course materials in public K-12 schools and colleges, and reassigned the case after the district court issued multiple opinions riddled with AI-hallucinated facts and law. *Id.* at *1–7. The court held that the district court "got the law wrong" by failing to analyze the law's scope and constitutional applications under *Moody* and by applying the wrong preliminary-injunction standards. *Id.* at *2–7. The holding goes no further.

The panel also offered non-precedential guidance to the new judge that, mostly in footnotes, mischaracterized binding academic-freedom case law to announce that university classroom instruction falls wholly outside the First Amendment. *Id.* at *8–14. But Supreme Court decisions do not expire, and *Keyishian*, which has never been overruled, speaks to classroom instruction. Neither the Fifth Circuit nor this Court can ignore its teaching that "the First Amendment . . . does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603.

Second, although the *JFT* panel quoted *Buchanan* regarding "speech that does not serve an academic purpose" falling "outside the protection of the First Amendment," *JFT*, 2026 WL 3167654, at *12 n.36, it ignored *Buchanan*'s parallel holding, based on *Keyishian*, that classroom instruction that *does* serve an academic purpose is protected by the First Amendment's guarantee of academic freedom. *Buchanan*, 919 F.3d at 852. In the context of university instruction, the *Buchanan* court plainly held "classroom discussion is protected activity." *Id.* at 852.

The Fifth Circuit "adheres to a 'rule of orderliness,' under which a panel may not overturn a controlling precedent 'absent an intervening change in law, such as by a statutory amendment, or the Supreme Court, or our en banc court.'" *Vaughan v. Anderson Reg'l Med. Ctr.*, 849 F.3d 588, 591 (5th Cir. 2017) (citation omitted). Accordingly, where there is conflict between two panels, the prior panel controls. *United States v. Walker*, 302 F.3d 322, 325 (5th Cir. 2002) (declining to follow later issued opinion "based on this circuit's rule that one panel may not overrule a prior panel opinion and the earlier precedent controls"). Here, the *Buchanan* court's interpretation of *Keyishian* and its reasoning are both binding on this Court under the rule of orderliness. *Mullis v. Lumpkin*, 47 F.4th 380, 391 (5th Cir. 2022) ("When a panel of our court decides the meaning of a Supreme Court opinion, it binds later panels to that interpretation."); *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 400 n.28 (5th Cir. 2022) ("The rule of orderliness applies as equally to a panel's implicit reasoning as it does to its express holdings.").

Defendants lack any other controlling authority in their favor. *Urofsky v. Gilmore* concerned a group of professors' challenge to a ban on accessing sexually explicit materials on state-owned computers. 216 F.3d 401 (4th Cir. 2000) (en banc). And *Wozniak v. Conry* pertained to a dispute over the school's grading process. 236 F.3d 888, 891 (7th Cir. 2001).

*Regents of Univ. of Cal. v. Bakke* is an affirmative action case that recognized that "[a]cademic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment" and that a university's "judgments as to education includes the selection of its student body." 438 U.S. 265, 312 (1978) (opinion of Powell, J.). The case never speaks to academic freedom rights held by faculty members. Moreover, *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332 (6th Cir. 2010) and *Borden v. Sch. Dist. of Twp. of East Brunswick*, 523 F.3d 153 (3d Cir. 2008) both concern the K-

12 context, where educators have less robust First Amendment protections. *See, e.g.*, *Evans-Marshall*, 624 F.3d at 344 ("'[U]niversities occupy a special niche in our constitutional tradition' and the constitutional rules applicable in higher education do not necessarily apply in primary and secondary schools." (citation omitted)).

Defendants also cite numerous minority opinions that are not law. They quote the concurrence in *Epperson v. Arkansas*, but the Supreme Court invalidated a statute that banned teaching evolution in public schools, and admonished that "[t]he State's undoubted right to prescribe the curriculum for its public schools does not carry with it the right to prohibit . . . the teaching of a scientific theory or doctrine where that prohibition is based upon reasons that violate the First Amendment." 393 U.S. 97, 107 (1968) (citing *Keyishian*, 385 U.S. at 605–06).

In *McDonald v. Trs. of Ind. Univ.*, 186 F.4th 917 (7th Cir. 2026), the court held that the plaintiffs lacked standing without reaching the merits. *Id.* at 921. It did **not** adopt the concurrence's theory that "academic freedom belongs to the university" and not to professors. *Id.* at 930 (Easterbrook, J., concurring). And in *Kilborn v. Amiridis*, 131 F.4th 550, 557–58 (7th Cir. 2025), the Seventh Circuit held that a professor's "in-class remarks [that] fall within his teaching responsibilities" implicate constitutional interests pertaining to academic freedom. In a statement respecting the denial of rehearing en banc, one judge opined that, when a professor and a university disagree about teaching, "the university has to win," and that a university may require professors to avoid derogatory language in class. *Kilborn v. Amiridis*, 135 F.4th 1100, 1101–02 (7th Cir. 2025) (Easterbrook, J., statement respecting denial of reh'g en banc). Nothing about the holding in either *McDonald* or *Kilborn* supports Defendants' position.

Nor can the idea that academic freedom belongs **solely** to the university be squared with *Keyishian's* protection of classroom discussion by professors: "Scholarship cannot flourish in an

atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Keyishian,* 385 U.S. at 603 (quoting *Sweezy v. State of New Hampshire*, 354 U.S. 234, 250 (1957)).

**2. *Garcetti* does not apply and the Censorship Policy fails under *NTEU*.**

Applying public-employee speech doctrine poses no impediment to granting a preliminary injunction. To begin, the Court should reject Defendants' attempt to apply *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006), to public university professors. The Supreme Court expressly reserved the question of whether the case applies to speech related to university instruction. *Id.* at 425. Defendants do not cite authority from any circuit applying the *Garcetti* rule to a university professor's teaching. In fact, the Seventh Circuit recently noted that "[e]very other circuit to decide the issue has recognized that *Garcetti* does not apply to university teaching or scholarship."[5] *Kilborn*, 131 F.4th at 558. For good reason: "if *Garcetti* applies to all aspects of scholarship and teaching, academic freedom is a nullity." *Pernell*, 181 F.4th at 1153. "And that cannot be—though the Supreme Court has been stingy about the details of academic freedom, it has been generous in its declarations that scholarship and teaching are part of the First Amendment package." *Id.*

The two district court cases Defendants cite—*Oller v. Roussel*, No. 6:11-CV-002207, 2014 WL 4204836 (W.D. La. Aug. 22, 2014) and *Nichols v. Univ. of S. Miss.*, 669 F. Supp. 2d 684,

[5] The Fifth Circuit's *JFT* decision does not hold that *Garcetti* applies to university professors' classroom instruction. 2026 WL 3167654, at *11. Rather, the court instructs the district court to consider the Supreme Court's application of *Garcetti* in *Kennedy v. Bremerton School District*, 597 U.S. 507, 527 (2022) on remand. *Id.* But *Kennedy* concerned a high school football coach taking part in prayer and giving speeches on the field after football games, not instruction in a university classroom. 597 U.S. at 514–20. Accordingly, the Fifth Circuit simply recognizes that the district court must "follow *Kennedy*'s application of *Garcetti*" where "the personal (e.g., non-curricular) statements of teachers and professors in the classroom are implicated." 2026 WL 3167654, at *12. That instruction is irrelevant in cases only involving college professors' classroom instruction.

698–99 (S.D. Miss. 2009)—do not address whether it is appropriate to apply *Garcetti* in higher education. In *Oller*, the district court granted summary judgment to the defendants principally because the plaintiff professor had not suffered an adverse employment action. 2014 WL 4204836, at *3–5. On appeal, the per curiam Fifth Circuit did not mention *Garcetti*; it affirmed because the plaintiff "fail[ed] to show evidence that Defendants have prohibited him from stating his beliefs or censored his speech." *Oller v. Roussel*, 609 F. App'x 770, 774 (5th Cir. 2015) (per curiam). *Nichols* concerned a music instructor disparaging homosexuality in a conversation with a student after a voice lesson. 669 F. Supp. 2d at 688–91. While the district court referenced *Garcetti*, it relied on cases from the K-12 context and held that the First Amendment was not implicated because the plaintiff was not speaking as a citizen on a matter of public concern. *Id.* at 698–99.

Defendants do not refute that *NTEU*, 513 U.S. 454, establishes the appropriate test. Dkt. 26 at 26-28. There, the Supreme Court distinguished *ex post* challenges by employees sanctioned for their speech, *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), from challenges to *ex ante* rules that operate as a "wholesale deterrent to a broad category of expression by a massive number of potential speakers," and raise "far more serious concerns." *NTEU*, 513 U.S. at 467–68. Where those concerns are present, "the government must shoulder a correspondingly 'heav[ier]' burden, and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights." *Janus v. AFSCME, Council 31*, 585 U.S. 878, 907 (2018) (citations omitted) (quoting *NTEU*, 513 U.S. at 466).[6]

[6] In a footnote, Defendants argue that *Janus*'s application of *NTEU* is inapposite because this case does not involve a law compelling speech in support of third parties. Dkt. 36 at 20–21 n.13. But *NTEU* itself does not involve speech in support of third parties, and *Janus* explained that it applied the *NTEU* test because the "speech-restrictive law" at issue imposed "a blanket requirement" with a "widespread impact" on employees. 585 U.S. at 907. Just so here. Defendants also cite *Janus*'s discussion of *Garcetti*, but *Janus* did not involve university professors' instruction, about which *Garcetti* expressly reserved comment.

This case falls into the *NTEU* category. Indeed, Defendants agree *Pickering* is an unsuitable fit because Plaintiffs were not terminated. Dkt. 36 at 21. The questions the Court should ask here are: (1) "[whether] the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government"; (2) whether the asserted harms are "real, not merely conjectural"; and (3) whether the regulation will "alleviate the[] harms in a direct and material way." *NTEU*, 513 U.S. at 468, 475. Plaintiffs established in their motion that, under this test, the Censorship Policy is unconstitutional. *See* Dkt. 26 at 27–28; *cf.* Dkt. 36 at 20–25.

Regardless, Plaintiffs also meet the *Pickering* test. At step one, Plaintiffs' in-class speech is protected. Defendants argue curriculum-related speech is inherently not of public concern, but that ignores *Buchanan*, which held that "classroom discussion is protected activity." 919 F.3d at 852. As discussed above, *Buchanan* distinguished discussion that serves an academic purpose, which is protected, from discussion unrelated to an academic purpose, which is not. *Id.* at 853–54. The discussions of gender, sexuality, and race targeted by the Policy serve an academic purpose and are therefore of public concern. *See also Meriwether*, 992 F.3d at 507 (in-class instruction is speech on a matter of public concern); *Reges*, 175 F.4th at 1033 (same); *Kilborn*, 131 F.4th at 557, 559–61 (same); *cf. Pernell*, 181 F.4th at 1159–64 (applying *Pickering* balancing to university professors' classroom speech and holding the State's interests insufficient).

Defendants cite *Kirkland v. Northside Independent School Dist.* to argue that Plaintiffs must show the "words or conduct" in question "are conveyed by the teacher in his role as a citizen and not in his role as an employee." 890 F.2d 794, 799 (5th Cir. 1989). But that case involves high school instruction and predates *Garcetti*'s express reservation of whether classroom instruction is covered by the employee-speech jurisprudence. Regardless, *Buchanan*'s holding controls here.

On *Pickering* step two, Plaintiffs' First Amendment interest outweighs any university interest in regulating their speech. Courts have recognized that universities may have interests in making personnel decisions to ensure that faculty members employ sound academic methodology, *Heim v. Daniel*, 81 F.4th 212, 230–32 (2d Cir. 2023), or prevent professors from publishing research based on fraudulent data, *Pugel v. Bd. of Trs. of the Univ. of Ill.*, 378 F.3d 659, 668 (7th Cir. 2004). But they have no valid interest in prophylactically banning ideas from the classroom based on viewpoint. *Pernell*, 181 F.4th at 1161. Defendants offer no such interest here.

**3. Professors' classroom instruction is not government speech.**

Defendants' position that professors are hired guns who speak for the State is contradicted by A&M System Policy 12.01. Dkt. 26 at 2–3. Section 1.1 recognizes that "[e]ach faculty member must be free from the corrosive fear that others, inside or outside the academic community, because their vision may differ, may threaten the faculty member's professional career or the material benefits accruing from it." Section 1.2 states that "[e]ach faculty member is entitled to full freedom in the classroom in discussing the subject that the faculty member teaches." The Fifth Circuit has never held that university professors' speech instructing adult students is government speech;other courts have rejected the notion. *See, e.g.*, *Pernell*, 181 F.4th at 1155–58.

Defendants' government speech theory relies on two book-curation cases: *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc) and *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005). Neither restricted an individual speaker's expression or addressed universities or classroom instruction, so neither bears on whether a college professor's classroom speech is protected.

Finally, in pointing to the Supreme Court's dicta in *Rosenberger v. Rector & Visitors of Univ. of Va.*, stating that "[w]hen the University determines the content of the education it provides, it is the University speaking" and the government may "regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own

message," 515 U.S. 819, 833 (1995), they completely ignore the Court's immediate qualification of that statement: "It does not follow . . . that viewpoint-based restrictions are proper," because a "holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles." *Id.* at 834. The *Rosenberger* Court recognized that viewpoint-based restrictions, like the Censorship Policy, are "presumed to be unconstitutional." *Id.* at 828.

**B. Plaintiffs are likely to succeed on their vagueness claim.**

**1. The vagueness doctrine is strict in the area of free expression.**

The Due Process Clause of the Fourteenth Amendment prohibits state laws or regulations that are "so vague that persons of common intelligence must necessarily guess at their meaning and differ as to their application." *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) (citation modified). Contrary to the Response, Dkt. 36 at 26, the doctrine is not limited to criminal laws. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (FCC regulations); *Keyishian*, 385 U.S. at 603–04 (faculty rules); *Merriott v. City of Bossier City*, 179 F.4th 393, 407-09 (5th Cir. 2026) (speech at city council meeting).

The Board cites *Ford Motor Co. v. Tex. Dep't of Transp.*, which applied "a less stringent standard" to "civil statutes that regulate economic activity." 264 F.3d 493, 507 (5th Cir. 2001); Dkt. 36 at 27. Here, because the Policy touches on free expression, a "strict" standard applies, and "precision of regulation must be the touchstone." *Keyishian*, 385 U.S. at 603–04. Vagueness challenges can succeed when the law has the "capacity" to chill protected speech. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008) (collecting cases).

Nor does the presumption of constitutionality, which applies to every law, displace the stringent standard. The Supreme Court and the Fifth Circuit have invalidated vague university rules that touch on speech. *See, e.g.*, *Keyishian*, 385 U.S. at 603–04; *Shamloo v. Miss. State Bd. of*

*Trs. of Insts. of Higher Learning*, 620 F.2d 516, 523–24 (5th Cir. 1980) (university rule permitting only "wholesome" activities void for vagueness). Likewise, the Board's reliance on *Magee* and *Hill* for the proposition that a rule "surely valid 'in the vast majority of its intended applications'" survives a facial attack misses the mark. Dkt. 36 at 36. This Policy is neither clear nor valid in the vast majority of its intended applications, including with respect to syllabus reviews, guidance, exception requests, and course cancellations.

*JFT*, 2026 WL 3167654, does not change the standard. *JFT* relied on the *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023) "all of its applications" formulation and said a facial vagueness challenge fails if the law has a "clear core of meaning" in some "foreseeable application." *JFT*, 2026 WL 3167654, at *13–14. But allowing a law that implicates the First Amendment to stand if one application is understandable, even where most of it is not, contradicts Fifth Circuit precedent that "[b]ecause the First Amendment needs 'breathing space,' government regulation must be drawn with some specificity." *Serv. Emps. Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) ("*SEIU*") (quoting *Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*, 848 F.2d 544, 559 (5th Cir. 1988)). Accordingly, "[r]egulation of speech must be through laws whose prohibitions are clear. Flexibility in a statute is permissible, but the statute must provide 'fair notice' so that its prohibitions may be avoided by those who wish to do so." *SEIU*, 595 F.3d at 596–97 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110–12 (1972)).

Contrary to *JFT*, this case law is not confined to the political assembly context. A litany of Fifth Circuit cases apply the more stringent standard when the First Amendment is implicated. *Contra* Dkt. 38 at 10; *compare JFT*, 2026 WL 3167654, at *13 n.37, *with, e.g.*, *Shamloo,* 620 F.2d at 523 (analyzing university student demonstration regulations and noting "[t]he degree of specificity required in regulations affecting First Amendment rights is even greater"); *Woodlands*

*Pride*, 168 F.4th at 308; *Roy v. City of Monroe*, 950 F.3d 245, 251 (5th Cir. 2020); *Howard Gault*, 848 F.2d at 559.

Because *JFT*'s dicta departs from these prior panels, the rule of orderliness requires applying the earlier precedent. *See, e.g.*, *Walker*, 302 F.3d at 325. And by its own terms *McClelland*'s vagueness analysis involved no speech, 63 F.4th at 1014 (vagueness claim fails because there is not a liberty or property interest in playing football or being captain of the team), and neither it nor *JFT* purported to displace the Supreme Court's rule that "precision of regulation must be the touchstone" for expression—announced in striking down state-university faculty regulations as vague. *Keyishian*, 385 U.S. at 603–04. No panel may narrow that holding. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

*McClelland* and *JFT* also overlook that the Supreme Court more recently rejected the "all applications" vagueness formulation—even where no constitutionally protected speech is involved. In *Johnson v. United States*, the Court explained that "although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." 576 U.S. 591, 602 (2015) (emphasis added); *id.* at 603 ("[T]he dissent's supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a statute to be vague, it is vague in all its applications (and never mind the reality)"); *accord Sessions v. Dimaya*, 584 U.S. 148, 172 n.7 (2018) (affirming *Johnson* and explaining that "one simple application does not a clear statute make").

Even under *JFT*, the Censorship Policy fails because it lacks a "commonsense core of meaning." *JFT*, 2026 WL 3167654, at *13. Nearly every term of the Policy is subject to contested meanings that have been interpreted in contradictory, arbitrary, and discriminatory ways.

**2. The Policy fails to give fair notice.**

The Policy fails to give fair notice because its key terms are undefined or turn on the subjective reactions of students. A rule is impermissibly vague when it "subjects [individuals] to sanctions based not on their own objective behavior, but on the subjective viewpoints of others." *Women's Med. Ctr.*, 248 F.3d at 422. In *Shamloo*, for example, the Fifth Circuit held a university rule void because students would have "great difficulty determining whether or not [their] activities constitute prohibited unwholesome conduct." 620 F.2d at 523–24.

Defendants assert that "the Challenged Policies are reasonably clear and contain definitions of the key terms of 'race ideology' and 'gender ideology' to provide additional clarity." Dkt. 36 at 27; *see also* Dkt. 36 at 26 (characterizing the Policy as containing "words of common understanding") (citing *Magee v. City of S. Padre Island*, No. B-09-227, 2011 WL 10646506, at *5 (S.D. Tex. Mar. 10, 2011)). Yet "nearly every word of the Censorship Policy carries contested, subjective meanings," including: "*What does it mean to "advocate"?*"; "*What is a "topic"?*"; "*What is a topic related to sexual orientation or gender identity?*"; "*What do the ideology definitions forbid?*"; "*Does "advocate" modify 'topics related to sexual orientation or gender identity' and how?*"; and "*What is a necessary educational purpose?*" Dkt. 26 at 29–31.

These are not hypothetical queries dreamed up by lawyers; each of these questions stems from real confusion by professors and department chairs or contradictory guidance issued by Defendants and officials. *Id.* For example, the System's own officials defined "advocate" differently. System FAQ 1 defined advocacy as teaching that "requires students to hold certain beliefs, and/or to ridicule certain beliefs." Dkt. 26-2 at 69 (Cook Decl. Ex. K). The Provost's Guidance thereafter added a second, broader definition: "to support or argue for a cause, policy, or group, or to plead in favor of it." Dkt. 26-9 ¶17 & Ex. D (Bright). Prof. Bright's department head noted the "breadth of the university's working definition of advocacy," and applied a third

subjective test: is there a "risk that students could interpret a faculty member's comments or reading assignments as leading or encouraging them to hold specific positions"? *Id.* ¶¶12–14 & Ex. F. This shifting guidance demonstrates both that the undefined terms of the Policy are not words of common understanding and that the guidance itself exacerbates its vagueness.

**3. Shifting, conflicting guidance proves arbitrary enforcement.**

Although the Board admits that "initial questions may have existed" regarding the Policy, it contends, without any supporting evidence, that those questions are "largely resolved" and that review of Plaintiffs' courses "has greatly mitigated" vagueness. Dkt. 36 at 31; *id.* at 28 (similar).

In contrast, Plaintiffs have offered significant, unrefuted evidence that leaving the meaning to administrators' case-by-case review, under an undefined "necessary educational purpose" exception, is a defect, not a cure. Dkt. 26 at 25–26, 31–33. The review process has resulted in more confusion and seemingly arbitrary and unexplained results. Dkt. 26 at 24–25; *see, e.g.*, Dkt. 26-1 ¶¶21–22 (Sadler) (exception request "not compelling enough"); Dkt. 26-5 ¶14 (Reddy) (never informed of review standards); Dkt. 26-7 ¶13 (McConnell) (never informed of exception standard); Dkt. 26-9 ¶¶42–43 (Bright) (one course granted an exception while another was not, despite "an exceedingly similar syllabus statement"); Dkt. 26-6 ¶¶12–21 (Neumann) (textbook's cover found noncompliant, despite the same book being allowed at the flagship campus). Indeed, when a professor sought pre-approval for a slide deck, he was told that some slides offended the Policy but not which ones. Dkt. 26 at 31; Dkt. 26-8 Ex. H (Peterson) (review "is not as simple as approving a slide" because it "depends on the context, presentation and discussion").

Further, administrators are applying shifting, contradictory interpretations of the Policy sometimes even after the initial syllabus review. Dkt. 26 at 32–33. Prof. George's syllabus was approved one day and flagged the next. Dkt. 26-4 ¶¶9–10 (George). Another of his courses was approved until a student complained and then he was told to change it immediately but not what

to change. *Id.* ¶¶13–19. Instruction from other university officials has demonstrated how different officials "attach different meaning" to the Policy in "an arbitrary and discriminatory manner." *Shamloo*, 620 F.2d at 523-24; Dkt. 26 at 31–33; *see, e.g.*, Dkt. 26-5 ¶11 & Ex. C (Reddy) (English Department advised the Policy "will not be applied to heteronormative orientation and identity"). As the Theatre program head described, the "[P]olicy's definition of 'gender identity' isn't made clear … The [P]olicy stays clear of trying to navigate those gray waters, *leaving it to us to do so*." Dkt. 26-7 ¶14 & Ex. C (McConnell) (emphasis added).

**4. The Policy's vagueness inflicts ongoing, irreparable chill.**

When a vagueness claim is tethered to speech rights, chill is enough because "[i]t would be a bold teacher" who did not "stay as far as possible" from the forbidden zone. *Keyishian*, 385 U.S. at 601; *see also Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)) (the danger of a vague speech restriction "is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution"). That chill is real here. *See* Dkt. 26-7 ¶¶9–10 (McConnell) (removed foundational text to avoid cancellation); Dkt. 26-4 ¶¶24, 29 (George) (censored slides and cut primary sources); Dkt. 26-5 ¶21 (Reddy) (removed play).

## V. The remaining factors weigh in favor of a preliminary injunction.

### A. Plaintiffs are suffering irreparable harm.

Defendants argue that Plaintiffs delayed because suit could have been brought in late 2025. Dkt. 36 at 28. This contradicts their claim that the case is not ripe. Dkt. 36 at 10–11. And Defendants are wrong about the timing. For instance, Professor Reddy learned that her Fall 2026 LGBTQ literature course would be canceled on May 19, 2026. Dkt. 26-5 ¶¶4, 14 & Ex. D (Reddy). Even professors censored in the Spring semester suffered ongoing, worsening First Amendment harms. Professor Sadler's ENGL 203 course was censored in the Spring semester, Dkt. 26-1 ¶¶13–

14 (Sadler); but he did not learn that his Fall 2026 LGBTQ literature course would be canceled outright until May 19, 2026. *Id.* ¶¶19–21 & Ex. F. And Plaintiff George's injuries intensified over time: supervisors first ordered him to remove certain readings, then entire topics, and eventually he lost the ability to teach certain Fall 2026 classes at all. Dkt. 26-4 ¶¶10–36 (George); *see also* Dkt. 26-9 ¶¶35–51 (Bright) (noting continued confusion over Policy).

Further, the chaotic, inconsistent rollout of the Policy required substantial factual investigation before suit. Defendants rolled out the Policy on different timeframes with different standards and guidance across its 12 campuses. Dkt. 26 at 4–7. Even within a single campus, guidance and implementation differed by department. Plaintiffs reasonably spent time investigating these ever-shifting facts and the law and did not excessively delay. *See, e.g.*, *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 699 (N.D. Tex. 2015) ("Courts permit delays when determining the imminence of alleged irreparable harm where delays were 'caused by [plaintiff's] good faith efforts to investigate facts and law.'") (citing *Marks Organization, Inc. v. Joles*, 784 F. Supp. 2d 322, 333–34 (S.D.N.Y. 2011) and collecting cases); *Robinson v. Damphousse*, No. 1:26-CV-00705-ADA, 2026 WL 1333453, at *5 (W.D. Tex. May 13, 2026) (five or six months is not a delay in professor bringing suit against university).

Even if this Court were to find some delay, Plaintiffs' First Amendment injuries are irreparable as a matter of law. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))); *Book People*, 91 F.4th at 340–41 ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (citation omitted)). And such irreparable harm trumps any assertion of delay,

especially where the injuries are ongoing. *Tripathy v. Lockwood*, No. 22-949-PR, 2022 WL 17751273, at *2 (2d Cir. Dec. 19, 2022) (overturning district court's denial of preliminary injunction on basis of delay because First Amendment harms are irreparable); *Bakken v. United States Military Acad.*, 833 F. Supp. 3d 460, 518 (S.D.N.Y. 2026) ("But in the First Amendment context, delay in moving for a preliminary injunction does not by itself show the absence of irreparable injury."); *Alleman v. Harness*, No. CV 24-877-JWD-SDJ, 2026 WL 2195900, at *39 (M.D. La. July 30, 2026) (rejecting argument that delay forecloses injunctive relief because "Plaintiffs' First Amendment injury is ongoing. That is, their speech . . . remains chilled.").[7]

Defendants' cases are inapposite. *Expedi, Inc. v. Rebound Int'l, LLC*, No. 4:20-CV-3897, 2021 WL 3702169, at *3 (S.D. Tex. May 13, 2021), concerns trademark infringement, not First Amendment harm. *Hotze v. Hollins*, No. 4:20-CV-03709, 2020 WL 6437668, at *3 (S.D. Tex. Nov. 2, 2020), *aff'd in part, vacated in part sub nom. Hotze v. Hudspeth*, 16 F.4th 1121 (5th Cir. 2021), concerned emergency litigation surrounding an election. There, the court found that waiting until the last day of early voting to seek relief was too late. Courts are wary of the disruptive effects of late-filed attempts to change the rules of elections. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020). No similar considerations are present here.

Nor do Defendants show prejudice from any delay. They claim mid-semester relief will harm students, but students will benefit from their professors' free speech. Any decision was likely to issue mid-semester regardless of when Plaintiffs filed, and Defendants' objection is undercut by their own willingness to impose the Policy mid-stream.

[7] *See also Arc of California v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) ("[T]ardiness is not particularly probative in the context of ongoing, worsening injuries"); *Moore v. City of Van, Tex.*, 238 F. Supp. 2d 837, 852–53 (E.D. Tex. 2003) (any delay by plaintiffs did not undermine their First Amendment injury).

**B. The balance of the equities and public interest favor an injunction.**

Defendants do not contest that they have no interest in "enforcing a regulation that violates federal law" and that "injunctions protecting First Amendment freedoms are always in the public interest." Dkt. 26 at 34 (citing *Book People*, 91 F.4th at 341; *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012) (citation omitted)). Instead, they argue that a mid-semester injunction would upset student expectations about course content. But the Constitution has already determined that whatever gains might come from suppressing classroom speech are outweighed by the speech allowed. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976) ("It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us."). Defendants showed no such sensitivity to student expectations when they imposed the Policy—canceling classes and removing topics midstream. Dkt. 26-9 ¶¶24–27 (Bright); Dkt. 26-4 ¶¶14–19 (George). The Policy also upset student expectations that Texas A&M would remain the model of academic freedom it had long been. Dkt. 26 at 2–3. Meanwhile, any delay in relief lets Defendants keep irreparably harming Plaintiffs, who are already planning Spring 2027 curricula and undergoing syllabus review. An injunction is necessary to lift the chill on A&M campuses and allow faculty to shape their Spring 2027 curricula according to their expertise and their fields' academic standards.

**C. The requested injunction is necessary for complete relief to the plaintiffs.**

Where a state law facially violates the First Amendment, the appropriate remedy is an injunction barring enforcement. *Book People,* 91 F.4th at 341 (affirming preliminary injunction barring official from enforcing facially unconstitutional law). Yet Defendants assert the requested relief is improper under *Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025). They overstate *CASA*'s reach. In *CASA*, the Supreme Court explained that because federal courts lack the statutory

authority to grant injunctive relief "broader than necessary to provide complete relief to each plaintiff with standing to sue," they likely cannot grant universal injunctions, which "prohibit enforcement of a law or policy against *anyone*." *Id*. at 837, 854, 861. But the Court also recognized "[t]he equitable tradition has long embraced the rule that courts generally may administer complete relief between the parties" and that "party-specific injunctions sometimes advantage nonparties." *Id*. at 851 (cleaned up). One such area is in the context of facial First Amendment challenges.

In *Welty v. Dunaway*, the Sixth Circuit considered the proper remedy for a facially viewpoint-discriminatory state law after *CASA*. Nos. 25-5738/5739, 2026 WL 2874671, at *21–24 (6th Cir. Sept. 24, 2026). It held that "the overwhelming weight of Supreme Court precedent counsels that the court should issue an injunction that vindicates the rights of non-parties." *Id.* at *22. Its reasoning was simple: "the distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court." *Id.* at *21 (quoting *Citizens United v. FEC*, 558 U.S. 310, 331 (2010)). Facial First Amendment challenges "vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *Id.* (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)). Courts are empowered "to invalidate *all* enforcement" of the unconstitutional law. *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). *Welty* added that "nothing in *CASA* addresses, let alone forecloses, the propriety of a broad injunction" barring enforcement of a state law in a facial First Amendment challenge, 2026 WL 2874671, at *22, because *CASA* was "primarily concerned with the powers of federal courts to issue universal injunctions against co-equal branches of the *federal government*," and the "same concern does not apply to a federal

court's injunction that enjoins enforcement of a state law against non-parties," *id.* at *23. If the Court determines the Policy is unconstitutional, it should enjoin its enforcement.[8]

Regardless, a preliminary injunction barring enforcement of the Policy across campuses is the only workable way to provide complete relief to Plaintiffs. To provide complete relief, courts must take account of "what is necessary, what is fair, and what is workable," in accordance with "well-known principles of equity." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (citation modified). Here, AAUP seeks relief for its hundreds of members, who are on every TAMUS campus. Dkt. 26-10 ¶4 (National AAUP). Applying the Policy professor by professor raises serious workability concerns: what if a Plaintiff co-teaches a class with a non-Plaintiff, or a Plaintiff's lecture has discussion sections taught by a mix of Plaintiffs and non-Plaintiffs? Defendants recognize these concerns, arguing that "it's not fair or workable for a federal court to be involved in issues of whether a particular faculty member's classroom lecture or discussion has veered across the line into gender or race ideology." Dkt. 36 at 34. Although Defendants are wrong that this Court would need to be involved after striking down the Policy, their concern that going class by class is impractical shows that relief should be System-wide.[9]

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for preliminary injunction.

---

[8] Defendants cite *Students Engaged in Advancing Tex. v. Paxton*, 177 F.4th 665 (5th Cir. 2026) (per curiam), but that order on a motion to stay is non-precedential. *Northshore Dev., Inc. v. Lee*, 835 F.2d 580, 583 (5th Cir. 1988) ("[A] motions panel decision is not binding precedent."). Further, the court's treatment of the scope of the injunction was dicta because it first found that the plaintiffs were unlikely to succeed on the merits. *Students Engaged*, 177 F.4th at 669–73.

[9] Moreover, the possibility that the AAUP may be compelled to disclose its members to Defendants to vindicate their constitutional rights could raise grave constitutional concerns. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) (recognizing that a governmental order to reveal the identities of an organization's rank-and-file members "must be regarded as entailing the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association").

Dated: November 6, 2026

Respectfully submitted,

YETTER COLEMAN LLP

/s/ *Jamie Alan Aycock*

Jamie Alan Aycock
Attorney-in-Charge
Tex. Bar No. 24050241
SDTX No. 1233210
jamieaycock@yettercoleman.com
Amy C. Farish
Tex. Bar No. 24097818
SDTX No. 3437044
afarish@yettercoleman.com
Ayla Syed
Tex. Bar No. 24136507
SDTX No. 3875654
asyed@yettercoleman.com
Jared LeBrun
Tex. Bar No. 24144647
SDTX No. 3909041
jlebrun@yettercoleman.com
W. Seth Cook
Tex. Bar No. 24138570
SDTX No. 3899868
scook@yettercoleman.com
600 Travis Street, Suite 5400
Houston, Texas 77002
(713) 632-8000

Thomas Buser-Clancy
Tex. Bar No. 24078344
SDTX No. 1671940
tbuser-clancy@aclutx.org
Chloe Kempf
Tex. Bar No. 24127325
SDTX No. 3852674
ckempf@aclutx.org
Sophia Howard
Tex. Bar No. 24152382
SDTX No. 3983052
showard@aclutx.org
Brian Klosterboer
Tex. Bar No. 24107833
SDTX No. 3314357
bklosterboer@aclutx.org
ACLU FOUNDATION OF TEXAS INC.
P.O. Box 8306
Houston, TX 77288
(713) 942-8146

Emerson Sykes*
NY Bar No. 5020078
Ken Sexauer*
NY Bar No. 6231013
esykes@aclu.org
ksexauer@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500

**Admitted Pro Hac Vice*

**Certificate of Service**

I hereby certify that on this 6th day of November, 2026, a true and correct copy of the foregoing document was served on all counsel of record via the Court's CM/ECF system.

*/s/ Jamie Alan Aycock*
Jamie Alan Aycock